ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### No. 22-3042

---

### UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

**v.**

### COUY GRIFFIN,
*Defendant-Appellant.*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

### BRIEF FOR APPELLANT

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

LISA B. WRIGHT
Asst. Federal Public Defender
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004
(202) 208-7500
Lisa_Wright @fd.org

District Court
Cr. No. 21-92 (TNM)

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

**A.    Parties and Amici:**

This appeal arises from a criminal conviction of defendant-appellant Couy Griffin by plaintiff-appellee, the United States of America.  There are no intervenors or <u>amici</u>.

**B.    Rulings Under Review:**

This is an appeal from a judgment of conviction  (Appx:195) (entered June 21, 2022), for entering or remaining in a "restricted building or grounds" in violation of 18 U.S.C. § 1752(a)(1), after a bench trial before the Honorable Trevor N. McFadden. Mr. Griffin asserts that the district court misconstrued the "restricted building or grounds" element and the "knowingly" mens  rea element of that statute (Appx:528, 533-534), and that, properly construed, the government presented insufficient evidence to prove that Mr. Griffin violated § 1752(a)(1) beyond a reasonable doubt.

**C.     Related Cases:**

This case has not been before this Court previously.  Appellant is unaware of any related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES ...................................................................iii

JURISDICTIONAL STATEMENT ........................................................ 1

STATUTE INVOLVED .......................................................................... 1

QUESTIONS PRESENTED ................................................................... 2

STATEMENT OF THE CASE ............................................................... 3

STATEMENT OF FACTS ...................................................................... 5

      A.     The Government's Case ........................................................... 5

            1.  Video Editor Matt Struck ............................................... 5

            2.  U.S. Capitol Police Inspector Erickson ........................... 20

            3.  Secret Service Inspector Hawa ....................................... 28

      B.     The District Court's Verdict .................................................. 31

SUMMARY OF ARGUMENT ................................................................ 35

ARGUMENT ......................................................................................... 39

I.      THE GOVERNMENT FAILED TO PROVE THAT MR.
GRIFFIN ENTERED A "RESTRICTED BUILDING OR
GROUNDS." ................................................................................. 39

      A.     Standard Of Review ............................................................. 39

B.  To Qualify As A "Restricted Building Or Grounds," An Area Must Be Posted, Cordoned Off, Or Otherwise Comparably Demarcated As Restricted ............................... 40

C.  The Government Failed To Prove That, At The Time Mr. Griffin Entered The Disputed Area, It Was Visibly Or Verbally Demarcated As Restricted ............................... 43

II.  THE GOVERNMENT FAILED TO PROVE THAT MR. GRIFFIN "KNOWINGLY" ENTERED A "RESTRICTED BUILDING OR GROUNDS." ........................................................... 47

A.  Standard Of Review ............................................... 47

B.  The "Knowingly" Element Applies To The Area's Status As A "Restricted Building Or Grounds." ................. 48

C.  The Government Failed To Prove That Mr. Griffin Knew The Area He Entered Was A "Restricted Area." ................................................... 58

D.  The Government Failed To Prove Mr. Griffin Knew A Protectee Was Present ........................... 67

CONCLUSION ...................................................................... 69

CERTIFICATE OF LENGTH .............................................. 70

ADDENDUM

ii

# TABLE OF AUTHORITIES

## CASES

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009)......................49-50

*Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015)....................................65

*Jeannette Rankin Brigade v. Chief of Capitol Police*,
342 F. Supp. 575 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) .......................58-59

*McFadden v. United States*, 576 U.S. 186 (2015) ........36-38, 49-51, 54-56

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005).............................57

*United States v. Caputo*, 201 F.Supp.3d 65 (D.D.C. 2016)....................57

*United States v. Davis*, 863 F.3d 894 (D.C. Cir. 2017) ...........................66

*United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012) .......................39

*United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014)...........................39

*United States v. Jabr*, 4 F.4th 97 (D.C. Cir. 2021) ..................................57

*United States v. Sturgeon*,
2023 WL 3613237 (D.D.C. May 24, 2023)..........................................52-53

*United States v. Teffera*, 985 F.2d 1082 (D.C. Cir. 1993) .................66-67

*United States v. Williams*, 553 U.S. 285 (2008)......................................41

**STATUTES**

18 U.S.C. § 1752 ................ 1-2, 4, 29, 30, 31, 32, 41, 43, 45, 51, 52, 55, 56

18 U.S.C. § 1752(a)(1).............................1, 4, 31, 35, 40, 47-48, 50, 52, 57

18 U.S.C. § 1752(c) ................................. 1-2, 31, 40, 47, 48, 50, 52-53, 55

21 U.S.C. § 802(6) ............................................................................ 49

21 U.S.C. § 841(a)(1).................................................................. 49-51, 54

**ADDITIONAL AUTHORITIES**

Architect of the Capitol, *U.S. Capitol Grounds*,
https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/capitol-grounds ........................................................................... 9

S. Rep. No. 91-1252, 91st Cong., 2d Sess. (1970).................................... 42

*Webster's Third New International Dictionary* (1966)............................. 41

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. A timely notice of appeal having been filed on June 27, 2022, from the final judgment of conviction entered on June 21, 2022, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATUTE INVOLVED

18 U.S.C. § 1752 provides in part:

(a) Whoever—

> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

. . .

or attempts or conspires to do so, shall be punished . . . .

(c) In this section—

> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

>> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

1

(B) of a building or grounds where the President
or other person protected by the Secret Service is
or will be temporarily visiting; or

(C) of a building or grounds so restricted in
conjunction with an event designated as a special
event of national significance; and

(2)  the term "other person protected by the Secret
Service" means any person whom the United States
Secret Service is authorized to protect under section
3056 of this title or by Presidential memorandum,
when such person has not declined such protection.

## QUESTIONS PRESENTED

I.    Whether the evidence was insufficient to prove that Mr. Griffin

entered a "restricted building or grounds" as defined in 18 U.S.C.

§ 1752(c) where the government failed to present evidence that the

areas of the Capitol grounds that Mr. Griffin entered were "posted,

cordoned off, or otherwise restricted" at the time he entered or

remained there.

II.    Whether, assuming there was sufficient evidence that Mr. Griffin

entered a "restricted building or grounds," the government failed to

prove that he did so "knowingly," where it failed to present sufficient

evidence that he knew that the area he entered had the status of a

2

"restricted building or grounds" – a fact that could be established by showing *either* 1) he knew that, for reasons unknown, it qualified for that designation; *or* 2) he knew the underlying facts that made it so qualify.

## STATEMENT OF THE CASE

Mr. Griffin's misdemeanor conviction in this case arises out of his peaceful presence on the Capitol grounds on January 6, 2021. As the district court found, at the time Mr. Griffin entered the West Lawn at 2:31 p.m., he believed that Vice President Pence had already certified the electoral votes.  And by that time, thousands of people were already on the grounds and there were no longer any barriers, signage, or law enforcement presence to suggest that the grounds – or at least the parts of the grounds Mr. Griffin entered – had been closed to the public.

Mr. Griffin was with his friend, immunized government witness Matt Struck, who recorded their movements on his phone as they made their way up the lawn and onto the plaza at the foot of the Capitol Steps, where they walked through an open door at the base of the inaugural stand and up a staircase to the railing of the stage – the very front of the Lower West Terrace. There, Mr. Griffin borrowed a bullhorn

3

and spoke and prayed to the crowd on the plaza below, some of whom joined him in prayer. Although other areas closer to the Capitol might have appeared restricted, Mr. Griffin stayed apart from the protestors in those areas, limiting himself to parts of the lawn, plaza and terrace where there was no signage or police presence indicating that he was not allowed to be there. Upon leaving the stage, Mr. Griffin went back down to the plaza and left the grounds sometime after 4:48 p.m.

Mr. Griffin was ultimately charged with two misdemeanor counts under 18 U.S.C. § 1752(a): Count One charged him with "unlawfully and knowingly enter[ing] and remain[ing] in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so," in violation of § 1752(a)(1). Count Two charged him with disorderly and disruptive conduct to impede Government business in a restricted building and grounds, in violation of § 1752(a)(2).

After a two-day bench trial, the Honorable Trevor N. McFadden convicted Mr. Griffin of Count One, but acquitted him of Count Two. (Appx:539). On June 17, 2022, the court sentenced Mr. Griffin to 14

4

days in prison – the time he had already served in pre-trial detention –
along with a supervised release term of 12 months, a $3000 fine, and
$500 of restitution. (Appx:195-201). This appeal followed. (Appx:202).

## STATEMENT OF FACTS

### A. The Government's Case

At trial, the government presented the testimony of three
witnesses: 1) Matt Struck, who was with Mr. Griffin on January 5th,
6th, and 7th; 2) Inspector John Erickson of the U.S. Capitol Police; and
3) Inspector Lanelle Hawa of the U.S. Secret Service.

#### 1. Video Editor Matt Struck.

Mr. Struck testified that he was a freelance video editor from
Colorado who travelled to Washington, D.C. with his friend Couy
Griffin in order to attend the January 6, 2021, Stop the Steal rally.
(Appx:248-249). Mr. Griffin lived in New Mexico and was the founder of
Cowboys For Trump. (Appx:249-250). "We were invited" and Mr. Griffin
had hoped to speak at the rally and "give a prayer." (Appx:285-286).

