ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————

No. 22-3042
———————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

COUY GRIFFIN,                                 Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
———————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
JANANI IYENGAR
KIMBERLY L. PASCHALL
* DANIEL J. LENERZ
DC Bar #888283905
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street NW, Room 6.232
Washington, D.C. 20530
Daniel.Lenerz@usdoj.gov
(202) 252-6829

Cr. No. 21-92 (TNM)

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

### Parties and Amici

The parties to this appeal are appellant Couy Griffin and appellee the United States of America. There are no amici.

### Rulings Under Review

This is an appeal from a judgment entered by the Honorable Trevor N. McFadden following Griffin's conviction for unlawfully entering or remaining in a restricted building or grounds. Griffin argues that the evidence was insufficient to support his conviction.

### Related Cases

The government is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations other than those attached hereto are contained in the Addendum to the Brief for Appellant.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

COUNTERSTATEMENT OF THE CASE ........................................... 3

The Trial ............................................................................... 4

The Government's Evidence ...................................................... 4

1.  The Restricted Area ..................................................... 4

2.  Griffin's Conduct ........................................................ 6

The District Court's Findings ...................................................... 11

SUMMARY OF ARGUMENT ...................................................... 15

ARGUMENT ........................................................................... 18

I.  There Was Sufficient Evidence to Establish that Griffin Entered or Remained in "Any Restricted Building or Grounds" ....................................................................... 18

A.  Standard of Review ........................................................ 20

B.  The Statute .................................................................. 21

C.  Argument ..................................................................... 24

1.  There is no legal support for Griffin's argument that the unlawful actions of a riotous mob can de-restrict an area .......................................................... 25

2.  An area may be "otherwise restricted" without "clear onsite public notice." ......................................... 28

3.  The relevant area was "otherwise restricted" even under Griffin's definition. ............................................. 38

II.  There Was Sufficient Evidence to Establish that Griffin Knowingly Entered or Remained In Any Restricted Building or Grounds. ................................................................ 40

A. Section 1752(a)(1) Does Not Require A Defendant to Know Why an Area Is Restricted. ......................................41

B. The Evidence Was Sufficient Even Under Griffin's Proposed Standard...............................................................50

    1. Griffin knew he was in a restricted area....................51

    2. Griffin knew why the area was restricted..................57

CONCLUSION ........................................................................61

# TABLE OF AUTHORITIES*

**Cases**

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008)..................................34

*Biological Diversity v. EPA*, 722 F.3d 401 (D.C. Cir. 2013) ...................38

*Bryan v. United States*, 524 U.S. 184 (1998) ..........................................42

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ......................33

\* *Flores-Figueroa v. United States*, 556 U.S. 646 (2009)....................42, 44

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ...............................29

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010) .......29, 34

*McCulloch v. Maryland*, 17 U.S. 316 (1819)...........................................27

*McDonnell v. United States*, 579 U.S. 550 (2016)..............................34, 35

*McFadden v. United States*, 576 U.S. 186 (2015) ..............................46, 47

*NLRB Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191 (D.C. Cir. 1987)...28

*Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013) ............................49, 50

*Perrin v. United States*, 444 U.S. 37 (1979)............................................30

\* *Rehaif v. United States*, 139 S. Ct. 2191 (2019)...................41, 42, 46, 47

*Ruan v. United States*, 142 S. Ct. 2370 (2022) .......................................48

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*Simmons v. Elizabeth City*, 149 S.E. 375 (N.C. 1929) ............................ 27

*United States v. Abukhatallah*, 41 F.4th 608 (D.C. Cir. 2022) .............. 60

*United States v. Andries*, Cr. No. 21-93 (RC),
2022 WL 768684 (D.D.C. Mar. 14, 2022) ........................................... 26

*United States v. Borda*, 848 F.3d 1044 (D.C. Cir. 2017) ............ 20, 21, 50

*United States v. Branham*, 97 F.3d 835 (6th Cir. 1996) ........................ 21

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) ......................... 39

*United States v. Burwell*, 690 F.3d 500 (D.C. Cir. 2012) (en banc) ........ 47

*United States v. Catellanos*, 731 F.2d 979 (D.C. 1984) .................... 20, 60

*United States v. Cope*, 676 F.3d 1219 (10th Cir. 2012) .......................... 52

\* *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023) ....... 29, 30, 33, 34

*United States v. Gentry*, 555 F.3d 659 (8th Cir. 2009) .......................... 20

*United States v. Grace*, 461 U.S. 171 (1983) ........................................ 57

*United States v. Griffin*, 549 F. Supp. 3d 49
(D.D.C. 2021) ............................................................ 26, 27, 44, 45, 49

*United States v. Hillie*, 14 F.4th 677 (D.C. Cir. 2021) ........................... 60

*United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012) ................. 55

*United States v. Morgan*, 45 F.4th 192 (D.C. Cir. 2022) .................. 44, 47

*United States v. Shi*, 991 F.3d 198 (D.C. Cir. 2021) .............................. 56

*United States v. Thomas*, 864 F.2d 188 (D.C. Cir. 1988) ........... 20, 52, 55

*United States v. Washington*, 12 F.3d 1128 (D.C. Cir. 1994) ................21

*United States v. Williams*, 553 U.S. 285 (2008)......................................33

*United States v. Williams*, 836 F.3d 1 (D.C. Cir. 2016).........................54

*Watts v. United States*, 394 U.S. 705 (1969) ..........................................28

*Wood v. Moss*, 572 U.S. 744 (2014) ..................................................28, 44

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ................................................27

**Other Referenes**

18 U.S.C. § 1752 ........................................................ 32, 33, 36, 38, 39, 47

18 U.S.C. § 1752(a)(1).... 3, 16, 18, 19, 22, 23, 30, 36, 40-42, 45, 47, 49, 60

18 U.S.C. § 1752(a)(2)............................................................................3

18 U.S.C. § 1752(b)(1)(2). .................................................................23

18 U.S.C. § 1752(b)(2)........................................................................23

18 U.S.C. § 1752(c)(1) ............................................................ 15, 28, 42

18 U.S.C. § 1752(c)(1)(A) .................................................................46

18 U.S.C. § 1752(c)(1)(B) ........................................................ 26, 46, 48

18 U.S.C. § 1752(c)(1)(C) .................................................................46

18 U.S.C. § 3056(a)(3)........................................................................44

18 U.S.C. § 3056(a)(6)........................................................................44

21 U.S.C. § 802(6)...............................................................................46

21 U.S.C. § 841(a)(1)...........................................................................46

3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c)
   (3d ed. 2022)......................................................................................43

Federal Restricted Buildings and Grounds Improvement
   Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012) ........................22

H.R. Rep. No. 112-9...............................................................................45

Omnibus Crime Control Act of 1970, Pub. L. No. 91-644,
  84 Stat. 1880 (1971) ................................................................. 21

USA PATRIOT Improvement and Reauthorization Act of 2005,
  Pub. L. No. 109-177, 120 Stat. 192 (2006) ........................... 22

S. Rep. 91-1249 (1970) ................................................................. 21

S. Rep. 91-1252 (1970) ......................................... 21, 31, 32, 36

Webster's Third New International Dictionary 506 (1976) ................... 39

# ISSUES PRESENTED

I.    Whether there was sufficient evidence that Griffin entered and remained in "any restricted building or grounds" where Griffin entered an area of the Capitol grounds that had been surrounded by bicycle racks, snow fencing and preexisting permanent walls, manned in places by law enforcement, and labeled with signs indicating that the area was closed, and where these physical indicia of the restricted area were unlawfully moved and destroyed, but not removed entirely, by a riotous mob.

II.    Whether there was sufficient evidence that Griffin knowingly entered and remained in a restricted area where Griffin entered an area of the Capitol grounds that he had seen fenced off the day before and then climbed onto the inaugural stage by, among other things, walking over that same fencing, using a bike rack as a ladder, and entering a previously locked door, and where Griffin knew the Vice President was present at the Capitol on January 6.

# Glossary

A.            Appendix for Appellant

Br.           Brief for Appellant

Exh.          Government Exhibit

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 22-3042

————————————

UNITED STATES OF AMERICA,                      Appellee,

v.

COUY GRIFFIN,                                  Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

BRIEF FOR APPELLEE

————————————

## INTRODUCTION

In advance of Congress's January 6, 2021, certification of the Electoral College vote, the United States Capitol Police restricted an area around the Capitol and part of its grounds. Consisting of bicycle racks, snow fencing and preexisting permanent walls, manned in places by law enforcement, and labeled with signs indicating that the area was closed, a restricted perimeter was in place before the first rioters arrived at the Capitol on January 6.

