**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 22-3042**

---

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee,*

**v.**

**COUY GRIFFIN,**
*Defendant-Appellant.*

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**REPLY BRIEF FOR APPELLANT**

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

LISA B. WRIGHT
Asst. Federal Public Defender
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004
(202) 208-7500
Lisa_Wright @fd.org

District Court
Cr. No. 21-92 (TNM)

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ….………………………….…..…….………1

ARGUMENT………………………………………………………………..3

I.  THE GOVERNMENT FAILED TO PROVE THAT, AT THE
    TIME MR. GRIFFIN ENTERED THE DISPUTED AREA, IT
    WAS "POSTED, CORDONED OFF, OR OTHERWISE
    RESTRICTED"…………………………………………………………..3

    A.  It Is Not The Case That An Area Can Become
        De-Restricted Only By Action Of The Same Entity
        That Restricted It…………………………………………………...3

    B.  For An Area To Be "Otherwise Restricted" Requires
        On-Site Public Notice Setting Off The Restricted Space……....7

    C.  The Disputed Area Was Not "Otherwise Restricted"
        When Mr. Griffin Entered…………………………………………13

II. THE GOVERNMENT FAILED TO PROVE THAT MR.
    GRIFFIN KNOWINGLY ENTERED OR REMAINED IN A
    RESTRICTED BUILDING OR GROUNDS…………………………17

    A.  "Knowingly" Modifies The Term "Restricted Building
        Or Grounds" And If The Government Opts To Prove
        Such Knowledge By Proving Knowledge Of The
        Qualifying Facts, It Must Prove Knowledge Of Both
        Qualifying Facts In This Case…………………………………….17

    B.  The Government Failed To Prove That Mr. Griffin
        Knew The Area He Entered Was A "Restricted Area"……...22

    C.  The Government Failed To Prove That Mr. Griffin
        Knew A Protectee Was Present…………………………………23

CONCLUSION……………………………………………………………25

# TABLE OF AUTHORITIES

## CASES

*Begay v. United States*, 553 U.S. 137 (2008)..................................1, 10-11

*Cox v. Louisiana*, 85 S. Ct. 476 (1965) .....................................................23

*Crandon v. United States*, 494 U.S. 152 (1990)....................................6-7

*Hughey v. United States*, 495 U.S. 411 (1990)..........................................6

*McFadden v. United States*, 576 U.S. 186 (2015).........................2, 17-21

*Rehaif v. United States*, 1 39 S. Ct. 2191 (2019)....................................19

*United States v. Fischer*, 64 F.4ᵗʰ 329 (D.C. Cir. 2023) ................1, 11-13

*United States v. Sturgeon*, No. 21-cr-91 (RCL)........................................22

## STATUTES

18 U.S.C. § 1752 ................................................................. 4, 5, 11, 13, 21

18 U.S.C. § 1752(a)(1)................................................................. 10, 19, 24

18 U.S.C. § 1752(c) ....................................................... 1, 7, 8, 11, 13, 18

21 U.S.C. § 802(6)................................................................................ 18, 21

21 U.S.C. § 812 .................................................................................... 18, 19

21 U.S.C. § 841(a)(1).................................................................................19

**ADDITIONAL AUTHORITIES**

S. Rep. No. 91-1252, 91st Cong., 2d Sess. (1970)....................................13

*Oxford English Dictionary,* available at http://www.oed.com...............7-8

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012)……………………………………………………..12

## SUMMARY OF ARGUMENT

The government has failed to prove that Mr. Griffin entered or remained in a "restricted building or grounds." The government's theory that only the entity that restricted an area can de-restrict it, is wrong. Here, the area may have been "restricted" as to the mob that saw the perimeter and "destroyed" it, but as to latecomers like Mr. Griffin, there was simply no "restricted" perimeter in place.

The government is not helped by its assertion that § 1752(c) applies to any area of a building or grounds "that is posted, cordoned off, or in another way made accessible only to certain authorized people." (Govt. Br. 29). Mr. Griffin's point is that such "other way" had to be comparable to "posting" or "cordoning off." "Declaring" a restriction (whatever that means) is not comparable to posting or cordoning off where it does not provide notice to those approaching the "declared" perimeter. The government's reliance on *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), is misplaced as that case makes clear why, for purposes of understanding the term "otherwise," the apposite case is *Begay v. United States*, 553 U.S. 137 (2008), not *Fischer*.