Through Mr. Struck, the government admitted dozens of the video
clips he recorded documenting their activities on January 5, 2021, when
they arrived in Washington (Appx:251), through January 7, 2021, after

they had left the city (Appx:255). *See* GX10 through GX62, GX67, and
GX68 (chronological videos from January 6th, starting at 1:28 p.m.);
GX10-1 through GX62-1 (identical to GX10 through GX62 but with time
stamps from metadata showing the start time of each video (Appx:293,
324)); GX63 (January 5th); and GX64 (January 7th).[1]

After arriving in Washington on January 5th, Struck recorded Mr.
Griffin delivering a video message to supporters (GX63) while standing
in the parking lot off Third Street near the Reflecting Pool, with the
Capitol in the background. (Appx:253-254).



*Screenshot from GX63: Mr. Griffin on January 5, 2021, between Third Street
and the West Front of the Capitol.*

---

[1] "GX__" refers to the government's exhibits. "DX__" refers to defense
exhibits. Photographs and documentary exhibits are reproduced in
Appellant's Appendix at 167-185 (government) and 190-194 (defense).
All video exhibits are on the discs included therewith (except GX38-1,
which is not on the government's exhibit list). GX38 is a duplicate of
part of GX37.

On January 6th, Mr. Griffin and Struck attended the morning rally near the Ellipse and saw metal barriers "surround[ing] the [P]resident when he was doing his speech." (Appx:303). As seen in DX28, those barriers were manned by Secret Service officers deciding who would or would not be allowed to enter into the fenced-off areas. (Appx:309-312).

Struck and Mr. Griffin had not planned to go to the Capitol but, after leaving the rally, they followed people heading down the Mall, encountering no law enforcement along the way.  (Appx:287-288).



*Screenshot from GX10, taken at 1:29 p.m.*

Struck's videos captured unmanned metal bike racks as he and Mr. Griffin crossed Third Street (Appx:306-307; GX15/DX17) and again near the Ulysses S. Grant Memorial between the Capitol Reflecting Pool and First Street (Appx:302-305; GX25/DX5; GX26/DX6;

7

GX30/DX4). Unlike the bike racks at the Ellipse rally site that were guarded by Secret Service (DX28), these unmanned bike racks between First and Third Streets were not "closed off." (Appx:312) ("Nothing was barricaded off. So it didn't feel like a barricade.").





8



*Screenshots from GX15 (top): bike racks along Third Street; GX25 (middle) &
GX26 (bottom): bike racks near the Grant Memorial.*

The videos capture Mr. Griffin socializing around the Reflecting

Pool and the Grant Memorial. (GX16 to GX31). Around 1:45 p.m., a

woman mentioned "Mike Pence" and Mr. Griffin responded, "yeah, he

certified it." (DX1-A (transcript of GX16/DX1); Appx:290-291).

Approximately 45 minutes later, at around 2:30 p.m., Mr. Griffin

and Mr. Struck traversed First Street to the Olmsted Wall that marks

the western border of the Capitol grounds along First Street.[2]  By that

time, the district court found, "thousands" of people were already on the

West Lawn. (GX33; Appx:529). The section of the wall Mr. Griffin

---

[2] Architect of the Capitol, *U.S. Capitol Grounds*,
https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-
building/capitol-grounds ("The grounds immediately surrounding the
U.S. Capitol are bordered by a stone wall and cover an area of 58.8
acres. Its boundaries are Independence Avenue on the south,
Constitution Avenue on the north, First Street NE/SE on the east, and
First Street NW/SW on the west.").

approached was crowded with people, leaving just a small gap for those trying to join the group on the grounds.  Mr. Griffin waited his turn and crossed over the wall and onto the lawn:



*Screenshot from GX33: Griffin (in cowboy hat) crossing Olmsted Wall at 2:31 p.m.*



*Screenshot from GX37: Mr. Griffin (lower right) on Capitol lawn.*

Making their way up the lawn, Messrs. Griffin and Struck reached the stone retaining wall that separates the public lawn from the public walkway and plaza at the foot of the Capitol Steps. After waiting in a

small line, Mr. Griffin proceeded up to the plaza via a bike rack "ladder"

that had been positioned against this mid-grounds retaining wall.





*Screenshots from GX37: scene at the mid-grounds retaining wall (top) and Mr. Griffin waiting to use bike rack as ladder to cross to plaza beyond (bottom).*

Advancing across the plaza, and into the section of the plaza

between the Capitol Steps, the videos show Mr. Griffin and Struck came

to a white wall that demonstrators were crossing via a plywood ramp.

(GX37). As seen below, Mr. Griffin went up the ramp and hopped down

to the raised floor at the base of the inaugural buildout.  Again, the

videos show that the area was free of any postings or police.



*Screenshot from GX37: Mr. Griffin climbing ramp*
*near base of inaugural stage.*

Dead ahead, as seen below, two men were banging on a closed

door built into the base of the inaugural platform, in a "bang bang bang"

rhythm with a drumbeat from the crowd:



*Screenshot from GX37-1: Two men banging on door of inaugural*
*buildout at time-count 07:00 (2:48 p.m.)*

On the tapes, discussion can be heard about going up to the next tier – the Lower West Terrace being the first landing up the Capitol Steps. (GX39). People can be seen herding slowly up the Capitol Steps, with others scrambling up to the railing to bypass the bottleneck. (GX40).  A nearby voice, which Mr. Struck was not able to identify, says, "We'll wait till they get this door broken down." (Appx:282-283; GX40). Six seconds later, at GX40, time-count 00:35, Struck and his camera have advanced towards the Capitol Steps sufficiently to see that, around the corner of the buildout, there is a second door. (GX40 at 00:35). This one is wide open and people are, and have been,[3] moving through it (screenshot below).

---

[3] *Compare* GX40 at 00:11 and 00:31 (woman in pink pom-pom hat advances from beyond the front of the buildout (facing the Capitol) to past the corner of the buildout (turned to face the right), where, it will be revealed four seconds later, there is an open door).  At 00:37 (screenshot below) she (or at least her pom-pom) can be seen entering the door.

13



*Screenshot from GX40 (time count 00:37): demonstrators ascending Capitol Steps and railing as others wait to move through open door (far right) that first comes into view around the corner of the buildout at time-count 00:35.*

Around 2:55 p.m., Mr. Griffin and Struck joined the line for that door (GX41-GX42) and moved up a staircase, Mr. Griffin quipping, "'I love the smell of napalm in the air." (GX43; Appx:259). Nothing in the videos suggests that the door they used had been broken down or that there were signs or law enforcement to warn that that entry point, or the Lower West Terrace in general, was closed to the public.[4]

---

[4] According to the Capitol Police witness, the staircase was "built for evacuation purposes on the inaugural platform" (Appx:371), but no such marking is visible in the video.





*Screenshots from GX43: protestors (top) and Mr. Griffin (bottom) climbing staircase to inaugural stage on Lower West Terrace.*

Upon exiting the staircase at the railing of the stage, Mr. Griffin immediately took a place at the railing and stayed right there. (GX43). As shown in the videos Struck took from the stage (GX43 to GX56), there was a large crowd on the Lower West Terrace, virtually all whom were facing the Capitol. In the videos, Mr. Griffin remains apart from that crowd. From his perch at the railing, his focus is in the other direction, out over the the lawn and plaza below.  Above him, a line of

police can be seen observing the Lower West Terrace from positions along the Upper West Terrace (GX45, GX47, GX52), but they give no indication that those on Mr. Griffin's level are not allowed to be where they are.





*Screenshots from GX45 (top (actual view)) & GX52 (bottom (zoomed view)): actual and zoomed views from inaugural stage, showing large Capitol-facing crowd on Lower West Terrace and law enforcement officers stationed along Upper West Terrace.*

Around 3:30 p.m., Mr. Griffin was able to borrow a bullhorn, which he used to gather the attention of protestors below (GX53) and

lead them in a short prayer. (GX54/DX9 (showing some with hands raised in prayer); Appx:316-317) (Struck: "[s]ome of them started to kneel"; "they've been calmed and they're listening to Couy.").



*Screenshot from GX54/DX9: Mr. Griffin leading a prayer from the inaugural stage.*

By 4:28 p.m., Mr. Griffin was back on the plaza below, where he stayed, talking on his phone, until at least 4:50 p.m. (GX57 to GX62; Appx:326-327). Behind him, police remained stationed along the Upper West Terrace with the inaugural stage below still full of demonstrators:



*Screenshot from GX62-1: Mr. Griffin on the West Plaza steps at 4:48 p.m., with police still observing demonstrators from the Upper West Terrace.*

17

The next day, January 7th, Struck recorded Mr. Griffin delivering a video message from outside their hotel in Roanoke, Virginia. Although Mr. Griffin had been nowhere near the Capitol when the grounds were breached at 12:55 p.m.,[5] he had "watch[ed] tidbits of the mainstream news this morning, and their reporting on the events yesterday," and offered his take on how "those patriots" had come to "spill over" the "roped off" Capitol grounds:

> We get down to the Capitol. They have all of the inauguration setup for Joe Biden on the back side of the Capitol. And they had it just roped off. Well, of course, you are going to have *those patriots* that get down there, and when the D.C. police says you can't step over this, because we are getting it ready for Joe Biden, what do you think was going to happen? A few spilled over and then a few more spilled over.

(GX64) (emphasis added).

The government admitted a video of a similar statement made at a County Commission meeting in New Mexico on January 14th, during which Mr. Griffin attempted to explain the actions of those at the front

---

[5] The government's videos begin at 1:28 p.m., at which point Struck and Mr. Griffin were just passing the Air and Space Museum. (GX10 screenshot *supra* at 7). At 1:00 p.m., when the snow fencing was being ripped out (GX74; GX73 screenshot *infra* at 25), they were likely just leaving the Ellipse rally.