Appellant Couy Griffin was part of the mob that stormed the Capitol that day. He climbed over a stone wall that marked part of the restricted perimeter, walked on a downed snow fence immediately behind the wall, and eventually made his way onto the inaugural stage that had been built on the Capitol's west side, climbing other walls, walking over more downed fencing, and entering a previously locked doorway along the way. The day before, Griffin had visited the Capitol, where the restricted perimeter was plainly visible. In the days after the riot, Griffin stated that although there "there was some fencing up" at the Capitol on January 6, "[p]retty soon, that crowd just pushed through," and he extolled the "patriots" who ignored the "D.C. police" who said, "[Y]ou can't step over this."

Griffin argues that this evidence was insufficient to establish that he knowingly entered or remained in "any restricted building or grounds" because, by the time he arrived, other rioters had breached and damaged much of the restricted perimeter, thereby rendering the Capitol grounds no longer restricted. In other words, in Griffin's view, only those rioters who themselves moved the bike racks, tore down the snow fencing, or destroyed the area-closed signs can be prosecuted under 18 U.S.C.

2

§ 1752(a)(1)—and maybe not even them. According to Griffin, any rioter who subsequently entered the already-breached perimeter is innocent even if he knew that he had entered a restricted area without lawful authority.

This argument is meritless. There is no basis in logic or law for Griffin's assertion that a restricted area becomes unrestricted simply because a mob has unlawfully moved or destroyed the physical indicators marking the restricted perimeter. Nor is there any merit to Griffin's argument that the evidence was insufficient to establish that he knew he was in a restricted area on January 6. Griffin saw the restricted perimeter in place on January 5, and he went onto the inaugural platform, which common sense dictates is off limits to the public. Griffin's conviction under § 1752(a)(1) should thus be affirmed.

## COUNTERSTATEMENT OF THE CASE

On March 7, 2022, Griffin was charged by information with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), and disorderly and disruptive conduct in a restricted building or grounds, in violation of § 1752(a)(2) (Appendix for Appellant (A.) 110-11). Following a March 21-22, 2022, bench trial, the

Honorable Trevor N. McFadden found Griffin guilty of the first charge and acquitted him of the second (A.530). On June 17, Judge McFadden sentenced Griffin to 14 days in prison followed by one year of supervised release and ordered him to pay a $3,000 fine and $500 in restitution (A.195-201). Griffin timely appealed (A.202).

## The Trial

### *The Government's Evidence*

### 1.     The Restricted Area

Before Congress's January 6, 2021, certification of the Electoral College vote, the Capitol Police restricted an area around the Capitol and a portion of its grounds. They did so by erecting a barrier consisting of metal bike racks, plastic snow fencing, and preexisting walls (A.341-43; A.168 (Government Exhibit (Exh.) 2)). One such wall was the Olmstead Wall, which is "on the north end of the Capitol west front, border[ing] the sidewalk and 1st Street near Peace Circle" (A.367; see A.352-53; Exh. 73 at 0:10–0:25 (showing location of 1st Street and Peace Circle)). Parts of the barrier were labeled with "area closed" signs and manned by law enforcement (A.344-45, 352, 354; A.169-70 (Exhs. 4-5); Exh. 73 at 0:10–0:25, 1:45–2:15). The barrier was erected because of the "demonstration

4

that was planned further down the Mall . . . to keep people outside of the grounds, to stop them from coming around inside the area" (A.376).

Although that barrier marked the restricted area's external boundary, there were numerous additional barriers—both temporary and permanent—within it. For example, there was a layer of snow fencing immediately behind the Olmstead Wall (see A.169 (showing snow fence at bottom of photograph); Exh. 33-1 at 1:05 (showing trampled snow fence); A.368-69). There was additional snow fencing midway up the Capitol's west lawn marked with "area closed" signs (A.343-44, 354, 361; A.169-70 (Exhs. 3-4); Exh. 73 at 1:19; Exh. 74 at 0:01). That second layer of snow fencing was erected to protect the inaugural stand on the Capitol's west front (A.340-41, 375). The inaugural stand was also protected by the Lower West Terrace wall and additional bike racks (A.362; see Exh. 74 at 25:45–29:00 (showing members of the mob breaking through the snow fence, climbing the wall, and pushing through bike racks manned by law enforcement)). And the interior of the Capitol building was closed to the public and patrolled by the Capitol Police (A.337-38, 379).

## 2.    Griffin's Conduct

Couy Griffin was the founder of "Cowboys for Trump" and a County Commissioner in Otero County, New Mexico (A.249; A.178 (Exh. 101); Exh. 78). Matt Struck, a video editor who lives in Colorado, met Griffin in 2019 and began taking videos for Cowboys for Trump (A.249-50).

Griffin and Struck traveled together to Washington, D.C., arriving on January 5, 2021 (A.250-51). Sometime that day, they drove to the Capitol in a car emblazoned with a Cowboys for Trump logo (A.266-67; Exh. 63). Standing on the portion of Pennsylvania Avenue leading to Peace Circle, with the Capitol and the inaugural stage in the background, Griffin filmed a video in which he said, among other things, that "everybody that I spoke to today has Mike Pence in their prayers. We're praying for you Mike. We trust that you will do the right thing." (Exh. 63 at 1:00–1:10.) Griffin continued: "we have everything to lose, and nothing to gain, by allowing our elections to be fraudulent and for Joe Biden, God forbid, to ever become anything that remotely resembles the President of the United States" (*id.* at 1:19–1:37).

The next day, January 6, Griffin and Struck attended then-President Donald Trump's rally at the Ellipse (A.285-87, 435-46). They

left the rally and walked toward the Capitol, with Struck filming at times along the way (A.253, 266, 287-88). As they were walking, they heard people chanting "decertify" (A.288; Exh. 18-1 at 0:03–1:40). Griffin was also part of a conversation in which he responded, "Yeah, he certified it," when others said, "Some people said Pence . . . would certify this election . . . Arizona" (A.191).

Griffin and Struck arrived at the east side of the Capitol reflecting pool, near the Ulysses S. Grant Memorial, at approximately 2:00 p.m. (A.303-04; Exh. 25-1). There, they saw a man standing on the Grant statue and shouting, "Storm the Capitol" (A.304-05; Exh. 26-1). By that time, rioters had pushed through the bike racks and snow fencing blocking the entrance to the walkway between Peace Circle and the Capitol, causing the officers there to run for safety (A.171 (Exh. 5); Exh. 73 at 0:20–0:38). Rioters had also trampled and knocked down most of the snow fence on the Capitol's west lawn, climbed over the Lower West Terrace wall, and pushed past the bike racks and police officers protecting the terrace, flooding that area (A.361-62; Exh. 74 at 25:20–30:30). A video that Struck took at 2:12 p.m. showed the mob filling much of the Capitol's west lawn up to the inaugural stage (Exh. 30-1).

Griffin entered the restricted area approximately 15 minutes later (A.258; Exh. 33-1). He did so by stepping on a bicycle and using it to climb over the Olmstead Wall (A.367; Exh. 33-1 at 0:53–1:04). People in the crowd could be heard saying, "It's the only way in" (Exh. 33-1 at 0:18–0:22). When Griffin landed on the other side, he walked on top of the snow fence that had been erected to help secure the restricted area (A.368-69; Exh. 33-1 at 1:04–2:02). The fence was on the ground, along with torn-up pieces of "area closed" signs (A.368-69).

From there, Griffin made his way onto the inaugural stage (Exh. 57-1). On his way to the stage, Griffin walked over more downed snow fencing and used a bike rack as a ladder to climb the Lower West Terrace wall (A.258, 369-71; Exh. 37-1 at 0:35–1:20). He then used a plywood ramp to scale a wooden wall protecting the inaugural stage (Exh. 37-1 at 6:00–6:23). Griffin stopped to watch as rioters climbed onto the stage, asking, "Should we try to make it up to the next tier?" (Exh. 39-1 at 0:03–0:07.) Griffin continued, "I'm not saying I couldn't climb up there. I just don't know if I want to put forth the energy. . . . We'll wait till they get this door broken down." (A.282-83; Exh. 40-1 at 0:15–0:22.) Griffin then climbed to the stage via an emergency exit stairwell (A.371; Exhs. 42-1,

8

43-1). As he did so, he covered his mouth and nose with his jacket and exclaimed, "I love the smell of napalm in the air" (A.259-60; Exh. 43-1 at 0:30–0:37). During the riot, law enforcement used chemical irritants to try to disperse the crowd (A.350-51, 363-64, 369). Griffin walked onto the inaugural stage a little before 3:00 p.m. and remained on or near it until at least 4:48 p.m. (Exh. 43-1 at 0:56; Exh. 62-1). While he was there, rioters were attempting to breach the Capitol building through the Lower West Terrace tunnel door, which led directly to the stage (A.359; Exh. 73 at 17:52–18:15, 18:58–19:46). Police began clearing the inaugural stage of rioters shortly after 5:00 p.m., using chemical irritants and flash grenades to disperse the crowd (A.350-51; Exh. 74 at 4:33:00–4:40:00).