The government has failed to identify evidence establishing that at the time Mr. Griffin arrived, the area was "otherwise restricted." The temporary snow fencing on the ground in spots around the lawn did not provide sufficient public notice that any area was restricted, and there was not sufficient evidence for a rational factfinder to conclude that the door Mr. Griffin passed through to the stage restricted that area. To the contrary, everywhere Mr. Griffin entered was "accessible" – that is, capable of being entered – by anyone and therefore not a "restricted building or grounds."

Even if there were sufficient proof that Mr. Griffin entered or remained in a "restricted building or grounds," the government could not convict Mr. Griffin without also proving that he did so *knowing of that status,* which includes the fact that a protectee was present. As to this legal requirement, the government utterly fails to distinguish *McFadden v. United States*, 576 U.S. 186 (2015). And the government's attempts to analogize the "protectee" requirement to a jurisdictional element and to find support in legislative history similarly fail.

The government defends the district court's conclusion that by the time Mr. Griffin was on the stage, he knew he was in a restricted

2

area, but the district court's reasoning was flawed for all the reasons explained in appellant's opening brief. As for whether Mr. Griffin knew that Vice President Pence was still present 45 minutes after he understood the certification to be over, Mr. Griffin cannot be found guilty beyond a reasonable doubt based on the statements and beliefs of others in the crowd who were not operating on the same (mis)information he was. With burden-shifting not an option, Mr. Griffin's conviction must be reversed for insufficiency.

## ARGUMENT

## I. THE GOVERNMENT FAILED TO PROVE THAT, AT THE TIME MR. GRIFFIN ENTERED THE DISPUTED AREA, IT WAS "POSTED, CORDONED OFF, OR OTHERWISE RESTRICTED."

### A. It Is Not The Case That An Area Can Become De-Restricted Only By Action Of The Same Entity That Restricted It.

The government contends that the Capitol Police created a "restricted perimeter" on January 6th using bike racks, preexisting permanent walls, and snow fencing, manned "in places" by law

enforcement officers and marked "at points" with "area-closed" signs,[1] and that the restriction of the perimeter remained in place even after the signs and barriers "were destroyed by the riotous mob." (Govt. Br. 25-26).

According to the government, only the entity that restricted an area – here, the Capitol Police – could de-restrict it. The government says Mr. Griffin cites no authority for the proposition that an area may become unrestricted through the unlawful actions of third parties, but it is the government that bore the burden of proving beyond a reasonable doubt that the area was "otherwise restricted" *at the time Mr. Griffin entered* at 2:31 p.m. There is nothing in the text of § 1752 to suggest that *for purposes of prosecuting a person like Mr. Griffin* – a person who comes upon an unrestricted area that had *earlier* been posted restricted – it should matter whether the area was no longer posted because the

---

[1] The government says that when the first protestors arrived, the disputed area was "restricted, as that term is defined in § 1752" (Govt. Br. 15, 19), but § 1752 does not *define* "restricted." It defines "restricted buildings or grounds" – as a "posted, cordoned off, or otherwise restricted area" of a building or grounds meeting specified criteria. What it means for an area to be "otherwise restricted" is a central question in this case and blurring any distinction between an area that has been "restricted" and a "restricted building or grounds" does not aid in answering it.

restricting entity took down the postings, because the wind blew the postings away, or because a riotous mob ripped them down.

In any event, even if the government's theory about who can "de-restrict" is correct, as to the latecomers like Mr. Griffin, who arrived long after the perimeter had been destroyed, the Capitol Police – by making no effort to reestablish the perimeter once the mob pushed past – *did* effectively de-restrict the area. As is evident from the Struck videos, the people entering the lawn at 2:30 p.m. were largely looky-loos who, unlike the violent group that overran the barricades, gave no indication of any inclination to challenge or disobey any law enforcement instruction. The Capitol Police made the choice not to have officers clear such people from the lawn and other areas Mr. Griffin traversed, and not to reestablish the original perimeter, either through their physical presence or via bullhorn, until after Mr. Griffin had left those areas.  The police chose to focus on the noncompliant people who had effectively pushed any previously-set perimeter back to the doors of the Capitol and beyond.  That decision – a perfectly reasonable one given the circumstances – left the areas Mr. Griffin entered unrestricted for purposes of § 1752.