18

of the January 6th crowd who had "pushed through" fencing, while

making clear he himself had arrived later.

> We walked down the Mall and we were gonna leave. We
> were in debate to leave or not. I wasn't even going down to
> the Capitol. I knew that there was a lot of people that were
> going, but with the news that Mike Pence had just certified
> the election, that was kinda what the crowd was thinking
> about. But we thought, well, let's not leave too early, let's go
> ahead and see what they are doing. We walked down to the
> Capitol and on the inaugural side when all those people all
> those Trump people got down there that had just not gotten
> anything necessarily from the President that was new, and
> then heard that Mike Pence had certified a fraudulent
> election, the element in the crowd was pretty elevated, I
> would say. When *they* got down to the inaugural side, *there
> was some fencing up.* They were saying that this -- that you
> couldn't go any further because this was being reserved for
> Joe Biden and his inauguration. Well, you tell a million
> Trump supporters that, they are going to go down there.
> Pretty soon, *that crowd* just pushed through. *I wasn't
> anywhere in the front of it, I was in the back.*

(GX78; Appx:308-309) (emphasis added)

After Mr. Griffin's arrest on January 19th, and release from

pretrial detention on February 5th, he asked Mr. Struck to release to the

press all of the videos Struck recorded, but Struck declined. (Appx:261-

262, 268).

### 2.  U.S. Capitol Police Inspector Erickson

Inspector John Erickson testified that, on January 6, 2021, he was the Inaugural Task Force Commander, planning security for the inauguration out of an office on North Capitol Street. (Appx:348). As events unfolded, he reported to the Capitol and ultimately assisted in clearing people trying to breach the Capitol through the Lower West Terrace Door. (Appx:349-351).

Per Erickson, on January 6th, the Capitol Police had closed areas of the grounds normally "open for people to traverse" (Appx:339), creating a "restricted area" corresponding to the area inside the yellow line on GX2 (Appx:168).



*GX2 (Appx:168): "Restricted area" on January 6, 2021*
*as alleged by government.*

20

According to Erickson, in real life, the yellow "restricted" perimeter consisted of "permanent walls" ("part of the infrastructure of the grounds" (Appx:353, 374, 383)) together with "bike racks" used to block the public access points along those walls. (Appx:342-343, 367-368). Per Erickson, the Capitol Police put those bike racks in place on January 6th because "[w]e had that demonstration that was planned further down the Mall." (Appx:374). *See also* Appx:404 ("they closed the west front for construction and demonstration reasons").[6]

To establish that the drawn-on yellow line in GX2 represented an actual, marked perimeter that existed on January 6th, the government had Erickson identify two photos of "area closed" signs, undated and without time stamps.

---

[6] Erickson explained that Capitol Police restrictions like those that day are imposed under a statute granting such authority to the Capitol Police Board (Appx:394-395) and that, in controlling visitor access to its secure perimeter, the Capitol Police would have consulted with the Secret Service only if a visitor was there to see its protectee. Otherwise, authorization would come through the Congressional office of whomever was being visited. "I'm not charged with the protection of the vice president." (Appx:377-381).



*GX4 (Appx:170) : "Area Closed" sign (location/time unknown).*



*GX5 (Appx:171): "Area Closed" sign at Pennsylvania Avenue walkway.*

Per Erickson, the sign in GX4 (Appx:170), which reads "Area Closed By order of the United States Capitol Police Board," is hanging on a snow fence.  (Appx:345). In GX5 (Appx:171), an identical sign is shown on a set of bike racks being pushed past at the "west front face of the Pennsylvania Avenue walkway" of the Capitol. (Appx:245). Erickson identified those same bike racks, with signs visible, as viewed from Peace Circle at 12:51 p.m. (Appx:352-353; GX73 (montage of Capitol Police footage)).



*Screenshot from GX73: Pennsylvania Avenue walkway barricade, flanked by Olmsted Wall, as seen from Peace Circle at 12:51 p.m.*

22

Upon inquiry from the court, Erickson acknowledged that bike racks were placed only at the "entrances" of the perimeter and that the Olmsted Wall portion of the perimeter – visible on each side of the bike racks above – was not marked off with bike racks and had "[n]o signs or anything." (Appx:352-353, 367-368, 405-406).

Erickson explained that "initially," there had been plastic mesh "snow fencing" up on the grounds, not as part of the yellow perimeter, but on the grassy area "inside" the perimeter (Appx:343, 387). That snow fencing had been erected in the period before January 6th to protect the security of the inaugural buildout during construction. (Appx:374). Looking at Struck's January 5th parking lot video, Erickson was able to discern "glimpses" of signed snow fencing in the distance, behind Mr. Griffin and "through the trees back there." (Appx:366-367) (discussing GX63, screenshot at *supra* 6). Erickson testified that GX3 (below) – a photo of the Capitol showing green snow fencing in the foreground and a line of signed snow fencing further up the lawn – was a fair representation of what the West Front "would have looked like" in the morning hours of January 6th. (Appx:343-344) (COURT: "Did you say when . . . this photo was taken?" AUSA: "I did not.").

23



*GX3: snow fencing on West Lawn as it "would have looked"*
*the morning of January 6th.*

Looking at GX74, a Capitol Police video taken from "the roof of the inaugural platform of the Lower West Terrace" (Appx:361), Erickson identified mid-lawn snow fencing as it appeared undisturbed at 12:30 p.m., and then after "[p]eople have knocked over or stepped over the snow fence" at 12:58 p.m. (Appx:362; 354 (identifying fencing as seen in GX73 montage video at 12:58 p.m.) (screenshot below)). Indeed, GX74 shows clearly that during the first three minutes of the initial breach of the lawn (between 12:56 p.m. and 12:59 p.m.), a horde of people stormed past the snow fencing, some trampling it, others taking the time to stop and affirmatively rip it down, first one side, then the other.[7]

---

[7] Unfortunately, the copy of GX74 provided to counsel by the government stops at 1:02 p.m. and neither defense counsel below nor the government has been able to locate a copy that contains later portions played at trial. Therefore, counsel has been unable to view a



*Screenshot from GX73: snow fencing being torn down at 12:58 p.m.*

Indeed, the only plastic mesh that can be seen in Struck's videos is rolled up on the ground in GX33 (near the Olmsted Wall) and "down on the ground" in GX37 (near the retaining wall). (Appx:370). As seen below, in both exhibits, the mesh is underfoot, folded or "rolled up," without intact, readable signs. (Appx:368-370, 387-388). Looking for signage on those videos, Erickson saw only what he thought was part of a "tore up" sign by the Olmsted Wall, along with a ziptie on the mesh indicating a sign had "possibly" been torn off. (Appx:369, 388). Given that state of affairs, Erickson agreed that, "when the defendant's walking over the wall," there was no warning not to enter. "It is not

_____

complete version of GX74 and has had to include the incomplete version on the disc of video exhibits submitted with Appellant's Appendix.

there. You can't see it." (Appx:388). When defense counsel sought to

confirm that a person crossing over at that point "wouldn't know

whether this was snow fencing that was --," Erickson jumped in:

"Probably not, but they should know not to climb over the wall."

(Appx:389).



*Screenshot from GX33: Struck video showing green mesh on the
ground near the Olmsted Wall.*



*Screenshot from GX37: Struck video showing green mesh underfoot
near the mid-grounds retaining wall.*

26

Erickson also discussed parts of a montage video – GX73, a hodgepodge of events recorded by Capitol Police cameras between 12:51p.m. and 4:31p.m. – identifying various scenes inside and outside the Capitol, on the West and East Fronts, most of which bore no relevance to the "entering and remaining" count here on appeal. (Appx:357).

As for GX74, the rolling rooftop video, Erickson identified a 2:57 p.m. still shot showing the "Lower West Terrace and the inaugural stand and the west front completely covered with people" (Appx:361-363) as well as a 3:03 p.m. frame showing "white smoke" over the Lower West Terrace that "could have" come from chemical irritants or flash bangs that tactical teams were at some point using to try to clear the Lower West Terrace Door. (Appx:350, 363-364).[8] *See also* Appx:357 (smoke over crowd in GX73 at 2:15 p.m., "possibly" from flash bang or chemical grenade); Appx:369 (smoke in distance in GX34 at 2:35 p.m.) (screenshot below).

---

[8]  These images would be on the portion of GX74 that appellant does not have.



*Screenshot from GX34: Struck video showing smoke in front of Capitol at 2:35 p.m.; Mr. Griffin in right foreground.*

### 3.  Secret Service Inspector Hawa

Inspector Lanelle Hawa was the Secret Service liaison/site agent for Vice President Pence's trip to the Capitol on January 6th. (Appx:413-414). On the afternoon of January 5th, she e-mailed a Head of State Notification (GX6; Appx:172), informing the Capitol Police of when/where VP Pence would be arriving, with a general outline of his expected movements within the building. (Appx:415-417). On January 6th, Hawa was with the Vice President from the time his motorcade arrived at 12:30 p.m., through his time at a secure loading dock underneath the East Senate Plaza, to the time he returned to the Senate Chamber. (Appx:419-421, 423-425, 427). Per Hawa, the underground loading dock – where VP Pence was already located by the time Mr. Griffin crossed the Olmsted Wall (GX75; Appx:423, 426, 451,

28

471-473) – fell within the yellow perimeter of GX2. (Appx:417-418, 425, 428).