The day after the attack on the Capitol, Struck filmed a video of Griffin in Roanoke, Virginia (A.255, 260-61, 295; Exh. 64). In it, Griffin called the attack "the most historic and amazing thing that I have ever seen" (Exh. 64 at 1:15–1:20). Griffin said, "we walked down to the Capitol, and about three-quarters of the way down there, we get the news . . . that Mike Pence had sold us all out. And our elections were certified and we were done." (*Id.* at 3:15–3:30.) "And then we get down to the Capitol and

they have all the inauguration set up for Joe Biden on the back side of the Capitol. And they had it just roped off." (*Id.* at 3:33–3:42.)

According to Griffin, "[O]f course you're gonna have those patriots who get in there and went over the — when the D.C. police tells 'em you can't step over this because this is — we're getting it ready for Joe Biden. What do you think was gonna happen?" (Exh. 64 at 3:42–3:53.) "So a few spilled over, and then a few more spilled over, and then pretty soon it was just like a huge amazing Trump rally, on the exact place — I sat two feet from where Joe Biden, or whoever, will be inaugurated in as President." (*Id.* at 3:53–4:10.) Griffin declared, "I didn't break anything. I didn't assault anybody. . . . I just walked up to the top of the Capitol. It was a beautiful day." (*Id.* at 4:10–4:21.)

The following week, Griffin spoke at a meeting of the Otero County Commission (A.178; Exh. 78). Griffin said, among other things, that on January 6 he "wasn't even going down to the Capitol. I knew that there were a lot of people that were going, but it was with the news that Mike Pence had just certified the election." (Exh. 78 at 1:56–2:05.) Griffin thought, "[L]et's not leave too early. . . [L]et's go ahead and we'll just see what they're doing. So, we walked down to the Capitol[.]" (*Id.* at 2:11–

2:17.) When the crowd "got down to the . . . inaugural side, there was some fencing up. And . . . they were saying . . . that you couldn't go any further because this was being reserved for Joe Biden and his inauguration. Well, you tell a million Trump supporters that . . . . Pretty soon, that crowd just pushed through." (*Id.* at 2:42–3:02.) Green "wasn't anywhere in the front of it," he "was in the back" (*id.* at 3:02–3:05). Presumably referring to the Lower West Terrace tunnel, Griffin said, "the side of that Capitol that I was on, you couldn't have got through there with a D6 [bulldozer]. . . . [T]hey had barricades through that little hole that was on that inaugural side. They had barricades and officers . . . . I didn't see anybody go in and . . . not get spit back out with mace and lumps on their head." (*Id.* at 6:46–7:10.)

### The District Court's Findings

In finding Griffin guilty of entering and remaining in a restricted building or grounds, the court concluded that the restricted area was "identified in [Government] Exhibit 2" (A.528; *see* A.168 (Exh. 2)). "The Olmstead [W]all along the First Street served as part of this restricted area" (A.528). The wall "is about a 5-foot stone wall that separates the sidewalk from the west front lawn" (*id.*). The snow fences within the

restricted area "were established as additional, subsequent barriers" (A.532).

Griffin arrived in D.C. on January 5 and made a speech in front of the Capitol's west side (A.527). At that time, "the various barriers on the west front of the lawn were clearly visible, including snow fencing with signs saying that the area was closed" (A.527-28). It was "likely that Mr. Griffin saw those barriers" (A.528).

The next day, Griffin attended President Trump's rally and then began walking toward the Capitol (A.528). En route, he "heard that Vice President Pence had already certified the election" (*id.*). Griffin approached the Capitol's west front, "passing the Grant statue and the Peace Monument on First Street" (*id.*). At around 2:31 p.m., Griffin "entered the restricted area by climbing over the Olmstead [W]all" (*id.*). At that point, "there were no[ ] signs indicating it was restricted . . . and there were numerous other people climbing the wall and thousands of people inside" (A.528-29).

Griffin walked toward the Capitol, "climbing at least two other small walls, and walking over the snow fencing which had either been trampled or removed by numerous protestors who had preceded him into

the area" (A.529). Griffin then went "up a narrow staircase into the inauguration stage which had been erected on the west front of the Capitol. The staircase had a door. The door had been closed. And he or someone near him said, 'We'll wait until they get this door broken down.'" (*Id.*) In that area, "[t]here was OC spray or pepper spray . . . from officers trying to clear the protestors," which "Griffin was clearly aware of" (*id.*). Ultimately, Griffin "remained in the restricted area for some time": he was "on the terrace or inauguration stage as late as 4:48 p.m." (*id.*).

On January 7, Griffin made a video "in which he admitted that the area was roped off for the inauguration and that police indicated people couldn't enter the area" (A.529-30). The next week, Griffin "spoke at a special meeting of the Otero County Commissioners where he talked about fencing being up because the site was 'being reserved for Joe Biden and his inauguration. Well, you tell a million Trump supporters that that are going down there, pretty soon that crowd pushed through.'" (A.530.)

The court found "ample evidence that Mr. Griffin knowingly entered or remained within the restricted area" (A.536). First, Griffin "saw the west front on January 5 complete with multiple rings of snow fencing with signage. When he crossed the west front lawn on January 6,

he would have seen this fencing trampled underfoot." (*Id.*) Second, "he crossed over three different walls, including the Olmstead [W]all. Each of these were tall enough that he needed help from others or to rely upon a jerry-rigged ladder or ramp to get over them." (*Id.*) This "would suggest to a normal person that perhaps you should not be entering the area" (*id.*). Third, Griffin "climbed an emergency exit staircase onto a wooden inauguration stage that had a closed door. Either he or someone close to him said that the door had to be busted open." (*Id.*) Fourth, Griffin "smelled OC spray in the area of the terrace where police had been trying to clear people" (*id.*). And fifth, Griffin "made two statements in the days afterwards admitting that the area had been cordoned off and that police were telling people to stay away" (A.536-37). Although there was "a fair argument" that Griffin was not himself "told by the police to stay away," his "statements corroborate the government's argument that he knew he was in an area he was not allowed to be in" (A.537).

Taken together, the court concluded, these factors established Griffin's guilt (A.537). Even if it was "not clear" that Griffin "knew he was entering a restricted area when he initially climbed over the Olmstead

14

[W]all," by the time Griffin "was on the [inaugural] stage, he certainly knew he shouldn't be there. And yet, he remained." (*Id.*)

## SUMMARY OF ARGUMENT

There is no serious dispute that the Capitol and part of its grounds were restricted, as that term is defined in § 1752, when the mob first arrived on January 6. The Capitol Police had built a restricted perimeter consisting of bike racks, snow fencing, and preexisting permanent walls. The perimeter was manned in places by law enforcement officers and marked at points with "area closed" closed signs. Within the restricted perimeter there were numerous other layers of fences and walls and additional law enforcement officers and area closed signs. This was sufficient to satisfy any possible interpretation of "any posted, cordoned off, or otherwise restricted area[.]" § 1752(c)(1).

Griffin's argument that, by the time he entered the Capitol's west front lawn, the area had become unrestricted due solely to the mob's attack is meritless for three independent reasons. Nothing in § 1752 suggests that a properly restricted area may become unrestricted through the unlawful actions of individuals different from those who restricted the area in the first place. Even if that were theoretically

15

possible, § 1752's text, structure, and history refute Griffin's argument that, to be restricted, a building or grounds must have "some type of clear on-site public notice setting off the restricted space" (Brief for Appellant (Br.) at 40). And, in any event, sufficient public notice existed at the time Griffin entered and remained in the restricted area: the preexisting walls, various layers of trampled snow fencing, and locked door provided ample notice that the space was restricted. Griffin's sufficiency challenge thus must be rejected.

There was also sufficient evidence to establish that Griffin entered and remained in the restricted area knowingly. The district court correctly concluded that a defendant need not know that a Secret Service protectee is present to act knowingly. Such a requirement cannot be squared with Congress's intent in enacting § 1752(a)(1), and nothing in the statute's text demands that its "knowingly" requirement extend to the reasons why an area may be "posted, cordoned off, or otherwise restricted." Like typical trespassing statutes, a defendant's knowledge that he is in a restricted area and lacks lawful authority to be there is sufficient to prove a violation of § 1752(a)(1).

16

Even if that were not the case, there was ample evidence that Griffin knowingly entered and remained in a restricted area. Griffin visited the Capitol on January 5 and saw the multiple layers of fencing on the west front lawn, fencing he walked on the next day. Griffin climbed three different walls, using a bicycle, a bike rack, and a piece of plywood to get over them. Griffin not only went onto the inaugural stage, a place that common sense dictates is off limits, but did so through a door he knew had to be broken open, while smelling the chemical irritants the police were using to try to disperse the rioters. And he admitted knowing that the area had been fenced off and police had told the rioters to stay away, but that the mob entered the area regardless. Taken together, these facts easily established Griffin's knowledge that the area he entered was restricted.