5

The government asserts that the country's "overwhelming interest in protecting the safety of its Chief Executive," would be "undermined entirely" if a mob could "de-restrict" the area around the President by destroying a restricted perimeter.  (Govt. Br. 28) (quotation omitted). First, even if the government's plan for protecting the President from mobs depended on the deterrence created by potential misdemeanor trespass convictions – which one hopes is not the case – such convictions are still available as to those who destroy, or witness the destruction of, restrictions, *i.e.*, the mob. Those are the people who need to be deterred. Mr. Griffin was not part of the mob that took down the restrictions, but arrived after the fact to find a normally unrestricted area to be unrestricted. Not being able to prosecute Mr. Griffin does not undermine, let alone "undermine[] entirely" (Govt. Br. 28), the country's interest in protecting the President.

In any event, "expansive declarations of purpose" and "general declarations of policy" cannot overcome the language of a criminal statute or justify an interpretation advanced by the government even where such language is deemed ambiguous. *Hughey v. United States*, 495 U.S. 411, 422 (1990) (citing *Crandon v. United States*, 494 U.S. 152,

6

160 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text").

### B. For An Area To Be "Otherwise Restricted" Requires On-Site Public Notice Of Such Restriction.

The government argues that an area may be "otherwise restricted" without on-site public notice, but does not explain how an entity would accomplish such restriction other than by "declar[ing]" it (Govt. Br. 29) – apparently at a location other than the "declared" perimeter and to people other than those the entity wants to keep out. That makes no sense.

Relying on the dictionary definitions of "otherwise" and "restricted," the government concludes that § 1752(c) applies to any area of a building or grounds "that is posted, cordoned off, *or in another way made accessible only to certain authorized people*." (Govt. Br. 29) (emphasis added).

First, according to the same dictionary the government relies on, "accessible" simply means "capable of being entered," *Accessible (adj.)*,

7

Oxford English Dictionary, available at http://www.oed.com. By the time Mr. Griffin arrived at 2:31 p.m., the previously restricted area was "capable of being entered" *by anyone*. Thus, under the government's own definition, the disputed area was not, at the relevant time, "made accessible only to certain authorized people."

The government's theory that the original restricted area "*remained* 'accessible only to certain authorized people'" and that this was "evidenced" by law enforcement's "subsequent efforts to clear the area of rioters" by "'push[ing] people back off the Capitol grounds'" (Govt. Br. 33) (emphasis added), fails to appreciate that such efforts to advance the police perimeter were attempts to create a *new* restricted area, not evidence of an existing one. According to the government, police began clearing the inaugural stage shortly after 5:00 p.m (Govt. Br. 9), but Mr. Griffin was back down on the plaza no later than 4:28 p.m. (GX57-1). Mr. Griffin was at all times on the fully accessible – and thus lawful – side of the police perimeter.

Second, Mr. Griffin does not disagree with the government's formulation – that § 1752(c) applies to an area of a building or grounds "that is posted, cordoned off, or in another way made accessible only to

8

certain authorized people" (Govt. Br. 29) – but simply contends that the "[]other way" an area is "made" inaccessible must be a way comparable to the way posting and cordoning off make an area inaccessible. The government disagrees (Govt. Br. 33-36) but suggests no alternative ways an area could be "made [in]accessible" that do not involve public notice comparable to posting or cordoning off.

Instead, the government implies without explicitly stating that an entity can "otherwise restrict" an area simply by conceiving of restrictions and then "declaring" them into existence. (Govt. Br. 29-30). It is entirely unclear what the government means by "declare" or how it contends the restrictions were "declared" here so as to make the disputed area inaccessible to Mr. Griffin at the time he entered.[2]

The government's assertion that a private landowner need not post or fence his land in order to "declare" it off-limits to visitors (Govt. Br. 30) does not illuminate its theory. This case does not involve the tort

---

[2] Again, to be made "[in]accessible," an area must be "[in]capable of being entered." To meet this requirement, it is not enough that the government thinks or decides that a person cannot enter. The area itself must be made incapable of being entered. That can happen only through on-site public notice or physical barrier.