Hawa testified that the area within the yellow perimeter was restricted on January 6th for three reasons:  1) the inaugural buildout; 2) the certification of the Electoral College votes; and 3) COVID. Hawa did not list the presence of a Secret Service protectee as a reason for the establishment of the yellow perimeter and, even when prompted by the prosecutor to say whether the Vice President's visit was a reason for the restriction, Hawa said only that "[h]e was a part of the Electoral College . . . certification." (Appx:418).

As to the role of the Secret Service in setting a § 1752 perimeter around one of its protectees, Hawa agreed that "[i]t's the Secret Service that decides what the perimeter is" – "the one that decides where the area should be" – and "[u]ltimately, it's the the Secret Service that is making the decision of who can come into the . . . restricted area, and who cannot."  (Appx:432-434, 437).  *See also* Appx:438 ("Secret Service will provide or agree upon the credentials that are needed to access our secure perimeter."). Yet, she acknowledged that the January 6th perimeter in GX2 was set by the Capitol Police (Appx:439-440) and that

she – the liaison/site agent for VP Pence's January 6th visit – did not

know whether the Capitol Police had even informed the Secret Service

of that perimeter. (Appx:448-449) ("I can't speak to that."). Rather, she

described a situation in which the § 1752 perimeter Mr. Griffin was

charged with crossing had been piggybacked onto a perimeter set by the

Capitol Police, explaining that, based on the "long-standing

relationship" with the Capitol Police, the Secret Service knows where

the perimeter "typically is for events like this." (Appx:440). *See also*

Appx:458-459 ("we're pretty familiar with what their protocols are when

there's events at the Capitol;" when a dignitary is expected, "certain

protocols . . . fall into place" and "we trust that those protocols are being

followed").

Hawa claimed to be familiar with the "agreed-upon standard

boundary" for certain events, Appx:450, but faltered when asked to

identify the real-life perimeter in effect on January 6th. *See* Appx:442

(venturing that askew bike racks on *west* side of First Street (which she

called Third Street) in DX4/GX30 "should have been" the "restricted

area line"); Appx:442-443 (acknowledging she did not know whether the

wall being crossed in DX18/GX33 – the Olmsted Wall – was part of the

30

"restricted area line": "I'm not familiar with where that wall is exactly.").[9]

## B.  The District Court's Verdict.

For closing arguments, the court asked the parties to focus on the knowledge element:  "I'm inclined to think the government has shown that he did enter a restricted area.  . . . [T]he harder question is whether he knew he had."  (Appx:475). The court specifically inquired whether Mr. Griffin "needs to know that the [V]ice [P]resident is there" (Appx:482) – a legal question the parties had addressed in pre-trial briefing.  (Appx:326-327, 330-336).

Ultimately, the district court ruled that the "knowingly" *mens rea* of § 1752(a)(1) does not extend to the "restricted building or grounds" element as defined in § 1752(c) and, thus, the government need not prove that Mr. Griffin knew a Secret Service protectee was or would be temporarily visiting the restricted area.  (Appx:532-534).[10]

---

[9] The court accepted defense counsel's representation that, before January 6th, § 1752 had never been used to prosecute someone for entering the Capitol grounds. (Appx:493) (court:  "I believe that").

[10] The court also ruled that:  1) because Inspector Hawa testified that the Secret Service "consulted with" the Capitol Police in setting up the January 6th perimeter, "this case doesn't squarely present the question

The district court made the following findings in support of its
denial of Mr. Griffin's motion for judgment of acquittal and its verdict of
guilty on Count One (entering and remaining in a "restricted building
and grounds") and not guilty on Count Two (disorderly and disruptive
conduct to impede government business in a restricted building and
grounds):

The court recognized that Mr. Griffin and Mr. Struck travelled to
D.C. to attend the Stop the Steal rally and "did not come to create
unrest or break any laws." (Appx:527).

> At th[e] time [Mr. Griffin spoke in front of the Capitol on
> January 5th (GX63)], the various barriers on the west front of
> the lawn were clearly visible, including snow fencing with
> signs saying that the area was closed. I think it is likely that
> Mr. Griffin saw those barriers.

> On January 6, Mr. Griffin . . . attended [the rally] . . .
> dressed in professional attire and . . . unarmed, quite unlike
> many other people present who came prepared to cause
> trouble . . . .

---

of whether the Capitol Police, acting independently of the Secret
Service, can designate a restricted area" (Appx:531), a question the
court had answered affirmatively pre-trial. (Appx:94-107); 2) the
underground loading dock was within the § 1752 "restricted building or
grounds" even if it was not part of the Capitol building or Capitol
grounds as defined elsewhere (Appx:534-535); and 3) the Vice President
can "temporarily visit" the Capitol despite having an office and
constitutional duties there (Appx:535-536).

. . . En route [from the rally] to the Capitol, they heard that Vice President Pence had already certified the election. That was incorrect, but I think it is relevant to Mr. Griffin's later conduct and knowledge.

. . . At around 2:31 p.m., the defendant entered the restricted area by climbing over the Olmste[]d [W]all. As far as I can tell, there were no signs indicating it was restricted at that point, and there were numerous other people climbing the wall and thousands of people inside the wall.

The defendant walked towards the Capitol, climbing at least two other small walls, and walking over the snow fencing which had either been trampled or removed by numerous protestors who had preceded him into the area.

He then walked up a narrow staircase into the inauguration stage which had been erected on the west front of the Capitol. The staircase had a door. The door had been closed. And he or someone near him said, "We'll wait until they get this door broken down." That's from [GX 40].

There was OC spray or pepper spray in the area from officers trying to clear the protestors. Mr. Griffin was clearly aware of the OC spray, as shown in [GX43].

(Appx:527-529).

The court found that, after attempting to lead the crowd below in prayer, to which a number of people appeared to respond, Mr. Griffin remained in the restricted area until at least 4:48 p.m. (Appx:529 (citing GX54; GX62)).

33

As to the "knowingly" element of Count One, the district court concluded that there was "ample evidence that Mr. Griffin knowingly entered or remained" within the "restricted area":

> First, he saw the west front on January 5 complete with multiple rings of snow fencing with signage. When he crossed the west front lawn on January 6, he would have seen this fencing trampled under foot.
>
> Two, he crossed over three different walls, including the Olmste[]d [W]all. Each of these were tall enough that he needed help from others or to rely upon a jerry-rigged ladder or ramp to get over them. All of this would give – would suggest to a normal person that perhaps you should not be entering the area.
>
> Third, he then climbed an emergency exit staircase onto a wooden inauguration stage that had a closed door. Either he or someone close to him said that the door had to be busted open.
>
> Fourth, he smelled OC spray in the area of the terrace where police had been trying to clear people from the area.
>
> Fifth, he also made two statements in the days afterwards admitting that the area had been cordoned off and that police were telling people to stay away. I think the defense has a fair argument that these statements don't show he specifically was told by the police to stay away, but I do think these statements corroborate the government's argument that he knew he was in an area he was not allowed to be in.
>
> While no one of these factors would alone be conclusive of a violation, together they show proof beyond a reasonable doubt. It's certainly not clear to me that Mr. Griffin knew he

was entering a restricted area when he initially climbed over the Olmste[]d [W]all, even though he was, but by the time he was on the stage, he certainly knew he shouldn't be there. And yet, he remained. I find this properly makes out a violation of 1752(a)(1).

(Appx:334-335).

## SUMMARY OF ARGUMENT

Mr. Griffin's conviction for "knowingly" entering or remaining in "any restricted building or grounds" in violation of § 1752(a)(1) must be vacated where the government failed to prove that Mr. Griffin entered a "restricted building or grounds" at all, let alone that he did so "knowingly."

Congress defined "restricted building or grounds" as an area meeting very specific statutory requirements. Construing Congress's words correctly, the government did not prove that the area Mr. Griffin entered had the status of a "restricted building or grounds" at the time he entered or remained there, and, to the extent it did, it did not prove that Mr. Griffin knew it had that status.

*First*, an area cannot qualify as a "restricted building or grounds" unless 1) it is "posted," "cordoned off," or "otherwise" demarcated as "restricted"; and 2) it falls into one of three qualifying categories, one of

which is that a Secret Service protectee is visiting. Although the
government presented evidence that, on January 6th, the Capitol Police
established a perimeter that the Secret Service – at least after the fact –
considered a "restricted building or grounds" in light of Vice President
Pence's visit, and that parts of that perimeter were *initially* cordoned off
and posted, the government failed to establish that, by the time Mr.
Griffin entered the West Lawn at 2:31 p.m., that original perimeter was
demarcated as restricted in a way comparable to a public "post[ing]" or
"cordon[ing] off." The government presented no evidence that at any of
the places *Mr. Griffin* entered, from the Olmsted Wall to the railing of
the inaugural stage, there were – *at the time he entered or remained* –
any law enforcement officers, signs, barricades, public announcements,
or warnings of any kind that those areas were off-limits. For this
reason, no trier of fact could find beyond a reasonable doubt that Mr.
Griffin ever stepped foot in a "restricted building or grounds" at all.

Second, and independently, no rational factfinder could be
convinced that Mr. Griffin "*knowingly* enter[ed] or remain[ed] in *any
restricted building or grounds*." This statutory formulation requires
proof that Mr. Griffin knew that the area he was entering or remaining

36

in was an *area listed in the definition of "restricted building or grounds."*
*See McFadden v. United States*, 576 U.S. 186, 191-92 (2015) (analyzing
mens rea required to "knowingly . . . distribute . . . a controlled
substance").