There was also sufficient evidence to establish Griffin's knowledge that the Vice President was present within the restricted area. Griffin's January 5 statements about praying for the Vice President to "do the right thing" show that he knew the Vice President would be present at the Capitol on January 6. And there was no evidence that Griffin believed the Vice President had left the Capitol before Griffin entered the

restricted area. To the contrary, rioters could be heard chanting "traitors" and shouting things such as "Pence, you'd better get your shit together Pence. You'd better get your shit together," and "come out Mike Pence, we'd love to see you, come out Mike Pence." And Griffin told another rioter, "[T]hey're lucky we're not armed." Indeed, Griffin ultimately spent more than two hours inside the restricted area while watching the police forcibly repel rioters who attempted to enter the Capitol. Viewing this evidence and drawing all reasonable inferences in the government's favor, a rational factfinder could have concluded that, while inside the restricted area, Griffin believed the Vice President was at the Capitol.

## ARGUMENT

### I. There Was Sufficient Evidence to Establish that Griffin Entered or Remained in "Any Restricted Building or Grounds."

The statute that Griffin was convicted of violating, 18 U.S.C. § 1752(a)(1), makes it a crime to "knowingly enter[ ] or remain[ ] in any restricted building or grounds without lawful authority to do so[.]" This is the most common charge brought against the participants in the January 6 attack on the Capitol. *See* 30 Months Since the Jan. 6 Attack on the Capitol, https://www.justice.gov/usao-dc/30-months-jan-6-attack-

capitol (approximately 935 out of 1,069 defendants charged under § 1752(a)(1) as of July 6, 2023).

Griffin does not seriously dispute that the Capitol Building and grounds were restricted, as that term is defined in § 1752, when the mob arrived on January 6. Instead, he argues that, by the time he entered the west front lawn, the area had become unrestricted due solely to the mob's attack. This argument is meritless. Nothing in § 1752 suggests that a properly restricted area may become unrestricted through the unlawful actions of individuals different from those who restricted the area in the first place. Even if that were theoretically possible, § 1752's text, structure, and history refute Griffin's argument that, to be restricted, a building or grounds must have "some type of clear on-site public notice setting off the restricted space" (Brief for Appellant (Br.) at 40). And, in any event, sufficient public notice existed at the time Griffin entered the restricted area: the preexisting walls, various layers of trampled snow fencing, and locked door provided ample notice that the space was restricted.

## A.    Standard of Review

Griffin challenges the sufficiency of the evidence that the area he entered and then remained in on January 6 was a "restricted building or grounds" for purposes of § 1752(a)(1). Insofar as this argument "hinges on the interpretation of [the] statute," this Court's review is de novo. *United States v. Gentry*, 555 F.3d 659, 664 (8th Cir. 2009). In separately assessing whether there were sufficient facts to meet the correct statutory definition, this Court "must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational juror could have found the elements of the crime beyond a reasonable doubt." *United States v. Borda*, 848 F.3d 1044, 1053 (D.C. Cir. 2017); *see generally United States v. Catellanos*, 731 F.2d 979, 984 (D.C. 1984) ("The governing standard for reviewing the sufficiency of the evidence in non-jury cases is the same as that applied in jury cases"). The Court's review "allow[s] the government the benefit of all reasonable inferences that may be drawn from the evidence" and "provid[es] no incentive for the parties to retry the case on appeal." *United States v. Thomas*, 864 F.2d 188, 191 (D.C. Cir. 1988) (quotation marks omitted). A defendant "'faces a high threshold' and bears a 'heavy burden' when seeking to overturn a

20

guilty verdict on this ground." *Borda*, 848 F.3d at 1053 (quoting *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994), and *United States v. Branham*, 97 F.3d 835, 853 (6th Cir. 1996)).

## B.    The Statute

Section 1752 was created by the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891-92 (1971). Enacted as part of a bill meant to address the "disturbingly high levels of assassination and political violence" in America, S. Rep. 91-1249, at 2 (1970), Section 1752 was intended to help "[en]sure that the President is fully protected at all times against the isolated deranged individual . . . [and to] protect the President from organized premeditated attempts on his life." S. Rep. 91-1252, at 6 (1970). Recognizing that "security is of paramount importance when the President is away from the White House," at which point he or she is "most vulnerable," and that it had "become increasingly difficult to maintain the necessary level of security," Congress enacted § 1752. *Id.* at 6-7. The statute made it a crime to, among other things, "willfully and knowingly enter or remain in . . . any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting, in violation of the regulations governing

ingress or egress thereto," 84 Stat. at 1892. The statute delegated to the Secretary of the Treasury authority "to prescribe regulations governing ingress or egress . . . to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." *Id.*

Congress subsequently expanded § 1752's protections so that they applied to any "other person protected by the Secret Service." Pub. L. No. 97-308, 96 Stat. 1451, 1451 (1982). This change was meant to "extend to all persons protected by the United States Secret Service the same 'zone of protection' authority which presently exists for the protection of the President[.]" H.R. Rep. 97-451, at 1 (1982). Congress later eliminated the references to regulations, making it a crime "willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192, 252 (2006).

Most recently, Congress amended § 1752 as part of the Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012). That amendment, which enacted § 1752 in

its present form, was meant "to correct and simplify" the statute. H.R. Rep. No. 112-9, at 1 (2011). It also "clarifie[d] that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." *Id.* at 2. Section 1752 thus no longer requires a defendant to have acted "willfully."

Section 1752(a) makes it a crime to engage in various acts in or near "any restricted area or grounds." Those crimes are misdemeanors unless the offense results in significant bodily injury or the defendant uses or carries a deadly or dangerous weapon or firearm, at which point they become felonies punishable up to 10 years in prison. § 1752(b)(1)-(2). The statute's most basic prohibition, akin to trespassing, prohibits "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so[.]" § 1752(a)(1). The statute defines the term "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]

§ 1752(c)(1).

## C.   Argument

Griffin argues that there was insufficient evidence that he entered a "restricted building or grounds" on January 6 (Br. at 39-47). According to Griffin, "[t]he statute's plain text requires some type of clear on-site public notice setting off the restricted space" (*id.* at 40), which, he argues, did not exist when he entered the Capitol's west front lawn on January 6 because the mob had "destroyed [it] long before 2:31 p.m." (*id.* at 46). This argument lacks merit for three independent reasons. First, nothing in § 1752 suggests that a properly restricted area may become unrestricted through the unlawful actions of individuals different from those who initially restricted the area. Second, § 1752's text, structure, and history refute Griffin's argument that, to be restricted, a building or grounds must have "some type of clear on-site public notice setting off the restricted space." Third, even if that type of notice were required, there was sufficient evidence to establish its existence at the time Griffin entered and remained in the restricted area.

24

1.    **There is no legal support for Griffin's argument that the unlawful actions of a riotous mob can de-restrict an area.**

Here, there is no real dispute that the area on the Capitol's west front that Griffin entered on January 6 was restricted for purposes of § 1752 when the mob first arrived. As discussed above (at 4-5), the Capitol Police had built a restricted perimeter around the Capitol and part of its grounds consisting of bike racks, snow fencing, and preexisting permanent walls. The perimeter was manned in places by law enforcement officers and marked at points with "area closed" closed signs. Within the restricted perimeter there were numerous other layers of bike racks, snow fencing, and permanent walls, and additional law enforcement officers and area closed signs. And the Vice President was at the Capitol on January 6 for the certification of the Electoral College vote (A.418-28). This was sufficient to satisfy any possible interpretation of "any posted, cordoned off, or otherwise restricted area . . . of a building

or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[.]" § 1752(c)(1)(B).[1]

The signs and barriers protecting the Capitol were not removed by the Capitol Police or any other law enforcement agency, but instead were destroyed by the riotous mob that attacked the Capitol on January 6 (see, e.g., A.361-62; A.171 (Exh. 5); Exh. 73 at 0:20–0:38; Exh. 74 at 25:20–30:30). Griffin cites no authority for the proposition that an appropriately restricted area may become unrestricted through the unlawful actions of individuals different from those who restricted the area in the first place.

That lack of authority is unsurprising. Although § 1752 "says nothing about who must do the restricting," the "relevant phrase appears in the passive voice, implying that *someone* must do the physical posting, cordoning off, or restricting." *United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021) (emphasis added); *see also United States v. Andries*, Cr. No. 21-93 (RC), 2022 WL 768684, at *15 (D.D.C. Mar. 14, 2022) ("[Section 1752] does not say who must restrict the area. . . . [T]his open-ended

---

[1] Griffin insists that he "does not concede that such intermittent barriers were sufficient" (Br. at 45 n.12), but he does not explain what more was required or argue that the barriers at the Capitol on January 6 were insufficient.

structure makes policy sense. It extends the law's protection of Secret Service protectees to areas where sufficient physical restrictions may already exist . . . or where partner federal or local authorities are willing to assist with setting restrictions[.]"). And the fact that some person or entity must restrict the area implies that only the same person or entity may de-restrict it. After all, "the power to create implies the power to destroy." *Simmons v. Elizabeth City*, 149 S.E. 375, 376 (N.C. 1929).