9

of trespass but requires this Court to determine what is required to prove a *criminal* trespass under the plain language of § 1752(a)(1). Putting aside that many ordinary criminal trespass statutes do require notice comparable to a posting or cordoning off, the question here is what Congress required in this particular federal statute. And this statute is quite unique in that it does not criminalize the crossing of an *existing* property line but allows the government to *create* a *new* boundary by carving it out of existing private or public property – or even, as here, carving it out of an existing public forum. It only makes sense that, in this situation, Congress would expect the Secret Service or its law enforcement partners to do something more than simply imagine such a carve-out, or agree on such a carve-out amongst themselves, in order to "make" a previously accessible area inaccessible to all but certain authorized people.

By specifically listing "post[ing]" and "cordon[ing] off" as examples of actions that can be taken to restrict an unrestricted area, Congress was conveying that similar actions are required to make an area "otherwise restricted." *See Begay v. United States*, 553 U.S. 137, 142 (2008) (holding that "otherwise" clause in 18 U.S.C.

10

§ 924(e)(2)(B)(ii)[3] "cover[ed] only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another'") (emphasis in original). The government relies on *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), as supporting a contrary interpretation, but for all the reasons discussed in *Fischer*, *id.* at 345-346, *Begay* is the apposite precedent in this case.

First, § 1752(c) is structured like the statute in *Begay*, and unlike the statute in *Fischer*. In *Fischer*, the "otherwise" clause "s[at] within a separately numbered subparagraph, after a semicolon and line break," putting the two subsections "visually on an equal footing and indicat[ing] that they ha[d] separate meanings." *Id.* at 345 (quotation omitted). Here, as in *Begay*, the text at issue "includes a list of examples followed by 'otherwise' in a single, unbroken sentence within the same subparagraph" such that "the position of 'otherwise' . . . inherently relates the word to the list immediately before it." *Id. Fischer* recognized that the *ejusdem generis* canon applies when a catch-all term

---

[3] *See* 18 U.S.C. § 924(e)(2)(B)(ii) ("'violent felony' means any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another").

is "directly preceded by a list of terms," *id.* (quotation omitted), and the *noscitur a sociis* canon "holds that 'words grouped in a list should be given related meanings.'" *Id.* (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (quotation omitted)).

Second, adopting the government's interpretation of "otherwise restricted" would make the statutory terms "posted" and "cordoned off" superfluous. The government's theory that those terms would retain meaning because they make clear that Congress intended "restricted" to mean "accessible only to certain authorized people" as opposed to some other type of restriction (Govt. Br. 34-36), does not make sense. If the statute simply punished whoever "knowingly *enters* or remains in [*any restricted area*] . . . where a [Secret Service protectee] is . . . temporarily visiting, *without lawful authority* to do so," it would be perfectly clear that Congress was referring to areas that were "restricted" in the sense of being accessible only to authorized people. No one would think "restricted" was referring to areas where "certain actions" were "[dis]allowed" or where "a person's movements" were "confined" (Govt. Br. 35) such that Congress was intending to criminalize unauthorized entry into "no smoking" areas or "no running" zones. Congress included

12

"posted" and "cordoned off" for a reason and that reason was the public notice they provide. *See* S. Rep. 91-1252 at 9 (1970) (emphasizing importance of having "public notice" of "clearly defined areas" and listing "i.e., by posting or cordoning off" as ways restricted areas might be made "known to the public"). Thus, it is the ability of "posting" and "cordoning off" to give on-site notice to the public that is the "common attribute" connecting those listed terms to the "otherwise restricted" clause. *Fischer*, 64 F.4th at 346.

For these reasons, an area can be "otherwise restricted" as required under § 1752(c) only when action is taken to publicly demarcate the area in way comparable to posting or cordoning off. "Declaring" is not an action comparable to posting or cordoning off when it is not done in a way that reaches members of the public who are approaching the claimed perimeter of a restricted area.

## C.  The Disputed Area Was Not "Otherwise Restricted" When Mr. Griffin Entered and Remained.

The government is wrong in claiming that, at the time Mr. Griffin entered, there was clear on-site public notice that the area he was entering was restricted.