As explained in *McFadden*, there were two ways the government
could have met that burden:  The government could prove *either* that
Mr. Griffin 1) knew that the area, in some unspecified way, qualified as
a "restricted building or grounds"; or 2) knew the facts that made it
qualify, even if not realizing their legal significance.  As for the former
alternative, the government made no attempt to prove (via Secret
Service signage, for example) that Mr. Griffin knew that the area bore
the legal designation of "restricted building or grounds." As for the
latter alternative, the government had to prove Mr. Griffin knew facts
meeting *both* parts of Congress's "restricted building or grounds"
definition:  1) that the area was posted, cordoned off, or otherwise
"restricted" (which the government tried, but failed, to prove); *and* 2)
that it was an area where a protectee – here, Vice President Pence –
was visiting (which the government persuaded the district court it did

not have to prove).  Absent such proof, Mr. Griffin could not be convicted of "knowingly" entering a "restricted building or grounds."

In sum, there was insufficient proof that:  1) Mr. Griffin entered an adequately demarcated "restricted area;" 2) Mr. Griffin knew it was so demarcated; and 3) Mr. Griffin knew protectee Pence was or would be visiting. Any one of these three lapses in proof requires that Mr. Griffin's conviction be reversed and retrial be barred:

But even if this Court were to determine that the evidence on all three of these points was sufficient for a *hypothetical factfinder* to find guilt beyond a reasonable doubt, the district court here reached its verdict under a misunderstanding of the elements.  Because the court erred in 1) implicitly rejecting any requirement that the "restricted area" be publicly demarcated; and 2) explicitly rejecting any requirement that there be knowledge of the protectee's presence, a remand is necessary for the district court to weigh the evidence as *actual factfinder*, and determine whether those elements were, as properly construed, proven beyond a reasonable doubt.

## ARGUMENT

### I. THE GOVERNMENT FAILED TO PROVE THAT MR. GRIFFIN ENTERED A "RESTRICTED BUILDING OR GROUNDS."

#### A. Standard Of Review.

Mr. Griffin preserved his legal argument as to the proper interpretation of the "restricted building or grounds" element at Appx:495-496 ("Under the canons noscitur a sociis and ejusdem generis, . . . [']otherwise restricted['] means a physical demarcation of the area."), and preserved his insufficiency of the evidence claim at Appx:466, 474-475 (motion for judgment of acquittal).

This Court reviews questions of statutory interpretation *de novo*. *See United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014). The Court also reviews insufficiency claims *de novo*, considering whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gaskins*, 690 F.3d 569, 576 (D.C. Cir. 2012).

### B.   To Qualify As A "Restricted Building Or Grounds," An Area Must Be Posted, Cordoned Off, Or Otherwise Comparably Demarcated As Restricted.

To be guilty of violating § 1752(a)(1), a defendant has to enter or remain in an area that has the special status of a "restricted building or grounds."  As relevant here, Congress has defined that term as follows:

> (c) (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>> . . .
>> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting . . . .

§ 1752(c)(1)(B).

"[O]therwise restricted" in this definition does not mean restricted via e-mails or protocol agreements between law enforcement agencies. It certainly does not mean restricted via a yellow line drawn on a photograph such as GX2, even if such line were drawn in preparation for January 6th rather than for post-January 6th litigation.

Rather, "otherwise" restricted means restricted in a way that gives notice to the public comparable to a physical "posting" or "cordoning off."  The statute's plain text requires some type of clear on-site public notice setting off the restricted space.  This follows directly from the ordinary meaning of "posted" and "cordoned off." At the time of

40

§ 1752's enactment, "posted" meant to forbid (property) to trespassers under penalty of legal prosecution by notices placed around the boundaries." *Webster's Third New International Dictionary* 1771 (1966). "Cordon" referred to "a line or circle of persons or objects around any person or place," while "cordon off" meant "to form a protective or restrictive cordon around (an area)" – for example, "a cordon of police kept back the crowd," or "[they] were not allowed in the front yard, which was cordoned off by the police." *Id.* at 506.

The ordinary meaning of these two terms indicates, in turn, that an "otherwise restricted" area must also be demarcated in a manner that clearly sets off the specific area that is off-limits. *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 294 (2008) ("a word is given more precise content by the neighboring words with which it is associated").

The government did not dispute that such public demarcation was required. See Appx:480 (prosecutor arguing that law allows for an area that is "cordoned off, posted that this is restricted in any way" and "that includes having a law enforcement officer there, having signs that say that the area is restricted, informing people that this area is restricted through overhead announcements, things of that nature"); Appx:443-

41

444 (Hawa testifying that people "have to be made aware that there's a restricted area" and that the Secret Service "normally" accomplishes that "[b]y notifications or by restricted signs" but, absent that, "they would eventually – they would come upon somebody perhaps, that would be able to tell them that it's a restricted area.").

The statute's mandate that any off-limits area be publicly identified reflects Congress's desire to balance "greater protection for the President without any 'chilling effect' on lawful dissent" by ensuring that "the limits of that dissent will be clearly drawn." S. Rep. No. 91-1252, 91st Cong., 2d Sess. 7 (1970). Constitutional overbreadth and vagueness concerns were especially acute, in Congress's view, "in cases where the President will be merely temporarily visiting an area" that is otherwise public. *Id.* at 7. In those situations, Congress expected the Secret Service to "make every effort . . . to make such restricted areas known to the public (i.e., by posting or cordoning off)" – a requirement under the statute that stands independent of the "element[] of the crime [to] knowing[ly] . . . violate[] the restricted area." *Id.* at 8.

42

**C. The Government Failed To Prove That, At The Time Mr. Griffin Entered The Disputed Area, It Was Visibly Or Verbally Demarcated As Restricted.**

The district court did not explicitly address Mr. Griffin's argument that canons of statutory construction required the government to prove that the alleged "restricted building or grounds" was "restricted" via signage or law enforcement presence comparable to a "post[ing]" or "cordon[ing] off."  Rather, the court simply found that the yellow line in GX2 identified the "restricted area for purposes of § 1752" and that the unmarked Olmsted Wall along First Street served as part of the restricted perimeter (Appx:528).  *See also* Appx:532 ("[t]he Olmste[]d [W]all was clearly the restricted area for purposes of . . . 1752 and for this case.").

Implicitly, though, the district court rejected Mr. Griffin's interpretation of the "restricted building or grounds" definition when it found that "[he] entered the restricted area" when he "climb[ed] over the Olmste[]d [W]all" at around 2:31 p.m., even though, "[a]s far as I can tell, there were not signs indicating it was restricted at that point"

43

(Appx:528)[11], and "[i]t's certainly not clear to me that Mr. Griffin knew he was entering a restricted area when he initially climbed over the Olmste[]d [W]all" (Appx:537).

The court's finding was surprising in that it had earlier appeared skeptical that unmarked infrastructure like the Olmsted Wall could, in these circumstances, serve to "restrict" the public grounds of the Capitol. *See* Appx:257-258 (Judge McFadden, after prosecutor played video of Mr. Griffin climbing over Olmsted Wall: "I take it that's not the barrier you think was relevant here, is it? . . . That is the barrier? . . . That wall there?").

Later, when the government argued that the Olmsted Wall itself was a barrier that conveyed that the public did not have authority to climb over it "to enter an area in a government space," the court seemed to reject that: "But the tricky part is, I think I could go down there today, and like if my hat fell over the Olmste[]d [W]all, I think I could jump over the Olmste[]d [W]all and get my hat, couldn't I?" The government agreed "that's a possibility." (Appx:477-478).

---

[11] *See* Appx:368 (Erickson confirming for court that there were "[n]o signs or anything" on the Olmsted Wall).

The district court's initial instinct was correct. The Olmsted Wall could not suffice to close the West Lawn to the public where it was not signed or manned and, by the time Mr. Griffin crossed it, was not part of a continuous barrier cordoning off entry to the otherwise public Capitol grounds. If the Olmsted Wall alone could act as a § 1752 perimeter, then the West Lawn would be "otherwise restricted" every day.

To the contrary, properly interpreted, no "restricted building or grounds" existed on January 6th before the Capitol Police placed the signed bike racks at the public entrances along the Olmsted Wall.[12] And if the day had not taken the turn it did, the West Lawn would have stopped being "restricted" when the Capitol Police removed those barriers. The government presented evidence that the Pennsylvania Avenue walkway was barricaded with bike racks at 12:51 p.m., *see* GX73 (screenshot *supra* at 25), but presented no evidence that the entrances through the Olmsted Wall were blocked or signed in any way when Mr. Griffin approached at 2:31 p.m. To the contrary, the

---

[12] Mr. Griffin does not concede that such intermittent barriers were sufficient to create an adequately demarcated § 1752 perimeter, but they were certainly necessary.

45

government admitted a photograph showing people pushing past those very Pennsylvania Avenue bike racks (GX5, screenshot *supra* at 22; *see also* GX 73 (time-count 00:30)), and admitted a video showing hundreds of protestors mobbing the West Lawn via the Pennsylvania Avenue Walkway starting at 12:55 p.m. (GX74).

Thus, there was no evidence to support the court's conclusion that Mr. Griffin entered a "restricted building or grounds" when he crossed over the Olmsted Wall at 2:31 p.m. Certainly, the imaginary yellow line drawn on GX2 was not enough to "otherwise restrict" the Capitol grounds at 2:31 p.m. Even if the signed bike racks and police presence in place at the entrance to the Olmsted Wall earlier at 12:51 p.m. was sufficient – in conjunction with the unsigned/unmanned wall itself – to "otherwise restrict" the area inside that perimeter, there was nothing comparable to a posting or cordoning off in place at the intended perimeter by the time Mr. Griffin arrived.