Even were that not so, the actions of a riotous mob cannot de-restrict an area. As the Supreme Court famously has explained, "a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve. . . . [W]here this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme." *McCulloch v. Maryland*, 17 U.S. 316, 426 (1819). And allowing an area to become de-restricted through such unlawful actions would be entirely inconsistent with "a statute designed to safeguard the President and other Secret Service protectees[.]" *Griffin*, 549 F. Supp. 3d at 57. *See generally Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) ("[I]f Congress has made its intent in the statute clear, we must give effect to that intent.") (quotation marks omitted); *NLRB Union v.*

*Fed. Lab. Rels. Auth.*, 834 F.2d 191, 198 (D.C. Cir. 1987) ("The principal charge of a court in statutory construction is to ascertain congressional intent."). Indeed, the country has a "'valid, even . . . overwhelming, interest in protecting the safety of its Chief Executive.'" *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quoting *Watts v. United States*, 394 U.S. 705, 707 (1969)). That interest would be undermined entirely if a mob could de-restrict the area surrounding the President by pulling down signs and barriers or otherwise destroying the restricted perimeter. Griffin's sufficiency argument should thus be rejected because the area he entered was properly restricted before he entered it on January 6 and never lawfully lost that status.

### 2. An area may be "otherwise restricted" without "clear onsite public notice."

Griffin's sufficiency challenge also fails for a second reason: to be restricted, a building or grounds does not "require some type of clear on-site public notice setting off the restricted space" (Br. at 40).

Section 1752(c) defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" of various places, including "a building or grounds where the President or other person

28

protected by the Secret Service is or will be temporarily visiting[.]" To determine what Congress meant by "otherwise restricted area," this Court "begin[s] by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, (2010) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)). The court "must enforce plain and unambiguous statutory language according to its terms." *Id.*

The word "restricted" when applied to "an area, building, etc." means "accessible only to certain authorized people." *Restricted (adj.)*, Oxford English Dictionary, *available at* http://www.oed.com. And "otherwise" means "in another way" or "in a different manner." *Otherwise*, Oxford English Dictionary. *See generally United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023) (same). Thus, the plain meaning of § 1752(c) is that it applies to any area of a building or grounds that is posted, cordoned off, or in another way made accessible only to certain authorized people.

It is thus sufficient under § 1752(c) for the individual or entity in charge of a location to declare that location may be entered only by some

people. The location would then be an "otherwise restricted area"—one "made accessible only to certain authorized people" in a different way than signs or a cordon. If Congress had meant to require "clear on-site public notice setting off the restricted space" (Br. at 40), it would have said so directly. Just as a private landowner need not erect a fence or post "no trespassing" signs to declare his land off-limits to visitors, the entity restricting an area under § 1752 need not delineate the restricted area in any particular fashion. A lack of notice may make it difficult, if not impossible, for the government to prove beyond a reasonable doubt that a defendant *knew* that he was in a restricted area and that he lacked lawful authority to be there. *See* § 1752(a)(1) ("making it a crime to "knowingly enter[ ] or remain[ ] in any restricted building or grounds without lawful authority"). But it does not mean that the area is not restricted in the first place. Rather, to be restricted, an area simply must be "accessible only to certain authorized people." This "broad interpretation of the statute — encompassing all forms of [restrictions] — is unambiguous and natural, as confirmed by the 'ordinary, contemporary, common meaning' of the provision's text[.]" *Fischer*, 64 F.4th at 337 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

This understanding of § 1752 is also consistent with the statute's history and Congress's intent in enacting it. Since it initially enacted § 1752, Congress has consistently expanded its protections, first by extending it to Secret Service protectees other than the President, then by eliminating the need for a defendant to violate regulations as an element of the crime, and most recently by eliminating the requirement that a defendant act willfully (see *supra* at 21-24). Congress has thus made clear its intent that § 1752 apply broadly, maximizing the Secret Service's ability to protect the President, Vice President, and others.

A broad reading of "otherwise restricted" is likewise consistent with Congress's intent at the time it originally enacted § 1752. Congress understood that the President is "most vulnerable" and security "of paramount importance" when "the President is away from the White house[.]" S. Rep. 91-1252, at 6. Congress thus sought to provide the Secret Service with authority to create what it later called a "zone of protection," H.R. Rep. 97-451, at 1, that was not dependent on assistance from local law enforcement, a dependence that had made it "increasingly difficult to maintain the necessary level of security," S. Rep. 91-1252, at 6. The Secret Service's authority to "otherwise restrict[]" an area addressed "the

special case of a temporary Presidential visit where flexibility must be maintained," S. Rep. 91-1252, at 2, and where "there w[ould] not be adequate time" for "written public notice," *id.* at 9. Although Congress "anticipated that the Secret Service w[ould], consistent with Presidential security, . . . make such restricted areas known to the public (i.e., by posting or cordoning off)," *id.*, it did not limit § 1752's applicability to that situation or require public notice, when, for example, it would be inconsistent with Presidential security. Instead, Congress allowed for an area to be "otherwise restricted," thus providing the Secret Service with the flexibility necessary to ensure the President's safety.

Applying the correct understanding of § 1752, it is evident that the Capitol and its grounds were "otherwise restricted" on January 6. That day, the Capitol Police had erected a barrier of bike racks, snow fencing, and preexisting walls "to keep people outside of the grounds, to stop them from coming around inside the area" (A.376). As of the morning of January 6, visitors were not allowed to be in the restricted portion of the Capitol grounds (A.339). The fact that members of the mob later moved the bike racks, trampled the snow fencing, and destroyed the "area closed" signs did not somehow render the area no longer "otherwise

restricted"—it remained "accessible only to certain authorized people," as evidenced by law enforcement's subsequent efforts to clear the area of rioters (A.148-49 ("[W]e tried to push people back off the Capitol grounds. . . . We . . . just kept pushing down onto the inaugural stand, and eventually down the stand, through the Lower West Terrace, and then through the grass back to First Street.")). The evidence thus was sufficient to establish that the area Griffin entered when he climbed over the Olmstead Wall was a "restricted building or grounds" for purposes of § 1752.

In arguing that § 1752 "requires some type of clear on-site public notice setting off the restricted space" (Br. at 40), Griffin invokes the "canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). But, as this Court has recently emphasized, "'canons of construction are no more than rules of thumb that help courts determine the meaning of legislation. . . . When the words of a statute are unambiguous . . . th[e] first canon is also the last: judicial inquiry is complete.'" *Fischer*, 64 F.4th at 335 (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). Notably,

33

nowhere in his argument does Griffin discuss the definitions of "otherwise" and "restricted" or address the plain meaning of those terms. As discussed above, their meaning "is clear," and thus the Court "'must enforce [the] plain and unambiguous statutory language according to its terms.'" *Id.* at 335 (quoting *Hardt*, 560 U.S. at 251).

In any event, it is unclear why "clear on-site public notice" should be chosen as the "common attribute [that] connects the specific items in [§ 1752(c).]" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). The meanings of both "posted" and "cordoned off" include the common element of limiting access to certain people: as Griffin recognizes, "posted" means, among other things, "to forbid (property) to trespassers under penalty of legal prosecution," and "cordon off" is a way to ensure that people are "not allowed in" (Br. at 41 (quotation marks omitted)). In a statute designed to safeguard the President and others, Congress presumably was focused on the common attribute of limited access rather than one—public notice—that serves no protective function. *See generally McDonnell v. United States*, 579 U.S. 550, 568 (2016) ("we look to the context in which the words appear"); *Fischer*, 64 F.4th at 346 ("the *noscitur a sociis* or associated-words canon . . . requires some context cues

34

indicating that the statutory text should be limited by its company"). By using the specific terms "posted" and "cordoned off" together with "otherwise restricted," Congress made clear that an area is not "restricted" simply because it has boundaries, because certain actions are not allowed within it, or because a person's movements within it are confined. *See Restricted (adj.)*, Oxford English Dictionary (defining "restricted" to include "[l]imited in extend, numbers, scope, or action; confined" and "not allowed to travel freely; confined to a certain area or areas"). Instead, an area is "otherwise restricted" when it is "accessible only to certain authorized people." *Id.*

Nor would this understanding of "otherwise restricted" render the terms "posted" and "cordoned off" superfluous. *See generally McDonnell*, 579 U.S. at 569 (noting "the presumption that statutory language is not superfluous") (quotation marks omitted). Both of those terms include possible definitions that do not incorporate the aspect of limited access. *See Posted*, Oxford English Dictionary ("To fix notices to (a wall, etc.); to put up notices in or around (a site, area, etc.)."); *Cordon*, Oxford English Dictionary ("To enclose with, or to cut *off* with, a cordon . . . Chicago is fairly cordoned by a great chain of mammoth manufacturing plants."). By

using the terms "posted, cordoned off, or otherwise restricted" in tandem, Congress made clear that § 1752 applies when access to an area is limited to certain people.