13

The snow fencing on the ground did not provide sufficient public notice so as to "otherwise restrict" the area beyond it. First, the government says snow fencing "immediately behind the Olmste[]d Wall" "had been erected . . . to provide additional visual notice of the restricted area." (Govt. Br. 38). But Inspector Erickson – who as head of the inaugural security task force, had been involved in putting up the inaugural security barriers – did not recall that there had been a layer of snow fencing "as far out to the yellow [perimeter]" as opposed to "further inside that yellow," on the "west grassy area further up," an unknown number of feet from the Olmsted Wall. (Appx:342-344, 387, 405-406). Erickson called the downed snow fencing "another layer of area of restricted" but made clear it had been put up not to delineate a § 1752 restricted area but to protect the inaugural buildout during construction (Appx:369, 373, 388), and Hawa confirmed that that fencing would have gone up months earlier in connection with the building of the inaugural stage (Appx:448-449).

But all that aside, the government misses the point that downed temporary snow fencing is very different than a downed permanent fence. In the latter case, one could at least argue that it is clear that the

14

fence is *meant to be up* and restricting the area. With temporary snow fencing, especially fencing that is partially rolled up, it is entirely unclear to the person who comes upon it whether it is meant to be up or meant to be down. Likewise, a situation where only one section of a fence has come down but the rest remains standing is very different than the situation here where nothing remained of any barrier. And without any readable signage, the meaning of even erect plastic mesh can be less than clear. It is absurd to suggest that, without any explanatory markings or signage, "a line drawn on the ground" could "provide clear notice of a restricted area" (Govt. Br. 39).

As for the government's argument that the "locked door" at least gave notice that the inaugural stage itself was restricted (Govt. Br. 39), the government points to no evidence that the open door Mr. Griffin used to access the stage was "previously locked" (Govt. Br. 54). Indeed, construction workers can be seen using that door in the period just before the grounds were breached. *See* GX74 at 03:25 (showing worker ascending same stairwell Mr. Griffin came up). By pointing out that protestors were knocking on a locked door near the door Mr. Griffin used, Mr. Griffin is not attempting to "retry the case on appeal" as the

15

government suggests (Govt. Br. 55). Rather, he is establishing that the statement about "wait[ing] till they get this door broken down" (Appx:282-283; GX40) is too thin a basis for conviction beyond a reasonable doubt where it is consistent with an alternative hypothesis of innocence, namely that the statement was referring to the other door.[4] Even if it were 50/50 which door the statement was referencing – and it is not 50/50 given that people were seen banging on one door while, within two seconds of the statement, people were moving through the other door, (Appellant's Br. 12-13)[5] – that would be insufficient to convict beyond a reasonable doubt.

This Court should vacate Mr. Griffin's conviction where, absent any on-site notice restricting public access, the disputed areas were not

---

[4] To the extent the government is suggesting that Mr. Griffin should have challenged the district court's finding that the door was closed as "clear error" (Govt. Br. 55), that is not correct. As the government notes, the standard for reviewing sufficiency of the evidence is the same for a bench trial as a jury trial. (Govt. Br. 20).

[5] Unless all the movement that took place between 00:11 and 00:31 (*see* Appellant's Br. at 13 n.3) took place in the two seconds between the end of the statement at 00:29 and 00:31, then some of the movement was taking place before the statement was made, indicating that the door Mr. Griffin used was not in fact closed at the time of the statement.

"otherwise restricted" at the time Mr. Griffin entered and remained there.

## II. THE GOVERNMENT FAILED TO PROVE THAT MR. GRIFFIN KNOWINGLY ENTERED OR REMAINED IN A RESTRICTED BUILDING OR GROUNDS.

### A. "Knowingly" Modifies The Term "Restricted Building Or Grounds" And If The Government Opts To Prove Such Knowledge By Proving Knowledge Of The Qualifying Facts, It Must Prove Knowledge Of Both Qualifying Facts In This Case.

The government acknowledges that it had to prove that Mr. Griffin knew "he was in 'any restricted building or grounds'" (Govt. Br. 41). Under *McFadden v. United States*, 576 U.S. 186, 192 (2015), one way the government could have met its burden would have been by proving that Mr. Griffin knew the facts that caused the area to meet the definition of a "restricted building or grounds," here, that it was restricted and that the Vice President was there.

The government argues that *McFadden* does not control because "the definition of controlled substance is simple" and "the definition of 'restricted building or grounds' is not." (Govt. Br. 47). That is just not correct.