Other than the signed snow fencing that had been erected in connection with the inaugural buildout – which was destroyed long before 2:31 p.m. (GX74) – there was no evidence that any of the areas Mr. Griffin entered inside the yellow line had ever been signed as off-

46

limits. Nor, during the period he entered and remained, was there any law enforcement presence cordoning off those areas or announcing any restricted status, either in person or via overhead announcement. Erickson acknowledged that, to the extent there may have at one point been a snow fence sign near where Mr. Griffin crossed the Olmsted Wall, by the time he crossed over, there was no such sign to be seen. Appx:388 ("It is not there. You can't see it.").

Because the government presented insufficient evidence that, at the time Mr. Griffin entered and remained on the Capitol grounds, he entered and remained in an area that was "posted, cordoned off, or otherwise restricted" as required by § 1752(c), the government failed to prove Mr. Griffin entered a "restricted building or grounds" and his conviction under § 1752(a)(1) must be vacated.

## II. THE GOVERNMENT FAILED TO PROVE THAT MR. GRIFFIN "KNOWINGLY" ENTERED A "RESTRICTED BUILDING OR GROUNDS."

### A.    Standard Of Review.

Mr. Griffin having preserved both 1) his legal claim as to § 1752(a)(1)'s "knowingly" requirement (Appx:330-336, 505-508) ("knowingly" applies to the actus reus of entering a "restricted building

or grounds" as that term was defined by Congress); and 2) his factual insufficiency claim (Appx:466, 474-475 (motion for judgment of acquittal)), he is entitled to the same *de novo* standards of review set out in Section I(A).

**B.    The "Knowingly" Element Applies To The Area's Status As A "Restricted Building Or Grounds."**

Section 1752(a)(1) criminalizes "*knowingly* enter[ing] or remain[ing] in any *restricted building or grounds* without authority to do so." Thus, separate and apart from the requirement that the area entered *has the status of* a "restricted building or grounds," Congress has required that the accused *know that status*.

Congress has set forth two requirements for an area to qualify as a "restricted building or grounds":  1) it must be a posted, cordoned off, or otherwise "restricted area"; *and* 2) it must fall into one of three categories – (A), (B), or (C) – that Congress has identified as warranting special protection, one of which is that a Secret Service protectee is visiting. § 1752(c).

Here, at the government's urging, the district court did not require the government to prove that Mr. Griffin knew that the area he entered was a "restricted building or grounds," but only that he knew it was a

"restricted area." But those formulations are not the same and there does not appear to be any textual basis for the government's conception of its mens rea burden.

It is simply not accurate to say, as the government did below (Appx:124-25, 482, 521-522), that Congress set out a mens rea requirement that the defendant knowingly enter a "restricted area." Rather, Congress set out a mens rea requirement that the defendant knowingly enter a "restricted building or grounds." Being a "restricted area" is just one part of the two-part definition of "restricted building or grounds."

The government's burden here is clear in light of the Supreme Court's analysis of an analogous criminal statute in *McFadden v. United States*, 576 U.S. 186 (2015). In *McFadden*, the Court considered the mens rea of 21 U.S.C. § 841(a)(1), which makes it unlawful to "knowingly . . . distribute… a controlled substance" – a term separately defined by Congress in § 802(6)) as a "substance . . . included in schedule I, II, III, IV, or V." *Id.* at 191-92.

> Under the most natural reading of this provision, the word "knowingly" applies not just to the statute's verbs but also to the object of those verbs – "*a* controlled substance." *See Flores-Figueroa v. United States*, 556 U.S. 646, 650 . . .

49

(2009); *id.*, at 657 . . . (Scalia, J., concurring in part and concurring in judgment); *id.*, at 660-661 . . . (Alito, J., concurring in part and concurring in judgment). When used as an indefinite article, "a" means "[s]ome undetermined or unspecified particular."  Webster's New International Dictionary 1 (2d ed. 1954). [Given the definition of "controlled substance"], [t]he ordinary meaning of § 841(a)(1) thus requires a defendant to know only that the substance he is dealing with is *some unspecified substance listed on the federal drug schedules.*

*Id.* at 191-192 (first emphasis in original).

Likewise, "any" "restricted building or grounds" describes only an "unspecified particular" and the ordinary meaning of  § 1752(a)(1) thus requires a defendant to know only that the area he is entering is *some unspecified area listed in § 1752(c).*

The *McFadden* Court went on to explain two ways the government could meet its knowledge burden in such a circumstance.

[First,] [t]hat knowledge requirement may be met by showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was. Take, for example, a defendant whose role in a larger drug organization is to distribute a white power to customers.  The defendant may know that the white powder is listed on the schedules even if he does not know precisely what substance it is. And if so, he would be guilty of knowingly distributing "a controlled substance."

*Id.* at 192

50

Likewise here, the § 1752 knowledge requirement may be met by showing that the defendant knew he was entering an area that met the definition of a "restricted building or grounds," even if he did not know which type of qualifying area it was. Take, for example, a defendant who sees Secret Service signage of the type in effect at the homes of former Presidents, telling entrants that they are entering a "restricted building or grounds." The defendant knows the area meets that definition even if he does not know how or why.  And so he would be guilty of knowingly entering a "restricted building or grounds."  Here, the government made no attempt to establish knowledge of this type.

But under the analogous statute in *McFadden,* the Supreme Court recognized a second way the government could meet its burden:

> The knowledge requirement may also be met by showing that the defendant knew the identity of the substance he possessed. Take, for example, a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules.  . . . Because ignorance of the law is typically no defense to criminal prosecution,  . . . this defendant would also be guilty of knowingly distributing "a controlled substance."

*Id.*

Likewise here, the knowledge requirement could be met by showing that the defendant knew the qualifying characteristics of the

51

area. Take for example a defendant who knows he is entering a posted, cordoned off, or otherwise restricted area that is the White House or is a rally for Secret Service protectee Donald Trump.  He does not know that these characteristics qualify the area as a § 1752 "restricted building or grounds" but, because ignorance of the law is no defense, he would be guilty of knowingly entering a "restricted building or grounds." But here, the government persuaded the district court that it had to prove knowledge of only half of the relevant characteristics – knowledge that the area was a "restricted area," but not knowledge of the existence of one of the facts listed in § 1752(c)(1)(A), (B), or (C), *i.e.*, that a protectee was present.  (Appx:124-25, 482-483, 521-522).

As Judge Lamberth recently held, both are required. In *United States v. Sturgeon*, No. 21-cr-91(RCL), a multi-count January 6th bench trial, the defense argued that, as to the § 1752(a)(1) count, the government had to prove that the defendant knew the area entered was a "restricted building or grounds" as the statute defines it (ECF 162) and the court agreed, ruling that "the government must prove not only that defendants knew they were in a 'posted, cordoned off, or otherwise restricted area,' but also that they knew that it was such an area 'of a

52

building or grounds where the President or other person protected by the Secret Service is or will be temporarily visting.'" ECF 163 (citing § 1752(c)(1)(B)). The government pressed flawed statutory interpretation arguments, asserted that other January 6th judges were requiring the government to prove only that the area "was restricted" – not "why" it was restricted – and quoted specifically from Judge McFadden's ruling in this case. ECF 164. Judge Lamberth rejected those arguments, convicting the *Sturgeon* defendants only after finding beyond a reasonable doubt that they "knew that Vice President Pence, a Secret Service protectee, was visiting, or was going to visit, the Capitol grounds." 2023 WL 3613237, *1, *5 (May 24, 2023).

To the extent the government is attempting to extract some everyday meaning of "restricted" from the statutorily-defined term "restricted building or grounds," there is no theory of statutory construction that would call for a Congressionally-defined term like "restricted building or grounds" to be broken up into its generically defined component parts – "restricted" "building" or "grounds" – for purposes of the knowledge element when those three words have, together, been given a specific, term-of-art, meaning. The Supreme

Court rejected a similar gambit in *McFadden*, in which the government argued that its burden was met if the defendant "'knew he was dealing with an illegal or regulated substance' *under some law.*" 576 U.S. at 195 (emphasis added). The Supreme Court responded:

> Section 841(a)(1) . . . requires that a defendant knew he was dealing a "a controlled substance." That term includes only those drugs listed on the federal drug schedules . . . . It is not broad enough to include all substances regulated by any law.

*Id.*

Thus, just as it is not enough to know that a substance is generically "controlled" (antibiotics are "controlled"), it is not enough to know that a building or grounds is generically "restricted" (any place bearing an "area closed" sign is "restricted"). Rather, the government must prove a defendant knows he is in a "restricted building or grounds."

In this case, the government failed to prove that Mr. Griffin knew that, *for whatever unspecified reason*, the area in question met the definition of a "restricted building or grounds." One reason for this failure is that the area was posted – to the extent it was posted at all – with Capitol Police "area closed" signage rather than Secret Service

"restricted building or grounds" signage that could have established the necessary knowledge element. The government could, alternatively, have tried to prove that Mr. Griffin knew the underlying facts that (perhaps unbeknownst to him) qualified the area as a "restricted building or grounds" – *i.e.*, that the area was "restricted" *and* that Vice President Pence was present. As Mr. Griffin will show below, on these unique facts, the government failed to prove those things either.