In addition to being demanded by the statute's plain text, this understanding is supported by § 1752's mens rea requirement. When it initially enacted § 1752, Congress made entry into or remaining within a restricted area a crime only if a person "willfully and knowingly" did so. *See* 84 Stat. at 1892. The statute still requires a person to act "knowingly." § 1752(a)(1). Thus, the conduct proscribed by § 1752 is not criminal absent some form of notice that access to a building or area is restricted. Congress recognized exactly that when it "anticipated that the Secret Service will make every effort . . . to make such restricted areas known to the public," but did not expressly require public notice and instead "provided that one of the elements of the crime is that the person 'knowingly and willfully' violates the restricted area." S. Rep. No. 91-1252, at 9. If "some type of clear on-site public notice setting off the restricted space" (Br. at 40) is necessary to render an area restricted, it is unclear why Congress would need to limit prosecutions to those who knowingly enter or remain in such an area.

Moreover, Griffin's interpretation would lead to absurd results. It would mean that a mob could de-restrict an area, thus endangering Secret Service protectees in the process—precisely what happened here (A.422 ("[W]e had individuals, unknown individuals who were breaking through a security barrier of a site where we had protectees. So it becomes a security issue[.]")). It would mean that people on the east side of the Capitol could lawfully push past bike racks and police officers (Exh. 73 at 1:45–2:15) simply because people on the west side of the Capitol had previously destroyed part of the "continuous barrier cordoning off entry to the otherwise public Capitol grounds" (Br. at 45). And it would mean that a person could enter an area he *knew* to be off limits simply because the signs indicating that restriction had been removed by someone else. Or—most absurdly—by the person himself: if someone tore down "no trespassing" signs or police tape, the area would no longer "be demarcated in a manner that clearly sets off the specific area that is off-limits" (Br. at 41), and the person could then enter it without fear of criminal prosecution despite knowing the area was restricted and he lacked authority to enter. Section 1752 "should not be construed to

37

produce [such] an absurd result." *Ctr. For Biological Diversity v. EPA*, 722 F.3d 401, 411 (D.C. Cir. 2013) (quotation marks omitted).

### 3. The relevant area was "otherwise restricted" even under Griffin's definition.

Finally, Griffin's sufficiency challenge fails on its own terms. Even if Griffin were correct that § 1752 "requires some type of clear on-site public notice setting off the restricted space" (Br. at 40), that public notice existed at the time he entered and remained in the restricted area.

When Griffin climbed the Olmstead Wall on January 6, that wall was still present and intact. As he did so, someone in the crowd said, "It's the only way in" (Exh. 33-1 at 0:18–0:22). The wall was tall enough that Griffin needed to stand on a bicycle to get over it—which, as the district court found, "would suggest to a normal person that perhaps you should not be entering the area" (A.536). The snow fence that had been erected immediately behind the Olmstead Wall to provide additional visual notice of the restricted area was also still present, albeit on the ground and being trampled by rioters. That fence likewise provided "clear on-site public notice setting off the restricted space" (Br. at 40). Nothing in the statute requires a restricted area to be physically inaccessible or

surrounded by an unbroken barrier: "post[ing]" does nothing to prevent a person from entering an area, and an area may be "cordoned off" by officers "'placed at intervals[.]'" *United States v. Bursey*, 416 F.3d 301, 307 (4th Cir. 2005) (quoting Webster's Third New International Dictionary 506 (1976)). Just as a line drawn on the ground could provide clear notice of a restricted area, a fence lying on the ground does as well.

Notice was also provided by the other walls Griffin climbed—"[e]ach of [which] were tall enough that he needed help from others or to rely upon a jerry-rigged ladder or ramp to get over them"—and the "closed door . . . that had to be busted open" before he climbed onto the inaugural stage (A.536). Even if the outer perimeter of the restricted area was no longer demarcated by "clear on-site public notice" at the time Griffin entered it, nothing in § 1752 prevents smaller areas (such as the Capitol building itself or the inaugural platform) within a perimeter from remaining restricted—just because the White House lawn is open for the Easter Egg Roll does not mean that visitors have free reign to enter the White House itself. The walls Griffin climbed, additional snow fencing he walked over, and locked door he went through provided sufficient, indeed repetitive, notice that the areas beyond were restricted. Viewing the

evidence in the light most favorable to the prosecution, a rational factfinder could have found sufficient evidence of "clear on-site public notice setting off the restricted space" to satisfy even Griffin's interpretation of § 1752's requirements.

## II. There Was Sufficient Evidence to Establish that Griffin Knowingly Entered or Remained In Any Restricted Building or Grounds.

Griffin separately argues that there was insufficient evidence that he "knowingly" entered or remained in "any restricted building or grounds" (Br. at 48-68). This argument is likewise meritless. As the district court correctly concluded, a defendant need not know that a Secret Service protectee is present to act knowingly. Such a requirement cannot be squared with Congress's intent in enacting § 1752(a)(1), and nothing in the statute's text demands that its "knowingly" requirement extend to the reasons why an area is "posted, cordoned off, or otherwise restricted." And even if § 1752(a)(1) requires Griffin to have known that the area he entered and remained in was restricted *and* why it was restricted—because then-Vice President Pence was present—there was sufficient evidence to establish Griffin's knowledge on both fronts.

### A. Section 1752(a)(1) Does Not Require A Defendant to Know Why an Area Is Restricted.

The district court correctly concluded that, under § 1752(a)(1), a defendant need not know why a particular area is restricted. Section 1752(a)(1) makes it a crime to "knowingly enter[ ] or remain[ ] in any restricted building or grounds without lawful authority to do so." There is no dispute that the statute requires that a defendant know both that he was in "any restricted building or grounds" and that he was "without lawful authority" to be there. The question is what it means for a defendant to know that he is in "any restricted building or grounds."

Whether "a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). Courts begin with the presumption "that Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct." *Id.* (quotation marks omitted). Although "as 'a matter of ordinary English grammar,' [courts] normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime,'" *id.* at 2196 (quoting *Flores-Figueroa v.*

41

*United States*, 556 U.S. 646, 650 (2009)), ultimately, "the inquiry into a sentence's meaning is a contextual one." *Flores-Figueroa*, 556 U.S. at 652. Unless "the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998).

Here, the district court correctly concluded that, under § 1752(a)(1), the government does not "have to prove somebody knew that a specific dignitary was there" (A.534). This result can be seen by inserting the definition of "restricted building or grounds" from § 1752(c)(1) into § 1752(a)(1). The statute then applies to "whoever—

> knowingly enters or remains in any [posted, cordoned off, or otherwise restricted area—(A) of the White House or its grounds, or the Vice President's official residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance,] without lawful authority to do so.

§ 1752(a)(1), (c)(1).

Where, as here, "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196. Here, the

facts that constitute the offense, and that criminalize otherwise innocent conduct, are that a defendant knew he was entering a "posted, cordoned off, or otherwise restricted area," and that he knew he lacked authority to do so. In this way, § 1752(a)(1) resembles typical trespassing statutes. *See* 3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) ("[T]he common requirement of criminal trespass offenses is that the actor be aware of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.") (quotation marks omitted).

There are good reasons to believe that Congress did not intend to require a defendant to know *why* a particular area is restricted—for example, because "the President or other person protected by the Secret Service is or will be temporarily visiting" or because it is "so restricted in conjunction with an event designated as a special event of national significance." § 1752(c)(1)(B)-(C). First, like jurisdictional elements, these requirements "have nothing to do with the wrongfulness of the defendant's conduct[.]" *Rehaif*, 139 S. Ct. at 2196. A defendant who enters

43

an area he knows to be restricted while knowing that he lacks authority to be there has engaged in wrongful conduct regardless of whether he knows the area is restricted because, for example, a former First Lady or a "distinguished foreign visitor[ ] to the United States" is present. 18 U.S.C. § 3056(a)(3), (6).

Second, as the district court recognized (A.534), such a requirement would run contrary to Congress's intent in enacting "a statute designed to safeguard the President and other Secret Service protectees[.]" *Griffin*, 549 F. Supp. 3d at 57. If the statute "require[s] the Secret Service to somehow be telling people" a protectee is present (A.534), that would tend to make the person less safe, not more. It would make no sense for Congress to require such a result given the "overwhelming[ ] interest in protecting the safety of [the] Chief Executive." *Wood*, 572 U.S. at 758 (quotation marks omitted). *See generally United States v. Morgan*, 45 F.4th 192, 206 (D.C. Cir. 2022) (explaining that "the ordinary textual understanding of the operation of the word 'knowingly' in criminal statutes . . . is 'a contextual one,' subject to being overcome") (quoting *Flores-Figueroa*, 556 U.S. at 652).