17

"[C]ontrolled substance" is defined as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). To complete the definition, one has to follow the trail to those Part B schedules as set forth in 21 U.S.C. § 812. As relevant here, "restricted buildings or grounds" simply means an "otherwise restricted area . . . of a building or grounds where . . . [a] person protected by the Secret Service is . . . temporarily visiting." § 1752(c).

Per *McFadden*, to prove a defendant "knowingly" distributed a "controlled substance" via proof of knowledge of the qualifying facts, the government must prove the defendant knew they were distributing "a drug or other substance, or immediate precursor" and knew the identity of the substance (say, "heroin") that, perhaps unbeknownst to the defendant, was listed on one of the five drug schedules. If, as the government argues (Govt. Br. 46-47), requiring it to prove Mr. Griffin knew that a Secret Service protectee was visiting the Capitol is "extending" the "knowingly" modifier too far into the statute (from

§ 1752(a)(1) to § 1752(c)), then requiring the government to prove a

defendant knew he was distributing "heroin" would certainly have

extended "knowingly" too far into the statute in *McFadden* (from

§ 841(a)(1) to § 802(6) to § 812(c) (Schedule I (b)(10))).

In fact, the "knowingly" is not being "extended" to elsewhere in

the statute at all. The defendant must simply have knowledge of the

element that "knowingly" directly modifies –in § 841(a)(1), that the

substance is a "controlled substance" or, here, that the area is a

"restricted building or grounds." When the Supreme Court in *McFadden*

ruled that to prove knowledge of that element, the government may, as

one alternative, prove knowledge of the facts causing the element's

definition to be met, it was simply incorporating the qualifying facts

into the element at issue, not extending "knowingly" down a definitional

provision that may or may not have multiple means of being satisfied

and may or may not reside in a distant code section. The government's

attempt to cast the § 1752(c) definition as a "long statutory phrase"

(Govt. Br. 42) (quoting *Rehaif v. United States*, 139 S. Ct. 2191, 2196

(2019)) simply because there are three types of protected areas – (A), (B)

or (C) – that meet it, is not persuasive when compared to *McFadden*

19

where there were hundreds of substances that met the "controlled substance" definition.

The government suggests Mr. Griffin's argument is that there is a difference between warning a defendant he is entering a "Restricted Area (proper noun)" and "restricted area (noun)." (Govt. Br. 49). What Mr. Griffin is actually saying is there is a difference between warning a defendant they are entering a "restricted building or grounds" – which is the term-of-art element the government acknowledges a defendant must know – and telling someone that the "building or grounds" that they are entering is "restricted."[6] Being "restricted" is only one-half of the definition of a "restricted building or grounds," the other half being the special status of the area (*e.g.*, White House or visiting protectee). The government is trying to conflate the everyday meaning of a

---

[6] The government complains that "requiring" warnings that an area is a "restricted building or grounds" will hinder § 1752(a)'s protective purpose. First, appellant is not suggesting such warnings are required. Second, to the extent the Secret Service's primary concern is creating effective perimeters, explicit warnings would only further that purpose. Concern over the logistics of providing signage templates to the Secret Service's law enforcement partners (Govt. Br. 49-50) seems at odds with its protective mission.

"restricted" "building" or "grounds" with the statutorily defined term, "restricted building or grounds." As already explained (Appellant's Br. 53-54), *McFadden* does not allow that. *See* 576 U.S. at 195 (rejecting argument that defendant need only know that "substance" is "controlled" under some law or regulation as opposed to being a "controlled substance" as defined in § 802(6)).

The government's various other points are just distractions from the fact that this case is controlled by the reasoning in *McFadden*. First, the protectee's presence is not at all analogous to a "jurisdictional element." (Govt. Br. 43-44). The protectee's presence is not a "hook" to allow Congress to go after otherwise wrongful conduct, but rather the very reason Congress cares to punish such conduct as wrongful at all. Second, a ruling for Mr. Griffin would not require the Secret Service to convey that a protectee is present (Govt. Br. 44) and, in any event, communicating such information – which is generally not a secret – can further Congress's intent, enhancing order and control around a temporarily restricted area by heightening respect for its boundaries and preventing inadvertent intrusions. Third, nothing about Congress's decision to remove § 1752's "willfully" requirement or to rearrange its

21

elements (Govt. Br. 45) suggests a desire to reduce the government's

burden to prove knowledge. If anything, the government's argument

that "knowingly" should not travel down the sentence to the "where . . .