The district court ruled that the inclusion of a mens rea requirement in § 1752(a), combined with the absence of such a requirement from the § 1752(c) definitional provision, "foreclosed" any argument that the "knowingly" requirement extended to that definition. (Appx:533-534). But this is not a case where mens rea must be presumed or puzzled out. Mr. Griffin does not seek to extend the "knowingly" requirement down the statute to the particulars of the § 1752(c) definitional provision, but simply submits that "knowingly" plainly applies to the immediate direct object of the verb it modifies – "any restricted building or grounds." As explained in *McFadden*, proving that Mr. Griffin knew the facts that qualified the area he entered as a "restricted building or grounds" was simply an option the

government could rely on in the event it could not prove Mr. Griffin

knew he was entering an area that, in some way or another, met the

definition of a "restricted building or grounds."

The district court expressed doubt that Congress would require

the government to prove knowledge that a "specific dignitary" was

present, reasoning that requiring the Secret Service to tell people

"which protectee" was in the restricted area would undermine the

protective purpose of the statute. (Appx:534). But Mr. Griffin does not

contend that a § 1752 violator has to know "which protectee" is in the

area, or even that any protectee is in the area.  Again, one simply needs

to know that the area is a "restricted building or grounds."

In cases where this generic information has not been provided as

part of the posting or cordoning off, the underlying facts will typically

be easy to prove. *See* Appx:447 (Hawa had never, in 23 years,

experienced a "circumstance where a person walked into the area and

they didn't know the president or the vice president was in it."). Indeed,

in most "fence-jumper" cases, the defendant goes past the perimeter

precisely *because* it is a "restricted building or grounds." When the

"restricted building or grounds" is the White House, the government can

argue that the defendant knew he was entering an area listed in

category (A) because he could see the White House right in front of him.

*See United States v. Caputo*, 201 F.Supp.3d 65, 72 (D.D.C. 2016) ("like

every other reasonable person who visits the White House perimeter,

Caputo was well-aware that unauthorized entry onto the grounds was

illegal"). Frequently, defendants who jump barricades admit their

knowledge. *See United States v. Jabr*, 4 F.4th 97, 99 (D.C. Cir. 2021)

(defendant explained to law enforcement her "ill-conceived . . . plan to

attain an audience with the President"). And often, a protectee's

presence will have been publicized, such as for a rally or public speech,

*see United States v. Bursey*, 416 F.3d 301, 304 (4th Cir. 2005) (7000

tickets issued for presidential rally; defendant conceded he knew

President was visiting), as was the presence of Vice President Pence at

the Capitol on January 6th.

The government's mens rea burden under § 1752(a)(1) should not

be lowered simply because, for some January 6th defendants, like Mr.

Griffin, the government will not be able to meet it.

### C.     The Government Failed To Prove That Mr. Griffin Knew The Area He Entered Was A "Restricted Area."

The district court acknowledged that it was not clear that Mr. Griffin knew he was entering a restricted area when he crossed the Olmsted Wall but concluded that, by the time he was on the stage, he knew "he shouldn't be there." (Appx:537).

As discussed in Section I(C), there was no marked perimeter when Mr. Griffin entered the West Lawn and, other than the destroyed snow fencing, there was no evidence that any of the interior areas *Mr. Griffin* entered had ever been signed as off-limits, nor evidence that *Mr. Griffin* encountered law enforcement cordoning off those areas or announcing they were closed.

Critically, binding precedent establishes that the entire Capitol grounds is a public forum:

> The Captiol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year. . . . Nor is the primary purpose for which the Capitol was designed – legislating – incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C.) (three-judge panel), *aff'd*, 409 U.S. 972 (1972)

("fundamental function of a legislature in a democratic society assumes
accessibility to [public] opinion"). Mr. Griffin was therefore entitled to
presume that, *absent notification otherwise*, he had the right to enter
and remain on the Capitol grounds.  To the extent the court thought
"nobody thinks that random tourists could just kind of waltz up there,"
it had the presumption backwards. *See* Appx:499-501 (defense counsel:
"If nobody thinks that, they don't know their D.C. Circuit law.  . . .
[With no signage or law enforcement instruction on the West Front
Steps,] what you're left in that vacuum with is a public forum. . . .
[W]e're coming to [these January 6th cases] with the assumption that
someone should not be on the Capitol grounds.  . . . [I]t's a remarkable
assumption, because there's case law going back decades saying that's
not true. Not only are you not prohibited; you have a right.").

 Without any affirmative notification that the areas Mr. Griffin
traversed were closed to the public, there must be a presumption that
he believed he could be in those places.  The district court based its
contrary knowledge finding on five factors that it felt together made out
proof beyond a reasonable doubt. Yet, some of the court's finding are
factually unsupported and those that are supported are, even together,

too "equivocal" to permit a beyond-a-reasonable-doubt inference of knowledge that the area being entered was "posted, cordoned off, or otherwise restricted."

First, the court relied on the fact that Mr. Griffin saw the West Front, complete with rings of signed snow fencing, on January 5th (Appx:536), "likely" saw that fencing on the 5th (Appx:527-528),[13] and then "would have" seen it trampled under foot as he crossed the lawn on January 6th (Appx:536).

But the district court found that by the time Mr. Griffin entered the lawn, *he thought the certification of electoral votes was over* (Appx:528, 537-538), making the significance of the fencing on the ground highly uncertain. Seeing rolled up fencing *after the certification* on January 6th is akin to seeing rolled up fencing after a 4th of July concert. The fact that it was seen up on July 3rd, tells one very little

---

[13] To the extent the court suggests there were other "barriers," besides snow fencing, visible "on the west front of the lawn" in the January 5th video (Appx:527), there is no basis for that.  There is no evidence that the bike racks were set up to barricade the West Front until the 6th. If there were bike racks blocking access to the lawn on the 5th, they cannot be seen in the video (GX63, screenshot *supra* at 6).

about whether there remain post-concert restrictions it is meant to be enforcing, but for having been downed.

Second, the court reasoned that crossing over three walls tall enough to require assistance to get over, would "suggest to a normal person" that "perhaps" he should not be entering the area. But none of the three walls Mr. Griffin crossed was closing off access to the area beyond. Both stone walls provided access via public entrances/walkways and the area beyond the white wall was likewise reachable simply by walking around it. *See* GX73 (time-count 06:14). As long as an area is properly accessible, taking a shortcut over infrastructure meant to be gone around does not raise an inference of knowledge that the area is even "perhaps" restricted. Taking the shortcut may be lazy and disrespectful of public infrastructure, but it does not create any inference of knowledge about the status of the area beyond. If Judge McFadden retrieved his hat from the West Lawn (Appx:477-478), no inference of knowledge would arise from the fact that he hopped the Olmsted Wall rather than walked around it. Likewise, Mr. Griffin's choice to take the direct route up the middle to the West Front shows nothing more than inconsiderate impatience in the face of a crowd.

Third, the court found that Mr. Griffin had accessed the stage via a "closed door" that "[e]ither he or someone close to him said . . . had to be busted open." (Appx:536). There is simply no evidence that the door Mr. Griffin entered was closed at the time that statement was made. Indeed, just six seconds later, when the door comes into view around the corner, it is open and people are, and have been, moving through it. *See supra* 12-14 & n.3. Given the video evidence, the only reasonable inference is that the statement about waiting for a door to be broken down referred to a different door – the one on the same side of the buildout on which Struck is recording and on which two men had been seen rhythmically banging shortly before. Absent evidence that the door Mr. Griffin went through had been posted, cordoned off, or otherwise restricted, his use of it raises no inference of knowledge that the area beyond the door – which he could have reached less quickly or directly via the Capitol Steps – was off-limits.

Fourth, the court considered that Mr. Griffin appeared to smell OC spray as he took the staircase to the Lower West Terrace. But the fact that some individuals were being disorderly and attempting to go beyond where they were permitted, and that those people and/or police

62

were using chemical irritants that were wafting to other areas of the grounds, did not tell Mr. Griffin that he was not allowed to be where he was at the time he was there, standing peaceably at the railing of the Lower West Terrace.[14] There was no indication that police were using chemical irritants on people like him – people who were not attempting to breach any police line – and indeed, the law enforcement officers he could see, stationed atop the Upper West Terrace above, were simply observing, rather than taking any action to disperse him. *See supra* at 16 (screenshots from GX45 and GX52). It was reasonable for Mr. Griffin to think that illegal actions by those at the fringe of a demonstration do not diminish the right of those behaving legally to stay where they believe they are allowed to be.

Finally, the court pointed to Mr. Griffin's videotaped statements on January 7th and January 14th "admitting that the area had been cordoned off and that police were telling people to stay away." (Appx:536-537). The court recognized that those statements "don't show

---

[14] See Appx:538-539 (court recognizing that by calling on people to kneel, "arguably, [Mr. Griffin] was trying to calm people down, not rile them up" and noting that Mr. Griffin compared favorably to those engaging in disorderly conduct on the government's montage video).

63

he specifically was told by police to stay away," but concluded that they nevertheless "corroborate" the argument that "he knew he was in an area he was not allowed to be in." (Appx:537).