44

Third, requiring that a defendant know the reason an area is restricted is difficult to square with Congress's elimination of the statute's requirement that the defendant act "willfully." That change was meant to "correct and simplify" the statute, and to "clarif[y] that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." H.R. Rep. No. 112-9, at 1-2. When it eliminated the statute's "willfully" requirement, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" from § 1752(a)(1) to a separate definitional provision. *Compare* 18 U.S.C. § 1752(a)(1) (2011) *with* 18 U.S.C. § 1752(a)(1) (2023). Nothing in this statutory amendment suggests that Congress meant to require a defendant to know why an area is posted, cordoned off, or otherwise restricted. To the contrary, by eliminating the statute's requirement that a defendant act willfully and moving the relevant language to a separate statutory section, Congress made clear its intent to lower the bar for prosecutions under § 1752. *See Griffin*, 549

F. Supp. 3d at 56 ("But Congress did lower the mens rea requirement, striking the requirement that a defendant act 'willfully.'").

In arguing that the government must prove a defendant's "knowledge of the existence of one of the facts listed in § 1752(c)(1)(A), (B), or (C), *i.e.*, that a protectee was present" (Br. at 52), Griffin relies entirely on the Supreme Court's decision in *McFadden v. United States*, 576 U.S. 186 (2015). But *McFadden* does not answer the question presented here. There, the Supreme Court held that the statute which "makes it 'unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" requires "a defendant to know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *Id.* at 191-92 (quoting 21 U.S.C. § 841(a)(1)). That was because "controlled substance" is defined "as 'a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V." *Id.* (quoting 21 U.S.C. § 802(6)).

The Supreme Court was thus not faced in *McFadden* with the question presented here, which is "how far into the statute the modifier [knowingly] extends." *Rehaif*, 139 S. Ct. at 2196. Just as a defendant

46

charged with a controlled-substance offense must know that he possessed such a substance, *McFadden*, 576 U.S. at 191-92, a defendant charged under § 1752(a)(1) must know that he entered or remained in "any restricted building or grounds." But whereas the definition of controlled substance is simple, the definition of "restricted building or grounds" is not. Merely because a statute has an express "knowingly" requirement does not answer the question "how far down the sentence the word 'knowingly' travel[s]." *United States v. Burwell*, 690 F.3d 500, 512 (D.C. Cir. 2012) (en banc). The answer to that question is ultimately one of congressional intent. *See, e.g.*, *Rehaif*, 139 S. Ct. at 2195; *Morgan*, 45 F.4th at 205.

The government's argument is not, as Griffin would have it, based on an "attempt[ ] to extract some everyday meaning of 'restricted' from the statutorily-defined term 'restricted building or grounds'" (Br. at 53). Rather, it is based on the statutory definition of "restricted building or grounds." Before the 2012 amendments, § 1752 made it a crime "willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily

47

visiting[.]" § 1752(a)(1) (2011). After those amendments, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" to a different section of the statute. § 1752(c)(1)(B). Under either version, the relevant question is which of the words "'knowingly' modifies[.]" *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022). For the reasons previously discussed, § 1752's text, structure, and context support the conclusion that Congress intended to require that a defendant know he was entering or remaining in a "posted, cordoned off, or otherwise restricted area"—words that immediately follow "knowingly" when the definition of "restricted building or grounds" is inserted—and that he lacked lawful authority to be there, but not to know why the area was restricted.

The flaw in Griffin's interpretation is underscored by his argument that the requisite knowledge may be established when "a defendant who sees Secret Service signage of the type in effect at the homes of former Presidents, telling entrants that they are entering a 'restricted building or grounds'" (Br. at 51). Putting aside the fact that § 1752 applies only to places where Secret Service protectees are or will be temporarily visiting

(thus making such signs more difficult to post), it is unclear how the knowledge Griffin posits differs from a defendant's knowledge that he is entering a posted, cordoned off, or otherwise restricted area. It appears to be Griffin's position that if a defendant is warned he is entering a Restricted Area (proper noun), he can be convicted of violating § 1752(a)(1), but if the defendant is warned that he is entering a restricted area (noun), he cannot. There is no reason why Congress would draw such a nonsensical distinction.

Moreover, requiring "Secret Service signage" or its equivalent could substantially hinder § 1752(a)'s protective purpose. "[W]hile the Secret Service has primary responsibility for guarding its protectees . . . it invariably relies on other law enforcement agencies for support[,]" including "state and local police who assist when protectees travel outside of the District[.]" *Griffin*, 549 F. Supp. 3d at 54. *See, e.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1218 (10th Cir. 2013) ("Whenever the President travels, the Secret Service is in charge of security, and it works with other federal agencies, as well as state and local entities, to design and implement security measures."). Such agencies would rarely, if ever, have access to "Secret Service signage." Nor would it be practical to post

49

signs all along the "nearby roadways" that are "of particular concern to the Secret Service" due to "the risk of attack by vehicle-borne explosives." *Pahls*, 718 F.3d at 1218.

The district court thus correctly rejected Griffin's argument that he could not "be convicted under 1752(a) unless the government shows he knew a Secret Service protectee was or would be temporarily visiting in the restricted building or grounds at issue" (A.532).

## B. The Evidence Was Sufficient Even Under Griffin's Proposed Standard.

The Court should also affirm Griffin's conviction because the evidence was sufficient even under Griffin's proposed interpretation of the statute. According to Griffin, the government was required to prove both (1) that he knew he was in "a posted, cordoned off, or otherwise restricted area" (Br. at 58-67) and (2) that he knew the reason why the area "warrant[ed] special protection"—in this case, because the Vice President was present (*id.* at 48, 67-68). "[V]iewing the evidence in the light most favorable to the prosecution," there was substantial evidence from which "*any* rational juror could have found [both of] the[se] elements of the crime beyond a reasonable doubt." *Borda*, 848 F.3d at 1053.

### 1. Griffin knew he was in a restricted area.

As the district court correctly concluded, there was "ample evidence that Mr. Griffin knowingly entered or remained within [a] restricted area" (A.536). First, Griffin "saw the west front on January 5 complete with multiple rings of snow fencing with signage. When he crossed the west front lawn on January 6, he would have seen this fencing trampled underfoot." (*Id.*) Second, "he crossed over three different walls, including the Olmstead [W]all. Each of these were tall enough that he needed help from others or to rely upon a jerry-rigged ladder or ramp to get over them." (*Id.*) This "would suggest to a normal person that perhaps you should not be entering the area" (*id.*). Third, Griffin "climbed an emergency exit staircase onto a wooden inauguration stage that had a closed door. Either he or someone close to him said that the door had to be busted open." (*Id.*) Fourth, Griffin "smelled OC spray in the area of the terrace where police had been trying to clear people" (*id.*). And fifth, Griffin "made two statements in the days afterwards admitting that the area had been cordoned off and that police were telling people to stay away" (A.536-37). Taken together, these facts easily established Griffin's knowledge that the area he entered was restricted.

51

Griffin's argument to the contrary errs in numerous respects. First, Griffin challenges each piece of evidence establishing his knowledge independently. But, when engaging in sufficiency review, an appellate court does not "examine the evidence in bits and pieces. Rather, the appellate court evaluates the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Cope*, 676 F.3d 1219, 1225 (10th Cir. 2012) (quotation marks omitted). Second, Griffin fails to view the evidence and to draw all reasonable inferences in the light most favorable to the government, but instead relies on other inferences that could have been drawn from the evidence, improperly attempting "to retry the case on appeal." *Thomas*, 864 F.2d at 191.

For example, Griffin asserts that it is immaterial that he saw the Capitol fenced off on January 5 because, when he arrived on January 6, the fencing was no longer up, "making the significance of the fencing on the ground highly uncertain" (Br. at 60). But, contrary to Griffin's suggestion, the fencing was not neatly "rolled up" on January 6 (*id.*)— rather, it was being trampled by rioters, including Griffin, and still had parts of ripped-up "area closed" signs attached (A.368-69). The context in

which that fencing was being trampled underfoot included, among other things, a rioter yelling "Storm the Capitol," someone saying that climbing a wall is "the only way in," bike racks being used as ladders, rioters invading the inaugural stage, someone saying "[w]e'll wait till they get this door broken down," police using chemical irritants to try to disperse the crowd, and Griffin seeing rioters attempt to enter the Capitol building through the Lower West Terrace door and come out injured.

Griffin subsequently described his knowledge that the mob had pushed through the fencing surrounding the Capitol despite being told to stay out. Contrary to Griffin's argument, these statements were not "clearly based on information Mr. Griffin learned after the fact" (Br. at 65). Rather, a reasonable juror could infer that they were based on Griffin's knowledge that the Capitol was fenced off on January 5 and that, the next day, rioters were filling the area, trampling on those same fences, and using them as ladders to climb walls while the police desperately tried to prevent further incursions. Thus, regardless of whether Griffin "thought the certification of electoral votes was over" (Br. at 60), viewed in the light most favorable to the government, the fact that Griffin saw the fences protecting the Capitol on January 5 and saw those

same fences trampled underfoot by a mob invading the Capitol grounds on January 6 was, by itself, enough to "meet[ ] the low bar required to defeat a sufficiency-of-the-evidence challenge." *United States v. Williams*, 836 F.3d 1, 7 (D.C. Cir. 2016).