[a protectee] is" clause was stronger before Congress joined that clause

together with the "restricted" clause to make up the two-part definition

of a new "restricted building or grounds" term – a term that the

government admits is modified by "knowingly." (Govt. Br. 41, 47).

The government does not even acknowledge that Judge Lamberth

in *United States v. Sturgeon*, No. 21-cr-91 (RCL), rejected similar

arguments and required the government to prove knowledge of the Vice

President's presence. (Appellant's Br. 52-53). Judge McFadden erred as

a matter of law in concluding such knowledge is not required.

### B.  The Government Failed To Prove That Mr. Griffin Knew The Area He Entered Was A "Restricted Area."

The government argues that there was sufficient evidence that

Mr. Griffin knew the area he entered was a restricted area, relying on

the reasons cited by the district court. (Govt. Br. 51-57). Mr. Griffin has

addressed the flaws in the district court's reasoning in its opening brief

(Appellant's Br. 59-66) and will not repeat those arguments here. Mr.

Griffin notes only that there was nothing to indicate that the government was enforcing time, place, or manner regulations upon him (Govt. Br. 56) and asks the Court to consider that he could see that police were observing his conduct from the Upper West Terrace and making no move to disperse him from the areas where he entered and remained. *Cf. Cox v. Louisiana*, 85 S. Ct. 476 (1965) (reversing under Due Process Clause conviction for picketing "near" courthouse where defendant "was led to believe that his demonstration on the far side of the street violated no statute").

### C.  The Government Failed To Prove That Mr. Griffin Knew A Protectee Was Present.

As to proof that Mr. Griffin knew, while he was on the Capitol grounds, that the Vice President was at the Capitol, the government proffers only evidence that Mr. Griffin expected that the Vice President would be at the Capitol on January 6th "to do the right thing" (Govt Br. 57) and that *other people* in the crowd said things suggesting that *they* believed the Vice President was still at the Capitol during the relevant period. But the evidence is undisputed that *Mr. Griffin* was operating under the erroneous belief that by the time he crossed onto the West

Lawn, the certification of electoral votes had been over for at least 45 minutes. (Appx:528, 538). Having been misinformed, and having demonstrated a belief in that erroneous information, he cannot be convicted based on the beliefs of others who were not operating on the same (mis)information. The government's only real argument – that "there was no evidence indicating Griffin believed the Vice President had *left* the Capitol" (Govt. Br. 58) (emphasis added) – improperly shifts the burden from the government to Mr. Griffin, as the district court recognized (Appx:486).

* * *

For all of these reasons, the district court misinterpreted the legal requirements of § 1752(a)(1) and, as a result, found sufficient evidence to convict where, under correct legal standards, the evidence was insufficient. The government having failed to present sufficient evidence, Mr. Griffin's conviction must vacated and the charge dismissed.

Alternatively, in the event this Court were to conclude that the evidence was sufficient to find guilt beyond a reasonable doubt of the elements as properly construed, Mr. Griffin asks to remand for the

24

district court to reconsider its finding of guilt in light of the correct legal requirements. This request is not a request to evaluate the sufficiency of the evidence against an erroneous legal standard (Govt. Br. 60), but rather akin to a request for a new trial after an improper jury instruction. Here, the district court effectively instructed itself incorrectly as to the "otherwise restricted" requirement for a "restricted building or grounds" and as to the "knowingly" requirement with respect to the protectee's presence. Because this was a bench trial and the original factfinder remains available, only a remand for new factfinding, as opposed to a new trial with a new factfinder, is required.

## CONCLUSION

This Court should vacate Mr. Griffin's conviction for insufficient evidence. Barring that, his conviction must be reversed and remanded

for the district court to evaluate the evidence against the elements of

§ 1752 as properly construed.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Lisa B. Wright
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
lisa_wright@fd.org


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Opening Brief was prepared in Century Schoolhouse 14-point font, and pursuant to Fed. R. App. P. 27(d)(2) and contains 4661 words.


____/s/_____
Lisa B. Wright
Assistant Federal Public Defender

26