But even a cursory examination of those video statements reveals that, in both, Mr. Griffin was explaining/justifying the experiences of *others* at a time when he was still halfway down the Mall, not admitting to any contemporaneous awareness that the parts of the grounds *he* traversed had been restricted at the time *he* was there. *See* GX64 (discussing how "those patriots" "spilled over" "roped off" areas after being told by "D.C. police" to stay away); GX78 (discussing how, when "they" got down to the west front, "there was some fencing up" that they were told "was being reserved for Joe Biden," but "that crowd" just "pushed through"). These statements obviously did not describe anything Mr. Griffin experienced. By the time he arrived, there was no "fencing" or "rop[ing] off" of anything and no "police" providing any information at all. The "spill[ing]" was long over and he certainly participated in no "push[ing] through." Per the January 7th video, Mr. Griffin was simply giving his take on the initial breach in response to what he had seen on "the mainstream news." (GX64). On January 14th,

64

he made clear that his description of the initial breach was not an eyewitness account: "I wasn't anywhere in the front of it, I was in the back." (GX78). Because these statements were clearly based on information Mr. Griffin learned after the fact, they can in no way "corroborate" any contemporaneous knowledge on his part that he was not allowed to be where he was.

Thus, against the background of "the Capitol grounds [as] a public forum by requirement of the First Amendment," *Hodge v. Talkin*, 799 F.3d 1145, 1161 (D.C. Cir. 2015), the inference that Mr. Griffin thought he had a right to be all of the places he entered – up to and including the stage at the front of the Lower West Terrace – cannot on this evidence be overcome beyond a reasonable doubt. A reasonable person would expect that, if a part of the Capitol grounds was meant to be closed, there would be some signage, barricades, or police presence to tell him so. But everywhere Mr. Griffin went – past walls that enclosed nothing and through an open door near the base of the Capitol Steps – he encountered no postings or police suggesting he had reached an area that was off-limits. Given his (incorrect) belief that the day's big event had concluded, the significance of rolled up fencing on the ground was

65

speculative at best. Certainly, a factfinder could conclude Mr. Griffin stayed put on the stage knowing that, *elsewhere*, chemicals were being deployed on or by people engaged with police. And *later*, when Mr. Griffin learned that the lawn itself had originally been restricted, he expressed some understanding of why "those patriots" had failed to abide by those restrictions. But neither of those things says anything about what Mr. Griffin knew *at the time* about the areas *Mr. Griffin* entered.

"[T]he government's web of inference is too weak to meet the legal standard of sufficiency" where the alternative explanations of its evidence "are at least equally consistent with" the "plausible hypotheses" that Mr. Griffin believed that the parts of the Capitol grounds that he entered were open and that any closed perimeter was closer to, or at, the Capitol building itself. *United States v. Teffera*, 985 F.2d 1082, 1086, 1088 (D.C. Cir. 1993). "Equivocal" evidence is not enough. *United States v. Davis*, 863 F.3d 894, 904, 906 (D.C. Cir. 2017) (possible "innocent explanations" for government's evidence rendered it "equivocal and thus insufficient to sustain [a] conviction[]" even when "viewed collectively"). Where, as here, "the government's overall

66

evidence of guilt is so thin, the alternate hypotheses consistent with innocence become sufficiently strong that they must be deemed to instill a reasonable doubt." *Teffera*, 985 F.2d at 1088.

### D. The Government Failed To Prove Mr. Griffin Knew A Protectee Was Present.

The government produced no evidence that Mr. Griffin knew that the Vice President was in the Capitol building or on the Capitol grounds at the time that Mr. Griffin entered or remained in the "restricted" area. To the contrary, the evidence showed Mr. Griffin saying "yeah, he certified it," 45 minutes before he entered the West Lawn (DX16), and the district court found that "[e]n route to the Capitol, they heard that Vice President Pence had already certified the election" (Appx:528) and that, indeed, "defendant thought the electoral certification had already occurred prior to his entering the restricted area" (Appx:538).

The government did not dispute the district court's findings on this point but, in connection with its disorderly conduct argument, "disagree[d] with the suggestion that he believed that the vice president was no longer at the Capitol building or had left already or something of that nature." (Appx:487). When the prosecutor argued that "there's no reason to believe that he thought that the vice president had already

[left]," the court asked, "Aren't you putting the burden a little bit on the wrong side there?" (Appx:486). Indeed, the government may have declined to concede that Mr. Griffin thought Vice President Pence was *not* at the Capitol, but the government certainly failed to present any basis on which a rational factfinder could draw an inference beyond a reasonable doubt that Mr. Griffin thought the vice president *was* at the Capitol. This failure independently establishes the insufficiency of the evidence and requires the reversal of Mr. Griffin's conviction and the barring of any retrial.

* * *

Finally, even if this Court were to conclude that the government presented sufficient evidence for a hypothetical factfinder to conclude that Mr. Griffin entered a "restricted building or grounds" and knew he had entered a "restricted building or grounds," given the district court's legal errors in interpreting those elements, a remand is required for the district court to weigh that evidence and determine whether those elements were, in its view as the *actual factfinder*, established beyond a reasonable doubt.

68

## CONCLUSION

For the foregoing reasons, this Court must reverse the denial of

Mr. Griffin's motion for judgment of acquittal and vacate his conviction.

At a minimum, the conviction must be reversed and the case remanded

for the district court to make a finding on the "restricted building or

grounds" requirement and on the knowingly requirement as those

elements are properly construed.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
LISA B. WRIGHT
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, DC 20004
(202) 208-7500

## CERTIFICATE OF LENGTH

I hereby certify, pursuant to Federal Rule of Appellate Procedure 32(a), that the foregoing Opening Brief for Appellant was prepared in a proportionately spaced 14-point serif font, and contains 12,712 words.


_____/s/_____
LISA B. WRIGHT
Assistant Federal Public Defender

# Addendum

# ADDENDUM

18 U.S.C. § 1752 .................................................................................. 1

21 U.S.C. § 802(6) ............................................................................... 3

21 U.S.C. § 841(a) ............................................................................... 4

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 84. Presidential and Presidential Staff Assassination, Kidnapping and Assault

18 U.S.C.A. § 1752

§ 1752. Restricted building or grounds

Effective: October 5, 2018

Currentness

**(a)** Whoever--

**(1)** knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

**(2)** knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

**(3)** knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or [1]

**(4)** knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; [2]

**(5)** knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

**(b)** The punishment for a violation of subsection (a) is--

**(1)** a fine under this title or imprisonment for not more than 10 years, or both, if--

**(A)** the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

**(B)** the offense results in significant bodily injury as defined by section 2118(e)(3); and

**(2)** a fine under this title or imprisonment for not more than one year, or both, in any other case.

**(c)** In this section--

   **(1)** the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--

      **(A)** of the White House or its grounds, or the Vice President's official residence or its grounds;

      **(B)** of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

      **(C)** of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

   **(2)** the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

### CREDIT(S)

   (Added Pub.L. 91-644, Title V, § 18, Jan. 2, 1971, 84 Stat. 1891; amended Pub.L. 97-308, § 1, Oct. 14, 1982, 96 Stat. 1451; Pub.L. 98-587, § 3(b), Oct. 30, 1984, 98 Stat. 3112; Pub.L. 103-322, Title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 109-177, Title VI, § 602(a), (b)(1), Mar. 9, 2006, 120 Stat. 252; Pub.L. 112-98, § 2, Mar. 8, 2012, 126 Stat. 263; Pub.L. 115-254, Div. B, Title III, § 381, Oct. 5, 2018, 132 Stat. 3320.)

### Footnotes

1      So in original. The word "or" probably should not appear.

2      So in original. Probably should be followed by "or".

18 U.S.C.A. § 1752, 18 USCA § 1752
Current through P.L. 118-3. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2

| United States Code Annotated |
| Title 21. Food and Drugs (Refs & Annos) |
| Chapter 13. Drug Abuse Prevention and Control (Refs & Annos) |
| Subchapter I. Control and Enforcement |
| Part A. Introductory Provisions (Refs & Annos) |

21 U.S.C.A. § 802

§ 802. Definitions

Effective: December 2, 2022
Currentness

As used in this subchapter:

**(1)** The term "addict" means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

**(2)** The term "administer" refers to the direct application of a controlled substance to the body of a patient or research subject by--

**(A)** a practitioner (or, in his presence, by his authorized agent), or

**(B)** the patient or research subject at the direction and in the presence of the practitioner,

whether such application be by injection, inhalation, ingestion, or any other means.

**(3)** The term "agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor, or dispenser; except that such term does not include a common or contract carrier, public warehouseman, or employee of the carrier or warehouseman, when acting in the usual and lawful course of the carrier's or warehouseman's business.

**(4)** The term "Drug Enforcement Administration" means the Drug Enforcement Administration in the Department of Justice.

**(5)** The term "control" means to add a drug or other substance, or immediate precursor, to a schedule under part B of this subchapter, whether by transfer from another schedule or otherwise.

**(6)** The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986.

United States Code Annotated
   Title 21. Food and Drugs (Refs & Annos)
     Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
       Subchapter I. Control and Enforcement
        Part D. Offenses and Penalties

21 U.S.C.A. § 841

§ 841. Prohibited acts A

Effective: December 2, 2022
Currentness

**(a) Unlawful acts**

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally--

**(1)** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

**(2)** to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

**(b) Penalties**

Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

**(1)(A)** In the case of a violation of subsection (a) of this section involving--

**(i)** 1 kilogram or more of a mixture or substance containing a detectable amount of heroin;

**(ii)** 5 kilograms or more of a mixture or substance containing a detectable amount of--

**(I)** coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

**(II)** cocaine, its salts, optical and geometric isomers, and salts of isomers;

**(III)** ecgonine, its derivatives, their salts, isomers, and salts of isomers; or