The same is true of, for example, Griffin's entry onto the inaugural stage to stand "two feet from where Joe Biden, or whoever, will be inaugurated in as President" (Exh. 64 at 3:53–4:10). Even if the Capitol grounds are usually open to the public (Br. at 58-59), common sense dictates that the inaugural stage is not, as the district court correctly recognized: "He went up to the stage that – nobody thinks that random tourists could just kind of waltz up there; right?" (A.499.) Moreover, to get onto the stage, Griffin first used a plywood ramp to scale one of its exterior walls (Exh. 37-1 at 6:00–6:23), and then walked through a previously locked door while smelling the chemical irritants that the police were using to try to disperse the rioters (A.536). And while Griffin was on the stage, rioters began yelling "time to go" because "SWAT [was] pushing people . . . . They're down at our level" (Exh. 49-1; see Exh. 50-1 (showing police in riot gear exiting Lower West Terrace tunnel)).

Although Griffin seeks to minimize this evidence as well—he claims that he could have "walked around" the wall instead of scaling it (Br. at 61), that it was a different door that was locked (*id.* at 62), and that the OC spray was "wafting [from] other areas" (*id.* at 63)—this is another improper attempt "to retry the case on appeal." *Thomas*, 864 F.2d at 191. Even if Griffin could have walked around the wall, the fact remains that he did not, and there is no indication that he knew the area beyond the wall was accessible other than by scaling it. Even if it was a different door that was locked—and Griffin never argues that the district court clearly erred by finding that the door Griffin entered was locked—the fact that similar doors to the inaugural stage remained locked would have been a strong indication that the one he entered was off limits as well.[2] The

---

[2] If Griffin had challenged the district court's finding as clearly erroneous, that challenge would fail. *See generally United States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012) ("Clear error review is exacting: to reverse a district court's findings of fact we must be left with the definite and firm conviction that a mistake has been committed.") (quotation marks omitted). The relevant video shows a group of people standing—but not moving forward—outside the door that Griffin eventually entered (Exh. 40-1 at 0:01–0:11). The fact that the video shows the door open (*id.* at 0:35) *after* Griffin says, "we'll wait till they get this door broken down" (*id.* at 0:27–0:29), does not somehow prove both that the door was already open and that Griffin knew that fact. Indeed, if that were the case, there would have been no reason for Griffin to say, "I'm not saying I couldn't

(continued . . . )

smell of chemical irritants likewise would put a person on notice that he is in a restricted area. Not only did Griffin enter an area—the inaugural stage—that he had seen fenced off the previous day, but he did so under circumstances that would indicate to any reasonable person that it remained off limits when he was there. Certainly, "viewing the evidence in the light most favorable to the prosecution, *any* rational juror could have found [that Griffin knew he was in a restricted area] beyond a reasonable doubt." *Bora*, 848 F.3d at 1053; *see also United States v. Shi*, 991 F.3d 198, 209 (D.C. Cir. 2021) (sufficient "evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt") (citation omitted).

There is no legal or logical basis for Griffin's suggestion that "there must be a presumption that he believed he could be in th[e] places" he entered on January 6 (Br. at 59). Regardless of whether the Capitol grounds are a public forum (*id.* at 58), that does not mean that members of the public may go there whenever they want: even in a public forum "the government may enforce reasonable time, place, and manner

---

climb up there, I just don't know if I want to put forth the energy" (*id.* at 0:15–0:22), as he watched rioters climbing up to the inaugural stage.

regulations[.]" *United States v. Grace*, 461 U.S. 171, 177 (1983). Here, Griffin saw the Capitol grounds fenced off on January 5. He went onto the inaugural stage, which is not and never has been open to the public (A.448-49 (explaining that fencing around inaugural stage "probably would have gone up a couple months before January")). That stage was built on the Lower West Terrace and the west front steps, which are likewise "restricted generally to the public" (A.338). In this context, and in the context of the riot at the Capitol more generally, the evidence of Griffin's knowledge that he was in a restricted area was neither "equivocal" nor "thin" (Br. at 66). As the district court correctly concluded, "by the time [Griffin] was on the [inaugural] stage, he certainly knew he shouldn't be there" (A.537).

## 2.  Griffin knew why the area was restricted.

There was also sufficient evidence to establish that Griffin knew why the area he entered was restricted—because the Vice President was at the Capitol on January 6.

There is no doubt that Griffin knew the Vice President would be present at the Capitol on January 6. In the video he recorded on January 5, Griffin discussed "praying for Mike [Pence]" to "do the right thing"

(Exh. 63 at 1:00–1:10). And after the January 6 attack, he described getting the news on the way to the Capitol "that Mike Pence had sold us all out. And our elections were certified and we were done." (Exh. 64 at 3:15–3:30.)

There was also sufficient evidence from which a reasonable juror could conclude that Griffin believed that the Vice President was still at the Capitol during the time he was in the restricted area. Even if Griffin believed (incorrectly) that Vice President Pence had already certified the election—his only argument on this point (Br. at 67-68)—there was no evidence indicating Griffin believed the Vice President had left the Capitol. To the contrary, he and the other members of the mob went to the Capitol for a reason, perhaps to punish the Vice President or because they believed they could force him to "decertify" the election (see Exh. 18-1 at 0:03–1:40 (people chanting "decertify")). Indeed, why "Storm the Capitol"—as Griffin heard one rioter shouting (Exh. 26-1)—if the Vice President was not present? When Griffin said to another rioter, "they're lucky we're not armed" (Exh. 37-1 at 2:00–2:07), he presumably meant the lawmakers inside the Capitol, including the Vice President. In the same video, another rioter can be heard screaming, "Pence, you'd better

get your shit together Pence. You'd better get your shit together." (Exh. 37-1 at 4:55–5:03.)

Ultimately, Griffin spent more than two hours inside the restricted area surrounded by thousands of other rioters. During that time, there were other indications that Griffin and other members of this mob understood that the Vice President remained inside the Capitol. For example, Griffin saw the Capitol Police forcibly repelling rioters who attempted to enter the Capitol through the Lower West Terrace tunnel, protecting the lawmakers who remained inside, including the Vice President (Exh. 49-1; Exh. 50-1; Exh. 78 at 6:46–7:10). Griffin heard members of the mob aiming chants of "traitors" at the Capitol (Exh. 57-1 at 0:15–0:45), while believing it was the Vice President that "had sold us all out" (Exh. 64 at 3:15–3:30). And Griffin heard a rioter use a megaphone to announce, "come out Mike Pence, we'd love to see you, come out Mike Pence" (Exh. 58-1 at 0:12–0:18). Viewing this evidence and drawing all reasonable inferences in the government's favor, a rational juror could have concluded that, while Griffin was inside the restricted area, he believed the Vice President was at the Capitol.

Griffin suggests that, because the district court did not make an explicit finding on this point, "a remand is required for the district court to weigh that evidence and determine whether those elements were, in its view as the *actual factfinder*, established beyond a reasonable doubt" (Br. at 68). But that is not how a sufficiency challenge works. "The governing standard for reviewing the sufficiency of the evidence in non-jury cases is the same as that applied in jury cases[.]" *Castellanos*, 731 F.2d at 984. In a jury case, the court "tests sufficiency against 'how a properly instructed jury would assess the evidence,' not on 'how the jury was instructed.'" *United States v. Abukhatallah*, 41 F.4th 608, 634 (D.C. Cir. 2022) (quoting *United States v. Hillie*, 14 F.4th 677, 682 (D.C. Cir. 2021)). It thus "does not matter for [a] sufficiency of the evidence challenge if the jury was provided with an erroneous path to a guilty verdict . . . as long as a properly instructed jury had enough evidence for conviction." *Id.* at 626. Here, because there was sufficient evidence to support Griffin's conviction even under his proposed interpretation of § 1752(a)(1)'s knowledge requirement, there is no basis for a remand even if the district applied the wrong legal standard.

CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
JANANI IYENGAR
KIMBERLY L. PASCHALL
Assistant United States Attorneys

/s/

DANIEL J. LENERZ
DC Bar #888283905
Assistant United States Attorney
601 D Street NW, Room 6.232
Washington, D.C. 20530
Daniel.Lenerz@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,832 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

                                    /s/
                          DANIEL J. LENERZ
                          Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Lisa B. Wright, Esq., Assistant Federal Public Defender, 625 Indiana Avenue, NW, Suite 550, Washington D.C. 20004, on this 31st day of July, 2023.

                                    /s/
                          DANIEL J. LENERZ
                          Assistant United States Attorney