

U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

*Patrick Henry Building*
*601 D Street, NW*
*Washington, D.C. 20530*

May 15, 2024

Mark J. Langer, Clerk
United States Court of Appeals
for the District of Columbia Circuit
333 Constitution Avenue, N.W., Room 5423
Washington, D.C. 20001-2866

     Re:   *United States v. Couy Griffin*, No. 22-3042
              Oral argument held December 4, 2023, before Judges Pillard,
              Katsas, and Rogers

Dear Mr. Langer:

     Pursuant to Federal Rule of Appellate Procedure 28(j), the government submits the transcript of an oral ruling made by the Honorable Randolph D. Moss on May 10, 2024, in *United States v. Smith*, No. 23-cr-71, which is relevant to the argument made at pages 40-50 of the government's brief.

     In his ruling, which is on pages 82 to 97 of the transcript, Judge Moss concluded that the "knowingly" *mens rea* in 18 U.S.C. § 1752(a)(1) does not require knowledge of a Secret Service protectee's presence within the restricted area. Judge Moss explained that, "even if a plain grammatical reading suggests otherwise, [ ] scienter requirements usually do not apply to purely jurisdictional elements, because they normally have nothing to do with the wrongfulness of the defendant's conduct" (5/10/24 Tr. 84). When Congress enacted § 1752, "the requirement that a Secret Service protectee be on the premises would appear to be jurisdictional only, in much the same way as in" *United*

*States v. Feola*, 420 U.S. 671 (1975) (*id.* at 87). Subsequent amendments did not "take a statute in which the presence of a federal protectee was jurisdictional and where there was not a knowing requirement" and "fundamentally change the law, in a way which would have been and would be a major change" (*id.* at 89). "Ultimately," Judge Moss explained, "the question . . . is what was Congress' intent?" (*id.* at 97). Answering that question, he "conclude[d] that the knowing requirement does not carry all of the way through section 1752(c)(1), but only goes up to the point of 'or otherwise restricted area'" (*id.*).

In reaching that conclusion, Judge Moss joined nine other district court judges. *See United States v. Easterday*, No. 22-404 (JEB), 2024 WL 1513527, at *10 (D.D.C. Apr. 8, 2024) (agreeing with and identifying six judges who had concluded that § 1752(a) did not "require[ ] knowledge as to the presence of a Secret-Service protectee"); *United States v. Ibrahim*, No. 21-cr-496 (TJK) (Apr. 16, 2024); *United States v. Kenyon*, No. 23-cr-101 (ABJ) (Mar. 12, 2024).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
Assistant United States Attorneys

_____/s/_____
DANIEL J. LENERZ
Assistant United States Attorney
601 D Street, NW
Washington, DC  20530

cc:   Lisa B. Wright, Esq.
      Assistant Federal Public Defender
      625 Indiana Avenue NW, Suite 550
      Washington, D.C. 20004

ATTACHMENT

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,
                                            Criminal Action
 4              Plaintiff,                  No. 1: 23-71

 5         vs.                              Washington, DC
                                            May 10, 2024
 6    BRYAN SHAWN SMITH,
                                            11:18 a.m.
 7              Defendant.
      _____/
 8

 9                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE RANDOLPH D. MOSS
10                UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      For the Plaintiff:     Eli Joseph Ross
13                           Greg Rosen
                             DOJ-USAO
14                           United States Attorney's Office
                             555 4th Street NW
15                           Washington, DC 20001

16                           Sara E. Levine
                             DOJ-USAO
17                           601 D Street NW
                             Washington, DC 20530
18

19              APPEARANCES CONTINUED ON NEXT PAGE

20

21

22    Court Reporter:        Sherry Lindsay
                             Official Court Reporter
23                           U.S. District & Bankruptcy Courts
                             333 Constitution Avenue, NW
24                           Room 6710
                             Washington, DC 20001
25
```

1          APPEARANCES CONTINUED

2   For the Defendant:      John M. Pierce
                            JOHN PIERCE LAW P.C.
3                           21550 Oxnard Street
                            Suite 3rd Floor OMB #172
4                           Woodland Hills, CA 91367

5                           Roger Roots
                            10 Dorrance Street
6                           Suite 700 #649
                            Providence, RI 02903

7

8                           Anthony Frank Sabatini
                            SABATINI LAW FIRM P.A.
9                           411 N. Donnelly St
                            Ste 3
10                          Mount Dora, FL 32757

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Criminal case 23-71, *United*

3  *States of America versus Bryan Shawn Smith.*

4          Would counsel please approach the podium and state

5  their name for the record, starting with government.

6          MR. ROSS:  Good morning, Your Honor.  Eli Ross, Sarah

7  Levine, and Greg Rosen on behalf of the United States.

8          THE COURT:  All right.  Good morning to all of you.

9          MR. PIERCE:  Good morning, Your Honor.  John Pierce,

10  Roger Roots and Anthony Sabatini on behalf of the defendant,

11  Bryan Smith, who is also present.

12          THE COURT:  All right.  Good morning to all of you as

13  well.

14          So we are here this morning for argument on the

15  question of whether the knowing requirement for purposes of

16  section 1752 extends to the requirement that a person protected

17  by the Secret Service is or will be temporarily visiting the

18  cordoned off area.  And I would be happy to hear from the

19  parties on this.  I have reviewed the briefs, decisions from my

20  colleagues, the legislative history, the relevant case law.

21  And I continue to think this is a close question and I am

22  interested in hearing what you have to say.

23          MR. ROSEN:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. ROSEN:  Greg Rosen on behalf of the United

1  States.

2        THE COURT:  Yes.

3        MR. ROSEN:  I am the pinch hitter, poor substitute

4  for counsel right now.  But, look, if you have read the

5  briefing, I think it is fair to say that -- I respectfully

6  disagree with the Court in terms of whether this is a close

7  case and here is why.  Ultimately when the first case came

8  about that was adverse to the government it was *Elizalde*.  And

9  in *Elizalde,* the issue over whether it was jurisdictional in

10  nature was not something that was properly vetted at the time.

11  And I think when I came before you in the middle of the

12  Middleton case, we discussed that.

13        THE COURT:  Right.

14        MR. ROSEN:  Since then, we have had a number of

15  decisions and the next adverse decision was *Groseclose* by Judge

16  Cooper.

17        THE COURT:  Yes.

18        MR. ROSEN:  And Judge Cooper's decision as we have

19  sort of used in our template and in our response, which you can

20  see, we actually think that the rationale that Judge Cooper has

21  employed actually is quite correct in terms of the evaluation

22  in terms of the federal protectee as a jurisdictional element,

23  meaning mens rea should not extend.  So where it sort of veered

24  off, of course, as we responded in our brief, is whether

25  ultimately to use Judge Cooper's words the addition of a

1    6-month penalty in 2006 reconceptualized the statute.

2            So if the Court finds that it did reconceptualize the

3    statute, then we can talk about *Elizalde*.  If the Court finds

4    it did not, which every Court since then has ruled it did not,

5    then this is a fairly cookie-cutter issue consistent with the

6    way the Supreme Court and the D.C. Circuit has evaluated

7    jurisdictional elements.

8            THE COURT:  Right.  So I am with you in that thinking

9    about it in that way.  But what has puzzled me, actually, is I

10   see the argument that an increase in a penalty from 6 to 12

11   months seems to be a difficult basis to conclude that what was

12   a jurisdictional requirement became an element and that

13   congress reconceived the statute fundamentally when it made

14   that change.  But what I am a little puzzled by that no one

15   seems to have addressed is there was a much more fundamental

16   change that occurred at the same time.  I believe it occurred

17   at the same time.  And that is that Congress added the felony

18   provision to the statute.  And the scienter requirement with

19   respect to the presence of a protectee is the same for the

20   felony provision and the misdemeanor.  So it is not just they

21   said, oh, by the way, we are going from 6 months to a year,

22   they also said, and by the way, you know, if you are carrying a

23   pocketknife when you trespass, under some circumstances, you

24   might be subject to up to 10 years of prison.  And that does

25   strike me as much more fundamental.

1          And then in a subsequent change to the statute they

2     also later then added the drone provision as well.

3          So what I am focusing on is whether those changes are

4     more fundamental in nature.  And I have been trying to think

5     through some of the hypotheticals.  I mean, imagine a person

6     who loves to go hunting in the Catoctin Mountains.  And is out

7     there and they have their rifle and they are out there hunting

8     in the woods.  And you know all of the time they step over that

9     barrier for Camp David.  And they go into the woods in Camp

10    David where they are doing their hunting.  They have got their

11    hunting rifle out there.  And, they have no idea and, in fact,

12    they have every reason to think that the president is, you

13    know, in Washington.  In fact, everyone is saying the president

14    is in Washington.  And there is a secret meeting that is taking

15    place with a foreign head of state that where they secretly

16    rushed the president off.  So he is present there.  And Camp

17    David may all be separately protected, but you get the point.

18         And the person has the rifle there and they are not

19    subject -- and they are using their rifle to go hunting as part

20    of their trespassing on that property.  It is now a 10-year

21    sentence.

22         Or, you know, the other hypothetical comes to mind is

23    someone goes to the Iowa Fair where we know candidates often

24    show up at the Iowa Fair.  And there is a parking lot at the

25    Iowa Fair.  And there is a line up that says do not cross this

line, the parking lot. The person has no idea that the reason
that is up is because the vice president's helicopter is going
to be landing there soon. And that person's truck is parked in
that parking lot. And they are annoyed. And they are saying
that line wasn't up when I came up before and there is now a
line there. I can't go get my truck? Of course, I am going to
get my truck. And they go and they get their truck and they
get in their truck and they are speeding away. And someone who
doesn't see them pulls in front of them and they are in a car
crash. And the person in the second car is injured, up to 10
years in prison. That feels much more fundamental to me, those
hypotheticals.

       MR. ROSEN: So I will couch this we obviously haven't
briefed the legislative history of that additional provision.

       THE COURT: It is in the same legislative history.
It is not extensive.

       MR. ROSEN: No. I just want to say, sort of
representing, I have not reviewed the Senate or House reports
in terms of what Congress' intent was in the legislative
history adopting this felony provision.

       THE COURT: Right.

       MR. ROSEN: But to attempt to address the Court's
hypothetical in sort of the parade of horribles situation.
When you look at and step back what Congress -- or what the
Supreme Court has consistently held is the whole point of sort

1  of the congressional scheme of how far knowingly travels.  The

2  concept -- I know it was used in *Elizalde*.  It was used in many

3  cases, the snare for the unsuspecting.  And the idea that we

4  want to be able to distinguish what would otherwise be innocent

5  conduct versus criminal conduct.

6          So take the example of the Camp David person.  If the

7  Camp David person is not carrying -- is carrying a firearm or

8  is carrying some dangerous weapon and they walk on and they

9  knowingly trespass into the area, but they have no idea who is

10 in Camp David at that time or that there is a protectee, the

11 risk and the purpose of Congress is to protect law enforcement

12 protectees in that zone, in that sphere of influence.

13         THE COURT:  Right.

14         MR. ROSEN:  So the assessment of risk does not turn

15 ultimately on the knowledge of whether or not someone is there.

16 What it turns on is what Congress' intent was, was to wholesale

17 protect people based upon a variety of risks.  So, for example,

18 a person who doesn't carry a weapon is less of a risk I think

19 fair to say than, I think, than a person with a weapon.

20         THE COURT:  Right.

21         MR. ROSEN:  So to answer Your Honor's question, I

22 think that those hypotheticals, which of course are not the

23 hypothetical here.

24         THE COURT:  The statute means what it means across

25 the board.

1      MR. ROSEN:  No, of course.  I think the answer

2   remains the same, which is so long as the government can prove

3   beyond a reasonable doubt that a person knowingly trespassed or

4   knowingly remained after being told to leave or sort of eject

5   themselves from the property, the fact they possessed something

6   additional as a matter of subsection B, which delineates when

7   the penalties are increased, it need not matter in terms of how

8   far knowingly travels in that respect.

9      THE COURT:  You are right that one factor that the

10  Supreme Court and the other courts have considered in deciding

11  how far knowingly travels is the risk of unfairly ensnaring

12  somebody in a statute, but that is not the only factor that the

13  courts consider.  And ultimately the Court has to decide, did

14  Congress intend knowingly to travel or not?  And in making that

15  determination, the Court has to, consistent with *Feola*, figure

16  out what the purpose of the statute is.  And if the purpose of

17  the statute, for example, is just to ensure there is a federal

18  forum or that the federal officials have the ability to bring

19  an action where the conduct would otherwise be punishable, for

20  example, under state law, that could cut one way.  And so in

21  *Feola*, the Court holds and says, what Congress was really

22  concerned about was that the states might not be trusted to as

23  vigorously enforce the murder statute or state murder law or

24  state assault law against a federal -- where a federal official

25  was a victim whereas a state official was a victim.  And we

1    want to be able to have our own say in this because we care

2    deeply about it and we want to make sure that we can actually

3    bring this prosecution even if the state doesn't bring it with

4    the same vigor that we might bring it.  And that suggests that

5    the requirement is really jurisdictional.  It is a question of

6    who gets to bring the case and where.

7           And the reason I bring up the felony provisions is

8    that in the past and I just -- I went back and listened again

9    to the portion of the oral argument in -- I can't remember if

10    it was *Griffon* or Griffith.

11           MR. ROSEN:  *Griffon*.

12           THE COURT:  Yeah, *Griffon*.  But that is part of what

13    at least Judge Katsas and Judge Pillard seem to be focusing on

14    is this just -- and there is some legislative history early on

15    that supports this view that this really was a trespass statute

16    or an analogous to -- we didn't want to rely on DC trespass law

17    and wanted to be able to provide some other mechanism.  But the

18    felony provision suggests this is a very different sort of law

19    now.

20           MR. ROSEN:  May I respond to that?

21           THE COURT:  Yes, of course.  That is why I asked.

22           MR. ROSEN:  Respectfully, I disagree.  So I think one

23    thing to step back, I think *Feola,* obviously, as Judge Cooper

24    did and as we have in our briefing, you know, *Feola* is sort of

25    the guiding light in terms of how we analyze a lot of these

1    issues.  And *Feola* remains good law by the Supreme Court in the

2    same context, which by the way, was a felony assault statute.

3    So I am not sure --

4            THE COURT:  But it was a felony assault statute from

5    the --

6            MR. ROSEN:  From the beginning.

7            THE COURT:  -- state analogue that they were looking

8    at was also felony assault statutes and saying -- I mean, I do

9    think that ultimately we all have to step back and say, what

10   was Congress trying to do here and what was the purpose, right,

11   of the statute?  And there I think what the Supreme Court and

12   the majority held was the purpose of the statute was to make

13   sure that there was a federal forum and federal officials could

14   bring a case where a federal official was attacked because we

15   weren't entirely comfortable with leaving that to the states.

16           MR. ROSEN:  So I think it is a little tautological in

17   nature.  Because when you start off for the '70s, for example,

18   and you pass this statute, it is abundantly clear -- there is

19   absolutely no reason to suggest otherwise that Congress

20   intended to federalize what was otherwise a trespass statute.

21           THE COURT:  Right.

22           MR. ROSEN:  So I think there is -- really not a

23   single judge disagrees with that presumption.

24           So then the question is sort of does it break clear

25   to the point that then there is this, to use again the word,

1    reconceptualization of the statute such that it now undermines

2    the presumption against the mens rea requirement to that

3    federal protectee element.

4         THE COURT:  Right.

5         MR. ROSEN:  So, again, knowing that we have not fully

6    briefed the B portion, the punishment portion --

7         THE COURT:  Right.

8         MR. ROSEN:  -- my response is still the same and here

9    is why:  So first of all, as we pointed out in *Feola*, the

10   dissenters in *Feola*, as you know, were very much focused on the

11   penalty structure.

12        THE COURT:  Right.

13        MR. ROSEN:  So what is pretty clear at least from

14   *Feola* and its progeny is that certainly it is something that

15   the Court can take into effect, but alone itself, the penalty

16   structure or penalty provision shouldn't be what is guiding

17   Congress' intent.  Congress' intent should be guided by what

18   the purpose of the original statute was.

19        THE COURT:  Agreed, except drop the word original.

20        MR. ROSEN:  So to address the hypothetical, which I

21   think will hopefully guide the Court where the government

22   thinks it should go, which is going back to the sort of the

23   patchwork of the state law that was the focus of statute 111,

24   graft that onto 1752.  Imagine you're in a scenario -- and I

25   brought this up, I think in the Middleton case, imagine you are

1    at the vice president's residence, Naval Observatory.  If you

2    could put a number of how many Americans know the vice

3    president lives at the Naval Observatory -- I don't have a

4    number to give you, but it is certainly not 100 percent.  There

5    is certainly many people within the United States that do not

6    know the Naval Observatory is where the vice president of the

7    United States lives.

8         THE COURT:  But if you drive by it, those signs and

9    the presence there, it is -- there are few places on the face

10   of the earth that are as clear that you are not allowed to

11   enter.

12        MR. ROSEN:  Which is an excellent point, because

13   according to -- according to this analysis, if the sign says,

14   keep out, you may not enter, barbed wire around, guns blazing,

15   Secret Service officers walking around and you trespass into

16   that area --

17        THE COURT:  Yeah.

18        MR. ROSEN:  -- according to the *Groseclose* analysis,

19   or the -- sort of what defense might argue otherwise, that

20   would not be a federal crime, because you didn't know --

21   government would have the burden to prove that you knew it was

22   the vice president.  If I put on that sign the vice president

23   is present or a protectee is present --

24        THE COURT:  Right.

25        MR. ROSEN:  -- that is what converts it now in terms

1    of knowledge and proving beyond a reasonable doubt, of course,

2    to a core trier of fact that we have now sort of federalized

3    it.

4          So take it to the felony example, if that person

5    walks in with a gun to the Vice President of the United States

6    where the vice president lives, no question there is risk, no

7    question there is danger.  The idea that could not be sort of

8    federalized because the whole purpose is to avoid the patchwork

9    of state laws, which by the way I don't know for sure, so I

10   want to couch this -- I believe the possession of that unless

11   you are a convicted felon would be misdemeanor under DC Code

12   offense.  The idea that Congress intended to protect people

13   like the vice president is actually supported by our analysis.

14   And if the linchpin of this is simply that if you put the words

15   vice president on the sign, that you have sort of absolved the

16   issue, that would be an absurd result that Congress never

17   intended.

18          THE COURT:  Why is that?

19          MR. ROSEN:  Because Congress couldn't have intended

20   that what would turn in terms of how far -- the criminality of

21   someone's conduct, the snare of the unsuspecting whether a

22   single sign says, by the way, there is a person here you should

23   be aware of.

24          THE COURT:  It goes to -- I am not saying this is

25   necessarily the case.  But it does go to how culpable someone

is.  And if someone knew that it was the vice president's
residence and they wandered in there, not necessarily with a
gun but a pocketknife or something like that.  If they knew
that was the vice president's residence that is more culpable
than if they were just taking a shortcut across that park and
they saw there were some signs there but they thought --

MR. ROSEN:  So --

THE COURT:  -- I mean --

Go ahead.

MR. ROSEN:  If I can respond.  I think we are sort of
focusing on the same thing, but different things.  The
culpability is the actus reus, which I would focus on is and
what enhances the culpability is the possession of a dangerous
weapon.  The dangerous weapon is what enhances the penalty, not
the knowledge of the person.  So if Congress truly intended
that the knowledge of the person presents more of a risk, than
the not knowledge of the person, Congress could have written
the statute that way.  I mean, in 2012 they got rid of the word
willfully from the statute.

THE COURT:  But there are times in which possession
of the dangerous weapon will not indicate any culpability at
all.

MR. ROSEN:  Correct.

THE COURT:  So the person who is at the Iowa Fair,
and you are allowed to possess a gun in Iowa and you have got a

1    gun strapped to your side.  I don't know whether you are

2    allowed to have it at the Fair or not.  But you walk across the

3    parking lot at the Iowa Fair where there is a sign that says do

4    not enter, you have no idea the reason it says do not enter is

5    the vice president's helicopter is going to be landing there in

6    10 minutes.

7              MR. ROSEN:  So my response to that that would hit the

8    nail on the head as to exactly why Congress passed the statute

9    in the first place and continues to enhance the penalties or to

10   change the structure, which remains to create this avoidance of

11   patchwork.  So if we didn't have the statute, use the Iowa

12   example, I don't know what Iowa's possession laws are.  And I

13   don't know what Iowa's possession laws are vis-a-vis restricted

14   areas.

15             THE COURT:  I don't either.

16             MR. ROSEN:  There are certainly trespass laws in

17   every 50 states.  So you can't trespass into an area.

18             THE COURT:  Right.

19             MR. ROSEN:  But Congress made the decision and the

20   intent that is driving Congress' decision is not whether one

21   possesses knowledge of a certain person.  They want to make

22   sure that every protectee of the US Secret Service is in a

23   place where the government can appropriately prosecute someone,

24   assuming they have the requisite mens rea.  So if you don't

25   have this statute and you don't have this coming in as a

1    federal protectee requirement in the way that it is a

2    jurisdictional element, what you have is you are relying then

3    on local states and local jurisdictions with a variety and

4    degree of different laws that carry a variety and degree of

5    different mens reas to prosecute people in a variety of

6    different ways which can include felony and misdemeanor

7    provisions.  That can't be what Congress had intended in the

8    '70s.  It can't be when they reconceptualized the statute in

9    2006.  And it can't be in 2012 when they got rid of the word

10   willfully.  Congress clearly -- we can make jokes sort of about

11   the political process, but Congress knows how to write a

12   statute.  And sometimes they write it better than others.  But

13   in this case, we submit that the additional in (c)(2) where it

14   extends to the definition of the restricted area, that is the

15   restricted area trying to ground itself in a federal protectee

16   jurisdictional element.  Not that a person must know all of the

17   way through.  Because I think it raises -- we have countered

18   with, obviously, our sort of absurd result response in your

19   brief.

20            THE COURT:  But by your same reasoning then, you

21   might also conclude that the knowledge requirement doesn't

22   apply to posted or cordoned off.  Because it may be that as a

23   matter of state law and there may be a legitimate interest that

24   you don't want someone wandering into where the vice president

25   is going to be.  And if it is, you know, whether it is cordoned

1    off or not, if it is private property in some way and you

2    wander onto it, why not be subject to prosecution?  Why does

3    your rationale say, knowingly applies to posted, but doesn't

4    apply to where the protected person will be?

5              MR. ROSEN:  Because -- and I know we are sort of

6    inverting it.  We are sort of going back to what I would call

7    the *Elizalde* framework.  But if you look at the way the statute

8    is structured (c)(1) says term restricted building or grounds

9    means any posted, cordoned or otherwise restricted area.  So as

10   a matter of law, that is the definitional subsection that we

11   have consistently argued knowingly has to reach to.  We don't

12   disagree that knowingly has to travel into there.

13             THE COURT:  Right.

14             MR. ROSEN:  The problem is what is (a), (b) and (c)

15   and what are they doing?  What they are doing is explaining the

16   federal interest in three different categories.  They are not

17   explaining the knowledge requirement that must flow throughout.

18             THE COURT:  But if what you have just said is right,

19   then you're the one who is saying that Congress fundamentally

20   reconceived the statute in 2012.  Because before 2012, the "of"

21   paragraphs were actually in the text -- the same text as the

22   cordoned off photograph.  And it wasn't broken out until 2012.

23             MR. ROSEN:  So I am not sure -- I am not sure I --

24   well, if that is what I am saying that is -- I don't think the

25   reconceptualization of the statute turns on whether or not

1    there is a restructuring of the statute.  It is what it is

2    restructuring to.  So nothing really changes in 2012 other than

3    it sort of breaks it out and lays it out in a more cohesive

4    format and it removes the word willfully.  And so it actually

5    decreases the mens rea required in 2012.  So in terms of what

6    (c)(1) is doing, the jurisdictional element had already sort of

7    been there.  It just sort of separated it out.

8         THE COURT:  But if you look at the version just

9    before 2012, I guess it is the 2006 version of the statute, it

10   said that it is a crime to knowingly enter or remain in a

11   posted, cordoned off or otherwise restricted area of a building

12   or grounds where the president or other person protected by the

13   Secret Service is or will be temporarily visiting.  It is all

14   in a single clause there.  So, I mean, if we were reading the

15   statute back then, we would have to break that sentence down

16   into different subparts.

17        MR. ROSEN:  So, no, I don't think that is correct and

18   here is why.  Because I think what we are talking about --

19   there are two different analyses that we briefed.  And there

20   are two different responses to both *Elizalde* and *Groseclose*.

21   *Because Elizalde* never focused on jurisdiction.  And having

22   been at the *Griffon* argument, there really even wasn't a

23   meaningful discussion about jurisdiction.  And we can sort of

24   go around in terms of, you know, whether that should have been

25   raised in an earlier capacity.  And certainly we'll see what

1  Griffon says.  I can certainly represent that 28J letters that
2  have been submitted to the Court talk exactly about this.  So
3  what I guess, I would respond to is, it doesn't matter what the
4  structure is, unless you are in the *Elizalde* world and you are
5  really trying to sort of understand Congress' intent in this
6  abstract capacity.
7       But if you find that it is a jurisdictional element,
8  which you do regardless of whether or not there is comma or a
9  clause in the same way, for example, that interstate commerce
10 in 922(g) for the purpose of 924(c) the *Rehaif* analysis carries
11 a similar sort of legal weight.  So on the *Groseclose* point, on
12 the jurisdictional point, it didn't reconceptualize the
13 statute.  That element is still in there.  It still remains a
14 jurisdictional statute.  The question that Judge Cooper asked,
15 which we have now answered and we think in the negative is
16 whether or not these tinkerings of the statute undermine the
17 presumption that mens rea should not apply.  So we have,
18 obviously, addressed the 6-month versus 12-month, you know,
19 difference in terms of penalty.  Your Honor has raised
20 obviously the felony.
21       THE COURT:  Right.
22       MR. ROSEN:  But my response to the felony is the
23 reason it doesn't change is because the culpability doesn't
24 turn on knowledge.  The culpability turns on a weapon.  So that
25 is what Congress is intending to punish, because that is the

1   risk to the protectees.  The risk to the protectee is that if

2   you engage in -- if you look at the second one, which is

3   significant body injury.  Obviously if you engage in

4   significant bodily injury, there is not a knowing requirement

5   that is going to attach to that.  The purpose of that

6   additional element is to ensure that when and if someone

7   illegally trespasses and we can prove the illegal trespass, if

8   they then also result in some sort of damage to the person or

9   damage to another person, we would like to punish that more

10  harshly.  That makes sense.

11         THE COURT:  So I realize that hypotheticals,

12  particularly unusual hypotheticals only get you so far.  But

13  what about my hypothetical the Iowa Fair?  My truck is parked

14  in a parking lot.  I come back.  The parking lot has now been

15  cordoned off.  There is -- I want to go home.  There is now a

16  snow fence or whatever it is around the parking lot.  I can't

17  get to my darn truck.  I am like, you know, understandably

18  annoyed.  I say, baloney.  I hop over the fence, get in my

19  truck, start speeding away.  Some other knucklehead has done

20  the same thing I have done.  That person is speeding away in

21  their truck and rams into me in the process of doing it.  And

22  that person is actually seriously injured.  As a result of my

23  trespass, it resulted in serious bodily injury to another

24  person.  Because I wouldn't have been driving my truck down

25  that road if it wasn't for my trespassing there.

1           And do we really think that under the circumstances
2    Congress, where I had no idea that the vice president was
3    getting ready to land in his helicopter there, Congress would
4    have intended, yes, it should be up to 10 years in prison for
5    that.
6           MR. ROSEN:  The answer is yes, but not for the
7    reasons -- judges certainly do not like when the government
8    says trust us, prosecutorial discretion.
9           THE COURT:  Right.
10          MR. ROSEN:  But I do think it is important to step
11   back and look at the forest from the trees.  There are two
12   problems with that hypothetical.  The first is a factual one.
13   The government still has to prove knowing trespass.  So I
14   assume for the hypothetical that the person realized, this was
15   a legitimate, cordoned off area and said --
16          THE COURT:  Do not cross this line.
17          MR. ROSEN:  -- I don't care.  I am going anyway.  I
18   want my property back.  I want my car back.
19          THE COURT:  Right.
20          MR. ROSEN:  Assuming we can prove that, which I do
21   candidly think has its own sort of factual problems in terms of
22   a presentation to a trier of fact and the reasonable inferences
23   one can make.  That being said, the other problem with it is I
24   do think you have an issue with the nexus to the offense
25   results in.  I think that there clearly has to be some nexus

1    that the trespass and the ongoing trespass is what results or

2    sort of cabins the enhanced penalty.  So in your hypothetical,

3    if the person trespassed and during the course of the trespass,

4    an agent tried to -- I mean, this would be a 111.  Someone

5    tried to go over to them and say, no, no, no, this is a

6    restricted area.  And they wallop them in the face and broke

7    their jaw, yes, I do think it would apply regardless of whether

8    or not the knowledge was met.

9           But in the hypothetical you posed, I don't think it

10   would -- I don't necessarily think that it would carry over if

11   someone during the course of fleeing or obstructing law

12   enforcement, there was a car cash that resulted by proximate

13   cause in serious bodily injury.  So, no, I think Congress would

14   have intended the latter to apply, maybe not the former as a

15   factual matter.  And maybe Your Honor knows this, the

16   hypotheticals -- you know, I love the hypotheticals.

17          THE COURT:  I understand.

18          MR. ROSEN:  But I am wary to go down that route,

19   particularly in the felony context because we are not talking

20   about a felony here.  What we are talking about is the

21   knowledge for the -- what we'll call the general trespass.  So

22   in order to evaluate the reconceptualization of the statute, we

23   still need to cabin the analysis to what 1752(a)(1) and its

24   subsequent penalties for this case carry.

25          I understand your response to me is, no, there is

1 this (b).  What do I do with (b)?  And I don't think you need

2 to do anything in this instance.

3   What I will say though for what it is worth, just so

4 the record is clear, I think we put this in our brief.  There

5 are references -- and Mr. Ross and Ms. Levine can certainly

6 argue factual inference as to the knowledge of the vice

7 president in any event.  So I know one of the questions coming

8 here and one question that you posed in the Middleton case is,

9 do I need to decide this now?

10   THE COURT:  Right.

11   MR. ROSEN:  We think in some ways you do, because we

12 do believe that the obligation is to get the law right.  We do

13 believe we are on the right side of the law.  If the Court

14 disagrees, obviously the Court disagrees.

15   But to the extent that the Court is also going to

16 separately find that the defendant had knowledge of the vice

17 president, you know, that is sort of one way of, as judges have

18 done, sort of postponing the inevitable waiting for *Griffon*.

19 Obviously, to the extent that *Griffon* comes about, we will have

20 to -- if it is an adverse decision to the government, we will

21 have to exercise and review our appellate options.  But one

22 sort of unfortunate thing that *Griffon* --

23   THE COURT:  I am trying to think of what your

24 appellate options would be.  What would your appellate options

25 be?  So let's say I disagree with you and I rule as a matter of

law at a bench trial that the scienter requirement -- that

there is a scienter requirement.  And I hold that the

government has not met its burden of proof with respect to the

scienter requirement.  Is that an appealable order?

MR. ROSEN:  No.

THE COURT:  So the only way this could ever go to the

Court of Appeals is if I ruled the other way; right?

MR. ROSEN:  No.  I was actually referring to *Griffon*.

THE COURT:  You would petition for cert?

MR. ROSEN:  If *Griffon* comes down in an adverse way

to the government, which I don't believe it should.  But I also

admit that *Griffon* didn't touch upon what we think is, for lack

of a better word, the winning argument.  So I don't know if it

will be the be all end all that resolves all of the issues.

But I know some judges have said -- even Judge Cobb ruled

against us in the *Samsel* case, but in a subsequent case, Judge

Cobb said this is a really interesting issue, I don't know

where my head is at.

THE COURT:  That is essentially what I said in

Middleton, I think.

MR. ROSEN:  Judge Lamberth is the original judge to

rule on this, but did not write an opinion on it.  Judge

Lamberth in the most recent case that is going on in *United

States versus Glenn Brooks* also opined that he would -- we

expect to get guidance at some point from the Circuit.  I am

1    not sure the Circuit is actually necessarily going to decide

2    the issue one way or the other.  But the government would

3    submit that upon further review of what is now a fulsome

4    briefing.  If the Court disagrees with us on the jurisdictional

5    point, I am not sure there is anything that I can in writing

6    argue or say that is going to convince you otherwise.

7              THE COURT:  Fair enough.  In *Griffon* were there other

8    grounds for the court -- where they might not have to reach the

9    issue if they rule on other grounds?

10             MR. ROSEN:  Yes.  So that was the alternative too is

11   that there was a sort of robust discussion about the fact that

12   we believed we could prove the presence of the vice president

13   and the knowledge of the vice president anyway.  And, of

14   course, there is this unique aspect which we all don't talk

15   about, because it is a unique sort of function of the statute.

16   But it is not simply that the vice president is there.  It is

17   or will be visiting.

18             THE COURT:  I know.

19             MR. ROSEN:  So one thing I think is very interesting

20   is during the *Griffon* argument Judge Katsas said when he was

21   questioning I believe government counsel, something to the

22   effect of, didn't everybody know Pence was there?  And in some

23   ways, yes.  In other ways, we still have a burden of proof of

24   showing that.

25             THE COURT:  Correct.

1        MR. ROSEN:  And judges have been at least from our

2 experience unwilling to make what we consider a more reasonable

3 inference of not only the nexus to the vice president, being at

4 congress, but also expanding that congress when they wrote the

5 statute didn't just intend if you go down the knowledge

6 requirement.

7        THE COURT:  Right.

8        MR. ROSEN:  It is not just about -- and you disagree

9 with us.  It is not just about if he is there at that time.  It

10 is, will he also be visiting?  So it is a really expansive mens

11 rea that I don't think has gotten fully fleshed out.  But that

12 is also because we don't think we need to get there.

13        THE COURT:  This is partially also in the

14 government's hands going forward too, in that I think and I

15 would have to go back and check to make sure I am right about

16 this -- but I think for anybody who was present at the Ellipse,

17 the speeches, including Rudy Giuliani's speech, talked about

18 the fact that the vice president was going to be at the

19 Capitol.  So all the government has to do is introduce that

20 into evidence, which it hasn't done -- at least in this case,

21 didn't do.

22        MR. ROSEN:  So I think -- and this goes to the

23 difficulties that are presented, which is, sure, if I can show

24 the person was at the speech.

25        THE COURT:  The opening argument in the case that is

1　　what the defense said in this case as their opening argument.

2　　　　　MR. ROSEN:  So for what it is worth -- I am here on

3　　the legal issue, not the facts.

4　　　　　THE COURT:  Fair enough.

5　　　　　MR. ROSEN:  To answer that, if someone was at the

6　　speech and heard the speech, then, yes, that is an important

7　　key factor for the Court to conclude that, of course, a person

8　　knew the Vice President of the United States was there.

9　　　　　THE COURT:  Right.

10　　　　MR. ROSEN:  That being said, we have had this

11　　argument, which is the government still has this burden to

12　　produce that evidence.  And if we can show it through video

13　　obviously we would and we would have.  So in the absence of

14　　that evidence, the real question, the rub as we come down to is

15　　whether or not Congress truly intended this to turn on I know

16　　that Mike Pence will or was there or is going to be there.  And

17　　we just think, respectfully, that cannot be the case.

18　　　　　THE COURT:  Okay.  Fair enough.  So I will give you a

19　　chance for reply.  Let me hear from the defense.

20　　　　　MR. ROSEN:  Thank you.

21　　　　　MR. SABATINI:  Just going to keep it somewhat brief,

22　　Your Honor.  You have read all of the cases, you know the

23　　opinions that we have relied on.  My brief is very short.  We

24　　believe that the analysis that they used was pretty much

25　　correct.  So I would really rather explore your hypotheticals,

1    which I think are instructive and definitely show the potential

2    and the meaning of the statute, but also how often this

3    occurrence is probably going to be if *Griffon* goes, in our

4    opinion, the wrong way.  Which is, we live now in 24-hour

5    political season.  There is protectees all over the place.  An

6    Iowa Fair I think is actually just one of many examples where

7    there is going to be large rallies and speeches in the

8    hyper-political culture where people can go to them and

9    incidentally become victim.  I think that is going to happen

10   more and more.  I don't think that was exactly the case with --

11              THE COURT:  I wouldn't call people who are

12   trespassing victims, but fair enough.

13              MR. SABATINI:  But I would say -- but in your

14   hypothetical you explained what I would consider almost like

15   minor trespass, where the guys sees the tape line, my car is

16   right here, not trying to break into a highly secured building,

17   something like that.  I think those occurrences are going to be

18   something that you'll see more and more if the Court -- and so

19   looking at --

20              THE COURT:  I am not sure that factually is right

21   that there are that many Secret Service protectees.  The role

22   of the Secret Service is fairly limited to the people who they

23   are protecting.  I don't think that has fundamentally changed

24   over time.  And maybe the political cycle is extending, but I

25   think that the number of protectees -- I could be wrong about

1    this, but I am not sure that -- I don't think the Secret
2    Service, for example, protects candidates until they are the
3    nominee, unless they are the former -- in the case of President
4    Trump they are already a protectee in any event.  I don't
5    think, for example, every candidate gets Secret Service
6    protection.
7             MR. SABATINI:  Sure, Your Honor.  The hypothetical
8    definitely shows the risk of abuse in limiting the mens rea
9    would actually get to.  And that is what animates the argument
10   is that the rights of the defendants to, you know, have the
11   government held to a standard in which they have to prove pure
12   knowledge of, you know, each element.  And the government's
13   reading of the statute limits that to the point where it goes
14   against the rights of the defendant and that is how we
15   interpret it.
16            THE COURT:  The rights of the defendant, I mean that
17   does -- that raises the argument though as to whether it is
18   innocent behavior or not.  If someone is engaged in unlawful
19   behavior, at least the Supreme Court seems much less concerned
20   about, they know they are doing something they are not supposed
21   to be doing.  And, you know, at least with respect to the pure
22   trespass provisions of this, maybe it goes from a 6-month crime
23   to a 12-month crime in DC where it would be 6 months -- at risk
24   for 6 months.  You are probably not likely, frankly, under DC
25   law or under federal law to get anything close to 12 months or

1    6 months, you know, if you step across a barrier and don't do

2    anything else that is wrong and then step back across the

3    barrier.

4         You know, my hypothetical, get your car and drive

5    away, one, you might not be prosecuted at all.  But, two, it is

6    highly unlikely you are going to get 6 months or even a year in

7    jail for having done that.  But you are knowingly violating the

8    law when you step over the line that says you may not cross

9    this line.

10        MR. SABATINI:  That is true, Your Honor.

11        But we would argue that another important

12   consideration and interpretation of the statute is that, you

13   know, interpreting it the way that the defendant suggests that

14   we suggest, it creates a harsher penalty for those who have

15   knowledge of the Secret Service protectee, puts them in a

16   worse, more harsh position.  So, therefore, it is more of a

17   deterrent.  It has a purpose-driven structure there where if

18   somebody knows that Mike Pence is in the building, that person

19   should be dealt with harsher.  So there is an internal logic

20   there I think should be upheld.  So for them to trespass, they

21   should be treated differently than those who are unknowing.

22        THE COURT:  Let me ask you, in 2012 when Congress

23   adopted the current version, the legislative history of that

24   change where they adopted the current structure -- and this is

25   not the legislative history that Judge Cooper is relying on of

1    going from 6 to 12 months, but just the current structure.  In

2    the report Congress says, there is no federal law that

3    expressly prohibits unlawful entry to the White House and the

4    grounds or the vice president's residence and its grounds.  The

5    Secret Service must therefore rely upon the provisions of the

6    D.C. Code, which address only minor misdemeanor infractions

7    when someone attempts to or unsuccessfully trespasses on the

8    grounds of the White House or the vice president or residence

9    or worse breaches the White House or the vice president's

10   residence itself.

11          And that does sound more like the jurisdictional

12   analysis.  They are saying, we don't want to have to rely on DC

13   law on this.  We want to make sure there is a federal law that

14   covers this.

15          MR. SABATINI:  Your Honor, I will be completely

16   frank, I mean, that is a very, very specific point.  And in

17   *Groseclose*, I have studied and we have done everything we could

18   in the last 36 hours to look into the legislative history and

19   make a counter-argument, but definitely not something that we

20   were able to explore to the fullest extent, to be candid with

21   you.  The government has written such an in-depth analysis.

22          THE COURT:  Fair enough.

23          So what is your position with respect to the original

24   version of the statute, the 1971 or whatever it was version?

25          MR. SABATINI:  I would argue that what was uttered in

1    *Groseclose* is correct that it took a massive substantive change

2    in 2006 and, therefore, the statutes have changed and so

3    therefore the mens rea should be approached differently than

4    the original 1971 law.

5          THE COURT:  And the massive change -- so you agree

6    with Judge Cooper's analysis that you think goes from 6 months

7    to 12 months that Congress actually consciously said to itself,

8    okay, this isn't an element and we are now going to make it an

9    element now because we are increasing the penalty?

10          MR. SABATINI:  Well, I approached it more from a

11    textualist viewpoint.  But if I was going to look and decipher

12    the intention of Congress, I would say that was pretty

13    significant change considering they don't do that many criminal

14    code revisions that often.  So, obviously, there was some

15    purposeful intention there to make it much more strict.

16          THE COURT:  They said the purpose of it was to bring

17    the penalty in line with 18 U.S.C. section 3056, which says

18    that whoever knowingly, willfully obstructs, resists or

19    interferes with a federal law enforcement agent engaged in the

20    performance of the protective functions authorized by this

21    section shall be imprisoned not more than a year.

22          Do you know if that provision includes a scienter

23    requirement and whether under that provision the knowingly

24    carries through to the fact that it is a federal law

25    enforcement official engaged in a protected function?

1    MR. SABATINI:  I actually don't know, Your Honor.  I

2    would be happy to research it rather quickly.  I am sure the

3    government will have a chance to reply to that with an

4    informative answer.

5        THE COURT:  Anything else?

6        MR. SABATINI:  No, Your Honor.  Thank you very much.

7        THE COURT:  All right.  I am sure you have that

8    question; right?

9        MR. ROSEN:  I wish I did have an answer right now.  I

10   would rather -- if we are sort of approaching different

11   statutes, you know, I always prefer to brief these issues a

12   little more fulsomely.

13       THE COURT:  But the government must have looked at

14   that one given --

15       MR. ROSEN:  Are you talking about in the context of a

16   civil disorder.

17       THE COURT:  The legislative history for the provision

18   that Judge Cooper relies on, adding the 12 months instead of 6

19   months says we are doing this to bring it in line with 3056.

20   And my question was, what was the scienter requirement under

21   3056, if you know?

22       MR. ROSEN:  I don't.  I can certainly find out, but I

23   don't.  What I'd say though is on that point, you know, the --

24   so I have a couple of responses.  On that point, the Feola

25   dissenters are actually sort of the most illuminating in that.

1    Because, again, they focused on a year increase or I think it

2    was multiple-year increase in terms of penalties.  And even

3    then, that was not what carried the day and still does not

4    carry the day.

5          In terms of the defendant's arguments, there are two

6    things I respond.  In terms of the -- one aspect of the statute

7    that we talk about is when we use these hypotheticals, we

8    constantly sort of talk about fixed areas.  But what was clear

9    from the *Griffon* argument and it is also what is clear from the

10    statute is it doesn't have to be fixed areas.  So the idea is

11    that Secret Service protectees are constantly moving around

12    throughout United States.

13          THE COURT:  Right.

14          MR. ROSEN:  So, obviously, you are not going to move

15    and have Secret Service agents around you in a circle, right,

16    necessarily with a sign saying protectee person present.  But

17    they would still be protected under the function, which is that

18    as they move from location to location to location, the Secret

19    Service would be able to erect, with law enforcement, barriers

20    or implements or obstructions or cordoned-off areas to restrict

21    in order to protect the safety of that person.  And so the --

22    we constantly sort of focus on the hypotheticals of the fixed.

23    It is fixed, right, because you are putting up a barrier.  It

24    doesn't have to be fixed.  Because if you look at the language,

25    the language says -- is quite broad; right?  It says, the term

1    restricted building or grounds means any posted, cordoned off

2    or otherwise restricted area.  I feel like we are arguing in

3    the Supreme Court relating to *Fischer* otherwise.  What does

4    otherwise mean in that capacity?  And it can mean certainly the

5    same, but it usually means distinct and different.  Because

6    otherwise what is the word otherwise doing there?  Otherwise

7    doing is to say there is a wide variety of ways that one can

8    restrict an area.  So it does not have to be -- you could have

9    a person walking by in a line where Secret Service are saying,

10   this is restricted, this is restricted, this is restricted.  If

11   you breach that area, you have now committed a crime.

12         If the sole difference from a jurisdictional element

13   perspective is, this is restricted, this is restricted, because

14   the guy behind me is the Vice President of the United States,

15   then that is the absurd result that we are essentially arguing.

16   That is why knowledge we don't think carries the weight that

17   defense counsel thinks it does.

18         So, you know, I -- the hypotheticals sort of go both

19   ways.

20         THE COURT:  It strikes me that analysis kinds of cuts

21   both ways in that it just increases the likelihood that someone

22   is going to innocently find themselves in violation of federal

23   statute.  So they are at the airport.  There is a lounge.

24   There is a sign that says, lounge closed, do not enter.  I am a

25   member of the United First Club.  I am going in.  You walk into

1    the lounge.  It turns out the vice president is in there, bam,

2    you know, you have now committed a federal crime.

3            MR. ROSEN:  So, again, in that instance you committed

4    a federal misdemeanor.

5            THE COURT:  Right.

6            MR. ROSEN:  You committed a federal misdemeanor,

7    because the purpose again was not to -- the purpose and

8    Congress' focus is on the protectee, not the defendant.  The

9    defendant comes in whether to again, snare the unsuspecting.

10   So that person, assuming we can prove it, already committed a

11   trespass.  That is the rub.  They already committed a trespass.

12   And the question is, who are we protecting here?  Are we

13   protecting the United Flyers' Club or are we protecting the

14   United States Secret Service protectee?

15           The last thing I wanted to respond to was what I

16   think is somewhat of a -- it was a casual comment and it was

17   something that was embedded in Judge Nichols' analysis, which

18   has to do with risk.  And I think that is actually a little bit

19   of a misplaced argument.

20           Because if you take Mr. Sabatini's response that a

21   person who knows that the vice president is there represents

22   more of a risk.  How so?

23           It actually -- when you -- we had included this in

24   our original briefing.  I think it is in a footnote.  But that

25   is actually not clear at all.  So if we are truly resting on a

1  risk analysis --

2      THE COURT:  Right.

3      MR. ROSEN:  -- then you are in the world of

4  hypotheticals that cut a thousand different ways.  Because a

5  person that goes into an area they are not supposed to, that is

6  a risk.  A person who goes in knowing that somebody is not

7  there, they thought, for example, the Speaker of the House at

8  the time, January 6, 2021, Nancy Pelosi was going to be there.

9  That is who they really represented the risk to.  But it turns

10  out, she is not a protectee of the US Secret Service.  Instead,

11  Vice President Pence is.  So does the knowledge that there is a

12  different important person really turn on whether they truly

13  represent a risk in that moment?  Well, maybe, maybe not.  That

14  cannot be what Congress intended for the patchwork to address.

15      THE COURT:  Let me ask you one final question, which

16  is --

17      MR. ROSEN:  Sure.

18      THE COURT:  I puzzle a little bit over what we mean

19  when we say the condition is a jurisdictional one or the

20  element is a jurisdictional one.  And in one sense, in some

21  contexts, it is pretty easy to understand what that means.

22  Where, you know, the gun has to have traveled interstate

23  commerce.  It is pretty clear that Congress wants to regulate

24  guns but it needs authority to do so.  And the only way it can

25  do so is by adding the condition it traveled in interstate

1  commerce.  There also may be circumstances or use of the word

2  jurisdictional where the federal government doesn't have

3  authority to adopt a general trespass statute.  But on federal

4  property, you can do it or where there is a federal protectee,

5  because it relates to a significant governmental interest in

6  protecting that person.  So you can do it there.  But it is a

7  question of where the Congress powers comes to.

8          There is another way of thinking of it, I suppose, as

9  jurisdictional which may be a little closer to what was at

10  issue in *Feola*, which is we are not so focused on whether there

11  is government federal power to regulate on needing a hook -- a

12  constitutional hook for constitutional jurisdiction.  But we

13  want it to be with something that is within federal authority

14  to decide how to apply this law, because we may not entirely

15  trust the state officials to apply it with the same vigor that

16  the federal officials would apply it to.  And maybe there are

17  other visions of what it means to be jurisdictional in nature.

18  And I am curious as to in what sense you -- whether, one, your

19  arguments turns on the federal protectee status being not

20  subject to the scienter requirement, to the extent that turns

21  on it being jurisdictional.  In what sense do you mean it is

22  jurisdictional?

23          MR. ROSEN:  If you read *Feola* -- *Feola* is often

24  interesting because there is a little circular logic going on

25  there.  Because I think I can answer the Court's question by

1    using *Feola* as the example.

2          THE COURT:  Okay.

3          MR. ROSEN:  Because in *Feola*, there were dual

4    purposes and the Court acknowledged there were dual purposes.

5    There was an anti-obstruction statute, but there was also a

6    hook to get in.  As long as there was a hook to get in, the

7    scienter did not extend.  There can be reasons in the 1752

8    context, for example, originally to avoid the patchwork, which

9    we think exists to this day, but also to ensure the federal

10   government's authority or power over protecting its

11   individual -- some anti-obstruction statute akin to 3056,

12   which, again, I didn't know the mens rea that attaches to that.

13   But you can have dual purposes.  You can have multiple

14   purposes, so long as one aspect of it was that Congress

15   intended to essentially federalize this.  And I think Your

16   Honor hit the nail on the head, which is the entire purpose of

17   this is to protect a certain subset of people.  And those

18   people are the ones that fall under the purview of what would

19   traditionally be a federal function that is necessary and

20   proper to essentially protect.  And so to go back to the

21   colloquy with opposing counsel, you know at the end of the day,

22   if you are really deciding whether you are reconceptualizing

23   the statute by changing the penalties, that alone doesn't swing

24   if you look at *Feola*.

25          Certainly the sentencing guidelines assessment -- we

1    appreciate where Judge Cooper is coming from but the sentencing

2    guidelines assessment -- it is a statutory body that just

3    changes.  So, of course, there is the placement of the

4    jurisdictional element and where it gets moved, whether it is

5    2006 or 2012.  But it doesn't change the essence that is still

6    jurisdictional in nature and otherwise it has some purpose to

7    bring this across the board.

8         THE COURT:  To bring it within federal purview?

9         MR. ROSEN:  Yes.

10        THE COURT:  So that is the way you are using it.  And

11   even though I said that was my final question, last time when

12   you were here in Middleton, I asked you about special event of

13   national significance.  Anything new on that?  I think at that

14   time you said, to your knowledge, it wasn't something that was

15   typically used and you weren't quite sure what it meant.

16        MR. ROSEN:  So we think we know what it means, there

17   is not a lot of case law on it.  It is supposed to be for the

18   Democratic National Convention or the Republican National

19   Convention.  It is supposed to be where there are high

20   dignitaries, because there might not be one specific person

21   there who sort of represents the entire Secret Service

22   protectee environment, but has some federal interest.  So the

23   designation process is sort of I think what Your Honor was

24   asking about last time.  That is still not very well known to

25   me.  So I don't want to opine on how one gets designated as a

1    national security event or an NSSE, but we have not alleged

2    that it is --

3            THE COURT:  But is there any procedure or regulation

4    that deals with what that means or how it applies?

5            MR. ROSEN:  So I believe there is a cross-reference

6    to the Code of Federal Regulations, but I need to go back and

7    look at that.

8            THE COURT:  Okay.

9            MR. ROSEN:  So there is a process, but it was a

10   process that did not happen on January 6.

11           THE COURT:  So though if a member of the press corps

12   doesn't get credentials to get into one of the conventions and

13   they sneak into the convention, they violated the statute

14   potentially?

15           MR. ROSEN:  The answer, I don't know.

16           THE COURT:  Okay.

17           MR. ROSEN:  I think it is more of -- to answer more

18   broadly, I think it is a general trespass statute when the

19   Secret Service designates this thing as an important event.

20           THE COURT:  I see.  I got it now.  Give me one

21   second.

22           All right.  Thank you very much.  And anything else,

23   Mr. Sabatini, you want to add before we adjourn?

24           MR. SABATINI:  You had a question about the 3056, was

25   it --

1          THE COURT:  Come on up.

2          MR. SABATINI:  Oh, sure.

3          Judge Cooper pointed out in *Groseclose,* it is

4     knowingly and willfully obstruct, resist, interfere with a

5     federal law enforcement officer.  That is what they brought it

6     in line with.

7          THE COURT:  Right.  But my recollection is that Judge

8     Cooper said that the knowingly didn't travel in that statute,

9     but he didn't cite anything in support of that, which is what

10    got me thinking, what is the basis for that?

11         MR. SABATINI:  Understood.  I thought you just wanted

12    which elements read off to you.  But in terms of going into

13    case cites, I can do that and see if it was still upheld.  It

14    seems like it would be, the person would know that -- you would

15    have to prove that they know it was a Secret Service agent,

16    otherwise you could obstruct anyone walking on the sidewalk.

17         THE COURT:  All right.  Well, if there is anything

18    that anyone wants to send to me, I guess, before 2:00, you want

19    me to look at, I am happy to do it.

20         MR. SABATINI:  Thank you, Your Honor.

21         MR. ROSEN:  Your Honor, I will say, we will certainly

22    try.  I have childcare pick up on a half day, so I am not sure

23    that --

24         THE COURT:  This issue has been very well vetted, I

25    just didn't want to shut anybody off.  I am not urging anything

1    at this point.

2              MR. ROSEN:  I appreciate that.

3              THE COURT:  Thank you all.  This is enlightening.  I

4    will see you all back --

5              Is it 2:00, we are coming back, Glenda?

6              THE COURTROOM DEPUTY:  Yes, Your Honor.

7              THE COURT:  I will see you all back at 2:00.

8              (Recess taken at 12:14 p.m.)

9              THE COURTROOM DEPUTY:  Criminal case 23-71, *United*

10   *States of America versus Bryan Shawn Smith*.

11             Would counsel please approach the podium, state their

12   name for the record, starting with government counsel.

13             MR. ROSS:  Eli Ross and Sarah Levine on behalf of the

14   United States.

15             THE COURT:  Good afternoon to you.

16             MR. PIERCE:  Good afternoon, Your Honor.  John

17   Pierce, Roger Roots and Anthony Sabatini on behalf of

18   defendant, Bryan Smith, who is present.  We also have Emily

19   Lambert, our paralegal at counsel table.

20             THE COURT:  All right.  Good afternoon to all of you

21   as well.

22             And to start, you have my apologies for keeping you

23   waiting.  I am sure that you are all anxious to get my verdict.

24   I just wanted to make sure that I gave complete consideration

25   to the parties' arguments with respect to the scienter issue.

1     And there was a couple of issues that I felt like I needed to

2     go back and look at in light of the arguments, so that is why

3     it took me a little longer and I'm sorry for that.

4          So I am prepared to deliver my verdict now.  My

5     findings are all based on the beyond a reasonable doubt

6     standard that applies in this case.  I start off with some

7     background material, which doesn't really go to the ultimate

8     issues in the case and then I will turn to the ultimate issues

9     count by count.

10         The defendant in the case, Bryan Shawn Smith,

11    traveled from his home in Alabama to Washington, DC to hear

12    then-President Trump speak and to participate in the March for

13    Trump on January 6, 2021.  From the Ellipse, as Mr. Smith's

14    counsel has indicated, he made his way to the Capitol complex

15    where he joined a crowd that was trying to force its way into

16    the Capitol building.  He spent over an hour on the Capitol

17    grounds engaging with law enforcement officers on several

18    separate occasions, which we have discussed at length.

19         First, there was the interaction on the police line

20    on the west front of the Capitol.  Then, there was the

21    interaction at the southwest scaffolding.  And, finally, the

22    interaction at the inaugural tunnel entrancing also known as

23    the tunnel.

24         As a result of this conduct, Mr. Smith is charged in

25    a superseding indictment with seven offenses.  First,

obstructing, impeding or interfering with a law enforcement

officer during the commission of a civil disorder.  Second,

assaulting, resisting or impeding an officer with the intent to

commit another felony or aiding and abetting someone else in

doing so.  Third, entering or remaining in a restricted

building or grounds.  Fourth, impeding or disrupting the

orderly conduct of government business.  Fifth, engaging in

physical violence in a restricted building or grounds.  Sixth,

engaging in disorderly or disruptive conduct within the US

Capitol building or grounds.  And, seven, and finally, engaging

in physical violence in the US Capitol building or grounds.

We held a three-day bench trial.  And I am now

prepared to give you my verdict with respect to each count.

Let me start with Count 1 of the superseding indictment, which

charges Mr. Smith with civil disorder in violation of 18 U.S.C.

section 231(a)(3).  To find the defendant guilty of the charged

offense, the Court must find the government has proven the

following elements beyond a reasonable doubt:  First, that the

defendant knowingly committed an act with the intended purpose

of obstructing, impeding or interfering with one or more law

enforcement officers.  Second, at the time of the defendant's

act, the law enforcement officer or officers were engaged in

the lawful performance of their official duties incident to and

during a civil disorder.  And, third, that the civil disorder

in any way or degree obstructed, delayed or adversely affected

1    commerce or the movement of an article or commodity in commerce

2    or the conduct or performance of any federally protected

3    function.

4         Just by way of background, the Court finds with

5    respect to Count 1, that the events of January 6, 2021, at the

6    Capitol did constitute a civil disorder as defined by the

7    statute.  18 U.S.C. section 2321 defines the term civil

8    disorder to mean any public disturbance involving acts of

9    violence by groups of three or more persons which, A, causes an

10   immediate danger of injury to another person; B, causes an

11   immediate danger of damage to another individual's property; or

12   three, results in injury to another person or; four or D,

13   results in damage to another individual's property.

14        I don't think that one can credibly dispute that the

15   events of January 6, 2021, involved more than three people.

16   Nor can anyone credibly dispute that the crowd on January 6

17   engaged in acts of violence that caused immediate danger of

18   injury to others that, in fact, injured others and damaged

19   property.

20        The government has introduced substantial evidence

21   that show, in fact, all of the locations in which Mr. Smith can

22   be seen that day at the Capitol during the riot.  The Court was

23   first shown evidence of Mr. Smith at the west front of the

24   Capitol at approximately 2:10 p.m. where he was standing in

25   front of a police line behind bicycle racks.  And despite

1    instructions from the officers to the crowd to stay back and to
2    leave, the crowd pushes forward against the officers, hitting
3    officers violently with poles, engaging in violent interactions
4    with the officers, throwing items at the officers, pushing and
5    shoving the officers in an attempt to break through the police
6    line.  Among other evidence the Court relies on Government
7    Exhibit 602E.
8         Then, after the crowd had broken through the first
9    police line on the west front, Mr. Smith made his way to the
10   southwest scaffolding where the crowd of rioters were engaging
11   in acts of violence against the newly established police line.
12   Rioters knocked over bike racks that the officers were using to
13   maintain their -- the police line, struggled with officers to
14   gain control of them.  In fact, as Mr. Smith is standing in
15   front of the scaffolding, rioters have knocked over the bike
16   racks that were previously used to maintain the line and are
17   swarming around the scaffolding.  One rioter throws an object
18   at the officers, which actually almost hits Mr. Smith.  And I
19   am relying there on Government Exhibit 604E, 708 and 707.
20        Eventually Mr. Smith climbs the southwest
21   scaffolding.  Although we don't see him go all of the way up
22   the scaffolding, he does arrive at the lower west terrace and
23   then the tunnel.  At approximately 4:42 a group of rioters in
24   the tunnel use what appears to be a flagpole or something like
25   that to smash open the glass panes in a door in the tunnel.

1    And there was testimony that that was the door that
2    actually locked.  And that is Exhibit 710A.  Thereafter, a
3    large groups of rioters pushed against the police officers
4    repeatedly for at least 30 minutes.  Sergeant Bogner testified
5    that the pushing was very forceful and caused the officers to
6    actually have difficulty breathing.

7    During this period, the rioters threw objects at the
8    officers, discharged chemical sprays at them, used
9    flagpole-like objects to hit the officers, pointed strobe
10   lights in the officers' directions and engaged in threatening
11   and violent behavior directed at the officers who were doing
12   nothing more than guarding the entrance to the Capitol.

13   And the Court finds beyond a reasonable doubt that
14   throughout the Capitol on January 6 the civil disorder took
15   place including in each of the locations that Mr. Smith passed
16   through that day.  The rioters on the west front, the southwest
17   scaffolding and the tunnel were engaged in acts of violence
18   that both caused injury and threatened injury to others and
19   also damaged a great deal of property.

20   So with this initial finding, the Court turns to
21   other elements of the offense.  The government argues that the
22   evidence is sufficient to convict Mr. Smith of Count 1 under
23   several possible theories.  I don't need to reach all of those
24   theories, because I am convinced that the government is correct
25   with at least two of those theories and find that beyond a

1  reasonable doubt that Mr. Smith did commit the offense charged

2  in Count 1 and is guilty of that charge.

3  The first theory that I want to discuss is

4  Mr. Smith's actions at approximately 2:30 p.m. at the southwest

5  scaffolding.  At the southwest scaffolding, a group of police

6  officers were trying to keep the rioters away from the

7  scaffolding.  They were attempting to maintain the police line,

8  attempting to maintain something close to order.  Although they

9  were overwhelmed, the police officers had formed a police line

10  and had moved bike racks to create a barrier.  The officers

11  were trying to keep rioters from getting near the scaffolding.

12  Because as one officer testified, Officer Lombardy, the

13  scaffolding itself could be used as a weapon.  And because the

14  scaffolding or the stairs under the scaffolding provided access

15  to the lower west terrace and the officers were doing their

16  best to keep the rioters back.

17  If rioters were able to access the lower west terrace

18  en masse, before the officers were able to pull back to that

19  area, Officer Lombardini testified, and the Court finds his

20  testimony convincing, that they were concerned they would be

21  encircled and extremely vulnerable, even more vulnerable than

22  they were under the present circumstances.  So they were

23  desperate to keep, maintain that line and to keep people from

24  encircling them.

25  At 2:30 p.m., Mr. Smith is in front of the

1    scaffolding next to a series of three doors that lead to the

2    stairs to the lower west terrace.  At that time, all three

3    doors were initially closed.  At approximately 2:31 another

4    rioter, not Mr. Smith, opens the middle door to the

5    scaffolding.  Mr. Smith then runs over from where he was

6    standing, leaning on the scaffolding looking behind at the

7    officers who were doing their best to maintain control of the

8    situation.  And he comes over and an officer immediately tells

9    Mr. Smith to get back.  And you hear throughout the video, not

10   just at this point, but repeatedly throughout, "Get back, get

11   back, get back" over and over again.  And the officer says

12   directly to Mr. Smith "Get back" from the open doorway.

13          And then, Captain Augustine fairly quickly arrives

14   over there and he is carrying with him a shoulder carried OC

15   aerosol dispenser and he points it at Mr. Smith and he orders

16   Mr. Smith to "Give us the door."  And despite those clear

17   instructions and directions that Mr. Smith should get back,

18   Mr. Smith at least at first does not meaningfully step back or

19   retreat from the door.  He instead argues with the officer.

20          He says, "I am keeping them from coming in, you

21   better not threaten me."  And then as Mr. Smith is instructed

22   yet again to get back, he holds open the door.  And you see him

23   leaning with his arm against the door, holding the door open

24   despite those instructions.  And while he is holding the door

25   open and is being instructed to give us the door and to get

1    back, he says, "There is a fucking million and a half people

2    behind me, you don't think I can come through that door?"

3         And then finally after approximately 30 seconds of

4    Mr. Smith holding the door open arguing with Captain Augustine

5    and the other officer, he eventually does step back and let the

6    door swing shut.

7         I will say with respect to that, that it is true that

8    at times Mr. Smith's voice is level, is not yelling, but there

9    is a clear intensity and anger and threateningness to his

10   posture, his tone and his words in his confrontation with the

11   officer.

12        With respect to the first element, the Court finds

13   that Mr. Smith took these actions.  That is that he refused to

14   follow the directions of the officers, held the door open and

15   made a verbal threat to the officers with the intent to

16   obstruct, impede or interfere with the officers' efforts to

17   prevent the rioters from approaching the scaffolding and

18   otherwise advancing further into the complex.

19        The conversation is not a conversation that Mr. Smith

20   is having out of context.  It is a conversation which is clear

21   that Mr. Smith is indicating that he and others want to get

22   through those doors.  He is not simply -- he hasn't simply run

23   into the officers on the street and is having a polite

24   conversation with them.  He, in an angry tone and in a

25   threatening way, is confronting the officers.  And the only

1    reason for holding the door open and the only reason for having

2    those conversations is to try and convince the officers to back

3    down.

4         And, in fact, as the OC spray gun is pointed at

5    Mr. Smith, he actually orders directions at the officer and

6    says, put it down, put that down.  And I don't know in what

7    world one thinks you get to tell a police officer who is in the

8    middle of a riot that he should disarm himself under the

9    circumstances.  And I also have to say that it is my perception

10   from those events that the reason that Mr. Smith eventually

11   does give the police back the door and back away is because the

12   other option he had would be to be sprayed in the face with OC

13   spray.  And he has an officer who is pointing an OC aerosol

14   dispensing gun directly at him.  And despite the fact that he

15   is pointing this thing directly at him, Mr. Smith continues for

16   some point in time continues to engage with an angry exchange

17   with him and only eventually give in.  And it seems to the

18   Court that the only reason he gives in is because the officer

19   is making a show of force under the circumstances.

20        Mr. Smith had been standing near the southwest

21   scaffolding before engaging with Officer Augustine.  In fact,

22   he had stood immediately next to the door and peered through

23   the scaffolding.  He had seen the door was closed and the

24   officers were trying to keep people from coming through that

25   door and approaching the scaffolding.

1       And it was clear that the area behind the scaffolding

2   and underneath the scaffolding or behind the door and

3   underneath the scaffolding was behind a police line and was in

4   an area that the police were using to organize themselves to

5   retreat, to bring the bicycles up the stairs to get out of the

6   way.  And it was essential to them to maintain the area.  And

7   despite having observed the officers' efforts to keep the

8   rioters at a distance from the scaffolding, Mr. Smith did not

9   follow the officers' instructions to keep away from the door

10  and the scaffolding and instead held it open for some period of

11  time and made verbal threats to the officer.

12      And I conclude that Mr. Smith did so with the intent

13  to impede the officer's ability to subdue the rioters who were

14  in front of the southwest scaffolding and to safely retreat to

15  the lower west terrace.

16      I will also say that some of the questions asked at

17  trial of -- I think it was of Captain Augustine, well, what

18  else would you have been doing?  And his answer, well, I don't

19  know precisely what else I was doing, but that answer makes

20  complete sense to me.  There was a riot going on and he doesn't

21  know which particular rioter he would be engaging with, but I

22  have no doubt whatsoever that if he wasn't spending that time

23  at that door arguing with Mr. Smith, he would have been doing

24  something else to control this overwhelming riot.  I mean,

25  there were many, many, many more rioters than police officers.

1    The police officers were outnumbered.  They were frightened.

2    Their lives and well-being was at risk and they needed every

3    resource they possibly had to protect themselves and to protect

4    the Capitol.  And any time that they spent arguing or engaging

5    with belligerence was time they weren't able to spend

6    organizing themselves and protecting fellow officers and

7    protecting the Capitol.

8            Turning to the second element of Count 1, the Court

9    finds that at the time of Mr. Smith's acts at the southwest

10   scaffolding, law enforcement officers, including Captain

11   Augustine, were engaged in the lawful performance of their

12   duties incident to a civil disorder.  As explained, the Court

13   has already found that these events constituted a civil

14   disorder.  And in addition at approximately 2:30 p.m. when

15   Mr. Smith was holding open the scaffolding door, the evidence

16   shows that Captain Augustine and others at the southwest

17   scaffolding were doing their absolute best to control a riot

18   and to contain the rioters to prevent them from entering the

19   scaffolding or climbing up the scaffolding.  I think there is

20   one point in time in which there is somebody who is right next

21   to Mr. Smith who starts to climb up the scaffolding.  And an

22   officer comes over and bangs his baton.  And that person jumps

23   down from attempting to climb the scaffolding.  And Mr. Smith's

24   reaction to that is to step into that person's place, not to

25   climb the scaffolding at that point, but to take the spot.  He

1   knows what is going on.  He knows what sort of civil disorder

2   is taking place.

3          With respect to the third and final element of Count

4   1, the civil disorder in any way or degree obstructed, delayed

5   or adversely affected commerce or the movement of any article

6   or commodity in commerce or the conduct or performance of any

7   federally protected function.  The Court finds that element is

8   also satisfied.  I know there was a fair amount of back and

9   forth in the case with respect to the commerce element.  But I

10  don't even need to reach the commerce element, because I think

11  federally protected function element is clearly satisfied.  A

12  federally protected function is defined in 18 U.S.C. section

13  2332(3) to mean, "Any function, operation or action carried out

14  under the laws of the United States by any department, agency

15  or instrumentality of the United States or by an officer or

16  employee thereof."  And the term department includes the

17  departments of the Executive Branch, such as the Department of

18  Homeland Security which does include the Secret Service.  And

19  one of the Secret Service's statutory mandates is to protect

20  the vice president and his family.  And that function was

21  adversely effected when the rioters breached the police line,

22  were violent, broke into the Capitol.

23         Inspector Hawa from the Secret Service testified that

24  Vice President Pence had to be evacuated from his ceremonial

25  office and that he was not able to safely return and to

1    continue to perform his duties for several hours because of the

2    riot.

3          So it is clear me that the function of the Secret

4    Service was obstructed, delayed or adversely affected or the

5    conduct of the performance of the Secret Service was adversely

6    affected by the riot that occurred on January 6.  And the Court

7    thus finds that the civil disorder obstructed, delayed and

8    adversely affected a protected federally -- a federally

9    protected function.

10         In the alternative, although I don't think it is

11    necessary in this case, the Court also finds that commerce was

12    adversely affected by the civil disorder.  Government

13    Exhibit 502 shows that the Safeway grocery stores in the

14    District of Columbia were closed pursuant to the mayor's curfew

15    order.  And that order, which the Court can take judicial

16    notice of, explains that the civil disorder at the Capitol on

17    January 6, 2021, threatened the "health, safety and well-being

18    of persons in the District of Columbia and necessitated a

19    curfew."  And because the Safeway stores were closed due to the

20    civil disorder at the Capitol, the stores saw fewer sales than

21    predicted or that would otherwise have occurred on

22    January 6, 2021.

23         And I am convinced of that based on that documentary

24    evidence that has been submitted to the Court -- I know the

25    defense takes the view that the commerce requirement requires

1     more and that somehow one has to look at the balance of

2     commerce overall.  I don't read the statute that way at all.

3     And, in fact, I think that the statutory requirement is a

4     relatively minimal one for the commerce requirement.  It simply

5     requires in section 231(3) that the civil disorder in any way

6     or to any degree obstruct or delay, not only commerce but the

7     movement of any article or commodity in commerce.  And I think

8     that standard is easily satisfied here.  And I think even more

9     generally the commerce requirement is satisfied.  And,

10    therefore, I conclude that the third element is satisfied.

11            I also could conclude that the Government is correct

12    with respect to Count 1 on its theory with respect to the

13    events that occurred at the tunnel.  And the government argues

14    that Mr. Smith committed civil disorder in violation of section

15    231(a)(3) when he participated in the concerted heave-ho style

16    pushing with other rioters against the police line that

17    prevented members of the crowd -- that were attempting to

18    prevent members of the crowd from entering the Capitol building

19    through the tunnel entrance.

20            The first instance in which Mr. Smith pushed against

21    the police line in the tunnel occurred at approximately

22    2:50 p.m.  And at that time Mr. Smith had entered the tunnel,

23    made his way to front of the crowd and began to push forward in

24    concert with other rioters against the police line.  The CCTV

25    footage from the cameras or the camera that is immediately

1  above the door to the tunnel shows that Mr. Smith pushed

2  forward several times.  And based on the testimony from

3  Sergeant Bogner and the footage from Sergeant Bogner's body

4  camera, the Court concludes that Mr. Smith would have had to

5  have been quite close, if not directly against the police line

6  at the time that he was engaging in this pushing.  And it

7  doesn't make a difference to my mind as a matter of law as to

8  whether he was directly pushing against a police officer or

9  whether he had someone else's back who was pushing against the

10 police officer and he was engaged in the heave-ho and pushing

11 that other person forward who was pushing against the police

12 officer.  I think that those things are really equal to my

13 mind.

14         And the defense at times has argued that Mr. Smith

15 was just stuck in the tunnel.  He was just curious and wanted

16 to get up there to see what was going on.  And I think that is

17 just demonstrably false when one looks at the video footage.

18         Later at approximately 3:15 p.m., the CCTV footage

19 from inside the tunnel at Exhibit 403A also shows Mr. Smith

20 entering the tunnel again after having left.  When he reenters

21 the tunnel, the crowd at the front of the tunnel is engaged in

22 the heave-ho effort again, pushing against the police line.

23 And seeing this, Mr. Smith deliberately makes his way forward

24 to the front of the crowd of rioters, pushing against the

25 police in an effort to force their way into the building.  And

1    he is once again towards the front of the crowd.  He

2    participates in the heave-ho pushing against the police line

3    for about a minute and a half.  And that is again Exhibit 403A.

4         As I mentioned, the defense argues that the Court

5    cannot determine whether the rioters are pushing directly

6    against the police line at this point, because the camera from

7    the CCTV doesn't show the police line itself.  But the

8    government has also provided third-party footage that makes

9    clear that the rioters were at that time concertedly pushing

10   against the police line.  That is Exhibit 403D.  And Mr. Smith

11   can be seen in the third-party footage clearly participating in

12   the synchronized pushing.

13        I will also note that I went back and spent quite a

14   bit of time looking at the time sync from Sergeant Bogner's

15   camera, which shows his view of what is going on from inside

16   the Capitol from the CCTV.  And it is evident to me from

17   looking at that, the crowd is, in fact, pushing up directly

18   against the police line at the time that Mr. Smith is joining

19   in that effort.  And at times you can even see the police

20   officers' shields.  And you see at times those shields being

21   taken from the police officers and pulled back through the

22   crowd of rioters.

23        I want to focus my attention on the second episode of

24   the heave-ho effort for present purposes, but I do want to make

25   clear I think the first episode is equally applicable and it

1    does show that Mr. Smith twice engaged in that behavior.

2         With turning to the first element and with these

3    facts in mind, I find that Mr. Smith upon entering the tunnel

4    at approximately 3:15 for the second time, that he

5    intentionally made his way to the front of the crowd, which was

6    already engaging in the heave-ho effort to push the police

7    line, so that he could participate in that heave-ho effort.

8    And he clearly, to my mind, voluntarily joined in that effort.

9    And he was not pushed into doing it or stuck in the crowd in

10   doing it.  And he voluntarily and intentionally participated in

11   that heave-ho effort to obstruct, impede or interfere with one

12   or more law enforcement officers who were trying to prevent the

13   rioters from entering the Capitol through the tunnel.

14        As I mentioned, Mr. Smith argues that he didn't

15   voluntarily participate and that he was trapped.  As I have

16   indicated, I just don't think that is credible.  For the first

17   several heave-hos, by the Court's count, at least three which

18   are at Exhibit 403A at time mark 28 to 40, Mr. Smith could

19   easily have left the tunnel if he wanted and could have easily

20   ceased pushing against the police line.

21        There were few rioters behind him at that time.  He

22   wasn't sandwiched in in any way, yet he stayed and joined in

23   that effort.  It is true that eventually the tunnel becomes

24   more crowded and that it becomes increasingly difficult to

25   leave.  But when Mr. Smith indicated that he would like to

1 leave by turning around and gesturing with his hands, it is not

2 clear whether he was gesturing because he wants to leave or

3 somebody else in the crowd is getting crushed by the effort of

4 the crowd pushing against police officers. He is able to do

5 so. That, again, is 403A at a minute 50 to 2 minutes, 30.

6 And at this point when Mr. Smith visibly is seeking

7 to leave the tunnel, the group pushing appears to have stopped.

8 To the extent that Mr. Smith was at some point unable to easily

9 and quickly remove himself from the group that was pushing

10 against the police line, those moments don't in any way

11 undermine my finding that he voluntarily entered the tunnel and

12 voluntarily joined in the pushing effort. And I see no

13 indication that he was distressed in doing so and simply trying

14 to avoid the circumstance. To the contrary, he was

15 enthusiastically joining in with the effort.

16 In terms of the second element, the Court finds for

17 the reasons I have already explained that at the time of

18 Mr. Smith's acts in the tunnel, law enforcement officers were

19 engaged in the lawful performance of their duties incident to a

20 civil disorder. The officers in the tunnel were trying to

21 prevent the rioters from entering the building and were trying

22 to push the rioters back. And so I conclude that the second

23 element is satisfied. And the third element is satisfied for

24 the reasons that I have already given. So the Court finds

25 Mr. Smith guilty as to Count 1, civil disorder in violation of

18 U.S.C. section 231(a)(3).

Although, Count 2 of the superseding indictment charges Mr. Smith with inflicting bodily injury on certain officers in violation of 18 U.S.C. section 111(b), the government has provided notice and did provide notice of its intent not to pursue that charge, instead to pursue the lesser included offense of assaulting certain officers in violation of 18 U.S.C. 111(a). And the government also provided notice in advance of trial that it wasn't seeking to convict Mr. Smith on the 111(a) theory based on physical contact that Mr. Smith made with the officers that were alleged to have been assaulted, so I will put those issues aside.

To find Mr. Smith guilty under these circumstances of a violation of Count 2, the Court must find the government has proven beyond a reasonable doubt the following elements: First, the defendant assaulted, resisted, opposed, impeded, intimidated or interfered with either an officer or employee of the United States or a person assisting such an officer or employee in the performance of his official duties. Second, the defendant did such acts forcibly. Third, the defendant did such acts voluntarily and intentionally. Fourth, that the officer or employee of the United States was engaged in the performance of his official duties. And, fifth, the defendant acted with the intent to commit another felony. And here the government alleges the other felony is the offense charged in

1    Count 1, which the Court has already concluded that Mr. Smith

2    committed.

3            In the alternative, the government alleges that

4    Mr. Smith assaulted, resisted or impeded an officer as charged

5    in Count 2 by aiding and abetting others in committing that

6    offense.

7            So put differently, the government alleges that the

8    assault crime was committed by someone and that Mr. Smith

9    knowingly and intentionally aided and abetted that person in

10   committing the crime.  In order to find Mr. Smith assaulting,

11   resisting or impeding an officer because he aided and abetted

12   others in committing this offense, the Court must find the

13   government has proven beyond a reasonable doubt the following

14   elements:  First, that others assaulted, resisted or impeded an

15   officer by committing each of the elements of the charged

16   offense.  Second, that the defendant knew that the officer or

17   officers had been assaulted, resisted or impeded by others or

18   that others were going to do the same.  Third, that he

19   performed an act or acts in furtherance of the offense.

20   Fourth, that the defendant knowingly performed the act or acts

21   for purposes of aiding, assisting, facilitating or encouraging

22   others in committing the offense of assaulting, resisting or

23   impeding the officer.  And, finally, that the defendant did the

24   act or acts with the intent that others commit the offense of

25   assaulting, resisting or impeding the officers.

1        Here, the government argues that the Court can find

2   Mr. Smith guilty of Count 2 on one or both of two theories.

3   First, that Mr. Smith violated section 111(a) by joining the

4   rioters in the heave-ho in the tunnel to try and force the

5   break in the police line.  And, second, that he violated 111A

6   when he aided and abetted another rioter in committing an

7   assault or assaults against officers by handing that rioter a

8   stun gun that he in turn -- that he had activated and turned

9   on.

10        And for present purposes, I don't think I need to get

11   into a linguistic debate about whether to call this a stun gun

12   or a sparking device.  For reasons that I will explain, I don't

13   think it makes a difference.  So when I say stun gun,

14   understand that I am also including in that for present

15   purposes a sparking device that might not be classified by an

16   expert as a stun gun.

17        The government's first theory concerns the same

18   actions that I have already discussed in Count 1.  That is that

19   Mr. Smith knowingly and intentionally helped push against the

20   police line at approximately 3:15 in the tunnel as well as on

21   earlier occasion.  With respect to the first element of Count

22   2, the Court finds that Mr. Smith did resist, oppose,

23   intimidate and interfere with officers in the tunnel when he

24   pushed in concert with other rioters against a police line at

25   approximately 3:15 p.m.  Sergeant Bogner testified that he and

1    other MPD officers had been called in to assist the Capitol

2    Police in subduing the January 6, 2021 riot.  He further

3    testified that he and other MPD officers were in the tunnel

4    assisting the Capitol Police when Mr. Smith was pushing against

5    the police line.  And therefore when Mr. Smith was pushing

6    against the police line, he was pushing against law enforcement

7    officers who were assisting officers of the United States, that

8    is the Capitol Police in the performance of their official

9    duties.

10          For the same reasons the Court found that Mr. Smith

11   impeded and interfered with officers by participating in the

12   heave-ho against the police line for Count 1.  The Court also

13   finds that his actions resisted, opposed, impeded, intimidated

14   and interfered with officers for purposes of Count 2.

15          Mr. Smith's repeated pushing or shoving forward made

16   it harder for the police officers to hold that line and keep

17   the rioters out of the Capitol building.  As Sergeant Bogner

18   testified, the force of the rioters, including Mr. Smith,

19   exerted in his heave-ho push was extremely difficult and taxing

20   for the officers to oppose.  It consumed the energies of the

21   officers and made it much more difficult for those officers to

22   perform their duties to keep the rioters out of the Capitol

23   building that day, to clear the tunnel, to clear the area in

24   front of the tunnel, to protect themselves and to protect the

25   Capitol.

1       And when you look at that footage, I have to say, I

2   am struck by what a frightening circumstance that was for the

3   officers.  And I think, if anything, the officers who testified

4   here, including Sergeant Bogner, understated the dire

5   circumstances the officers faced in the tunnel.  I see in one

6   circumstance where there is one officer who is in the tunnel

7   who is on the line and his finger is bent at an angle and

8   bloodied.  One of the officers says, are you okay?  And he

9   says, my finger is broken.  And he goes back to holding the

10  line there.  There is a man whose finger is smashed, broken in

11  an obvious angle, bleeding and he is not leaving.  He is not

12  leaving because he has to protect the Capitol and do his job.

13  He is not complaining.  And it was to my mind, an extremely

14  frightening, dangerous circumstance for those officers.

15      The Court notes as I did in *United States versus Cua*

16  that the most natural reading of section 111(a) is that it

17  prohibits not only assaulting a designated person, but also

18  forcibly resisting, opposing, impeding, intimidating and

19  interfering with a designated person while engaged in the

20  performance of her official duties.  That is at 657 F. Supp. 3d

21  at 112.

22      So the Court need not find that an assault occurred

23  to find that the first element is satisfied if the defendant

24  otherwise resisted, opposed, intimidated or interfered with a

25  designated person, which I think is easily satisfied here.  I

1  think it is also actually the case that, although I don't need

2  reach it, that an assault also occurred as well, even though

3  Mr. Smith may not have personally -- or there is not evidence

4  that he had personal contact with the officers.  Pushing

5  someone else into an officer would constitute an assault in any

6  event.  But for the reasons I have stated, I don't think I need

7  to reach that question.

8       With respect to the second element of Count 2, the

9  Court finds that Mr. Smith committed the acts forcibly.  A

10  person acts forcibly if he uses force, attempts to use force or

11  threatens use of force against the officer.  A push is, in

12  fact, a use of physical force.  And the evidence clearly shows

13  Mr. Smith was pushing in the tunnel against at least the other

14  rioters in front of him, if not against directly against any

15  officers.

16       Moreover, Sergeant Bogner testified that rioters

17  exerted quite a bit of force on the police officers holding the

18  line in the tunnel when they engaged in the heave-ho.

19       You know, this is -- I am jumping backwards a little

20  bit.  But when I mentioned the officer with the broken finger

21  that was bleeding, it does bring back to my mind that going

22  back to the incident at the scaffolding that at the time that

23  Mr. Smith is engaging with Captain Augustine at that line

24  there, you know, far from just a friendly, everyday

25  conversation, Captain Augustine is bleeding from his face.  His

1    shirt is stained as a result of the attack.  This is a man who

2    is clearly in distress and under extremely adverse

3    circumstances.  And the conversation is not, oh, my gosh, I see

4    you are bleeding, is there anything I can do to help?  It is,

5    there are a million and a half of us behind me here, get out of

6    the way.  That was at least the implication.

7         But let me turn back to Count 2.  With respect to the

8    third element, the Court finds beyond a reasonable doubt that

9    Mr. Smith committed these acts voluntarily and intentionally.

10   As the Court explained with respect to Count 1, he

11   intentionally and voluntarily pushed against the police line in

12   the tunnel to try and break through the line.  After Mr. Smith

13   re-entered the tunnel, he deliberately made his way to the

14   front of the crowd where the crowd was already pushing forward

15   in the heave-ho manner.  And Mr. Smith joined in that effort to

16   push forward against the police officers.

17        The Court also rejects the defense that he was

18   trapped and not able to leave for the reasons that I have

19   previously explained.

20        The Court finds the fourth element is also satisfied,

21   that is that the subject of Mr. Smith's act was an officer or

22   employee of the United States who was engaged in the

23   performance of his official duties or a person assisting such

24   an officer or employee in the performance of his official

25   duties.  And as I previously explained that Sergeant Bogner was

present in the tunnel as part of the police line at the relevant times. And the other officers from the MPD were present there because they were called in to assist the US Capitol Police in trying to secure the Capitol buildings and grounds and to otherwise subdue the riot in the tunnel and elsewhere.

And then as to the fifth and final element, the Court concludes that Mr. Smith acted with the intent to commit the crime charged in Count 1 when he pushed forward in concert with the other rioters in the tunnel. He did so with the intent break the police line and obstruct the police officers' ability to respond to the ongoing civil disorder in the tunnel and the US Capitol more generally.

I don't need to reach this issue, but I am also convinced that the passing of the stun gun constituted a violation for purposes of Count 2. And so in the alternative, I do find that Mr. Smith aided and abetted another in assaulting officers by providing the stun gun or sparking flashlight to the other individuals.

Let me start with the stun gun or sparking device. The CCTV footage from the tunnel shows that at approximately 2:52 p.m. Mr. Smith removed a glove he was wearing, reached into his pocket and removed a black item. He then removes the item from its case, fiddles with it, holds it up in the air to look at it. The object emits a bright blue light. He places

1   the pin in it, which we have later learned was essentially the

2   safety device, indicating that he was familiar with the device.

3   It wasn't something he just found on the ground.  He knew how

4   it operated and rendered it to be operational.

5          Mr. Smith then passes the item to another individual

6   wearing a blue knit hat with Trump lettering on it.  Mr. Smith

7   first tries to pass it to a couple of others, who quite wisely

8   don't want to have anything to do with it.  But eventually the

9   individual in the blue hat does take the device.  At times the

10  defense has suggested that Mr. Smith was simply trying to find

11  the rightful owner of the device.  And I find that argument

12  incredible.  It is clear that he understood how the device

13  worked.  He was the one who rendered it operational.  He tested

14  it before passing it forward.  And he is looking to pass it not

15  to whoever in the tunnel might have lost their stun gun or

16  sparking device.  He is trying to pass it to the front where it

17  can be used against the officers at the front.  He is not

18  looking to his side or to his back.  He is not looking back at

19  the crowd and saying, hey, did anyone lose something here?  He

20  is passing it forward to those who can actually use it against

21  the officers.

22          The individual wearing the blue knit hat eventually

23  passes it to an individual with a beige knit hat who passes it

24  to the fourth man in the bright blue jacket.  When the man

25  wearing the bright blue jacket receives it, he examines it

1    briefly.  And the same red light can be seen, so we know it is

2    the same device that Mr. Smith took from his pocket.  A photo

3    of the man wearing the blue jacket outside of the tunnel shows

4    him holding the device and that is Exhibit 615E.

5         And I think there is actually agreement among the

6    witnesses in the case that the device was a Vipertek VTS797

7    stun gun or sparking device, if you want to call it that or a

8    similar model.  At trial, I examined that device and observed

9    that it appeared to be the same device that the man in the blue

10   jacket held.  And it also appears to be the same device that

11   the man in the blue hat hands the man in the beige hat.  The

12   VTS797 also bears characteristics that match what is seen in

13   the video while Mr. Smith is handling it.

14        First, Agent Lee testified that the Vipertek stun gun

15   is sold in a traveling case.  And you can see Mr. Smith

16   removing it from a similar case.  Agent Lee also testified that

17   the Vipertek requires the user to insert a pin prior to being

18   able to discharge it.  You can see Mr. Smith inserting the pin

19   into the device.  And third, Agent Lee advised how the device

20   emits a bright blue light and a loud static noise when it is

21   fired.  And Mr. Smith can be seen in the tunnel holding it up

22   with the same flash of blue light.

23        And then Agent Lee also showed how the device

24   displays a red light on its side, which then you can see in the

25   tunnel, both when Mr. Smith has the device and also when others

1    in the tunnel have it.  So the Court concludes that item

2    Mr. Smith removed from his pocket at approximately 2:52 was the

3    Vipertek VTS797 device or a similar device in all material

4    respects.

5          Turning to the elements.  With respect to the first

6    element, the government is required to prove under an aiding

7    and abetting theory that others violated 18 U.S.C. 111(a) by

8    assaulting, resisting or impeding officers in the tunnel and

9    specifically I find that individual who has been identified as

10   Zachary Rash or the man in the blue hat assaulted officers who

11   were at the front of the police line in the tunnel.

12         As I have explained, both in this case and elsewhere,

13   an assault includes an intentional attempt or threat to inflict

14   injury on anyone else when coupled with the apparent ability to

15   do so.  There is no evidence here that Mr. Rash actually did

16   inflict an injury on the officers at the front of the police

17   line in the tunnel or even that he actually made physical

18   contact with them.  But the CCTV footage shows that at

19   approximately 2:53 he made an aggressive lunging movement

20   toward the police line wielding the object which I am convinced

21   is the stun gun or sparking device at issue.  At the same time

22   that he can be seen lunging in the direction of the officer

23   that is at 2:53 and 25 seconds, the noise of the stun gun

24   firing can be heard exactly at that same time.  And I have got

25   this by comparing different exhibits.  Mr. Rash can also be

seen pushing forward toward the police line at 2:52:44 when
audio from two different police officers' body cameras pick up
the noise of a stun gun being fired.  That is Exhibits 402C and
701B.

So I find that Mr. Rash did discharge the stun gun
device while lunging at the police officers in the tunnel.  And
that in doing so, he threatened the officers with an apparent
ability to inflict bodily injury.

The defense has introduced evidence from their
expert, Dr. Kroll, that the VTS797 is not an especially
dangerous device, that someone who is shocked by it may not be
injured or incapacitated in any way.  I will note that although
he did give that testimony, he also, I think, was reluctant to
test it on himself.  And I didn't think any of us wanted to
test it on ourselves, I think it is safe to say, even if it
would not have been incapacitating or wouldn't cause one
convulsions or even long-term physical injury or physical
injury, I think it is fair to say that it would have -- and
there is reason to believe it would cause at least discomfort.
And, in fact, even the testimony from Dr. Kroll was that it
would be like a pinching feeling against the arm.  And if it is
a pinching feeling against the arm or the leg, one can rest
assured that in other portions of the body that it would be
quite painful.  But I don't think that is necessary at all to
my holding.  That is really an aside.  Because I don't need to

make any finding with respect to whether there was any actual
harm or even really whether the device had the ability to
inflict actual harm. An assault can occur without physical
contact or injury. And intentionally causing someone to fear
injury when coupled with the present ability to do so is
sufficient.

And everyone here agrees that when the VTS797 is
fired, it emits a very loud and scary electrical shock-type
noise that one typically associates with a Taser-like device.
And an officer hearing that device, in my view, would be
concerned about their physical safety, particularly when it is
pointed in their direction in the middle of a riot as occurred
here. Sergeant Bogner testified that despite all of the noise
and commotion that was occurring in the tunnel that day, he and
others officers in the tunnel were able to discern the noise
from a stun gun being discharged like the VTS797, because
officers are sensitive to weapons being used. And when you
know that sound, you know it to be a weapon. And it is
something that you pay attention to. Sergeant Bogner
elaborated by stating that "A stun gun presents safety
concerns, because a stun gun can hurt you. It can cause pain.
It can cause burns. It is something you pay attention to
because you don't want it used on you."

When Mr. Rash fired the stun gun while lunging at the
police officers in the tunnel, he threatened them with bodily

1    injury and had the apparent ability to inflict that injury,

2    even if the actual stun gun he was holding was not something

3    that would, in fact, cause injury.

4         Mr. Rash also did so forcibly.  He lunged forward

5    with the stun gun in an attempt -- that was an attempt to use

6    force to threaten the police officers.  And he did so

7    voluntarily and intentionally.  The video shows Mr. Rash taking

8    the stun gun from Mr. Smith, pushing his way to the front of

9    the police line before lunging at the officers while wielding

10   the stun gun.  And the recipients of this threat were the

11   officers who were present in the tunnel to assist the Capitol

12   Police, when they were engaged in the performance of their

13   official duties and holding the line and preventing the rioters

14   from entering the Capitol.  I think it is safe to say that

15   there is no reason to believe that Mr. Rash was using this

16   device as a joke or a party favor or anything.  It was being

17   used like a lot of what was going on in that tunnel that day,

18   to threaten and to scare the officers who were present there.

19        I will say, because this doesn't come across in the

20   record, but when you hear the device fire, it is frightening.

21   And I understand that there was a lot of noise in the tunnel,

22   but it is extremely loud and an extremely disturbing noise.

23   And I know that I personally jumped when I heard the device.

24        I will actually suggest to Mr. Ross, that if you are

25   going to do that ever again in a closing, you ask the judge's

1      permission first.  Some other judges would not take as kindly

2      to that as I would and you might find yourself in some trouble

3      with some of my colleagues in this Court were you to do that.

4      But it made the point.  It wasn't necessary because I had heard

5      it previously.  And the device is a scary device.  And I have

6      no doubt that the officers who were at the front of the line

7      were frightened by it.

8              I pause here for a second, because both with respect

9      to the pushing and more specifically with respect to that

10     device, the defense has suggested at times that you need the

11     particular officer here to testify.  And it needs to be

12     directed at a particular officer.  I am not convinced by that.

13     We know it was the officers who were at the front of the line

14     there.  We may not know their identities, but we know at any

15     particular time it was the particular officers that were at the

16     front of the line there.

17             And Mr. Roots may be right that were the government

18     to bring a subsequent prosecution regarding the use of the stun

19     gun at some other time or some other place that there might be

20     issues and concerns with that.  But it was used twice at a very

21     specific time, in a very specific place directed at whoever the

22     officers were who were at the front of the line.  I don't think

23     we need to know who they were in order to find that an assault

24     occurred.  And I also find that any reasonable officer under

25     the circumstances would have been frightened by that display of

1  force.

2  And then, finally, the Court finds that Mr. Rash

3  committed this assault with the intent to commit another

4  felony, that is civil disorder in violation of 18 U.S.C section

5  231(a)(3).  And as has been explained, the officers in the

6  tunnel were performing their lawful duties incident to a civil

7  disorder that was occurring in the tunnel at that time.  And by

8  lunging at the officers, threatening injury and causing them to

9  fear for their safety, Mr. Rash intentionally tried to impede

10  those officers' performance of their duties.  And that he

11  intentionally tried to make it more difficult for them to keep

12  the rioters from entering the Capitol through the tunnel.

13  Having found the first element of aiding and abetting

14  satisfied here, the Court turns to the remaining elements.  The

15  remaining elements in some sense run together.  They require

16  the defendant to know that the officer has been assaulted,

17  resisted or impeded by others or that others were going to do

18  the same and that the defendant knowingly performed an act in

19  furtherance of the offense with the purpose of aiding that

20  offense.  And I find that all of those elements are satisfied

21  here beyond a reasonable doubt.

22  Mr. Smith removed the stun gun from his pocket.  He

23  enabled it to fire, tested it to make sure it worked and then

24  passed it to another individual in the front of the group who

25  was closer to the police line than he was.  In doing so, he

knew that he was passing an item that could be used to assault, resist or impede the officers in the police line.  There was no other reason to do it than to pass it forward other than that. This was a device that could only be used under the circumstances be used for that purpose.  And, in fact, if Mr. Smith did not want another individual to use the stun gun in such a fashion, it would have made no sense for him to have passed it forward as he did after enabling it to fire by putting the pin in place.

As I have mentioned, the defense argues that Mr. Smith was attempting to return a lost item.  And I don't find that argument at all persuasive.

So for these reasons, the Court finds that Mr. Smith is guilty of Count 2, assaulting, resisting or impeding certain officers in violation of 18 U.S.C. section 111(a).

Before turning to the section 1752(a) counts, I want to address the two 5104 counts, which are Counts 6 and 7 of the superseding indictment.  Count 6 of the superseding indictment charges Mr. Smith with disorderly conduct in a Capitol building or grounds in violation of 40 U.S.C. section 5104(e)(2)(D). And to find him guilty of Count 6, the Court must find the government has proven the following elements beyond a reasonable doubt:  First, that Mr. Smith engaged in disorderly or disruptive conduct in any of the Capitol building or grounds.  Second, that he did so with the intent to impede,

1    disrupt or disturb the orderly conduct of a session of Congress

2    or either House of Congress and that he acted willfully and

3    deliberately.  And I find that the government has not met its

4    burden with respect to Count 6.  Specifically, the Court is

5    unable to find beyond a reasonable doubt that the government

6    has proven the second element.  The government did not admit

7    any evidence indicating that Mr. Smith was aware that Congress

8    was in session or at least was scheduled to be in session at

9    the time that he was at the Capitol.

10           And maybe that based on everything else we know from

11   the world, that seems reasonably clear, but I have to rely on

12   what the evidence is that was actually admitted in the case.

13   And the government provided a handful of Mr. Smith's social

14   media posts in the weeks and months leading up to

15   January 6, 2021.  But none of those posts discuss the

16   certification of the election, nor do they mention anything

17   about what Congress would be doing that day.  Exhibits 818 and

18   820 reference election fraud generally or allegations of

19   election fraud in Georgia, but they make no reference to

20   Congress' role in certifying the election.  And although the

21   government did introduce evidence that Mr. Smith discussed the

22   certification after January 6th, that doesn't satisfy the

23   government's beyond a reasonable doubt burden standard with

24   respect to his knowledge or intent that day.

25           It may be that one can infer that he would have known

1    that earlier, but I am not prepared to conclude that beyond a

2    reasonable doubt.

3          In a similar vein, Mr. Smith's counsel acknowledged

4    in their proposed findings of fact and opening brief that

5    Mr. Smith attended the rally at the Ellipse.  And there perhaps

6    was discussion of the certification of the election at the

7    rally.  I believe there was, but, again, that is not in

8    evidence before me in this case.  And so I can't rely on that.

9    Since it is the government that bears the burden beyond a

10    reasonable doubt on every element, I find Mr. Smith not guilty

11    of disorderly conduct and disruptive conduct in a Capitol

12    building or grounds for purposes of Count 6.

13          In Count 7, Mr. Smith is charged with committing an

14    act of physical violence in the Capitol building or grounds in

15    violation of 40 U.S.C. section 5104(e)(2)(F).  And to find

16    Mr. Smith guilty of Count 7, the Court must find that the

17    government has proven beyond a reasonable doubt the following

18    elements:  The defendant engaged in an act of physical violence

19    within the Capitol building or grounds and that he acted

20    willingly and knowingly.  With respect to the first element,

21    the Court finds that Mr. Smith engaged in an act of physical

22    violence on the Capitol grounds when he was pushing forward

23    against the rioters towards the police line in the tunnel at

24    approximately 3:15 p.m., as well as when he pushed forward

25    against the police line in the tunnel at approximately

1   2:50 p.m.

2          With respect to the second element, the Court finds

3   for the same reasons that the Court did with respect to Counts

4   1 and 2 that Mr. Smith's pushing forward in the tunnel was done

5   willfully and knowingly.  And therefore the Court finds

6   Mr. Smith guilty of Count 7, committing an act of physical

7   violence in the Capitol building or grounds in violation of 40

8   U.S.C. section 5104(e)(2)(F).

9          So that all then leads to the 1752(a) counts.  And

10  that presents the question that I heard oral argument on that I

11  have given a lot of thought to, that my colleagues have given a

12  lot of thought to, in particular whether the knowingly scienter

13  requirement carries through all of the statute to the point of

14  knowing not just that one has entered or remained, for example,

15  in a restricted building or grounds without lawful authority to

16  do so, where the restricted building or grounds means any

17  posted, cordoned off or otherwise restricted area.  But also

18  carries forward to knowing that a person protected by the

19  Secret Service is or will be temporarily visiting.  And as I

20  have previously indicated, I think this is a close and

21  difficult question.

22         And I look forward to getting some guidance from the

23  D.C. Circuit with respect to this question.  Both parties have

24  briefed the issue.  I am familiar with the many opinions that

25  have been offered by my colleagues on this issue, including

1     Judge Cooper's opinion in *United States versus Groseclose* and

2     Judge Howell's opinion in *United States versus Carnell*.  Judge

3     Cooper in the *Groseclose* case takes the position, as I

4     understand it, that the defense takes here that section

5     1752(a)'s knowledge requirement applies to the entire

6     definition of restricted building or grounds.  Judge Howell

7     adopted a different view, which is the view that the government

8     presses, which requires only that the defendant know that the

9     area was posted, cordoned off or otherwise restricted.

10          And I am not going to repeat here the very thoughtful

11    and thorough analyses in those two opinions as well as some of

12    the other opinions from my colleagues.  But I do want to hit on

13    some of the key points.  First, it is a fundamental principle

14    of statutory interpretation that Courts ordinarily read a

15    phrase in a criminal statute that introduces the elements of

16    the crime with the word knowingly as applying that word, that

17    is the scienter requirement to each element.  That is from

18    *Flores-Figueroa* 556 U.S. at 652 or put differently as the

19    Supreme Court did in the *Rehaif* case, as a matter of ordinary

20    English grammar, we normally read the statutory term knowingly

21    as applying to all of the subsequent listed elements of the

22    crime.

23          So we start with the proposition that 1752 would

24    ordinarily be read such that knowledge requirement carries all

25    of the way through.  But I think, as I understand it, not even

1    the defendant argues that it actually carries all of the way

2    through the statute.  Because if it carried all of the way

3    through, it would not only carry through 1752(c)(1)(B) but

4    would also carry through to (c)(2), because we are

5    incorporating the definitions and both of those are

6    definitional sections.  And the definition of the term other

7    person protected by the Secret Service, means any person whom

8    the United States Secret Service is authorized to protect under

9    section 3056 of this title or by presidential memorandum when

10   such person has not declined such protection.  And I don't

11   understand the defense -- and I don't think the defense, to my

12   knowledge in any of these cases, has argued that, for example,

13   if this were just the vice president's daughter who was present

14   at the Capitol that the government would bear the burden of

15   proving that the vice president's daughter had not declined

16   Secret Service protection.  So I think there is going to be a

17   question of really where one draws the line.

18           But even putting that question aside, the law is also

19   settled that where an element at issue is a jurisdictional

20   element, as the government argues is the case here, the rules

21   are different.  And even if a plain grammatical reading

22   suggests otherwise, the scienter requirements usually do not

23   apply to purely jurisdictional elements, because they normally

24   have nothing to do with the wrongfulness of the defendant's

25   conduct.  And instead jurisdictional elements function as a

1    hook to enable federal government to regulate certain conduct.

2         And as came out in some of the questions I posed, the

3    difference between jurisdictional elements and other elements,

4    was central to the Supreme Court's reading in *Feola*.  And it is

5    not purely using the term or the courts are not purely using

6    the term jurisdictional there in the sense of you need a

7    jurisdictional hook like the commerce clause.  But, rather, the

8    Court's use of the term jurisdictional in this sense also to

9    get to the question of whether Congress thought it important

10   that there be a federal forum or that the Justice Department

11   have the discretion to bring charges in the case.  So I think

12   it is a mistake in this context, particularly given the *Feola*

13   case, to read the word jurisdictional only in the sense of

14   saying was it added purely as matter of identifying some

15   federal power to regulate in the field.

16        In *Feola*, the Supreme Court held that the defendant

17   was not required to have known that the person he was

18   assaulting was a federal officer, because there in the words of

19   the Court section 111 was jurisdictional only.  And I am not

20   sure that it was jurisdictional in the sense of the commerce

21   clause hook in that case or at least I don't think that was how

22   the Court was using the phrase.  The Court reached that

23   conclusion because it determined that section 111, which

24   largely duplicated state law criminal provisions was chiefly

25   aimed at ensuring there would be a federal forum in which to

prosecute those who harm federal officials, just because the federal government might have greater interest in making sure that those prosecutions were vigorously pursued. But it didn't go necessarily to the culpability of the underlying conduct. Comparing section 1752 to section 111 and the Court's purposes of enacting each, Judge Cooper explained in *Groseclose*, that if the Court were to focus only on section 1752 as it stood when first enacted as part of the Omnibus Crime Control Act of 1970, the Court would be hard pressed to see a meaningful difference or any meaningful daylight between *Feola* and the present case. And I agree with that proposition.

In 1970, section 1752 provided that, "It shall be unlawful for any person or group of persons to willfully and knowingly enter or remain in any building or grounds designated by the Secretary of the Treasury as a temporary residence of the President or temporary residence" -- I'm sorry. "As a temporary residence of the President or as temporary officers of the President and his staff or any posted, cordoned off or otherwise restricted area of a building or grounds where the President is or will temporarily be visiting."

And as Judge Cooper quite ably and persuasively explained in *Groseclose*, Congress in 1970, as in *Feola* was motivated by a desire to federalize ordinary state law offenses in order to achieve more certainty and uniformity over security measures involving important federal officials, namely the

President, who was the only person who was protected under the original law.  The Senate Report explained the new law was designed to provide a uniform minimal federal jurisdiction for presidential security when the President is on temporary visits.  Consistent with that purpose, the original penalty for violating 1752 was capped at 6 months imprisonment.  And that was the same penalty commonly leveled against ordinary trespassers.  And he cites to D.C. Code.  And the same one that federal laws imposes against those who disrupt Congressional proceedings during the normal course of business when no Secret Service protectee is visiting.  And he cites to 5109(b).  Viewed from this perspective, Judge Cooper continues that the requirement that a Secret Service protectee be on the premises would appear to be jurisdictional only, in much the same way as in *Feola*.  And as I indicated, I find that reasoning convincing.

I will note at the same time congress passed the original law, it also included a provision that said none of the laws of the United States or the several states shall be superseded by this section, which does suggest to me that hey were focused on jurisdictional.  And they are saying, even though we are passing a law, which mirrors what might apply under state law, and we are going to have jurisdiction to do this, that we want to leave the state laws in place.  Congress was focused on jurisdiction in the sense of which authority

1 would have the power to bring the case or which authority would

2 be able to bring the case rather than perhaps in the strict

3 *Lopez* commerce-clause type jurisdictional sense.

4     That, obviously, is not the same statute that exists

5 today. There have been several intervening amendments. One of

6 the more substantial ones occurred in 2006, when the USA

7 Patriot Improvement and Reauthorization Act was passed into

8 law. And in *Groseclose* Judge Cooper found significant that

9 through the 2006 amendment Congress "doubled the maximum

10 penalty from 6 months to one year for violations 1752(a)(1)

11 through (4)." And as Judge Cooper wrote, "This significant

12 increase was not mere penalty inflation. Rather in doing so,

13 Congress seems to have reconceptualized 1752 and created a

14 different sort of federal crime."

15     "Therefore although," again, quoting Judge Cooper,

16 "Congress in 1970, may have conceived of section 1752 as

17 duplicating state prohibitions to confer federal jurisdiction,

18 much in the same way the Supreme Court in *Feola* understood 18

19 U.S.C. section 111, Congress in 2005 apparently did not share

20 this understanding. And instead viewed section 1752 as

21 precisely the type of offense that the majority in *Feola* went

22 out of its way to distinguish an aggregated offense leveling

23 and added penalty against those who endanger Secret Service

24 protectees."

25     And I have to say, I am not persuaded by the final

step in Judge Cooper's analysis.  I think that I find
everything up until that step quite persuasive in his analysis.
But to my mind, more is needed to reconceptualization a
statute.  And to take a statute in which the presence of a
federal protectee was jurisdictional and where there was not a
knowing requirement.  And to think that Congress just by
increasing the penalty from 6 months to a year, still a
misdemeanor, intended to fundamentally change the law, in a way
which would have been and would be a major change in the law
and the scope and the applicability.  Because it is, as the
litigation in these cases has shown, a significant question and
a significant issue as to whether the government has to prove
beyond a reasonable doubt that the defendant was aware that the
protectee would be present.

*Groseclose* attempts to bolster its reasoning by
citing to 18 U.S.C. section 3056(d), which is referred to in
the legislative history for the amendment in 2006.  And he
refers to 3056(d), which makes a crime punishable by up to one
year imprisonment to knowingly obstruct, resist or interfere
with a federal law enforcement agent engaged in the performance
of a protected function authorized by that section or by 1752.

And increasing the maximum penalty for violating
section 1752(a) to one year, the conference report explained
that the change was made to make the penalty for violating
section 1752, consistent with the prescribed penalty under 18

U.S.C. section 3056(d). And *Groseclose* reasoned that because
one must know that the individual that he is obstructing,
resisting or interfering with is a law enforcement officer
performing his official duties in order to violate 3056(d),
Congress must have similarly intended the same scienter
requirement to apply under 1752(a).

That might be right, but a couple of points with
respect to that. First of all, I have looked somewhat and I am
not sure that it is an entirely settled question, that a
violation of 3056(d) requires the government to prove beyond a
reasonable doubt, not only that someone knowingly and willfully
obstructed an official who was engaged in a protected function,
but also to know that was a federal law enforcement agent who
was engaged in a protected function authorized under that
statute. And it seems to me improbable actually that it goes
all of the way through. It maybe raises some of the similar
questions posed here of how far through the knowing requirement
travels. Because I would be very surprised if Congress
intended under 3056(d) to mean that the government has to prove
beyond a reasonable doubt that a person knew that the protected
function was authorized under that statute.

Even putting that aside, I am not convinced that the
reference to another penalty provision and simply bringing the
penalty provision from 6 months to a year, which I guess I note
is still a misdemeanor in light of the other penalty is

1    sufficient to implicitly reconceptualization a statute, in

2    essence to rewrite the statute in a way that imposes a

3    substantial additional burden on the Government that was not

4    present there.  And so for some reasons that I am not convinced

5    that simply increasing the penalty from 6 months to a year is

6    sufficient to show that Congress reconceptualized a decades-old

7    offense in such a fundamental way.  I am not convinced a

8    cross-reference to another provision simply for purposes of

9    saying that the penalty should be the same carries that weight.

10            As was indicated by my questioning, I am somewhat

11   more concerned about the fact that Congress at the same time

12   that it added the increased penalty for the misdemeanor, added

13   a felony provision for those who carry or use a firearm or

14   other dangerous weapon during and in relation to the offense or

15   where the offense results in significant bodily injury.  And I

16   do wonder whether the addition of that felony provision, which

17   carries a penalty of up to 10 years, does suggest that Congress

18   more fundamentally reconceptualized the statute.  And the same

19   scienter requirement would apply for purposes of the felony

20   provision as for purposes of the misdemeanor provision.  And to

21   my mind, this is where the question gets hard in this case or

22   in these cases.

23            And I think that one could make a substantial

24   argument that the addition of the felony provision did in a way

25   reconceptualization the statute.  But for a couple of reasons,

1    I am not convinced that even that addition did so.  And I have

2    a couple of reasons that I am not convinced that even that

3    addition does so.  First of all, just as a linguistic matter, I

4    think as I have previously indicated, it is necessary to draw

5    the line somewhere in the definitional section.  And the

6    question is just how much of the scienter requirement, how much

7    the definitional section applies -- how far into definitional

8    section the scienter requirement applies.  It is not carrying

9    all of the way through and you have got to draw the line at

10   some point in that process.  And for a couple of reasons, I

11   think the better view of the statute, although I admit this is

12   a close question, the better view of the statute is the one

13   that the government has taken in that the scienter requirement

14   should carry through the posted or cordoned off or otherwise

15   restricted area, but not beyond that.

16          One reason is there actually is a natural break at

17   that point in the language.  Two, if you were to conclude

18   otherwise, you wouldn't include the break at the natural break

19   in the language, but you would have to include it somewhere,

20   either partway through a sentence or not entirely clear to me

21   where you would draw the line.  Because I don't think anyone

22   takes the view, for example, that the defendant actually has to

23   know that person is, in fact, truly protected by the Secret

24   Service in order to satisfy 1752.  If you took the vice

25   president's daughter and everyone knew the vice president's

1   daughter was going to be there and it was cordoned off because

2   the vice president's daughter was going to be there, I would be

3   doubtful if Congress would have intended to say that the person

4   actually has to know that the vice president's daughter was

5   protected by the Secret Service, and beyond that, would have to

6   know that she was 16 years of age or younger if you actually

7   look at the Secret Service statute as to whether protection

8   applies and know that she didn't turn down the protection.

9          But the problems get even harder with respect to

10  other scenarios.  So under section 3056(a), the Secret Service

11  is also required to protect distinguished foreign visitors to

12  the United States and official representatives of the United

13  States performing special missions abroad when the President

14  directs that such protection be provided.  And I am not

15  persuaded that Congress would have and could have rationally

16  intended for the government to have to prove beyond a

17  reasonable doubt, for example, that the President had issued a

18  memorandum saying that the Deputy Undersecretary of Finance

19  from Ukraine who is visiting the Capitol Hill for a meeting

20  should be designated for protection by the Secret Service in

21  order to conclude that someone has violated the statute, even

22  if they knew that person was present.

23         But the provision that I find particularly tricky

24  is -- and I think the definitions all have to apply in the same

25  way.  And I have asked in the past and today, questions about

1    what 1752(c)(1)(C) means.  And that provides that the

2    restriction applies to building or grounds restricted in

3    conjunction with an event designated as a special event of

4    national significance.

5         And then if you go and you look at 18 U.S.C. section

6    3056, the statute recognizes that the President can direct that

7    an event be designated a special event of national

8    significance.  And then provides that at the end of each fiscal

9    year, the President through such agency or office as the

10   president may designate shall report to Congress with respect

11   to those events.  And there is no reason to think that Congress

12   ever thought that designation would ever be publically

13   announced until after the fact.  So if I were to read the

14   scienter requirement all of the way through (c)(1)(C), it seems

15   to me unlikely that that provision would ever have any meaning.

16   Because the person would not only have to know that they were

17   without authorization in a cordoned off area of a building or

18   grounds, but would have to know that the event had been

19   designated as a special event of national significance where,

20   based on my reading of the statute, it appears as though that

21   is reported by the President at the end of the fiscal year.

22        So there are other sources like the Congressional

23   Research Service, which describes special events of national

24   significance as being major sporting events, major

25   international summits held in the United States or Presidential

1   inaugurations.  There is no statutory definition of the term

2   that the Court is aware of or any regulation that implements

3   it.

4        And so I am doubtful that Congress would have

5   intended to give that provision essentially no meaning, because

6   that designation is one that, in fact, as far as I can

7   determine is not one that is publically announced at least

8   before the event occurs.

9        In addition, the House Report for the amendments to

10  statute in 2011, which created the current definitional section

11  which breaks it down in this way, I think further supports the

12  view that the subportions of 1752(c)(1) in (A), (B) and (C) are

13  jurisdictional in nature.  There, Congress explained it was

14  amending the statute to add section 1752(c)(1)(A), which

15  includes the White House or its grounds or the vice president's

16  official residence or grounds to the definition of restricted

17  building or grounds because -- and I am quoting now -- "Current

18  law prohibits unlawful entries upon any restricted building or

19  grounds where the President, Vice President or other protectee

20  is temporarily visiting.  However, there is no federal law that

21  expressly prohibits unlawful entry to the White House and its

22  grounds or the Vice President's residence and grounds.  The

23  Secret Service may must therefore rely upon a provision in the

24  District of Columbia code which addresses only minor

25  misdemeanor infractions when someone attempts to or

1  successfully trespasses upon the grounds of the White House or

2  the Vice President's residence or worse, breaches the White

3  House or the Vice President's residence itself.  H.R. 347

4  remedies this problem by specifically including the White

5  House, the Vice President's residence and the respective

6  grounds in the definition of restricted building or grounds for

7  purposes of section 1752."

8          To my mind, that goes to the original rationale in

9  the House Report back in 1970, which most if not all agree that

10  was jurisdictional in nature.

11          The final thing I will add is that with respect to my

12  concern about the addition of the felony provision, the

13  question for me is whether that provision was added because the

14  presence of the federal protectee increases the culpability of

15  the individual that acts in some way or whether it just

16  increases the federal interest in making sure there is a means

17  of enforcing the law in some way, which goes back to *Feola* and

18  the reasoning in *Feola*.

19          And I will note, that it is also a felony to simply

20  carry a firearm or dangerous weapon in any Capitol building

21  without any reference to who is present or federal protectee at

22  all.  And although that offense carries a 5-year sentence, here

23  there is reason to think why Congress would have included any

24  more serious penalty here, not because of merely the presence

25  of the federal protectee, but because the carrying or use of

1  the firearm has to be in relation to the offense, which is not

2  the case with respect to 40 U.S.C. section 5104(e).

3         And so that also, I think, supports my view that

4  although that provision did cause me some pause, I am not

5  convinced it changed things fundamentally, but ultimately the

6  question for me -- and I know I have been going on a long time.

7  Ultimately the question for me is what was Congress' intent?

8  Did Congress intend for the knowing requirement to carry all of

9  the way through or did it intend for it to stop before you got

10  to the particular protectee?  And I think one is a matter of

11  the language, there is not any easy way to parse the language

12  one way or the other on this.  It is not like *Rehaif* where you

13  could read the word knowingly all of the way through, in some

14  sense.  But more fundamentally, I think that I am convinced

15  that the original 1970 or '71 version of the statute included

16  what was essentially a jurisdictional requirement.  And that

17  although there had been changes over the years, I don't think

18  any of that is sufficient evidence that Congress intended to

19  change the statute in this fundamental way.

20         So for those reasons, I am going to conclude that the

21  knowing requirement does not carry all of the way through

22  section 1752(c)(1), but only goes up to the point of "or

23  otherwise restricted area."

24         So then turning back to Count 3 of the superseding

25  indictment, it charges Mr. Smith with entering and remaining in

a restricted building or grounds in violation of 18 U.S.C.
section 1752(a)(1). To find him guilty of this offense, the
Court must find that the government has proven the following
elements beyond a reasonable doubt, that Mr. Smith entered or
remained in a restricted building or grounds without lawful
authority to do so and he did so knowingly. And I find both of
those elements are satisfied. The evidence shows that
Mr. Smith was present in many locations at the US Capitol that
were posted, cordoned off or otherwise restricted and that he
did not have lawful authority to be there. The evidence shows
that he was repeatedly informed of this fact.

As a general matter, Lieutenant McCree from the
Capitol Police testified that the areas he passed through had
signage that indicated the areas were, in fact, off limits. It
may be that those signs had been knocked down or trampled. It
seems to me likely that even if those signs were knocked down
and trampled that some of them were still visible on the
ground. But I don't need to rely by any means on that
testimony or on the existence of the signs in any way.

Because I don't see how any sensible person could
have believed they were lawfully present given what was going
on at the Capitol. There were police lines. There was a riot
going on. Police officers were being assaulted. Police
officers were repeatedly saying, "Get back, get back." The
contention that that simply meant, move back momentarily, is

just not credible to my mind.  The police lines were clearly just being overwhelmed by the rioters.  And anyone who was there would have seen that is what was going on.  The police were trying to maintain the lines.  And as each line was overwhelmed, they set up another line.  And they were overwhelmed.  There was tear gas and OC spray in the air. People were engaged in battle on the grounds.  And there were police lines that were consistently being overrun.  And I am convinced beyond a reasonable doubt that Mr. Smith could not and did not believe that he could lawfully be present.  But even if I had any doubt about that, there is no way that he could have lawfully believed that he could be present in the tunnel where the rioters were assaulting the police officers who were pushing back and trying to maintain the line in the tunnel.  So I find Mr. Smith guilty with respect to Count 3.

Count 4 of the superseding indictment charges him with disorderly and disruptive conduct in a restricted building or grounds in violation of 1752(a)(2).  And in order to find him guilty on this count, I have to find the following elements beyond a reasonable doubt:  That the defendant engaged in disorderly or disruptive conduct in or in proximity to any restricted building or grounds, that he did so knowingly, with the intent to disrupt or impede the orderly conduct of government business or official functions.  Third, that his conduct occurred when or so that his conduct, in fact, impeded

or disrupted the orderly conduct of government business or official functions.  And I find that all three elements are satisfied beyond a reasonable doubt.

For the reasons I have already explained with respect to Count 1, the Court finds that Mr. Smith engaged in disruptive and disorderly conduct by shoving the police officers in the tunnel, which was a restricted area at the time of the offense.  And, moreover, I find that Mr. Smith did so with the intent to impede or disrupt the orderly conduct of government business or official functions.  And that was to impair or impede the Capitol Police from securing the Capitol building and maintaining the safety of the Capitol building.

And, finally, the Court finds that Mr. Smith was successful in his attempt and his pushing did prevent the Capitol Police from securing the tunnel area and the Capitol complex more generally on that afternoon.

Count 5 -- so I find him guilty of Count 4.

Count 5 of the superseding indictment charges Mr. Smith with engaging in physical violence in a restricted building or grounds in violation of 18 U.S.C. 1752(a)(4).  In order to find him guilty of Count 5 the Court must conclude beyond a reasonable doubt that each of the following elements were satisfied:  That Mr. Smith engaged in an act of physical violence against a person or property in or in proximity to any restricted building or grounds and that he did so knowingly.

1   The Court finds that the elements of Count 5 have been
2   satisfied beyond a reasonable doubt, first, for the same
3   reasons that I have explained with respect to Count 3.
4   Mr. Smith was present in a restricted building or grounds when
5   he was present in the tunnel and elsewhere on January 6, 2021.
6   And, likewise, I find that for the reasons already explained,
7   with respect to Counts 1, 2 and 7, that he engaged in an act of
8   violence when he pushed against the police line in the tunnel.
9   And finally for the reasons that I have explained with respect
10  to Counts 1 and 2, I find that Mr. Smith did so knowingly and
11  he knew that the tunnel was a restricted area and that knew he
12  was engaging in physical violence in that area.
13          So that is my verdict.  I will direct that the clerk
14  register and file that verdict.
15          Have you had the opportunity to discuss or should we
16  discuss now a date for sentencing?
17          MR. ROSS:  Yes, Your Honor.  The government has not
18  spoken with the defense on prospective dates at this point.
19          THE COURT:  Let me ask the Deputy Clerk to find a
20  date approximately 90 days out.
21          THE COURTROOM DEPUTY:  Are the parties available
22  August 20th at 10 a.m.?
23          MR. SABATINI:  Unfortunately, I am not, but my
24  cocounsel is.  Maybe there is -- if there is a couple other
25  days, I would like to try to maybe look at one we could all be

1  present.

2          THE COURTROOM DEPUTY:  August 22nd at 10:00 a.m.

3          MR. SABATINI:  It is actually that week that is the

4  issue.  Is there maybe something the week prior?

5          THE COURTROOM DEPUTY:  The judge is in trial.

6          MR. SABATINI:  Would it be possible to do the first

7  or second week of September?  It would be the following week.

8          THE COURT:  Let me ask, the week that I am in trial,

9  is that the Greene case?

10          THE COURTROOM DEPUTY:  Yes, Your Honor.

11          THE COURT:  I think I am not going to sit on Fridays,

12  if that helps.

13          THE COURTROOM DEPUTY:  Okay.

14          THE COURT:  Are you out that week?

15          MR. ROSS:  I am, Your Honor.  I am going out of town.

16          THE COURT:  Do you need to be here or can your

17  cocounsel cover it?

18          MR. ROSS:  I'd like to be here, if we could find an

19  amenable date.

20          THE COURTROOM DEPUTY:  August 8th?  No.  I'm sorry,

21  9th.  I'm sorry.

22          MR. SABATINI:  The 8th would be perfect?  Not

23  available, ma'am.

24          THE COURTROOM DEPUTY:  No, that is Thursday.  The

25  judge is in trial but he said he won't be sitting on Fridays.

1    MR. SABATINI:  Only Fridays, I understand.

2    MR. ROSS:  August 9th works for the government.

3    MR. SABATINI:  We can do that.

4    THE COURTROOM DEPUTY:  August 9th?

5    Mr. Sabatini.

6    MR. SABATINI:  Mr. Smith would actually prefer the

7    original date, the 20th, although I won't be present.  It would

8    be half our counsel team.

9    THE COURT:  I would will leave that up to Mr. Smith.

10   If he wants to proceed on the other date when you are not

11   present, that is fine.  If he wants to proceed on the day you

12   can be here, that is fine too.

13   MR. SABATINI:  The 20th is fine, Your Honor.

14   THE COURT:  Okay.  All right.  We'll put the matter

15   down for sentencing on August 20th.

16   And what are the parties' positions with respect to

17   whether Mr. Smith should be remanded pending sentencing?

18   MR. ROSS:  If I may, Your Honor, I think two prongs

19   here -- given the Court's finding for Count 2, especially

20   concerning the aiding and abetting charge, we would ask the

21   Court, you know, considering the context by which that device

22   was handed forward, of course, Mr. Smith handed that device

23   forward for the intent, you know, that it be used on officers

24   in accordance with the Court's finding, whether it was or was

25   not was, frankly, a stroke of luck, you know, by Zach Rash's

1    action.  But we would ask the Court more holistically to look

2    at what he did there and then how he came back in and continued

3    to engage in those acts of violence.  Understanding that under

4    111(a), it is not mandatory and the Court has discretion.  The

5    burden would now shift to the defense to show why not.

6         THE COURT:  The question would be then whether I

7    can -- if I can find by clear and convincing evidence that he

8    does not pose a risk of flight and a risk to the community or

9    danger to the community, then I am required to release him.

10   And if I am not convinced by clear and convincing evidence as

11   to either of those two elements then I am required to hold him;

12   right?

13        MR. ROSS:  Yes, Your Honor.

14        THE COURT:  So what is your argument as to -- maybe I

15   should hear from the defense, since they have got the burden on

16   that first.  And then I can let you respond.

17        MR. ROSS:  Yes, Your Honor.  If I could also go to

18   the more -- what the government's position is -- the more

19   important issue concerning this is the potential flight risk.

20   You know, aside from Mr. Smith's, you know, lack of

21   responsiveness during the pendency of these proceedings and his

22   decisions to go dark for lack of a better word and forcing the

23   government to come to this Court.  And at least there was one

24   indication that he just totally disregarded the Court's order.

25        THE COURT:  Wasn't that when he said that he was

1   sick?

2           MR. ROSS:  I can't recall the specifics, Your Honor.

3   And I don't want to misrepresent.

4           THE COURT:  Was there more than one occasion?  I do

5   remember there was an occasion --

6           MR. ROSS:  There was one occasion in March where he

7   did not respond to the Court's order.  He was unresponsive to

8   the government.  I can't --

9           THE COURT:  My recollection is that he indicated he

10  was ill when that happened.

11          MR. ROSS:  Understood, Your Honor.  But I think the

12  bigger issue was when -- and we are happy to put our agent on

13  the stand, if you would like to hear from the agent -- that at

14  the time Mr. Smith was ordered to self report to the FBI, when

15  it was originally -- when he was originally arrested, the FBI

16  surveillance team outside of Mr. Smith's house observed

17  Mr. Smith and his wife piling what seemed to be luggage or bags

18  into the truck.  Mr. Smith then went around northern Alabama,

19  Huntsville area, did not go directly to the FBI office that he

20  was supposed to go to.  It was only after the FBI engaged his

21  attorney at the time that he did go to an FBI office.  From my

22  understanding, he didn't actually go there and the FBI arrested

23  him.

24          THE COURT:  Where did they arrest him?

25          MR. ROSS:  If I could have one moment, Your Honor.

1          THE COURT:  Yes.

2          MR. ROSS:  Would the Court like to hear from the

3     agent?

4          THE COURT:  If there is no objection, I am fine with

5     that.  He can come to the podium.

6          SPECIAL AGENT LEE:  Where would you like me to start,

7     sir?

8          THE COURT:  If you can address his arrest and whether

9     you thought that he was evading arrest, I guess.

10         SPECIAL AGENT LEE:  So originally, Your Honor, we had

11    worked a deal where he would come in at a certain time.  I

12    think it was early December of 2022.  At the time, the time

13    came and passed.  He still was not at our office.  Surveillance

14    team picked him up loading luggage into the car after the time

15    he was supposed to be at our office.  From there, drove the

16    opposite direction of the office at a high rate of speed.

17    Again, the surveillance team wasn't trying to hide at that

18    point again, because he is no longer headed in the correct

19    direction.  Took a circuitous route through town as we are

20    engaging his defense counsel at the time.  I think it was

21    Mr. Webb.  We finally got him on the phone.  Again, confirmed

22    we did provide the correct address, did provide the correct

23    time.  After that phone call, he did start heading in the

24    correct direction.  But after the route that we had driven, the

25    length of time that had gone on since he was supposed to

1    surrender, we made the determination to make a traffic stop

2    instead of allowing him to get to the office at that point.

3                THE COURT:  How much time passed between when he was

4    supposed to self surrender and when he was arrested?

5                SPECIAL AGENT LEE:  It was over an hour, sir.

6                THE COURT:  Let me hear from defense on this and I

7    will give you all a chance to respond.

8                Mr. Roots.

9                MR. ROOTS:  Yeah, I am -- obviously, we have just

10   gotten on this case fairly recently.  But my understanding from

11   the facts I am aware of, Mr. Smith actually surrendered in the

12   parking lot of the FBI building.

13               THE DEFENDANT:  No.

14               THE COURT:  You can talk -- why don't you talk to

15   Mr. Roots.  Make sure he gets it right.

16               MR. ROOTS:  So he was detained directly in front of

17   the parking lot of the FBI building.  That is our

18   understanding.

19               And I would remind the Court, this man actually has

20   held the highest security clearances in his lifetime.  He

21   has -- this is a man who works on Apache helicopters, the inner

22   mechanics, which are top secret information -- none of us

23   have -- I don't think even the Court -- none us of have the

24   right to know about these things.  In his life, he has had the

25   highest security clearances.  He knows the inner workings of

1  Black Hawk helicopters and Apache helicopters.  This is a man

2  who has been trusted, you could say, with the national security

3  secrets of the United States.

4          He has a stellar background, lots of medals, lots of

5  decorations in the US military and as a contractor.

6          And none of that has been denied by the government.

7  Like I said --

8          THE COURT:  Any arrests other than this case?

9          MR. ROOTS:  Other than this case, he has never once

10  been arrested.  This is the only arrest in his entire life.

11  That requires a little bit of adjustment for someone who has

12  held these high national security clearances.  And, you know,

13  if I had -- I think any of us who were -- had held that

14  position of trust in the federal government and were facing

15  charges like this, we would all have our moments of, you can

16  say, having a meltdown over things.

17          In any case, Mr. Smith has fully complied over the

18  past two years.  He has been to every hearing.  He arrives

19  early.  He leaves late.  He has taken on this case himself.  He

20  has internalized.  He has defended himself very rigorously.  He

21  has turned in his passport.  There is no danger he is going to

22  go anywhere.  He is battling cellulitis and these health

23  conditions which have caused his problems, to some extent.

24          THE COURT:  I am more concerned about ties to the

25  community.  Does he live with his wife and children?

```
 1              MR. ROOTS:  He has a wife.  He has four children.
 2    His ties --
 3              THE COURT:  Is that his wife there?
 4              Okay.
 5              MR. ROOTS:  His ties to the community are very
 6    extensive.  Ties with the church, ties with his business
 7    relationships --
 8              THE COURT:  How old are the kids?
 9              THE DEFENDANT:  Eighteen, 14, 8 and 6.
10              MR. ROOTS:  He says, 18, 14, 8 and 6.
11              THE COURT:  I heard him.
12              Anything else you want to add?
13              MR. ROOTS:  I would say, there is no real reason or
14    purpose or grounds for being stepped back in this case.
15              THE COURT:  All right.  Mr. Ross, do you want to
16    respond?
17              MR. ROSS:  The only thing I will add, Your Honor, is
18    the FBI thought it prudent to pull Mr. Smith out of his car and
19    arrest him given his decision making on that day of arrest.
20    You know, I don't -- understanding what the defense has argued
21    in terms of Mr. Smith's past, he made a conscious decision,
22    with -- represents a flight risk.
23              But anything else -- if the Court has any questions
24    at this point, Your Honor --
25              THE COURT:  What I am going to do is I am going to
```

order that he be placed on home incarceration with a monitoring
device.  And that way if there is any concern, someone will
know about it promptly.  And I will order that he report --
this will still be the same Pretrial Services folks.

Do you have Pretrial Services officer near your home?

THE DEFENDANT:  Yes, I do.

THE COURT:  I am going to order that you report to
the Pretrial Services officer.  How much time do you need to
get home?  Are you driving?

THE DEFENDANT:  It is a 14-hour drive.

Yes, Your Honor.

THE COURT:  So when will you be back home?  I guess
today is Friday.  How about if I order that you report by
Monday morning?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So I will order that you report Monday
morning to Pretrial Services and your current Pretrial Services
office.  And will order that you be held on home incarceration
pending sentencing with a monitoring device.  And I guess do I
need --

Do we have anyone from Pretrial Services?  I will
need the paperwork to do this.

Glenda, do you need help with that?  What do we do
about the paperwork at this hour on a Friday?

Let me do this.  Let me step off the bench and see if

1    you can work out the paperwork on this.  And I would order the

2    same conditions, I assume including no weapons in the home of

3    any kind.  And that at least we start off with home

4    incarceration, which means you cannot leave the home for any

5    purpose without prior authorization from the Court.  And that

6    you not violate any other state, local or federal law and that

7    you abide by all of the other restrictions which were

8    previously in place.

9              Mr. Roots.

10             MR. ROOTS:  Yeah.  This, of course, is very

11   expensive.  He is paying a lot of money for us, for the

12   attorneys.  We would beg the Court for an opportunity for him

13   to work and continue working, given he will be on an ankle --

14   my understanding he will be on an ankle monitoring system, we

15   would request that be able to leave his house, go to work and

16   this kind of thing.

17             THE COURT:  So I understand that.  That was the

18   reason that I said at least initially.  Because what I would

19   like to do is -- be able to do is hear from the Pretrial

20   Services officer.  Let's do this initially.  And if he can work

21   out a plan with Pretrial Services officer that is acceptable to

22   the Pretrial Services officer, you can come back to me and say,

23   this is our plan and agreement, he would leave the house during

24   these hours to go to work, this is where he would travel.  This

25   is what he would be allowed to do.  And then you can bring that

1  back to me once we have a chance to hear from Pretrial Services

2  and the government can respond to that as well.

3          MR. ROOTS:  Okay.  Thank you.

4          THE COURT:  Anything else tonight other than

5  resolving the paperwork on this?

6          MR. ROSS:  Other than acknowledging the Court's

7  directive concerning the stun gun, Your Honor, and future use

8  of it.

9          THE COURT:  Fair enough.

10          MR. ROSS:  I apologize.

11          THE COURT:  It wasn't so much me, but I could imagine

12  some of my colleagues would not have been happy.

13          MR. ROSS:  Understood, Your Honor.

14          THE COURT:  You might have been on the wrong end of

15  that device.

16          Yes, Mr. Roots.

17          MR. ROOTS:  I had one question.  I wasn't following

18  quite clearly enough.  Now, the Court acquitted Mr. Smith on

19  Count 6.  What about Count 7?  I didn't hear very --

20          THE COURT:  Count 7, let me just make sure what count

21  that was.  Count 7.  I convicted on Count 7, but let me just

22  double check that.

23          Oh, yes.  I am pretty sure I did convict on that one,

24  but let's see here.

25          Yes, I convicted.  I found him guilty of Count 7.

1          MR. ROOTS:  Okay.

2          THE COURT:  Everything except Count 6.

3          I am going to step off the bench for a minute.  I

4     know it is late on a Friday afternoon.  I'd ask if you all

5     could stay around.  I want to make sure we get the paperwork

6     done properly.  If there is any objection from the government

7     to any of the terms, I want to make sure you get a chance to

8     see what is in the paperwork before we ask Mr. Smith to attest

9     to the requirements.  I will be back.  Thank you.

10          (Recess taken at 4:59 p.m.)

11          THE COURTROOM DEPUTY:  Mr. Smith, so you are being

12     released on the same conditions that you were previously

13     released on, minus the fact that you need to report to Pretrial

14     Services office in the Middle District of Alabama no later than

15     Monday the 13th at 11:00 a.m.  Your other change is that you

16     are on home incarceration.  You are restricted to 24 hours a

17     day lockdown at your residence, except for medical necessities,

18     court appearances or other activities specifically approved by

19     the Court.

20          THE DEFENDANT:  Can I ask you a question?

21          THE COURTROOM DEPUTY:  Yes.

22          THE DEFENDANT:  You said activities approved by the

23     Court.  If I wanted to visit my father or someone who does not

24     obviously live in my home, would that be something I could get

25     approved by the Court?

1      THE COURTROOM DEPUTY:  You need to get it approved

2  by -- get approval by Pretrial Services.  So when you get to

3  Pretrial -- Pretrial Services will have this.  When you get

4  there to them on Monday, they will go through what this means

5  for you.

6      THE DEFENDANT:  Okay.

7      THE COURTROOM DEPUTY:  If there is anything or

8  anything needs to be changed, you contact your attorneys.  Your

9  attorneys file a motion with the Judge.

10      Okay.  So before you sign it, I have got to swear you

11  to it and then you sign it.

12      THE DEFENDANT:  Can you say or affirm?

13      THE COURTROOM DEPUTY:  Yeah.  No problem.  I need you

14  to stand and raise your right hand.  With the conditions I have

15  just read to you, do you solemnly affirm to follow the

16  conditions of release as set forth by the Court?

17      THE DEFENDANT:  I affirm.

18      THE COURTROOM DEPUTY:  I need your signature and city

19  and state.

20      Signature here and --

21      THE DEFENDANT:  I am breezing through this real

22  quick.

23      THE COURTROOM DEPUTY:  That is fine.

24      THE DEFENDANT:  Is any of these my copy?

25      THE COURTROOM DEPUTY:  No.  I can make a copy for

1    you, but, no, that is mine.

2              THE DEFENDANT:  That would be fantastic.

3              (Proceedings concluded at 5:14 p.m.)

1            <u>C E R T I F I C A T E</u>

2

3            I, SHERRY LINDSAY, Official Court Reporter, certify

4     that the foregoing constitutes a true and correct transcript of

5     the record of proceedings in the above-entitled matter.

6

7

8

9

10            Dated this 14th day of May, 2024.

11

12            _____
              Sherry Lindsay, RPR
13            Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**MR. PIERCE: [2]** 3/9 44/16
**MR. ROOTS: [11]** 107/9 107/16
108/9 109/1 109/5 109/10 109/13
111/10 112/3 112/17 113/1
**MR. ROSEN: [73]** 3/23 3/25 4/3
4/14 4/18 7/13 7/17 7/22 8/14
8/21 9/1 10/11 10/20 10/22 11/6
11/16 11/22 12/5 12/8 12/13 12/20
13/12 13/18 13/25 14/19 15/7
15/10 15/23 16/7 16/16 16/19 18/5
18/14 18/23 19/17 20/22 22/6
22/10 22/17 22/20 23/18 24/11
25/5 25/8 25/10 25/21 26/10 26/19
27/1 27/8 27/22 28/2 28/5 28/10
28/20 34/9 34/15 34/22 35/14 37/3
37/6 38/3 38/17 39/23 40/3 41/9
41/16 42/5 42/9 42/15 42/17 43/21
44/2
**MR. ROSS: [18]** 3/6 44/13 101/17
102/15 102/18 103/2 103/18 104/13
104/17 105/2 105/6 105/11 105/25
106/2 109/17 112/6 112/10 112/13
**MR. SABATINI: [21]** 28/21 29/13
30/7 31/10 32/15 32/25 33/10 34/1
34/6 42/24 43/2 43/11 43/20
101/23 102/3 102/6 102/22 103/1
103/3 103/6 103/13
**SPECIAL AGENT LEE: [3]** 106/6
106/10 107/5
**THE COURT: [125]**
**THE COURTROOM DEPUTY: [19]** 3/2
44/6 44/9 101/21 102/2 102/5
102/10 102/13 102/20 102/24 103/4
113/11 113/21 114/1 114/7 114/13
114/18 114/23 114/25
**THE DEFENDANT: [13]** 107/13 109/9
110/6 110/10 110/15 113/20 113/22
114/6 114/12 114/17 114/21 114/24
115/2

**'**

**'70s [2]** 11/17 17/8
**'71 [1]** 97/15
**'s [1]** 83/5

**0**

**02903 [1]** 2/6

**1**

**10 [8]** 1/5 2/5 5/24 7/10 16/6
22/4 91/17 101/22
**10-year [1]** 6/20
**100 percent [1]** 13/4
**10:00 a.m [1]** 102/2
**111 [14]** 12/23 23/4 63/4 63/8
63/10 65/3 67/16 73/7 79/15 85/19
85/23 86/5 88/19 104/4
**111A [1]** 65/5
**112 [1]** 67/21
**11:00 a.m [1]** 113/15
**11:18 [1]** 1/6
**12 [5]** 5/10 10/25 32/1 33/7 34/18
**12-month [2]** 20/18 30/23
**12:14 [1]** 44/8
**13th [1]** 113/15
**14 [2]** 109/9 109/10
**14-hour [1]** 110/10
**14th [1]** 116/10
**16 [1]** 93/6
**172 [1]** 2/3
**1752 [30]** 3/16 12/24 23/23 40/7
79/16 82/9 83/5 83/23 84/3 86/5
86/7 86/12 87/6 88/10 88/13 88/16
88/20 89/21 89/23 89/25 90/6
92/24 94/1 95/12 95/14 96/7 97/22
98/2 99/18 100/20
**18 [17]** 33/17 46/15 47/7 56/12
63/1 63/4 63/9 73/7 78/4 79/15
88/18 89/16 89/25 94/5 98/1
100/20 109/10

**1970 [6]** 86/8 86/12 86/22 88/16
96/9 97/15
**1971 [2]** 32/24 33/4

**2**

**20001 [2]** 1/15 1/24
**2005 [1]** 88/19
**2006 [8]** 5/1 17/9 19/9 33/2 41/5
88/6 88/9 89/17
**2011 [1]** 95/10
**2012 [10]** 15/18 17/9 18/20 18/20
18/22 19/2 19/5 19/9 31/22 41/5
**2021 [9]** 38/8 45/13 47/5 47/15
57/17 57/22 66/2 80/15 101/5
**2022 [1]** 106/12
**2024 [2]** 1/5 116/10
**20530 [1]** 1/17
**20th [4]** 101/22 103/7 103/13
103/15
**21551 [1]** 2/3
**22nd [1]** 102/2
**23-71 [3]** 1/4 3/2 44/9
**231 [5]** 46/16 58/5 58/15 63/1
78/5
**2321 [1]** 47/7
**2332 [1]** 56/13
**24 [1]** 113/16
**24-hour [1]** 29/4
**25 [1]** 73/23
**28 [1]** 61/18
**28J [1]** 20/1
**2:00 [3]** 43/18 44/5 44/7
**2:10 p.m [1]** 47/24
**2:30 p.m [3]** 50/4 50/25 55/14
**2:31 [1]** 51/3
**2:50 p.m [2]** 58/22 82/1
**2:52 [1]** 73/2
**2:52 p.m [1]** 70/22
**2:52:44 [1]** 74/1
**2:53 and [1]** 73/23
**2:53 he [1]** 73/19

**3**

**30 [3]** 49/4 52/3 62/5
**3056 [14]** 33/17 34/19 34/21 40/1
42/24 84/9 89/16 89/18 90/1 90/4
90/10 90/19 93/10 94/6
**32757 [1]** 2/10
**333 [1]** 1/23
**347 [1]** 96/3
**36 [1]** 32/18
**3:15 [1]** 65/20
**3:15 for [1]** 61/4
**3:15 p.m [3]** 59/18 65/25 81/24
**3d [1]** 67/20
**3rd [1]** 2/3

**4**

**40 [5]** 61/18 79/20 81/15 82/7
97/2
**402C [1]** 74/3
**403A [4]** 59/19 60/3 61/18 62/5
**403D [1]** 60/10
**411 [1]** 2/9
**4:42 [1]** 48/23
**4:59 [1]** 113/10
**4th [1]** 1/14

**5**

**5-year [1]** 96/22
**50 [2]** 16/17 62/5
**502 [1]** 91/3
**5104 [5]** 79/17 79/20 81/15 82/8
97/2
**5109 [1]** 87/11
**555 [1]** 1/14
**556 [1]** 83/18
**5:14 [1]** 115/3

**6**

**6-month [3]** 5/1 20/18 30/22

**601 [1]** 1/17
**602E [1]** 48/7
**604E [1]** 48/19
**615E [1]** 72/4
**649 [1]** 2/6
**652 [1]** 83/18
**657 [1]** 67/20
**6710 [1]** 1/24
**6th [1]** 80/22

**7**

**700 [1]** 2/6
**701B [1]** 74/4
**707 [1]** 48/19
**708 [1]** 48/19
**71 [3]** 1/4 3/2 44/9
**710A [1]** 49/2

**8**

**818 [1]** 80/17
**820 [1]** 80/18
**8th [2]** 102/20 102/22

**9**

**90 [1]** 101/20
**91367 [1]** 2/4
**922 [1]** 20/10
**924 [1]** 20/10
**9th [3]** 102/21 103/2 103/4

**A**

**a.m [4]** 1/6 101/22 102/2 113/15
**abetted [4]** 64/9 64/11 65/6 70/17
**abetting [5]** 46/4 64/5 73/7 78/13
103/20
**abide [1]** 111/7
**ability [8]** 9/18 54/13 70/11
73/14 74/8 75/2 75/9 76/1
**able [16]** 8/4 10/1 10/17 32/20
35/19 50/17 50/18 55/5 56/25 62/4
69/18 72/18 75/15 88/2 111/15
111/19
**ably [1]** 86/21
**about [41]** 4/8 5/3 5/9 9/22 10/2
17/10 19/18 19/23 20/2 21/13
23/20 23/20 24/19 26/11 26/15
27/8 27/9 27/15 27/17 29/25 30/20
34/15 35/7 35/8 41/12 41/24 42/24
60/3 65/11 75/11 80/17 91/11
93/25 96/12 99/11 107/24 108/24
110/3 110/13 110/24 112/19
**above [2]** 59/1 116/5
**above-entitled [1]** 116/5
**abroad [1]** 93/13
**absence [1]** 28/13
**absolute [1]** 55/17
**absolutely [1]** 11/19
**absolved [1]** 14/15
**abstract [1]** 20/6
**absurd [3]** 14/16 17/18 36/15
**abundantly [1]** 11/18
**abuse [1]** 30/8
**acceptable [1]** 111/21
**access [2]** 50/14 50/17
**accordance [1]** 103/24
**according [3]** 13/13 13/13 13/18
**achieve [1]** 86/24
**acknowledged [2]** 40/4 81/3
**acknowledging [1]** 112/6
**acquitted [1]** 112/18
**across [7]** 8/24 15/5 16/2 31/1
31/2 41/7 76/19
**act [15]** 46/19 46/22 64/19 64/20
64/24 69/21 78/18 81/14 81/18
81/21 82/6 86/8 88/7 100/23 101/7
**acted [4]** 63/24 70/8 80/2 81/14
**action [4]** 1/3 9/19 56/13 104/1
**actions [4]** 50/4 52/13 65/18
66/13
**activated [1]** 65/8
**activities [2]** 113/18 113/22

**A**

**acts [16]**   47/8 47/17 48/11 49/17 55/9 62/18 63/20 63/21 64/19 64/20 64/24 68/9 68/10 69/9 96/15 104/3

**actual [3]**   75/1 75/3 76/2

**actually [40]**   4/20 4/21 5/9 10/2 14/13 18/21 19/4 21/22 25/8 26/1 29/6 30/9 33/7 34/1 34/25 37/18 37/23 37/25 48/18 49/2 49/6 53/5 68/1 71/20 72/5 73/15 73/17 76/24 80/12 84/1 90/15 92/16 92/22 93/4 93/6 102/3 103/6 105/22 107/11 107/19

**actus [1]**   15/12

**add [5]**   42/23 95/14 96/11 109/12 109/17

**added [7]**   5/17 6/2 85/14 88/23 91/12 91/12 96/13

**adding [1]**   34/18 38/25

**addition [8]**   4/25 55/14 91/16 91/24 92/1 92/3 95/9 96/12

**additional [5]**   7/14 9/6 17/13 21/6 91/3

**address [7]**   7/22 12/20 32/6 38/14 79/17 106/8 106/22

**addressed [2]**   5/15 20/18

**addresses [1]**   95/24

**adjourn [1]**   42/23

**adjustment [1]**   108/11

**admit [3]**   25/12 80/6 92/11

**admitted [1]**   80/12

**adopt [1]**   39/3

**adopted [3]**   31/23 31/24 83/7

**adopting [1]**   7/20

**advance [1]**   63/9

**advancing [1]**   52/18

**adverse [5]**   4/8 4/15 24/20 25/10 69/2

**adversely [7]**   46/25 56/5 56/21 57/4 57/5 57/8 57/12

**advised [1]**   72/19

**aerosol [2]**   51/15 53/13

**affected [6]**   46/25 56/5 57/4 57/6 57/8 57/12

**affirm [3]**   114/12 114/15 114/17

**after [12]**   9/4 48/8 52/3 59/20 69/12 79/8 80/22 94/13 105/20 106/14 106/23 106/24

**afternoon [5]**   44/15 44/16 44/20 100/16 113/4

**again [21]**   10/8 11/25 12/5 35/1 37/3 37/7 37/9 40/12 51/11 51/22 59/20 59/22 60/1 60/3 62/5 76/25 81/7 88/15 106/17 106/18 106/21

**against [48]**   9/24 12/2 25/16 30/14 48/2 48/11 49/3 51/23 58/16 58/20 58/24 59/5 59/8 59/9 59/11 59/22 59/24 60/2 60/6 60/10 60/18 61/20 62/4 62/10 65/7 65/19 65/24 66/4 66/6 66/6 66/12 68/11 68/13 68/14 68/14 69/11 69/16 71/17 71/20 74/21 74/22 81/23 81/25 87/7 87/9 88/23 100/24 101/8

**age [1]**   93/6

**agency [2]**   56/14 94/9

**agent [12]**   23/4 33/19 43/15 72/14 72/16 72/19 72/23 89/20 90/13 105/12 105/13 106/3

**agents [1]**   35/15

**aggregated [1]**   88/22

**aggressive [1]**   73/19

**agree [3]**   33/5 86/11 96/9

**Agreed [1]**   12/19

**agreement [2]**   72/5 111/23

**agrees [1]**   75/7

**ahead [1]**   15/9

**aided [4]**   64/9 64/11 65/6 70/17

**aiding [7]**   46/4 64/5 64/21 73/6 78/13 78/19 103/20

**aimed [1]**   85/25

**air [2]**   70/24 99/6

**airport [1]**   36/23

**akin [1]**   40/11

**Alabama [3]**   45/11 105/18 113/14

**all [65]**   3/8 3/8 3/12 3/12 6/8 6/17 11/9 12/9 15/22 17/16 19/13 25/14 25/14 25/14 26/14 27/19 28/22 29/5 31/5 34/7 37/25 42/22 43/17 44/3 44/4 44/7 44/20 44/20 44/23 45/5 47/21 48/21 49/23 51/2 58/2 73/3 74/24 75/13 78/20 79/12 82/9 82/13 83/21 83/24 84/1 84/2 90/8 90/16 92/3 92/9 93/24 94/14 96/9 96/22 97/8 97/13 97/21 100/2 101/25 103/14 107/7 108/15 109/15 111/7 113/4

**allegations [1]**   80/18

**alleged [2]**   42/1 63/11

**alleges [3]**   63/25 64/3 64/7

**allowed [1]**   13/10 15/25 16/2 111/25

**allowing [1]**   107/2

**almost [2]**   29/14 48/18

**alone [2]**   12/15 40/23

**already [13]**   19/6 30/4 37/10 37/11 55/13 61/6 62/17 62/24 64/1 65/18 69/14 100/4 101/6

**also [57]**   3/11 5/22 6/2 11/8 17/21 21/8 24/15 25/11 25/24 27/4 27/10 27/12 27/13 29/2 35/9 39/1 40/5 40/9 44/18 45/22 49/19 53/9 54/16 56/8 57/11 58/11 59/19 60/8 60/13 63/8 65/14 66/12 67/17 68/1 68/2 69/17 69/20 70/14 72/10 72/12 72/16 72/23 72/25 73/25 74/13 76/4 77/24 82/14 84/18 85/8 87/18 90/13 93/11 96/19 97/3 104/17

**alternative [4]**   26/10 57/10 64/3 70/16

**although [13]**   48/21 50/8 57/10 63/2 68/1 74/12 80/20 88/15 92/11 96/22 97/4 97/17 103/7

**always [1]**   34/11

**am [79]**   3/21 4/3 5/8 5/14 6/3 7/6 11/3 14/24 18/23 18/23 18/24 21/17 22/17 23/18 24/23 25/25 26/5 27/15 28/22 29/20 30/1 34/2 34/7 36/24 36/25 39/18 43/19 43/22 43/25 44/23 45/4 46/12 48/19 49/24 51/20 57/23 65/14 67/2 68/19 70/14 73/20 77/12 81/1 82/24 83/10 85/19 88/25 90/8 90/22 91/4 91/7 91/10 92/1 92/2 93/14 95/4 95/17 97/4 97/14 97/20 99/8 101/23 102/8 102/11 102/15 102/15 104/9 104/10 104/11 106/4 107/9 107/11 108/24 109/25 109/25 110/7 112/23 113/3 114/21

**amenable [1]**   102/19

**amending [1]**   95/14

**amendment [2]**   88/9 89/17

**amendments [2]**   88/5 95/9

**AMERICA [3]**   1/3 3/3 44/10

**Americans [1]**   13/2

**among [1]**   48/6 72/5

**amount [1]**   56/8

**analogous [1]**   10/16

**analogue [1]**   11/7

**analyses [2]**   13/19 83/11

**analysis [14]**   13/13 13/18 14/13 20/10 23/23 28/24 32/12 32/21 33/6 36/20 37/17 38/1 89/1 89/2

**analyze [1]**   10/25

**anger [1]**   52/9

**angle [2]**   67/7 67/11

**angry [2]**   52/24 53/16

**animates [1]**   30/9

**ankle [2]**   111/13 111/14

**announced [2]**   94/13 95/7

**annoyed [1]**   7/4 21/18

**another [20]**   21/9 21/23 31/11

**A**

**arguing [5]**  36/2 36/15 52/4 54/23 55/4
**argument [19]**  3/14 5/10 10/9 19/22 25/13 26/20 27/25 28/1 28/11 30/9 30/17 32/19 35/9 37/19 71/11 79/12 82/10 91/24 104/14
**arguments [4]**  35/5 39/19 44/25 45/2
**arm [3]**  51/23 74/21 74/22
**around [10]**  13/14 13/15 19/24 21/16 35/11 35/15 48/17 62/1 105/18 113/5
**arrest [6]**  105/24 106/8 106/9 108/10 109/19 109/19
**arrested [4]**  105/15 105/22 107/4 108/10
**arrests [1]**  108/8
**arrive [1]**  48/22
**arrives [1]**  51/13 108/18
**article [3]**  47/1 56/5 58/7
**as [125]**
**aside [5]**  63/12 74/25 84/18 90/22 104/20
**ask [10]**  31/22 38/15 76/25 101/19 102/8 103/20 104/1 113/4 113/8 113/20
**asked [5]**  10/21 20/14 41/12 54/16 93/25
**asking [1]**  41/24
**aspect [3]**  26/14 35/6 40/14
**assault [14]**  9/24 11/2 11/4 11/8 64/8 65/7 67/22 68/2 68/5 73/13 75/3 77/23 78/3 79/1
**assaulted [8]**  63/11 63/16 64/4 64/14 64/17 73/10 78/16 98/23
**assaulting [11]**  46/3 63/7 64/10 64/22 64/25 67/17 70/18 73/8 79/14 85/18 99/13
**assaults [1]**  65/7
**assessment [3]**  8/14 40/25 41/2
**assist [3]**  66/1 70/3 76/11
**assisting [5]**  63/18 64/21 66/4 66/7 69/23
**associates [1]**  75/9
**assume [1]**  22/14 111/2
**assuming [3]**  16/24 22/20 37/10
**assured [1]**  74/23
**attach [1]**  21/5
**attaches [1]**  40/12
**attack [1]**  69/1
**attacked [1]**  11/14
**attempt [6]**  7/22 48/5 73/13 76/5 76/5 100/14
**attempting [5]**  50/7 50/8 55/23 58/17 79/11
**attempts [4]**  32/7 68/10 89/15 95/25
**attended [1]**  81/5
**attention [3]**  60/23 75/19 75/22
**attest [1]**  113/8
**attorney [1]**  105/21
**Attorney's [1]**  1/14
**attorneys [3]**  111/12 114/8 114/9
**audio [1]**  74/2
**August [6]**  101/22 102/2 102/20 103/2 103/4 103/15
**August 20th [2]**  101/22 103/15
**August 8th [1]**  102/20
**August 9th [2]**  103/2 103/4
**Augustine [8]**  51/13 52/4 53/21 54/17 55/11 55/16 68/23 68/25
**authority [9]**  38/24 39/3 39/13 40/10 82/15 87/25 88/1 98/6 98/10
**authorization [2]**  94/17 111/5
**authorized [5]**  33/20 84/8 89/21 90/14 90/21
**available [2]**  101/21 102/23
**Avenue [1]**  1/23
**avoid [3]**  14/8 40/8 62/14
**avoidance [1]**  16/10

**aware [5]**  14/23 80/7 89/13 95/2 107/11
**away [7]**  7/8 21/19 21/20 31/5 50/6 53/11 54/9

**B**

**back [59]**  7/24 10/8 10/23 11/9 12/22 18/6 19/15 21/14 22/11 22/18 22/18 27/15 31/2 40/20 42/6 44/4 44/5 44/7 45/2 48/1 50/16 50/18 51/9 51/10 51/11 51/11 51/11 51/17 51/18 51/22 52/1 52/5 53/2 53/11 53/11 56/8 59/9 60/13 60/21 62/22 67/9 68/21 68/22 69/7 71/18 71/18 96/9 96/17 97/24 98/24 98/24 98/25 99/14 104/2 109/14 110/12 111/22 112/1 113/9
**background [3]**  45/7 47/4 108/4
**backwards [1]**  68/19
**bags [1]**  105/17
**balance [1]**  58/1
**baloney [1]**  21/18
**bam [1]**  37/1
**bangs [1]**  55/22
**Bankruptcy [1]**  1/23
**barbed [1]**  13/14
**barrier [5]**  6/9 31/1 31/3 35/23 50/10
**barriers [1]**  35/19
**based [8]**  8/17 45/5 57/23 59/2 63/10 80/10 94/20
**basis [2]**  5/11 43/10
**baton [1]**  55/22
**battle [1]**  99/7
**battling [1]**  108/22
**be [164]**
**be 6 [1]**  30/23
**bear [1]**  84/14
**bears [2]**  72/12 81/9
**became [1]**  5/12
**because [76]**  7/2 10/1 11/14 11/17 13/12 13/20 14/8 14/19 17/17 17/22 18/5 18/20 19/18 19/21 20/23 20/25 21/24 23/19 24/11 26/15 27/12 33/9 35/1 35/23 35/24 36/5 36/13 37/7 37/20 38/4 39/5 39/14 39/24 39/25 40/3 41/20 49/24 50/12 50/13 53/11 53/18 56/10 57/1 57/19 60/6 62/2 64/11 67/12 70/3 75/7 75/16 75/21 75/23 76/19 77/4 77/8 84/2 84/4 84/23 85/18 85/23 86/1 89/10 90/1 90/18 92/21 93/1 94/16 95/5 95/17 96/13 96/24 96/25 98/20 106/18 111/18
**become [1]**  29/9
**becomes [2]**  61/23 61/24
**been [36]**  6/4 19/7 19/22 19/24 20/2 21/14 21/24 27/1 43/24 53/20 54/18 54/23 57/24 59/5 63/11 64/17 66/1 73/9 74/16 77/25 78/5 78/16 82/25 88/5 89/9 94/18 97/6 97/17 98/15 101/1 108/2 108/6 108/10 108/18 112/12 112/14
**before [17]**  1/9 4/11 7/5 18/20 19/9 42/23 43/18 50/18 53/21 71/14 76/9 79/16 81/8 95/8 97/9 113/8 114/10
**beg [1]**  111/12
**began [1]**  58/23
**beginning [1]**  11/6
**behalf [5]**  3/7 3/10 3/25 44/13 44/17
**behavior [4]**  30/18 30/19 49/11 61/1
**behind [9]**  36/14 47/25 51/6 52/2 54/1 54/2 54/3 61/21 69/5
**beige [1]**  71/23 72/11
**being [21]**  9/4 22/23 27/3 28/10 39/19 39/21 51/25 55/2 57/17 60/20 72/17 74/3 75/16 75/17 76/16 94/24 98/23 99/2 99/8

**109/14 113/11
**believe [12]**  5/16 14/10 24/12 24/13 25/11 26/21 28/24 42/5 74/19 76/15 81/7 99/10
**believed [3]**  26/12 98/21 99/12
**belligerence [1]**  55/5
**bench [5]**  1/9 25/1 46/12 110/25 113/3
**bent [1]**  67/7
**best [3]**  50/16 51/7 55/17
**better [6]**  17/12 25/13 51/21 92/11 92/12 104/22
**between [3]**  85/3 86/10 107/3
**beyond [28]**  9/3 14/1 45/5 46/18 49/13 49/25 63/15 64/13 69/8 78/21 79/22 80/5 80/23 81/1 81/9 81/17 89/13 90/10 90/20 92/15 93/5 93/16 94/9 99/9 99/20 100/3 100/22 101/2
**bicycle [1]**  47/25
**bicycles [1]**  54/5
**bigger [1]**  105/12
**bike [3]**  48/12 48/15 50/10
**bit [6]**  37/18 38/18 60/14 68/17 68/20 108/11
**black [2]**  70/23 108/1
**blazing [1]**  13/14
**bleeding [4]**  67/11 68/21 68/25 69/4
**bloodied [1]**  67/8
**blue [12]**  70/25 71/6 71/9 71/22 71/24 71/25 72/3 72/9 72/11 72/20 72/22 73/10
**board [2]**  8/25 41/7
**bodily [7]**  21/4 21/23 23/13 63/3 74/8 75/25 91/15
**body [5]**  21/3 41/2 59/3 74/2 74/23
**Bogner [9]**  49/4 59/3 65/25 66/17 67/4 68/16 69/25 75/13 75/19
**Bogner's [2]**  59/3 60/14
**bolster [1]**  89/15
**both [11]**  19/20 36/18 36/21 49/18 65/2 72/25 73/12 77/8 82/23 84/5 98/6
**Branch [1]**  56/17
**breach [1]**  36/11
**breached [1]**  56/21
**breaches [2]**  32/9 96/2
**break [10]**  11/24 19/15 29/16 48/5 65/5 69/12 70/11 92/16 92/18 92/18
**breaks [2]**  19/3 95/11
**breathing [1]**  49/6
**breezing [1]**  114/21
**brief [7]**  4/24 17/19 24/4 28/21 28/23 34/11 81/4
**briefed [4]**  7/14 12/6 19/19 82/24
**briefing [4]**  4/5 10/24 26/4 37/24
**briefly [1]**  72/1
**briefs [1]**  3/19
**bright [4]**  70/25 71/24 71/25 72/20
**bring [18]**  9/10 10/3 10/3 10/4 10/6 10/7 11/14 33/16 34/19 41/7 41/8 54/5 68/21 77/18 85/11 88/1 88/2 111/25
**bringing [1]**  90/23
**broad [1]**  35/25
**broadly [1]**  42/18
**broke [2]**  23/6 56/22
**broken [5]**  18/22 48/8 67/9 67/10 68/20
**Brooks [1]**  25/24
**brought [2]**  12/25 43/5
**BRYAN [6]**  1/6 3/3 3/11 44/10 44/18 45/10
**building [43]**  18/8 19/11 29/16 31/18 36/1 45/16 46/6 46/8 46/10 46/11 58/18 59/25 62/21 66/17 66/23 79/19 79/24 81/12 81/14 81/19 82/7 82/15 82/16 83/6 86/14

**B**

**building... [18]** 86/19 94/2 94/17 95/17 95/18 96/6 96/20 98/1 98/5 99/17 99/22 100/12 100/12 100/20 100/25 101/4 107/12 107/17
**buildings [1]** 70/4
**burden [11]** 13/21 25/3 26/23 28/11 80/4 80/23 81/9 84/14 91/3 104/5 104/15
**burns [1]** 75/22
**business [6]** 46/7 87/10 99/24 100/1 100/10 109/6

**C**

**CA [1]** 2/4
**cabin [1]** 23/23
**cabins [1]** 23/2
**call [6]** 18/6 23/21 29/11 65/11 72/7 106/23
**called [2]** 66/1 70/3
**came [6]** 4/7 4/11 7/5 85/2 104/2 106/13
**camera [4]** 58/25 59/4 60/6 60/15
**cameras [2]** 58/25 74/2
**Camp [6]** 6/9 6/9 6/16 8/6 8/7 8/10
**can [76]** 4/19 5/3 9/2 10/2 12/15 15/10 16/23 17/6 17/10 19/23 20/1 21/7 22/20 22/23 24/5 26/5 27/23 28/12 29/8 34/22 36/4 36/7 37/10 38/24 39/4 39/6 39/25 40/7 40/13 40/13 43/13 47/14 47/16 47/21 52/2 57/15 60/11 60/19 65/1 69/4 71/17 71/20 72/1 72/15 72/18 72/21 72/24 73/22 73/24 73/25 74/22 75/3 75/21 75/21 75/22 80/25 94/6 95/6 102/16 103/3 103/12 104/7 104/7 104/16 106/5 106/8 107/14 108/15 111/1 111/20 111/22 111/25 112/2 113/20 114/12 114/25
**can't [10]** 7/6 10/9 16/17 17/7 17/8 17/9 21/16 81/8 105/2 105/8
**candid [1]** 32/20
**candidate [1]** 30/5
**candidates [2]** 6/23 30/2
**candidly [1]** 22/21
**cannot [4]** 28/17 38/14 60/5 111/4
**capacity [1]** 19/25 20/6 36/4
**Capitol [52]** 27/19 45/14 45/16 45/16 45/20 46/10 46/11 47/6 47/22 47/24 49/12 49/14 55/4 55/7 56/22 57/16 57/20 58/18 60/16 61/13 66/1 66/4 66/8 66/17 66/22 66/25 67/12 70/4 70/4 70/13 76/11 76/14 78/12 79/19 79/24 80/9 81/11 81/14 81/19 81/22 82/7 84/14 93/19 96/20 98/8 98/13 98/22 100/11 100/11 100/12 100/15 100/15
**capped [1]** 87/6
**Captain [7]** 51/13 52/4 54/17 55/10 55/16 68/23 68/25
**car [8]** 7/9 7/10 22/18 23/12 29/15 31/4 106/14 109/18
**care [2]** 10/1 22/17
**Carnell [1]** 83/2
**carried [4]** 35/3 51/14 56/13 84/2
**carries [10]** 20/10 33/24 36/16 82/13 82/18 83/24 84/1 91/9 91/17 96/22
**carry [12]** 8/18 17/4 23/10 23/24 35/4 84/3 84/4 91/13 92/14 96/20 97/8 97/21
**carrying [7]** 5/22 8/7 8/7 8/8 51/14 92/8 96/25
**case [55]** 3/2 3/20 4/7 4/7 4/12 10/6 11/14 12/25 14/25 17/13 23/24 24/8 25/16 25/16 25/23 27/20 27/25 28/1 28/17 29/10 30/3 41/17 43/13 44/9 45/6 45/8 45/10

56/9 57/11 68/1 70/24 72/6 72/15 72/16 73/12 80/12 81/8 83/3 83/19 84/20 85/11 85/13 85/21 86/10 88/1 88/2 91/21 97/2 102/9 107/10 108/8 108/9 108/17 108/19 109/14
**cases [5]** 8/3 28/22 84/12 89/11 91/22
**cash [1]** 23/12
**casual [1]** 37/16
**categories [1]** 18/16
**Catoctin [1]** 6/6
**cause [7]** 23/13 74/16 74/19 75/21 75/22 76/3 97/4
**caused [4]** 47/17 49/5 49/18 108/23
**causes [2]** 47/9 47/10
**causing [2]** 75/4 78/8
**CCTV [6]** 58/24 59/18 60/7 60/16 70/21 73/18
**ceased [1]** 61/20
**cellulitis [1]** 108/22
**central [1]** 85/4
**ceremonial [1]** 56/24
**cert [1]** 25/9
**certain [7]** 16/21 40/17 63/3 63/7 79/14 85/1 106/11
**certainly [12]** 12/14 13/4 13/5 16/16 19/25 20/1 22/7 24/5 34/22 36/4 40/25 43/21
**certainty [1]** 86/24
**certification [3]** 80/16 80/22 81/6
**certify [1]** 116/3
**certifying [1]** 80/20
**chance [5]** 28/19 34/3 107/7 112/1 113/7
**change [15]** 5/14 5/16 6/1 16/10 20/23 31/24 33/1 33/5 33/13 41/5 89/8 89/9 89/24 97/19 113/15
**changed [4]** 29/23 33/2 97/5 114/8
**changes [4]** 6/3 19/2 41/3 97/17
**changing [1]** 40/23
**characteristics [1]** 72/12
**charge [3]** 50/2 63/6 103/20
**charged [8]** 45/24 46/16 50/1 63/25 64/4 64/15 70/9 81/13
**charges [8]** 46/15 63/3 79/19 85/11 97/25 99/16 100/18 108/15
**check [2]** 27/15 112/22
**chemical [1]** 49/8
**chiefly [1]** 85/24
**childcare [1]** 43/22
**children [2]** 108/25 109/1
**church [1]** 109/6
**circle [1]** 35/15
**Circuit [4]** 5/6 25/25 26/1 82/23
**circuitous [1]** 106/19
**circular [1]** 39/24
**circumstance [4]** 62/14 67/2 67/6 67/14
**circumstances [11]** 5/23 22/1 39/1 50/22 53/9 53/19 63/13 67/5 69/3 77/25 79/5
**cite [1]** 43/9
**cites [3]** 43/13 87/8 87/11
**citing [1]** 89/16
**city [1]** 114/18
**civil [23]** 34/16 46/2 46/15 46/24 46/24 47/6 47/7 49/14 55/12 55/13 56/1 56/4 57/7 57/12 57/16 57/20 58/5 58/14 62/20 62/25 70/12 78/4 78/6
**classified [1]** 65/15
**clause [5]** 19/14 20/9 85/7 85/21 88/3
**clear [24]** 11/18 11/24 12/13 13/10 24/4 35/8 35/9 37/25 38/23 51/16 52/9 52/20 54/1 57/3 60/9 60/25 62/2 66/23 66/23 71/12 80/11 92/20 104/7 104/10
**clearances [3]** 107/20 107/25 108/12

**clearly [9]** 17/10 22/25 56/11 60/11 61/8 68/12 69/2 99/1 112/18
**clerk [2]** 101/13 101/19
**climb [3]** 55/21 55/23 55/25
**climbing [1]** 55/19
**climbs [1]** 48/20
**close [7]** 3/21 4/6 30/25 50/8 59/5 82/20 92/12
**closed [5]** 36/24 51/3 53/23 57/14 57/19
**closer [2]** 39/9 78/25
**closing [1]** 76/25
**Club [2]** 36/25 37/13
**Cobb [2]** 25/15 25/17
**cocounsel [2]** 101/24 102/17
**code [6]** 14/11 32/6 33/14 42/6 87/8 95/24
**cohesive [1]** 19/3
**colleagues [6]** 3/20 77/3 82/11 82/25 83/12 112/12
**colloquy [1]** 40/21
**COLUMBIA [4]** 1/1 57/14 57/18 95/24
**come [9]** 21/14 28/14 43/1 52/2 76/19 104/23 106/5 106/11 111/22
**comes [6]** 6/22 24/19 25/10 37/9 39/7 51/8 55/22
**comfortable [1]** 11/15
**coming [6]** 16/25 24/7 41/1 44/5 51/20 53/24
**comma [1]** 20/8
**comment [1]** 37/16
**commerce [19]** 20/9 38/23 39/1 47/1 47/1 56/5 56/6 56/9 56/10 57/11 57/25 58/2 58/4 58/6 58/7 58/9 85/7 85/20 88/3
**commerce-clause [1]** 88/3
**commission [1]** 46/2
**commit [6]** 46/4 50/1 63/24 64/24 70/8 78/3
**committed [13]** 36/11 37/2 37/3 37/6 37/10 37/11 46/19 58/14 64/2 64/8 68/9 69/9 78/3
**committing [8]** 64/5 64/10 64/12 64/15 64/22 65/6 81/13 82/6
**commodity [3]** 47/1 56/6 58/7
**commonly [1]** 87/7
**commotion [1]** 75/14
**community [4]** 104/8 104/9 108/25 109/5
**comparing [2]** 73/25 86/5
**complaining [1]** 67/13
**complete [2]** 44/24 54/20
**completely [1]** 32/15
**complex [3]** 45/14 52/18 100/16
**complied [1]** 108/17
**conceived [1]** 88/16
**concept [1]** 8/2
**concern [2]** 96/12 110/2
**concerned [6]** 9/22 30/19 50/20 75/11 91/11 108/24
**concerning [3]** 103/20 104/19 112/7
**concerns [3]** 65/17 75/21 77/20
**concert [3]** 58/24 65/24 70/9
**concerted [1]** 58/15
**concertedly [1]** 60/9
**conclude [12]** 5/11 17/21 28/7 54/12 58/10 58/11 62/22 81/1 92/17 93/21 97/20 100/21
**concluded [2]** 64/1 115/3
**concludes [3]** 59/4 70/8 73/1
**conclusion [1]** 85/23
**condition [2]** 38/19 38/25
**conditions [5]** 108/23 111/2 113/12 114/14 114/16
**conduct [26]** 8/5 8/5 9/19 14/21 45/24 46/7 46/9 47/2 56/6 57/5 79/19 79/24 80/1 81/11 81/11 84/25 85/1 86/4 99/17 99/21 99/23 99/25 99/25 100/1 100/6 100/9
**confer [1]** 88/17

**C**

conference [1]   89/23
confirmed [1]   106/21
confrontation [1]   52/10
confronting [1]   52/25
congress [61]   5/13 5/17 7/24 8/11
  9/14 9/21 11/10 11/19 14/12 14/16
  14/19 15/15 15/17 16/8 16/19 17/7
  17/10 17/11 18/19 20/25 22/2 22/3
  23/13 27/4 27/4 28/15 31/22 32/2
  33/7 33/12 38/14 38/23 39/7 40/14
  80/1 80/2 80/7 80/17 85/9 86/22
  87/17 87/24 88/9 88/13 88/16
  88/19 89/6 90/5 90/18 91/6 91/11
  91/17 93/3 93/15 94/10 94/11 95/4
  95/13 96/23 97/8 97/18
Congress' [9]   7/19 8/16 12/17
  12/17 16/20 20/5 37/8 80/20 97/7
congressional [3]   8/1 87/9 94/22
conjunction [1]   94/3
conscious [1]   109/21
consciously [1]   33/7
consider [3]   9/13 27/2 29/14
consideration [2]   31/12 44/24
considered [1]   9/10
considering [3]   33/13 103/21
consistent [4]   5/5 9/15 87/5
  89/25
consistently [3]   7/25 18/11 99/8
constantly [1]   35/8 35/11 35/22
constitute [2]   47/6 68/5
constituted [2]   55/13 70/15
constitutes [1]   116/4
Constitution [1]   1/23
constitutional [2]   39/12 39/12
consumed [1]   66/20
contact [5]   63/10 68/4 73/18 75/4
  114/8
contain [1]   55/18
contention [1]   98/25
context [7]   11/2 23/19 34/15 40/8
  52/20 85/12 103/21
contexts [1]   38/21
continue [3]   3/21 57/1 111/13
continued [3]   1/19 2/1 104/2
continues [4]   16/9 53/15 53/16
  87/12
contractor [1]   108/5
contrary [1]   62/14
control [5]   48/14 51/7 54/24
  55/17 86/8
convention [1]   41/18 41/19 42/13
conventions [1]   42/12
conversation [6]   12/19 52/19
  52/20 52/24 68/25 69/3
conversations [1]   53/2
converts [1]   13/25
convict [3]   49/22 63/9 112/23
convicted [3]   14/11 112/21 112/25
convince [2]   26/6 53/2
convinced [14]   49/24 57/23 70/15
  73/20 77/12 90/22 91/4 91/7 92/1
  92/2 97/5 97/14 99/9 104/10
convincing [4]   50/20 87/16 104/7
  104/10
convulsions [1]   74/17
cookie [1]   5/5
cookie-cutter [1]   5/5
Cooper [16]   4/16 4/20 10/23 20/14
  31/25 34/18 41/1 43/3 43/8 83/3
  86/6 86/21 87/12 88/8 88/11 88/15
Cooper's [5]   4/18 4/25 33/6 83/1
  89/1
copy [2]   114/24 114/25
cordoned [17]   3/18 17/22 17/25
  18/9 18/22 19/11 21/15 22/15
  35/20 36/1 82/17 83/9 86/18 92/14
  93/1 94/17 98/9
cordoned-off [1]   35/20
core [1]   14/2
corps [1]   42/11

correct [13]   4/21 15/23 19/17
  26/25 28/25 33/1 49/24 58/11
  106/18 106/22 106/22 106/24 116/4
couch [2]   7/13 14/10
could [34]   9/20 11/13 13/2 14/7
  15/17 25/6 26/12 29/25 32/17 36/8
  43/16 50/13 58/11 61/7 61/18
  61/19 79/1 79/4 91/23 93/15 97/13
  98/20 99/9 99/10 99/12 99/12
  101/25 102/18 104/17 105/25 108/2
  112/11 113/5 113/24
couldn't [1]   14/19
counsel [12]   3/4 4/4 26/21 36/17
  40/21 44/12 44/12 44/19 45/14
  81/3 103/8 106/20
count [54]   45/9 45/9 46/13 46/14
  47/5 49/22 50/2 55/8 56/3 58/12
  61/17 62/25 63/2 63/14 64/1 64/5
  65/2 65/18 65/21 66/12 66/14 68/8
  69/7 69/10 70/9 70/16 79/14 79/18
  79/21 80/4 81/12 81/13 81/16 82/6
  92/24 99/15 99/16 99/19 100/5
  100/17 100/17 100/18 100/21 101/1
  101/3 103/19 112/19 112/19 112/20
  112/20 112/21 112/21 112/25 113/2
counter [1]   32/19
counter-argument [1]   32/19
countered [1]   17/17
counts [7]   79/16 79/17 79/17 82/3
  82/9 101/7 101/10
couple [8]   34/24 45/1 71/7 90/7
  91/25 92/2 92/10 101/24
coupled [2]   73/14 75/5
course [14]   4/24 7/6 8/22 9/1
  10/21 14/1 23/3 23/11 26/14 28/7
  41/3 87/10 103/22 111/10
court [108]   1/1 1/22 1/22 4/6 5/2
  5/3 5/4 5/6 7/25 9/10 9/13 9/15
  9/21 11/1 11/11 12/15 12/21 20/2
  24/13 24/14 24/15 25/7 26/4 26/8
  28/7 29/18 30/19 36/3 40/4 46/17
  47/4 47/22 48/18 49/13 49/20 50/19
  52/12 53/18 55/8 55/12 56/7 57/6
  57/11 57/15 57/24 59/4 60/4 62/16
  62/24 63/14 64/1 64/12 65/1 65/22
  66/10 66/12 67/15 67/22 68/9 69/8
  69/10 69/17 69/20 70/7 73/1 77/3
  78/2 78/14 79/13 79/21 80/4 81/16
  81/21 82/2 82/3 82/5 83/19 85/16
  85/19 85/22 85/22 86/7 86/9 88/18
  95/2 98/3 100/5 100/13 100/21
  101/1 103/21 104/1 104/4 104/23
  106/2 107/19 107/23 109/23 111/5
  111/12 112/18 113/18 113/19
  113/23 113/25 114/16 116/3 116/13
Court's [11]   7/22 39/25 61/17
  85/4 85/8 86/5 103/19 103/24
  104/24 105/7 112/6
courts [5]   1/23 9/10 9/13 83/14
  85/5
cover [1]   102/17
covers [1]   32/14
crash [1]   7/10
create [2]   16/10 50/10
created [2]   88/13 95/10
creates [1]   31/14
credentials [1]   42/12
credible [2]   61/16 99/1
credibly [2]   47/14 47/16
crime [14]   13/20 19/10 30/22
  30/23 36/11 37/2 64/8 64/10 70/9
  83/16 83/22 86/8 88/14 89/18
criminal [7]   1/3 3/2 8/5 33/13
  44/9 83/15 85/24
criminality [1]   14/20
cross [5]   6/25 22/16 31/8 42/5
  91/8
cross-reference [2]   42/5 91/8
crowd [21]   45/15 47/16 48/1 48/2
  48/8 48/10 58/17 58/18 58/23
  59/21 59/24 60/1 60/17 60/22 61/5
  61/9 62/3 62/4 69/14 69/14 71/19

crowded [1]   61/24
crushed [1]   62/3
Cua [1]   67/15
culpability [7]   15/12 15/13 15/21
  20/23 20/24 86/4 96/14
culpable [2]   14/25 15/4
culture [1]   29/8
curfew [2]   57/14 57/15
curious [2]   39/18 59/15
current [6]   31/23 31/24 32/1
  95/10 95/17 110/17
cut [2]   9/20 38/4
cuts [1]   36/20
cutter [1]   5/5
cycle [1]   29/24

**D**

D.C [4]   5/6 32/6 82/23 87/8
damage [4]   21/8 21/9 47/11 47/13
damaged [2]   47/18 49/19
danger [6]   14/7 47/10 47/11 47/17
  104/9 108/21
dangerous [8]   8/8 15/13 15/14
  15/21 67/14 74/11 91/14 96/20
dark [1]   104/22
darn [1]   21/17
date [5]   101/16 101/20 102/19
  103/7 103/10
Dated [1]   116/10
dates [1]   101/18
daughter [6]   84/13 84/15 92/25
  93/1 93/2 93/4
David [6]   6/9 6/10 6/17 8/6 8/7
  8/10
day [17]   35/3 35/4 40/9 40/21
  43/22 46/12 47/22 49/16 66/23
  75/14 76/17 80/17 80/24 103/11
  109/19 113/17 116/10
daylight [1]   86/10
days [2]   101/20 101/25
DC [10]   1/5 1/15 1/17 1/24 10/16
  14/11 30/23 30/24 32/12 45/11
deal [2]   49/19 106/11
deals [1]   42/4
dealt [1]   31/19
debate [1]   65/11
decades [1]   91/6
decades-old [1]   91/6
December [1]   106/12
decide [4]   9/13 24/9 26/1 39/14
deciding [2]   9/10 40/22
decipher [1]   33/11
decision [7]   4/15 4/18 16/19
  16/20 24/20 109/19 109/21
decisions [3]   3/19 4/15 104/22
declined [2]   84/10 84/15
decorations [1]   108/5
decreases [1]   19/5
deeply [1]   10/2
defendant [30]   1/7 2/2 3/10 24/16
  30/14 30/16 31/13 37/8 37/9 44/18
  45/10 46/16 46/19 63/16 63/20
  63/20 63/23 64/16 64/20 64/23
  67/23 78/16 78/18 81/18 83/8 84/1
  85/16 89/13 92/22 99/20
defendant's [3]   35/5 46/21 84/24
defendants [1]   30/10
defended [1]   108/20
defense [21]   13/19 28/1 28/19
  36/17 57/25 59/14 60/4 69/17
  71/10 74/9 77/10 79/10 83/4 84/11
  84/11 101/18 104/5 104/15 106/20
  107/6 109/20
defined [2]   47/6 56/12
defines [1]   47/7
definitely [3]   29/1 30/8 32/19
definition [6]   17/14 83/6 84/6
  95/1 95/16 96/6
definitional [6]   18/10 84/6 92/5
  92/7 92/7 95/10
definitions [2]   84/5 93/24
degree [5]   17/4 17/4 46/25 56/4

# D

**degree... [1]** 58/6
**delay [1]** 58/6
**delayed [4]** 46/25 56/4 57/4 57/7
**deliberately [3]** 59/23 69/13 80/3
**delineates [1]** 9/6
**deliver [1]** 45/4
**Democratic [1]** 41/18
**demonstrably [1]** 59/17
**denied [1]** 108/6
**department [4]** 56/14 56/16 56/17 85/10
**departments [1]** 56/17
**depth [1]** 32/21
**Deputy [2]** 93/18 101/19
**describes [1]** 94/23
**designate [1]** 94/10
**designated [9]** 41/25 67/17 67/19 67/25 86/14 93/20 94/3 94/7 94/19
**designates [1]** 42/19
**designation [3]** 41/23 94/12 95/6
**designed [1]** 87/3
**desire [1]** 86/23
**desperate [1]** 50/23
**despite [6]** 47/25 51/16 51/24 53/14 54/7 75/13
**detained [1]** 107/16
**determination [2]** 9/15 107/1
**determine [2]** 60/5 95/7
**determined [1]** 85/23
**deterrent [1]** 31/17
**device [40]** 65/12 65/15 70/20 71/2 71/2 71/9 71/11 71/12 71/16 72/2 72/4 72/7 72/8 72/9 72/10 72/19 72/19 72/23 72/25 73/3 73/3 73/21 74/6 74/11 75/2 75/9 75/10 76/16 76/20 76/23 77/5 77/5 77/10 79/4 103/21 103/22 110/2 110/19 112/15
**did [56]** 5/2 5/4 5/4 9/13 10/24 25/22 34/9 40/7 42/10 47/6 50/1 54/8 54/12 63/5 63/20 63/20 64/23 65/22 67/15 70/10 71/19 73/15 74/5 74/13 76/4 76/6 79/6 79/8 79/25 80/6 80/21 82/3 83/19 88/19 91/24 92/1 97/4 97/8 97/9 98/6 98/10 99/10 99/22 100/8 100/14 100/25 101/10 104/2 105/7 105/19 105/21 105/24 106/22 106/22 106/23 112/23
**didn't [18]** 10/16 13/20 16/11 20/12 25/12 26/22 27/5 27/21 40/12 43/8 43/9 43/25 61/14 74/14 86/3 93/8 105/22 112/19
**difference [6]** 20/19 36/12 59/7 65/13 85/3 86/9
**different [18]** 10/18 15/11 17/4 17/5 17/6 18/16 19/16 19/20 34/10 36/5 38/4 38/12 73/25 74/2 83/7 84/21 88/14
**differently [4]** 31/21 33/3 64/7 83/18
**difficult [6]** 5/11 61/24 66/19 66/21 78/11 82/21
**difficulties [1]** 27/23
**difficulty [1]** 49/6
**dignitaries [1]** 41/20
**dire [1]** 67/4
**direct [2]** 94/6 101/13
**directed [3]** 49/11 77/12 77/21
**direction [5]** 73/22 75/12 106/16 106/19 106/24
**directions [4]** 49/10 51/17 52/14 53/5
**directive [1]** 112/7
**directly [10]** 51/12 53/14 53/15 59/5 59/8 60/5 60/17 68/14 105/19 107/16
**directs [1]** 93/14
**disagree [5]** 4/6 10/22 18/12 24/25 27/8

**disagrees [4]** 11/23 24/14 24/14 26/4
**disarm [1]** 53/8
**discern [1]** 75/15
**discharge [2]** 72/18 74/5
**discharged [2]** 49/8 75/16
**discomfort [1]** 74/19
**discretion [3]** 22/8 85/11 104/4
**discuss [1]** 50/3 80/15 101/15 101/16
**discussed [4]** 4/12 45/18 65/18 80/21
**discussion [3]** 19/23 26/11 81/6
**disorder [23]** 34/16 46/2 46/15 46/24 46/24 47/6 47/8 49/14 55/12 55/14 56/1 56/4 57/7 57/12 57/16 57/20 58/5 58/14 62/20 62/25 70/12 78/4 78/7
**disorderly [7]** 46/9 79/19 79/23 81/11 99/17 99/21 100/6
**dispenser [1]** 51/15
**dispensing [1]** 53/14
**display [1]** 77/25
**displays [1]** 72/24
**dispute [2]** 47/14 47/16
**disregarded [1]** 104/24
**disrupt [4]** 80/1 87/9 99/23 100/9
**disrupted [1]** 100/1
**disrupting [1]** 46/6
**disruptive [6]** 46/9 79/24 81/11 99/17 99/21 100/6
**dissenters [2]** 12/10 34/25
**distance [1]** 54/8
**distinct [1]** 36/5
**distinguish [2]** 8/4 88/22
**distinguished [1]** 93/11
**distress [1]** 69/2
**distressed [1]** 62/13
**DISTRICT [8]** 1/1 1/1 1/10 1/23 57/14 57/18 95/24 113/14
**disturb [1]** 80/1
**disturbance [1]** 47/8
**disturbing [1]** 76/22
**do [77]** 6/25 11/8 11/10 13/5 16/3 16/4 20/8 22/1 22/7 22/10 22/16 22/20 22/24 23/7 24/1 24/1 24/2 24/9 24/11 24/12 24/12 27/19 27/21 31/1 33/13 33/22 36/24 37/18 38/24 38/25 39/4 39/6 39/21 43/13 43/19 60/24 62/4 64/18 67/12 69/4 70/17 71/8 73/15 75/5 76/25 77/3 78/17 79/3 80/16 82/16 83/12 84/22 84/24 87/23 91/16 98/6 102/6 102/16 103/3 105/4 109/15 109/25 110/5 110/6 110/8 110/19 110/21 110/22 110/23 110/23 110/23 110/25 111/19 111/19 111/20 111/25 114/15
**documentary [1]** 57/23
**does [27]** 5/24 8/14 11/24 14/25 18/2 30/17 32/11 35/3 36/3 36/8 36/17 38/11 48/22 51/18 52/5 53/11 56/18 61/1 68/21 71/9 87/20 91/17 92/3 97/21 104/8 108/25 113/23
**doesn't [20]** 7/9 8/18 10/3 17/21 18/3 20/3 20/23 35/10 35/24 39/2 40/23 41/5 42/12 45/7 54/20 59/7 60/7 76/19 80/22
**doing [25]** 6/10 18/15 18/15 19/6 21/21 30/20 30/21 34/19 36/6 36/7 46/5 49/11 51/7 54/18 54/19 54/23 55/17 61/9 61/10 62/13 74/7 75/23 80/17 88/17 88/12
**DOJ [2]** 1/13 1/16
**DOJ-USAO [2]** 1/13 1/16
**don't [68]** 13/3 14/9 16/1 16/12 16/13 16/15 16/24 16/25 17/24 18/11 18/24 19/17 22/17 23/9 23/10 24/1 25/11 25/13 25/17 26/14 27/11 27/12 29/10 29/23 30/1 30/4 31/1 32/12 33/13 34/1

34/22 34/23 36/16 41/25 42/15 47/14 48/21 49/23 52/2 53/6 54/18 56/10 57/10 58/2 61/16 62/10 65/10 65/12 68/1 68/6 70/14 71/8 74/24 74/25 75/23 77/22 79/11 84/10 84/11 85/21 92/21 97/17 98/18 98/20 105/3 107/14 107/23 109/20
**done [8]** 21/19 21/20 24/18 27/20 31/7 32/17 82/4 113/6
**Donnelly [1]** 2/9
**door [24]** 48/25 49/1 51/4 51/16 51/19 51/22 51/23 51/23 51/24 51/25 52/2 52/4 52/6 52/14 53/1 53/11 53/22 53/23 53/25 54/2 54/9 54/23 55/15 59/1
**doors [3]** 51/1 51/3 52/22
**doorway [1]** 51/12
**Dora [1]** 2/10
**Dorrance [1]** 2/5
**double [1]** 112/22
**doubled [1]** 88/9
**doubt [29]** 9/3 14/1 45/5 46/18 49/13 50/1 54/22 63/15 64/13 69/8 77/6 78/21 79/23 80/5 80/23 81/2 81/10 81/17 89/13 90/11 90/20 93/17 98/4 99/9 99/11 99/20 100/3 100/22 101/2
**doubtful [2]** 93/3 95/4
**down [15]** 19/15 21/24 23/18 25/10 27/5 28/14 53/3 53/6 53/6 55/23 93/8 95/11 98/18 98/16 103/15
**Dr [2]** 74/10 74/20
**draw [3]** 92/4 92/9 92/21
**draws [1]** 84/17
**drive [3]** 13/8 31/4 110/10
**driven [2]** 31/17 106/24
**driving [3]** 16/20 21/24 110/9
**drone [1]** 6/2
**drop [1]** 12/19
**drove [1]** 106/15
**dual [3]** 40/3 40/4 40/13
**due [1]** 57/19
**duplicated [1]** 85/24
**duplicating [1]** 88/17
**during [11]** 23/3 23/11 26/20 46/2 46/24 47/22 49/7 87/10 91/14 104/21 111/23
**duties [15]** 46/23 55/12 57/1 62/19 63/19 63/23 66/9 66/22 67/20 69/23 69/25 76/13 78/6 78/10 90/4

# E

**each [9]** 30/12 46/13 49/15 64/15 83/17 86/6 94/8 99/4 100/22
**earlier [3]** 19/25 65/21 81/1
**early [3]** 10/14 106/12 108/19
**earth [1]** 13/10
**easily [5]** 58/8 61/19 61/19 62/8 67/25
**easy [2]** 38/21 97/11
**effect [2]** 12/15 26/22
**effected [1]** 56/21
**effort [13]** 59/22 59/25 60/19 60/24 61/6 61/7 61/8 61/11 61/23 62/3 62/12 62/15 69/15
**efforts [2]** 52/16 54/7
**Eighteen [1]** 109/9
**either [5]** 16/15 63/17 80/2 92/20 104/11
**eject [1]** 9/4
**elaborated [1]** 75/20
**election [5]** 80/16 80/18 80/19 80/20 81/6
**electrical [1]** 75/8
**element [42]** 4/2 5/12 12/3 17/2 17/16 19/6 20/7 20/13 21/6 30/12 33/8 33/9 36/12 38/20 41/4 52/12 55/8 56/3 56/7 56/7 56/10 56/11 58/10 61/2 62/16 62/23 62/23 65/21 67/23 68/8 69/8 69/20 70/7

## E

element... [9]  73/6 78/13 80/6 81/10 81/20 82/2 83/17 84/19 84/20
elements [26]  5/7 43/12 46/18 49/21 63/15 64/14 64/15 73/5 78/14 78/15 78/20 79/22 81/18 83/15 83/21 84/23 84/25 85/3 85/3 98/4 98/7 99/19 100/2 100/22 101/1 104/11
Eli [3]  1/12 3/6 44/13
Elizalde [8]  4/8 4/9 5/3 8/2 18/7 19/20 19/21 20/4
Ellipse [3]  27/16 45/13 81/5
else [14]  31/2 34/5 42/22 46/4 54/18 54/19 54/24 62/3 68/5 73/14 80/10 109/12 109/23 112/4
else's [1]  59/9
elsewhere [3]  70/6 73/12 101/5
embedded [1]  37/17
Emily [1]  44/18
emits [3]  70/25 72/20 75/8
employed [1]  4/21
employee [6]  56/16 63/17 63/19 63/22 69/22 69/24
en [1]  50/18
enable [1]  85/1
enabled [1]  78/23
enabling [1]  79/8
enacted [1]  86/8
enacting [1]  86/6
encircled [1]  50/21
encircling [1]  50/24
encouraging [1]  64/21
end [5]  25/14 40/21 94/8 94/21 112/14
endanger [1]  88/23
energies [1]  66/20
enforce [1]  9/23
enforcement [17]  8/11 23/12 33/19 33/25 35/19 43/5 45/17 46/1 46/21 46/22 55/10 61/12 62/18 66/6 89/20 90/3 90/13
enforcing [1]  96/17
engage [4]  21/2 21/3 53/16 104/3
engaged [29]  30/18 33/19 33/25 46/22 47/17 49/10 49/17 55/11 59/10 59/21 61/1 62/19 63/22 67/19 68/18 69/22 76/12 79/23 81/18 81/21 89/20 90/12 90/14 99/7 99/20 100/5 100/23 101/7 105/20
engaging [15]  45/17 46/7 46/9 46/10 48/3 48/10 53/21 54/21 55/4 59/6 61/6 68/23 100/19 101/12 106/20
English [1]  83/20
enhance [1]  16/9
enhanced [1]  23/2
enhances [2]  15/13 15/14
enlightening [1]  44/3
enough [7]  26/7 28/4 28/18 29/12 32/22 112/9 112/18
ensnaring [1]  9/11
ensure [3]  9/17 21/6 40/9
ensuring [1]  85/25
enter [7]  13/11 13/14 16/4 16/4 19/10 36/24 86/14
entered [5]  58/22 62/11 69/13 82/14 98/4
entering [10]  46/5 55/18 58/18 59/20 61/3 61/13 62/21 76/14 78/12 97/25
enthusiastically [1]  62/15
entire [4]  40/16 41/21 83/5 108/10
entirely [4]  11/15 39/14 90/9 92/20
entitled [1]  116/5
entrance [2]  49/12 58/19
entrancing [1]  45/22

entries [1]  95/18
entry [2]  32/3 95/21
environment [1]  41/22
episode [2]  60/23 60/25
equal [1]  59/12
equally [1]  60/25
erect [1]  35/19
especially [2]  74/10 103/19
essence [1]  41/5 91/2
essential [1]  54/6
essentially [7]  25/19 36/15 40/15 40/20 71/1 95/5 97/16
established [1]  48/11
evacuated [1]  56/24
evading [1]  106/9
evaluate [1]  23/22
evaluated [1]  5/6
evaluation [1]  4/21
even [29]  10/3 19/22 25/15 31/6 35/2 41/11 50/21 56/10 58/8 60/19 68/2 73/17 74/15 74/17 74/20 75/2 76/2 83/25 84/18 84/21 87/21 90/22 92/1 92/2 93/9 93/21 98/16 99/11 107/23
event [13]  24/7 30/4 41/12 42/1 42/19 68/6 94/3 94/3 94/7 94/7 94/18 94/19 95/8
events [8]  47/5 47/15 53/10 55/13 58/13 94/11 94/23 94/24
eventually [7]  48/20 52/5 53/10 53/17 61/23 71/8 71/22
ever [5]  25/6 76/25 94/12 94/12 94/15
every [8]  5/4 6/12 16/17 16/22 30/5 55/2 81/10 108/18
everybody [1]  26/22
everyday [1]  68/24
everyone [3]  6/13 75/7 92/25
everything [4]  32/17 80/10 89/2 113/2
evidence [22]  27/20 28/12 28/14 47/20 47/23 48/6 49/22 55/15 57/24 68/3 68/12 73/15 74/9 80/7 80/12 80/21 81/8 97/18 98/7 98/10 104/7 104/10
evident [1]  60/16
exactly [4]  16/8 20/2 29/10 73/24
examined [1]  72/8
examines [1]  71/25
example [17]  8/6 8/17 9/17 9/20 11/17 14/4 16/12 20/9 30/2 30/5 38/7 40/1 40/8 82/14 84/12 92/22 93/17
examples [1]  29/6
excellent [1]  13/12
except [3]  12/19 113/2 113/17
exchange [1]  53/16
Executive [1]  56/17
exercise [1]  24/21
exerted [2]  66/19 68/17
Exhibit [9]  48/7 48/19 49/2 57/13 59/19 60/3 60/10 61/18 72/4
Exhibit 403A [2]  60/3 61/18
Exhibit 403D [1]  60/10
Exhibit 502 [1]  57/13
Exhibit 602E [1]  48/7
Exhibit 615E [1]  72/4
Exhibit 710A [1]  49/2
exhibits [3]  73/25 74/3 80/17
existence [1]  98/19
exists [2]  40/9 88/4
expanding [1]  27/4
expansive [1]  27/10
expect [1]  25/25
expensive [1]  111/11
experience [1]  27/2
expert [2]  65/16 74/10
explain [1]  65/12
explained [17]  29/14 55/12 62/17 69/10 69/19 69/25 73/12 78/5 86/6 86/22 87/2 89/23 95/13 100/4 101/3 101/6 101/9

explaining [2]  18/15 18/17
explains [1]  57/16
explore [2]  28/25 32/20
expressly [2]  32/3 95/21
extend [2]  4/23 40/7
extending [1]  29/24
extends [2]  3/16 17/14
extensive [2]  7/16 109/6
extent [6]  24/15 24/19 32/20 39/20 62/8 108/23
extremely [6]  50/21 66/19 67/13 69/2 76/22 76/22

## F

face [4]  13/9 23/6 53/12 68/25
faced [1]  67/5
facilitating [1]  64/21
facing [1]  108/14
fact [29]  6/11 6/13 9/5 14/2 22/22 26/11 27/18 33/24 47/18 47/21 48/14 53/4 53/14 53/21 58/3 60/17 68/12 74/6 73/6 79/5 81/4 91/11 92/23 94/13 95/6 98/11 98/14 99/25 113/13
factor [3]  9/9 9/12 28/7
facts [3]  28/3 61/3 107/11
factual [4]  22/12 22/21 23/15 24/6
factually [1]  29/20
fair [18]  4/5 6/23 6/24 6/25 8/19 15/24 16/2 16/3 21/13 26/7 28/4 28/18 29/6 29/12 32/22 56/8 74/18 112/9
fairly [4]  5/5 29/22 51/13 107/10
fall [1]  40/18
false [1]  59/17
familiar [2]  71/2 82/24
family [1]  56/20
fantastic [1]  115/2
far [9]  8/1 9/8 9/11 14/20 21/12 68/24 90/17 92/7 95/6
fashion [1]  79/7
father [1]  113/23
favor [1]  76/16
FBI [9]  105/14 105/15 105/19 105/20 105/21 105/22 107/12 107/17 109/18
fear [2]  75/4 78/9
federal [57]  4/22 9/17 9/18 9/24 9/24 11/13 11/13 11/14 12/3 13/20 17/1 17/15 18/16 30/25 32/2 32/13 33/19 33/24 36/22 37/2 37/4 37/6 39/2 39/3 39/4 39/11 39/13 39/16 39/19 40/9 40/19 41/8 41/22 42/6 43/5 85/1 85/10 85/15 85/18 85/25 86/1 86/2 86/25 87/3 87/9 88/14 88/17 89/5 89/20 90/13 95/20 96/14 96/16 96/21 96/25 108/14 111/6
federalize [3]  11/20 40/15 86/23
federalized [2]  14/2 14/8
federally [4]  47/2 56/7 56/11 56/12 57/8 57/8
feel [1]  36/2
feeling [2]  74/21 74/22
feels [1]  7/11
felon [1]  14/11
felony [24]  5/17 5/20 7/20 10/7 10/18 11/2 11/4 11/8 14/4 17/6 20/20 20/22 23/19 23/20 46/4 63/24 63/25 78/4 91/13 91/16 91/19 91/24 96/12 96/19
felt [1]  45/1
fence [2]  21/16 21/18
Feola [25]  9/15 9/21 10/23 10/24 11/1 12/9 12/10 12/14 34/24 39/10 39/23 39/23 40/1 40/3 40/24 85/4 85/12 85/16 86/10 86/22 87/15 87/18 88/21 96/17 96/18
few [2]  13/9 61/21
fewer [1]  57/20

**F**

**fiddles [1]** 70/24
**field [1]** 85/15
**fifth [3]** 46/7 63/23 70/7
**Figueroa [1]** 83/18
**figure [1]** 9/15
**file [2]** 101/14 114/9
**final [6]** 38/15 41/11 56/3 70/7 88/25 96/11
**finally [8]** 45/21 46/10 52/3 64/23 78/2 100/13 101/9 106/21
**Finance [1]** 93/18
**find [50]** 20/7 24/16 34/22 36/22 46/16 46/17 49/25 61/3 63/13 63/14 64/10 64/12 65/1 67/22 67/23 70/17 71/10 71/11 73/9 74/5 77/2 77/23 77/24 78/20 79/12 79/21 79/21 80/3 80/5 81/10 81/15 81/16 87/15 89/1 93/23 98/2 98/3 98/6 99/15 99/18 99/19 100/2 100/8 100/17 100/21 101/6 101/10 101/19 102/18 104/7
**find by [1]** 104/7
**finding [5]** 49/20 62/11 75/1 103/19 103/24
**findings [2]** 45/5 81/4
**finds [25]** 5/2 5/3 47/4 49/13 50/19 52/12 55/9 56/7 57/7 57/11 62/16 62/24 65/22 66/13 68/9 69/8 69/20 78/2 79/13 81/21 82/2 82/5 100/5 100/13 101/1
**fine [5]** 103/11 103/12 103/13 106/4 114/23
**finger [4]** 67/7 67/9 67/10 68/20
**fire [3]** 76/20 78/23 79/8
**firearm [4]** 8/7 91/13 96/20 97/1
**fired [4]** 72/21 74/3 75/8 75/24
**firing [1]** 73/24
**FIRM [1]** 2/8
**first [37]** 4/7 12/9 16/9 22/12 36/25 45/19 45/25 46/18 47/23 48/8 50/3 51/18 52/12 58/20 60/25 61/2 61/16 63/16 64/14 65/3 65/17 65/21 67/23 71/7 72/14 73/5 77/1 78/13 79/23 81/20 83/13 86/8 90/8 92/3 101/2 102/6 104/5
**fiscal [2]** 94/8 94/21
**Fischer [1]** 36/3
**fixed [5]** 35/8 35/10 35/22 35/23 35/24
**FL [1]** 2/10
**flagpole [2]** 48/24 49/9
**flagpole-like [1]** 49/9
**flash [1]** 72/22
**flashlight [1]** 70/19
**fleeing [1]** 23/11
**fleshed [1]** 27/11
**flight [3]** 104/8 104/19 109/22
**Floor [1]** 2/3
**Flores [1]** 83/18
**Flores-Figueroa [1]** 83/18
**flow [1]** 18/17
**Flyers' [1]** 37/13
**focus [6]** 12/23 15/12 35/22 37/8 60/23 86/7
**focused [6]** 12/10 19/21 35/1 39/10 87/21 87/25
**focusing [6]** 6/3 10/13 15/11
**folks [1]** 110/4
**follow [3]** 52/14 54/9 114/15
**following [10]** 46/18 63/15 64/13 79/22 81/17 98/3 99/19 100/22 102/7 112/17
**following week [1]** 102/7
**footage [9]** 52/25 59/3 59/17 59/18 60/8 60/11 67/1 70/21 73/18
**footnote [1]** 37/24
**force [7]** 45/15 53/19 59/25 65/4 66/18 68/10 68/10 68/11 68/12 68/17 76/6 78/1
**forceful [1]** 49/5

**forcibly [5]** 63/20 67/18 68/9 68/10 76/4
**forcing [1]** 104/22
**foregoing [1]** 116/4
**foreign [2]** 6/15 93/11
**forest [1]** 22/11
**format [1]** 19/4
**formed [1]** 50/9
**former [2]** 23/14 30/3
**forth [2]** 56/9 114/16
**forum [4]** 9/18 11/13 85/10 85/25
**forward [23]** 27/14 48/2 58/23 59/2 59/11 59/23 66/15 69/14 69/16 70/9 71/14 71/20 74/1 76/4 79/3 79/8 81/22 81/24 82/4 82/18 82/22 103/22 103/23
**found [6]** 55/13 66/10 71/3 78/13 88/8 112/25
**four [2]** 47/12 109/1
**fourth [5]** 46/6 63/21 64/20 69/20 71/24
**framework [1]** 18/7
**frank [2]** 2/8 32/16
**frankly [5]** 30/24 103/25
**fraud [2]** 80/18 80/19
**Friday [3]** 110/13 110/24 113/4
**Fridays [3]** 102/11 102/25 103/1
**friendly [1]** 68/24
**frightened [3]** 55/1 77/7 77/25
**frightening [3]** 67/2 67/14 76/20
**front [28]** 7/9 45/20 47/23 47/25 48/9 48/15 49/16 50/25 54/14 58/23 59/21 59/24 60/1 61/5 66/24 68/14 69/14 71/16 71/17 73/11 73/16 76/8 77/6 77/13 77/16 77/22 78/24 107/16
**fucking [1]** 52/1
**fullest [1]** 32/20
**fully [3]** 12/5 27/11 108/17
**fulsome [1]** 26/3
**fulsomely [1]** 34/12
**function [17]** 26/15 33/25 35/17 40/19 47/3 56/7 56/11 56/12 56/13 56/20 57/3 57/9 84/25 89/21 90/12 90/14 90/21
**functions [4]** 33/20 99/24 100/2 100/10
**fundamental [7]** 5/15 5/25 6/4 7/11 83/13 91/7 97/19
**fundamentally [7]** 5/13 18/19 29/23 89/8 91/18 97/5 97/14
**further [6]** 26/3 52/18 66/2 95/11
**furtherance [2]** 64/19 78/19
**future [1]** 112/7

**G**

**gain [1]** 48/14
**gas [1]** 99/6
**gave [1]** 44/24
**general [4]** 23/21 39/3 42/18 98/12
**generally [4]** 58/9 70/13 80/18 100/16
**Georgia [1]** 80/19
**gesturing [2]** 62/1 62/2
**get [47]** 6/17 7/6 7/7 7/7 7/8 21/12 21/17 21/18 24/12 25/25 27/12 30/9 30/25 31/4 31/6 40/6 40/6 42/12 42/12 44/23 51/9 51/10 51/10 51/11 51/12 51/17 51/22 51/25 52/21 53/7 54/5 59/16 65/10 69/5 85/9 93/9 98/24 98/24 107/2 110/9 113/5 113/7 113/24 114/1 114/2 114/2 114/3
**gets [6]** 10/6 30/5 41/4 41/25 91/21 107/15
**getting [4]** 22/3 50/11 62/3 82/22
**Giuliani's [1]** 27/17
**give [11]** 13/4 28/18 42/20 46/13 51/16 51/25 53/11 53/17 74/13 95/5 107/7
**given [9]** 34/14 62/24 82/11 82/11

**gives [1]** 53/18
**glass [1]** 48/25
**Glenda [2]** 44/5 110/23
**Glenn [1]** 25/24
**glove [1]** 70/22
**go [34]** 6/6 6/9 6/19 7/6 7/7 12/22 14/25 15/9 19/24 21/15 23/5 23/18 25/6 27/5 27/15 29/8 36/18 40/20 42/6 45/2 45/7 48/21 86/4 94/5 104/17 104/22 105/19 105/20 105/21 105/22 108/22 111/15 111/24 114/4
**goes [14]** 6/23 14/24 27/22 29/3 30/13 30/22 33/6 38/5 38/6 67/9 90/15 96/8 96/17 97/22
**going [57]** 5/21 7/2 7/6 12/22 16/5 17/25 18/6 21/5 22/17 24/15 25/23 26/1 26/6 27/14 27/18 28/16 28/21 29/3 29/7 29/9 29/17 31/6 32/1 33/8 33/11 35/14 36/22 36/25 38/8 39/24 43/12 54/20 56/1 59/16 60/15 64/18 68/21 76/17 76/25 78/17 83/10 84/16 87/23 93/1 93/2 97/6 97/20 98/21 98/23 99/3 102/11 102/15 108/21 109/25 109/25 110/7 113/3
**gone [1]** 106/25
**good [10]** 3/6 3/8 3/9 3/12 3/23 3/24 11/1 44/15 44/16 44/20
**gosh [1]** 69/3
**got [12]** 6/10 15/18 15/25 17/9 42/20 43/10 73/24 92/9 97/9 104/15 106/21 114/10
**gotten [2]** 27/11 107/10
**government [74]** 3/5 4/8 9/2 12/21 13/21 16/23 22/7 22/13 24/20 25/3 25/11 26/2 26/21 27/19 28/11 30/11 32/21 34/3 34/13 39/2 39/11 44/12 46/7 46/17 47/20 48/6 48/19 49/21 49/24 57/12 58/11 58/13 60/8 63/5 63/8 63/14 63/25 64/3 64/7 64/13 65/1 73/6 77/17 79/22 80/3 80/5 80/6 80/13 80/21 81/9 81/17 83/7 84/14 84/20 85/1 86/2 89/12 90/10 90/19 91/3 92/13 93/16 98/3 99/24 100/1 100/10 101/17 103/2 104/23 105/8 108/6 108/14 112/2 113/6
**government's [6]** 27/14 30/12 40/10 65/17 80/23 104/18
**governmental [1]** 39/5
**graft [1]** 12/24
**grammar [1]** 83/20
**grammatical [1]** 84/21
**great [1]** 49/19
**greater [1]** 86/2
**Greene [1]** 102/9
**Greg [3]** 1/13 3/7 3/25
**Griffith [1]** 10/10
**Griffon [15]** 10/10 10/11 10/12 19/22 20/1 24/18 24/19 24/22 25/8 25/15 25/12 26/7 26/20 29/3 35/9
**grocery [1]** 57/13
**Groseclose [14]** 4/15 13/18 19/20 20/11 32/17 33/1 43/3 83/1 83/3 86/6 86/22 88/8 89/15 90/1
**ground [3]** 17/15 71/3 98/18
**grounds [46]** 18/8 19/12 26/8 26/9 32/4 32/4 32/8 36/1 45/17 46/6 46/8 46/10 46/11 70/5 79/20 79/25 81/12 81/14 81/19 81/22 82/7 82/15 82/16 83/6 86/14 86/19 94/2 94/18 95/15 95/16 95/17 95/19 95/22 95/22 96/1 96/6 96/6 98/1 98/5 99/7 99/14 99/22 99/22 100/20 100/25 101/4 109/14
**group [6]** 48/23 50/5 62/7 62/9 78/24 86/13
**groups [2]** 47/9 49/3
**guarding [1]** 49/12
**guess [7]** 19/9 20/3 43/18 90/24

**G**

**guess... [3]** 106/9 110/12 110/19
**guidance [2]** 25/25 82/22
**guide [1]** 12/21
**guided [1]** 12/17
**guidelines [2]** 40/25 41/2
**guiding [2]** 10/25 12/16
**guilty [16]** 46/16 50/2 62/25
63/13 65/2 79/14 79/21 81/10
81/16 82/6 98/2 99/15 99/19
100/17 100/21 112/25
**gun [33]** 14/5 15/3 15/25 16/1
38/22 53/4 53/14 65/8 65/11 65/13
65/16 70/15 70/18 70/20 71/15
72/7 72/14 73/21 73/23 74/3 74/5
75/16 75/20 75/21 75/24 76/2 76/5
76/8 76/10 77/19 78/22 79/6 112/7
**guns [2]** 13/14 38/24
**guy [1]** 36/14
**guys [1]** 29/15

**H**

**H.R [1]** 96/3
**had [42]** 4/14 17/7 19/6 22/2
24/16 28/10 37/23 42/24 48/8 50/9
50/10 53/12 53/20 53/22 53/23
55/3 56/24 58/22 59/4 59/9 64/17
65/8 66/1 68/4 75/2 76/1 77/4
84/15 93/17 94/18 97/17 98/13
98/15 99/11 101/15 106/10 106/24
106/25 107/24 108/13 108/13
112/17
**half [5]** 43/22 52/1 60/3 69/5
103/8
**hand [1]** 114/14
**handed [2]** 103/22 103/22
**handful [1]** 80/13
**handing [1]** 65/7
**handling [1]** 72/13
**hands [3]** 27/14 62/1 72/11
**happen [2]** 29/9 42/10
**happened [1]** 105/10
**happy [5]** 3/18 34/2 43/19 105/12
112/12
**hard [2]** 86/9 91/21
**harder [2]** 66/16 93/9
**harm [3]** 75/2 75/3 86/1
**harsh [1]** 31/16
**harsher [2]** 31/14 31/19
**harshly [1]** 21/10
**has [86]** 4/20 5/4 5/6 5/9 6/18
7/1 7/25 9/13 9/15 18/11 18/12
20/19 21/14 21/19 22/13 22/21
22/25 25/3 27/11 27/19 28/11
29/23 31/17 32/21 37/18 38/22
41/6 41/22 43/24 45/14 46/17
47/20 53/13 55/13 57/24 58/1
59/14 60/8 63/5 63/14 64/1 64/13
67/12 71/10 72/25 73/9 74/9 77/10
78/5 78/16 79/22 80/3 80/6 81/17
82/14 84/10 84/12 89/11 89/12
90/19 92/13 92/22 93/4 93/21 97/1
98/3 101/17 104/4 107/19 107/21
107/24 108/2 108/4 108/6 108/9
108/11 108/17 108/18 108/19
108/20 108/20 108/21 109/1 109/1
109/20 109/23
**hasn't [1]** 27/20 52/22
**hat [7]** 71/6 71/9 71/22 71/23
72/11 72/11 73/10
**have [183]**
**haven't [1]** 7/13
**having [9]** 19/21 31/7 52/20 52/23
53/1 54/7 59/20 78/13 108/16
**Hawa [1]** 56/23
**Hawk [1]** 108/1
**he [208]**
**head [4]** 6/15 16/8 25/18 40/16
**headed [1]** 106/18
**heading [1]** 106/23
**health [2]** 57/17 108/22

**hear [12]** 3/18 28/19 45/11 51/9
76/20 104/15 105/13 106/2 107/6
111/19 112/1 112/19
**heard [6]** 28/6 73/24 76/23 77/4
82/10 109/11
**hearing [3]** 32/7 75/10 108/18
**heave [14]** 58/15 59/10 59/22 60/2
60/24 61/6 61/7 61/11 61/17 65/4
66/12 66/19 68/18 69/15
**heave-ho [13]** 58/15 59/10 59/22
60/2 60/24 61/6 61/7 61/11 65/4
66/12 66/19 68/18 69/15
**heave-hos [1]** 61/17
**held [13]** 7/25 11/12 30/11 46/12
52/14 54/10 72/10 85/16 94/25
107/20 108/12 108/13 110/18
**helicopter [3]** 7/2 16/5 22/3
**helicopters [3]** 107/21 108/1
108/1
**help [2]** 69/4 110/23
**helped [1]** 65/19
**helps [1]** 102/12
**her [1]** 67/20
**here [39]** 3/14 4/7 8/23 11/10
12/8 14/22 19/18 23/20 24/8 28/2
29/16 37/12 41/12 58/8 63/24 65/1
67/4 67/25 69/5 71/19 73/15 75/7
75/13 77/8 77/11 78/14 78/21 83/4
83/10 84/20 90/17 96/22 96/24
102/16 102/18 103/12 103/19
112/24 114/20
**hey [2]** 71/19 87/20
**hide [1]** 106/17
**high [3]** 41/19 106/16 108/12
**highest [1]** 107/20 107/25
**highly [2]** 29/16 31/6
**Hill [1]** 93/19
**Hills [1]** 2/4
**him [27]** 48/21 51/14 51/22 53/14
53/15 53/17 61/21 68/14 72/4 79/7
79/21 98/2 99/16 99/19 100/17
100/21 104/9 104/11 105/23 105/24
106/14 106/21 107/2 109/11 109/19
111/12 112/25
**himself [5]** 53/8 62/9 74/14
108/19 108/20
**his [64]** 22/3 45/11 45/14 48/9
50/9 51/9 52/9 52/10 52/10
52/10 54/18 55/22 56/20 56/24
57/1 58/23 59/23 60/15 61/5 62/1
63/19 63/23 66/13 66/19 67/7
67/12 68/25 68/25 69/13 69/23
69/24 70/23 71/18 71/18 72/2 73/2
76/8 78/22 80/24 86/18 89/2 90/4
99/24 99/25 100/14 100/14 104/21
105/17 105/20 106/8 106/20 107/20
107/24 108/10 108/21 108/23
108/25 109/2 109/3 109/5 109/6
109/18 109/19 111/15
**history [10]** 3/20 7/14 7/15 7/20
10/14 31/23 31/25 32/18 34/17
89/17
**hit [4]** 16/7 40/16 49/9 83/12
**hits [1]** 48/18
**hitter [1]** 4/3
**hitting [1]** 48/2
**ho [13]** 58/15 59/10 59/22 60/2
60/24 61/6 61/7 61/11 65/4 66/12
66/19 68/18 69/15
**hold [3]** 25/2 66/16 104/11
**holding [12]** 51/23 51/24 52/4
53/1 55/15 67/9 68/17 72/4 72/21
74/25 76/2 76/13
**holds [3]** 9/21 51/22 70/24
**holistically [1]** 104/1
**home [12]** 21/15 45/11 110/1 110/5
110/9 110/12 110/18 111/2 111/3
111/4 113/16 113/24
**Homeland [1]** 56/18
**Honor [34]** 3/6 3/9 3/23 20/19
23/15 28/22 30/7 31/10 32/15 34/1
34/6 40/16 41/23 43/20 43/21 44/6

44/16 101/17 102/10 102/15 103/13
103/18 104/13 104/17 105/2 105/11
105/25 106/10 109/17 109/24
110/11 110/15 112/17 112/13
**Honor's [1]** 8/21
**HONORABLE [1]** 1/9
**hook [7]** 39/11 39/12 40/6 40/6
85/1 85/7 85/21
**hop [1]** 21/18
**hopefully [1]** 12/21
**horribles [1]** 7/23
**hos [1]** 61/17
**hour [5]** 29/4 45/16 107/5 110/10
110/24
**hours [4]** 32/18 57/1 111/24
113/16
**house [16]** 7/18 32/3 32/8 32/9
38/7 80/2 95/9 95/15 95/21 96/1
96/3 96/5 96/9 105/16 111/15
111/23
**how [29]** 8/1 9/7 9/11 10/25 13/2
14/20 14/25 17/11 29/2 30/14
37/22 39/14 41/25 42/4 71/3 71/12
72/19 72/23 85/21 90/17 92/6 92/6
92/7 98/20 104/2 107/3 109/8
110/8 110/13
**Howell [1]** 83/6
**Howell's [1]** 83/2
**However [1]** 95/20
**hunting [5]** 6/6 6/7 6/10 6/11
6/19
**Huntsville [1]** 105/19
**hurt [1]** 75/21
**hyper [1]** 29/8
**hyper-political [1]** 29/8
**hypothetical [12]** 6/22 7/23 8/23
12/20 21/13 22/12 22/14 23/2 23/9
29/14 30/7 31/4
**hypotheticals [12]** 6/5 7/12 8/22
21/11 21/12 23/16 23/16 28/25
35/7 35/22 36/18 38/4

**I**

**I'd [3]** 34/23 102/18 113/4
**I'm [4]** 45/3 86/16 102/20 102/21
**idea [9]** 6/11 7/1 8/3 8/9 14/7
14/12 16/4 22/2 35/10
**identified [1]** 73/9
**identifying [1]** 85/14
**identities [1]** 77/14
**ill [1]** 105/10
**illegal [1]** 21/7
**illegally [1]** 21/7
**illuminating [1]** 34/25
**imagine [4]** 6/5 12/24 12/25
112/11
**immediate [3]** 47/10 47/11 47/17
**immediately [3]** 51/8 53/22 58/25
**impair [1]** 100/11
**impede [9]** 52/16 54/13 61/11 78/9
79/2 79/25 99/23 100/9 100/11
**impeded [8]** 63/16 64/4 64/14
64/17 66/11 66/13 78/17 99/25
**impeding [10]** 46/1 46/3 46/6
46/20 64/11 64/23 64/25 67/18
73/8 79/14
**implements [2]** 35/20 95/2
**implication [1]** 69/6
**implicitly [1]** 91/1
**important [8]** 22/10 28/6 31/11
38/12 42/19 85/9 86/25 104/19
**imposes [2]** 87/9 91/2
**imprisoned [1]** 33/21
**imprisonment [2]** 87/6 89/19
**improbable [1]** 90/15
**Improvement [1]** 88/7
**inaugural [1]** 45/22
**inaugurations [1]** 95/1
**incapacitated [1]** 74/12
**incapacitating [1]** 74/16
**incarceration [4]** 110/1 110/18
111/4 113/16

**I**

**incident [5]**   46/23 55/12 62/19
68/22 78/6
**incidentally [1]**   29/9
**include [4]**   17/6 56/18 92/18
92/19
**included [5]**   37/23 63/7 87/18
96/23 97/15
**includes [4]**   33/22 56/16 73/13
95/15
**including [9]**   27/17 49/15 55/10
65/14 66/18 67/4 82/25 96/4 111/2
**incorporating [1]**   84/5
**increase [4]**   5/10 35/1 35/2 88/12
**increased [2]**   9/7 91/12
**increases [3]**   36/21 96/14 96/16
**increasing [4]**   33/9 89/7 89/22
91/5
**increasingly [1]**   61/24
**incredible [1]**   71/12
**indicate [1]**   15/21
**indicated [9]**   45/14 61/16 61/25
82/20 87/15 91/10 92/4 98/14
105/9
**indicating [3]**   52/21 71/2 80/7
**indication [2]**   62/13 104/24
**indictment [8]**   45/25 46/14 63/2
79/18 79/18 97/25 99/16 100/18
**individual [10]**   40/11 71/5 71/9
71/22 71/23 73/9 78/24 79/6 90/2
96/15
**individual's [2]**   47/11 47/13
**individuals [1]**   70/19
**inevitable [1]**   24/18
**infer [1]**   80/25
**inference [2]**   24/6 27/3
**inferences [1]**   22/22
**inflation [1]**   88/12
**inflict [5]**   73/13 73/16 74/8 75/3
76/1
**inflicting [1]**   63/3
**influence [1]**   8/12
**information [1]**   107/22
**informative [1]**   34/4
**informed [1]**   98/11
**infractions [2]**   32/6 95/25
**initial [1]**   49/20
**initially [3]**   51/3 111/18 111/20
**injured [4]**   7/10 21/22 47/18
74/12
**injury [22]**   21/3 21/4 21/23 23/13
47/10 47/12 47/18 49/18 49/18
63/3 73/14 73/16 74/8 74/17 74/18
75/4 75/5 76/1 76/1 76/3 78/8
91/15
**inner [2]**   107/21 107/25
**innocent [2]**   8/4 30/18
**innocently [1]**   36/22
**insert [1]**   72/17
**inserting [1]**   72/18
**inside [2]**   59/19 60/15
**Inspector [1]**   56/23
**instance [3]**   24/2 37/3 58/20
**instead [8]**   34/18 38/10 51/19
54/10 63/6 84/25 88/20 107/2
**instructed [1]**   51/21 51/25
**instructions [4]**   48/1 51/17 51/24
54/9
**instructive [1]**   29/11
**instrumentality [1]**   56/15
**intend [4]**   9/14 27/5 97/8 97/9
**intended [8]**   11/20 14/12 14/17
14/19 15/15 17/7 22/4 23/14 28/15
38/14 40/15 46/19 89/8 90/5 90/19
93/3 93/16 95/5 97/18
**intending [1]**   20/25
**intensity [1]**   52/9
**intent [21]**   7/19 8/16 12/17 12/17
16/20 20/5 46/3 52/15 54/12 63/6
63/24 64/24 70/8 70/10 78/3 79/25
80/24 97/7 99/23 100/9 103/23

**intention [2]**   33/12 33/15
**intentional [1]**   73/13
**intentionally [11]**   61/5 61/10
63/21 64/9 65/19 69/9 69/11 75/4
76/7 78/9 78/11
**interaction [3]**   45/19 45/21 45/22
**interactions [1]**   48/3
**interest [6]**   17/23 18/16 39/5
41/22 86/2 96/16
**interested [1]**   3/22
**interesting [3]**   25/17 26/19 39/24
**interfere [5]**   43/4 52/16 61/11
65/23 89/19
**interfered [4]**   63/17 66/11 66/14
67/24
**interferes [1]**   33/19
**interfering [4]**   46/1 46/20 67/19
90/3
**internal [1]**   31/19
**internalized [1]**   108/20
**international [1]**   94/25
**interpret [1]**   30/15
**interpretation [2]**   31/12 83/14
**interpreting [1]**   31/13
**interstate [3]**   20/9 38/22 38/25
**intervening [1]**   88/5
**intimidate [1]**   65/23
**intimidated [3]**   63/17 66/13 67/24
**intimidating [1]**   67/18
**introduce [2]**   27/19 80/21
**introduced [2]**   47/20 74/9
**introduces [1]**   83/15
**inverting [1]**   18/6
**involved [1]**   47/15
**involving [2]**   47/8 86/25
**Iowa [9]**   6/23 6/24 6/25 15/24
15/25 16/3 16/11 21/13 29/6
**Iowa's [2]**   16/12 16/13
**is [575]**
**isn't [1]**   33/8
**issue [20]**   4/9 5/5 14/16 22/24
25/17 26/2 26/9 28/3 39/10 43/24
44/25 70/14 73/21 82/24 82/25
84/19 89/12 102/4 104/19 105/12
**issued [1]**   93/17
**issues [8]**   11/1 25/14 34/11 45/1
45/8 45/8 63/12 77/20
**it [356]**
**item [6]**   70/23 70/24 71/5 73/1
79/1 79/11
**items [1]**   48/4
**its [16]**   12/14 22/21 23/23 25/3
32/4 40/10 45/15 58/12 63/5 70/24
72/24 80/3 88/22 89/15 95/15
95/21
**itself [7]**   12/15 17/15 32/10 33/7
50/13 60/7 96/3

**J**

**jacket [4]**   71/24 71/25 72/3 72/10
**jail [1]**   31/7
**January [14]**   38/8 42/10 45/13
47/5 47/15 47/16 49/14 57/6 57/17
57/22 66/2 80/15 80/22 101/5
**January 6 [8]**   38/8 42/10 47/16
49/14 57/6 57/17 66/2 101/5
**January 6, 2021 [5]**   45/13 47/5
47/15 57/22 80/15
**January 6th [1]**   80/22
**jaw [1]**   23/7
**job [1]**   67/12
**John [4]**   2/2 2/2 3/9 44/16
**joined [5]**   45/15 61/8 61/22 62/12
69/15
**joining [3]**   60/18 62/15 65/3
**joke [1]**   76/16
**jokes [1]**   17/10
**Joseph [1]**   1/12
**judge [37]**   1/10 4/15 4/18 4/20
4/25 10/13 10/13 10/13 11/23
20/14 25/15 25/16 25/21 25/21
25/22 26/20 31/25 33/6 34/18

37/17 41/1 43/3 43/7 83/1 83/2
83/2 83/6 86/6 86/21 87/12 88/8
88/11 88/15 89/1 102/5 102/25
114/9
**judge's [1]**   76/25
**judges [5]**   22/7 24/17 25/15 27/1
77/1
**judicial [1]**   57/15
**jumped [1]**   76/23
**jumping [1]**   68/19
**jumps [1]**   55/22
**jurisdiction [7]**   19/21 19/23
39/12 87/3 87/23 87/25 88/17
**jurisdictional [40]**   4/9 4/22 5/7
5/12 10/5 17/2 17/16 19/6 20/7
20/12 20/14 26/4 32/11 36/12
38/19 38/20 39/2 39/9 39/17 39/21
39/22 41/4 41/6 84/19 84/23 84/25
85/3 85/6 85/7 85/8 85/13 85/19
85/20 87/14 87/21 88/3 89/5 95/13
96/10 97/16
**jurisdictions [1]**   17/3
**just [44]**   5/20 7/17 9/17 10/8
10/14 15/5 18/18 19/7 19/8 24/3
27/5 27/8 27/9 28/17 28/21 29/6
32/1 36/21 41/2 43/11 43/25 44/24
47/4 51/10 59/15 59/15 59/17
61/16 68/24 71/3 82/14 84/13 86/1
89/6 92/3 92/6 96/15 99/1 99/2
104/24 107/9 112/20 112/21 114/15
**Justice [1]**   85/10

**K**

**Katsas [2]**   10/13 26/20
**keep [13]**   13/14 28/21 50/6 50/11
50/16 50/23 50/24 53/23 54/7 54/9
66/16 66/22 78/11
**keeping [2]**   44/22 51/20
**key [2]**   28/7 83/13
**kids [1]**   109/8
**kind [2]**   111/3 111/16
**kindly [1]**   77/1
**kinds [1]**   36/20
**knew [12]**   13/21 15/1 15/3 28/8
64/16 71/3 79/1 90/20 92/25 93/22
101/11 101/11
**knit [3]**   71/6 71/22 71/23
**knocked [4]**   48/12 48/15 98/15
98/16
**know [89]**   5/22 6/8 6/13 6/22 6/23
8/2 10/24 12/10 13/2 13/6 13/20
14/9 16/1 16/12 16/13 17/16 17/25
18/5 19/24 20/18 21/17 23/16 24/7
24/17 25/13 25/15 25/17 26/18
26/22 28/15 28/22 30/10 30/12
30/20 30/21 31/1 31/4 31/13 33/22
34/1 34/11 34/21 34/23 36/18 37/2
38/22 40/12 40/21 41/16 42/15
43/14 43/15 53/6 54/19 54/21 56/8
57/24 68/19 68/24 72/1 75/18
75/18 76/23 77/13 77/14 77/14
77/23 78/16 80/10 83/8 90/2 90/13
92/23 93/4 93/6 93/8 94/16 94/18
97/6 103/21 103/23 103/25 104/20
104/20 107/24 108/12 109/20 110/3
113/4
**knowing [11]**   3/15 12/5 21/4 22/13
38/6 82/14 82/18 89/6 90/17 97/8
97/21
**knowingly [34]**   8/1 8/9 9/3 9/4
9/8 9/11 9/14 18/3 18/11 18/12
19/10 31/7 33/18 33/23 43/4 43/8
46/19 64/9 64/20 65/19 78/18
81/20 82/5 82/12 83/16 83/20
86/14 89/19 90/11 97/13 98/6
99/22 100/25 101/10
**knowledge [24]**   8/15 14/1 15/15
15/16 15/17 16/21 17/21 18/10
20/24 23/8 23/21 24/6 24/16 26/13
27/5 30/12 31/15 36/16 38/11
41/14 80/24 83/5 83/24 84/12
**known [4]**   41/24 45/22 80/25 85/17

## K

knows [7]   17/11 23/15 31/18 37/21
56/1 56/1 107/25
knucklehead [1]   21/19
Kroll [2]   74/10 74/20

## L

lack [3]   25/12 104/20 104/22
Lambert [1]   44/19
Lamberth [2]   25/21 25/23
land [1]   22/3
landing [2]   7/3 16/5
language [6]   35/24 35/25 92/17
92/19 97/11 97/11
large [1]   29/7 49/3
largely [1]   85/24
last [4]   32/18 37/15 41/11 41/24
late [2]   108/19 113/4
later [4]   6/2 59/18 71/1 113/14
latter [1]   23/14
law [57]   2/2 2/8 3/20 8/11 9/20
9/23 9/24 10/16 10/18 11/1 12/23
17/23 18/10 23/11 24/12 24/13
25/1 30/25 30/25 31/8 32/2 32/13
32/13 33/4 33/19 33/24 35/19
39/14 41/17 43/5 45/17 46/1 46/20
46/22 55/10 59/7 61/12 62/18 66/6
84/18 85/24 86/23 87/2 87/2 87/18
87/22 87/23 88/8 89/8 89/9 89/20
90/3 90/13 95/18 95/20 96/17
111/6
lawful [7]   46/23 55/11 62/19 78/6
82/15 98/5 98/10
lawfully [3]   98/21 99/10 99/12
laws [9]   14/9 16/12 16/13 16/16
17/4 56/14 87/9 87/19 87/24
lays [1]   19/3
lead [1]   51/1
leading [1]   80/14
leads [1]   82/9
leaning [2]   51/6 51/23
learned [1]   71/1
least [19]   10/13 12/13 27/1 27/20
30/19 30/21 49/4 49/25 51/18
61/17 63/13 69/6 74/19 80/8 85/21
95/7 104/23 111/3 111/18
leave [12]   9/4 48/2 61/25 62/1
62/2 62/7 69/18 87/24 103/9 111/4
111/15 111/23
leaves [1]   108/19
leaving [3]   11/15 67/11 67/12
Lee [4]   72/14 72/16 72/19 72/23
left [2]   59/20 61/19
leg [1]   74/22
legal [2]   20/11 28/3
legislative [10]   3/20 7/14 7/15
7/19 10/14 31/23 31/25 32/18
34/17 89/17
legitimate [2]   17/23 22/15
length [2]   45/18 106/25
less [2]   8/18 30/19
lesser [1]   63/6
let [15]   28/19 31/22 38/15 46/14
52/5 69/7 70/20 101/19 102/8
104/16 107/6 110/25 110/25 112/20
112/21
let's [3]   24/25 111/20 112/24
lettering [1]   71/6
letters [1]   20/1
level [1]   52/8
leveled [1]   87/7
leveling [1]   88/22
Levine [4]   1/16 3/7 24/5 44/13
Lieutenant [1]   98/12
life [2]   107/24 108/10
lifetime [1]   107/20
light [8]   10/25 45/2 70/25 72/1
72/20 72/22 72/24 90/25
lights [1]   49/10
like [29]   14/13 15/3 21/9 21/17
22/7 29/14 29/17 32/11 36/2 43/14

45/1 48/24 49/9 61/25 74/21 75/9
75/16 76/17 85/7 94/22 97/12
101/25 102/18 105/13 106/2 106/6
108/7 108/15 111/19
likelihood [1]   36/21
likely [2]   30/24 98/16
likewise [1]   101/6
limited [1]   29/22
limiting [1]   30/8
limits [2]   30/13 98/14
linchpin [1]   14/14
Lindsay [2]   112/3 116/12
line [74]   6/25 7/1 7/5 7/6 22/16
29/15 31/8 31/9 33/17 34/19 36/9
43/6 45/19 47/25 48/6 48/9 48/11
48/13 48/16 50/7 50/9 50/23 54/3
56/21 58/16 58/21 58/24 59/5
59/22 60/2 60/7 60/10 60/18
61/7 61/20 62/10 65/5 65/20 65/24
66/5 66/6 66/12 66/16 67/7 67/10
68/18 68/23 69/11 69/12 70/1
70/11 73/11 73/17 73/20 74/1 76/9
76/13 77/6 77/13 77/16 77/22
78/25 79/2 81/23 81/25 84/17 92/5
92/9 92/21 99/4 99/5 99/14 101/8
lines [4]   98/22 99/1 99/4 99/8
linguistic [2]   65/11 92/3
listed [1]   83/21
listened [1]   10/8
litigation [1]   89/11
little [10]   5/14 11/16 34/12
37/18 38/18 39/9 39/24 45/3 68/19
108/11
live [3]   29/4 108/25 113/24
lives [4]   13/3 13/7 14/6 55/2
loading [1]   106/14
local [3]   17/3 17/3 111/6
location [3]   35/18 35/18 35/18
locations [3]   47/21 49/15 98/8
lockdown [1]   113/17
locked [1]   49/2
logic [2]   31/19 39/24
Lombardini [1]   50/19
Lombardy [1]   50/12
long [5]   9/2 40/6 40/14 74/17
97/6
long-term [1]   74/17
longer [2]   45/3 106/18
look [21]   4/4 7/24 18/7 19/8 21/2
22/11 32/18 33/11 35/24 40/24
42/7 43/19 45/2 58/1 67/1 70/25
82/22 93/7 94/5 101/25 104/1
looked [2]   34/13 90/8
looking [8]   1/7 29/19 51/6 60/14
60/17 71/14 71/18 71/18
looks [1]   59/17
Lopez [1]   88/3
lose [1]   71/19
lost [2]   71/15 79/11
lot [16]   6/24 7/1 7/4 10/25 16/3
21/14 21/14 21/16 41/17 76/17
76/21 82/11 82/12 107/12 107/17
111/11
lots [2]   108/4 108/4
loud [3]   72/20 75/8 76/22
lounge [3]   36/23 36/24 37/1
love [1]   23/16
loves [1]   6/6
lower [5]   48/22 50/15 50/17 51/2
54/15
luck [1]   103/25
luggage [2]   105/17 106/14
lunged [1]   76/4
lunging [6]   73/19 73/22 74/6
75/24 76/9 78/8

## M

ma'am [1]   102/23
made [19]   5/13 16/19 45/14 48/9
52/15 54/11 58/23 61/5 63/10
66/15 66/21 69/13 73/17 73/19
77/4 79/7 89/24 107/1 109/21

maintain [9]   48/13 48/16 50/7
50/8 50/23 51/7 54/6 99/4 99/14
maintaining [1]   100/12
major [3]   89/9 94/24 94/24
majority [2]   11/12 88/21
make [26]   10/2 11/12 16/21 17/10
22/23 27/2 27/15 32/13 32/19 33/8
33/15 44/24 59/7 60/24 75/1 78/11
78/23 80/19 89/24 91/23 107/1
107/15 112/20 113/5 113/7 114/25
makes [6]   21/10 54/19 59/23 60/8
65/13 89/18
making [5]   9/14 53/19 86/2 96/16
109/19
man [12]   67/10 69/1 71/24 71/24
72/3 72/9 72/11 72/11 73/10
107/19 107/21 108/1
mandates [1]   56/19
mandatory [1]   104/4
manner [1]   69/15
many [11]   8/2 13/2 13/5 29/6
29/21 33/13 54/25 54/25 54/25
82/24 98/8
March [2]   45/12 105/6
mark [1]   61/18
masse [1]   50/18
massive [2]   33/1 33/5
match [1]   72/12
material [2]   45/7 73/3
matter [15]   9/6 9/7 17/23 18/10
20/3 23/15 24/25 59/7 83/19 85/14
92/3 97/10 98/12 103/14 116/5
maximum [2]   88/9 89/22
may [21]   1/5 6/17 10/20 13/14
17/22 17/23 31/8 39/1 39/9 39/14
68/3 74/11 77/14 77/17 80/25
88/16 94/10 95/23 98/15 103/18
116/10
maybe [13]   23/14 23/15 29/24
30/22 38/13 38/13 39/16 80/10
90/16 101/24 101/25 102/4 104/14
mayor's [1]   57/14
McCree [1]   98/12
me [46]   5/9 5/25 7/11 21/21 23/25
28/19 31/22 36/14 36/20 38/15
41/25 42/20 43/10 43/18 43/19
45/3 46/14 51/21 52/2 54/20 57/3
60/16 69/5 69/7 70/20 81/8 87/20
90/15 92/20 94/15 96/13 97/4 97/6
97/7 98/16 101/19 102/8 106/6
107/6 110/25 110/25 111/22 112/1
112/11 112/20 112/21
mean [16]   6/5 11/8 15/8 15/18
19/14 23/4 30/16 32/16 34/6 36/4
38/18 39/21 47/8 54/24 56/13
90/19
meaning [4]   4/23 29/2 94/15 95/5
meaningful [3]   19/23 86/9 86/10
meaningfully [1]   51/18
means [16]   8/24 8/24 18/9 36/1
36/5 38/21 39/17 41/16 42/4 82/16
84/7 94/1 96/16 98/18 111/4 114/4
meant [2]   41/15 98/25
measures [1]   86/25
mechanics [1]   107/22
mechanism [1]   10/17
medals [1]   108/4
media [1]   80/14
medical [1]   113/17
meeting [2]   6/14 93/19
meltdown [1]   108/16
member [2]   36/25 42/11
members [2]   58/17 58/18
memorandum [2]   84/9 93/18
mens [10]   4/23 12/2 16/24 17/5
19/5 20/17 27/10 30/8 33/3 40/12
mention [1]   80/16
mentioned [4]   60/4 61/14 68/20
79/10
mere [1]   88/12
merely [1]   96/24
met [3]   23/8 25/3 80/3

**M**

**middle [5]** 4/11 51/4 53/8 75/12 113/14
**Middleton [5]** 4/12 12/25 24/8 25/20 41/12
**might [16]** 5/24 9/22 10/4 13/19 17/21 26/8 31/5 41/20 65/15 71/15 77/2 77/19 86/2 87/22 90/7 112/14
**Mike [2]** 28/16 31/18
**military [1]** 108/5
**million [2]** 52/1 69/5
**mind [11]** 6/22 59/7 59/13 61/3 61/8 67/13 68/21 89/3 91/21 96/8 99/1
**mine [1]** 115/1
**minimal [2]** 58/4 87/3
**minor [3]** 29/15 32/6 95/24
**minus [1]** 113/13
**minute [3]** 60/3 62/5 113/3
**minutes [3]** 16/6 49/4 62/5
**mirrors [1]** 87/22
**misdemeanor [11]** 5/20 14/11 17/6 32/6 37/4 37/6 89/8 90/25 91/12 91/20 95/25
**misplaced [1]** 37/19
**misrepresent [1]** 105/3
**missions [1]** 93/13
**mistake [1]** 85/12
**model [1]** 72/8
**moment [2]** 38/13 105/25
**momentarily [1]** 98/25
**moments [2]** 62/10 108/15
**Monday [4]** 110/14 110/16 113/15 114/4
**money [1]** 111/11
**monitoring [3]** 110/1 110/19 111/14
**month [5]** 5/1 20/18 20/18 30/22 30/23
**months [18]** 5/11 5/21 30/23 30/24 30/25 31/1 31/6 32/1 33/6 33/7 34/18 34/19 80/14 87/6 88/10 89/7 90/24 91/5
**more [50]** 5/15 5/25 6/4 7/11 15/4 15/16 19/3 21/9 27/2 29/10 29/10 29/18 29/18 31/16 31/16 32/11 33/10 33/15 33/21 34/12 37/22 42/17 42/17 46/20 47/9 47/15 49/12 50/21 54/25 58/1 58/8 61/12 61/24 66/21 70/13 77/9 78/11 86/24 88/6 89/3 91/11 91/18 96/24 97/14 100/16 104/1 104/18 104/18 105/4 108/24
**moreover [2]** 68/16 100/8
**morning [9]** 3/6 3/8 3/9 3/12 3/14 3/23 3/24 110/14 110/17
**MOSS [1]** 1/9
**most [4]** 25/23 34/25 67/16 96/9
**motion [1]** 114/9
**motivated [1]** 86/23
**Mount [1]** 2/10
**Mountains [1]** 6/6
**move [3]** 35/14 35/18 98/25
**moved [2]** 41/4 50/10
**movement [4]** 47/1 56/5 58/7 73/19
**moving [1]** 35/11
**MPD [3]** 66/1 66/3 70/2
**Mr [1]** 61/18
**Mr. [162]**
**Mr. Rash [9]** 73/15 73/25 74/5 75/24 74/6 74/7 76/15 78/2 78/9
**Mr. Roots [5]** 77/17 107/8 107/15 111/9 112/16
**Mr. Ross [3]** 24/5 76/24 109/15
**Mr. Sabatini [2]** 42/23 103/5
**Mr. Sabatini's [1]** 37/20
**Mr. Smith [127]**
**Mr. Smith's [14]** 45/13 50/4 52/8 55/9 55/23 62/18 66/15 69/21 80/13 81/3 82/4 104/20 105/16 109/21

**Mr. Webb [1]** 106/21
**Ms. [1]** 24/5
**Ms. Levine [1]** 24/5
**much [17]** 5/15 5/25 7/11 12/10 28/24 30/19 33/15 34/6 42/22 66/21 87/14 88/18 92/6 92/6 107/3 110/8 112/11
**multiple [2]** 35/2 40/13
**multiple-year [1]** 35/2
**murder [2]** 9/23 9/23
**must [14]** 17/16 18/17 32/5 34/13 46/17 63/14 64/12 79/21 81/16 90/2 90/5 95/23 98/3 100/21
**my [62]** 3/19 7/6 7/7 12/8 16/7 20/22 21/13 21/13 21/17 21/18 21/22 22/4 22/12 22/25 22/18 22/18 25/18 28/23 29/15 31/4 34/20 41/11 43/7 44/22 44/23 45/4 45/4 46/13 53/9 59/7 59/12 62/03 61/8 61/5 67/9 67/13 68/21 69/3 74/25 75/10 77/3 82/11 82/25 83/12 84/11 89/3 91/10 91/21 94/20 96/8 96/11 97/3 99/1 101/13 101/23 105/9 105/21 107/10 111/14 112/12 113/23 113/24 114/24

**N**

**nail [2]** 16/8 40/16
**name [2]** 3/5 44/12
**namely [1]** 86/25
**Nancy [1]** 38/8
**national [10]** 41/13 41/18 41/18 42/1 94/4 94/7 94/19 94/23 108/2 108/12
**natural [3]** 67/16 92/16 92/18
**nature [7]** 4/10 6/4 11/17 39/17 41/6 95/13 96/10
**Naval [3]** 13/1 13/3 13/6
**near [3]** 50/11 53/20 110/5
**necessarily [6]** 14/25 15/2 23/10 26/1 35/16 86/4
**necessary [5]** 40/19 57/11 74/24 77/4 92/4
**necessitated [1]** 57/18
**necessities [1]** 113/17
**need [7]** 9/7 23/23 24/1 24/9 27/12 42/6 49/23 56/10 65/10 67/22 68/1 68/6 70/14 74/25 77/10 77/23 85/6 98/18 102/16 110/8 110/20 110/22 110/23 113/13 114/1 114/13 114/18
**needed [3]** 45/1 55/2 89/3
**needing [1]** 39/11
**needs [3]** 38/24 77/11 114/8
**negative [1]** 20/15
**never [3]** 14/16 19/21 108/9
**new [2]** 41/13 87/2
**newly [1]** 48/11
**next [5]** 1/19 4/15 51/1 53/22 55/20
**nexus [3]** 22/24 22/25 27/3
**Nichols' [1]** 37/17
**no [48]** 1/4 5/14 6/11 7/1 7/17 8/9 9/1 11/19 14/6 14/6 16/4 19/17 22/2 23/5 23/5 23/5 23/13 23/25 25/5 25/8 32/2 34/6 54/22 62/12 73/15 76/15 77/6 79/2 79/7 80/19 87/10 94/11 95/1 95/5 95/20 99/11 102/20 102/24 106/4 106/18 107/13 108/21 109/13 111/2 113/14 114/13 114/25 115/1
**noise [8]** 72/20 73/23 74/3 75/9 75/13 75/15 76/21 76/22
**nominee [1]** 30/3
**none [5]** 80/15 87/18 107/22 107/23 108/6
**normal [1]** 87/10
**normally [2]** 83/20 84/23
**northern [1]** 105/18
**not [196]**
**note [5]** 60/13 74/12 87/17 90/24 96/19

**notes [1]** 67/15
**nothing [3]** 19/2 49/12 84/24
**notice [4]** 57/16 63/5 63/5 63/8
**now [25]** 4/4 6/20 7/5 10/19 12/1 13/25 14/2 20/15 21/14 21/15 24/9 26/3 29/4 33/8 33/9 34/9 36/11 37/2 42/20 45/4 46/12 95/17 101/16 104/5 112/18
**NSSE [1]** 42/1
**number [4]** 4/14 13/2 13/4 29/25
**NW [3]** 1/14 1/17 1/23

**O**

**object [3]** 48/17 70/25 73/20
**objection [2]** 106/4 113/6
**objects [2]** 49/7 49/9
**obligation [1]** 24/12
**Observatory [3]** 13/1 13/3 13/6
**observed [3]** 54/7 72/8 105/16
**obstruct [7]** 43/4 43/16 52/16 58/6 61/11 70/11 89/19
**obstructed [5]** 46/25 56/4 57/4 57/7 90/12
**obstructing [4]** 23/11 46/1 46/20 90/2
**obstruction [2]** 40/5 40/11
**obstructions [1]** 35/20
**obstructs [1]** 33/18
**obvious [1]** 67/11
**obviously [14]** 7/13 10/23 17/18 20/18 20/20 21/3 24/14 24/19 28/13 33/14 35/14 88/4 107/9 113/24
**OC [5]** 51/14 53/4 53/12 53/13 99/6
**occasion [4]** 65/21 105/4 105/5 105/6
**occasions [1]** 45/18
**occur [1]** 75/3
**occurred [2]** 5/16 5/16 57/6 57/21 58/13 58/21 67/22 68/2 75/12 77/24 88/6 99/25
**occurrence [1]** 29/3
**occurrences [1]** 29/17
**occurring [2]** 75/14 78/7
**occurs [1]** 95/8
**off [26]** 3/18 4/24 6/16 11/17 17/22 18/1 18/22 19/11 21/15 22/15 35/20 36/1 43/12 43/25 45/6 82/17 83/9 86/18 92/14 93/1 94/17 98/9 98/14 110/25 111/3 113/3
**offense [24]** 14/12 22/24 46/17 49/21 50/1 63/7 63/25 64/6 64/12 64/16 64/19 64/22 64/24 78/19 78/20 88/21 88/22 91/7 91/14 91/15 96/22 97/1 98/2 100/8
**offenses [2]** 45/25 86/23
**offered [1]** 82/25
**office [11]** 1/14 56/25 94/9 105/19 105/21 106/13 106/15 106/16 107/2 110/18 113/14
**officer [50]** 43/5 46/2 46/3 46/22 50/12 50/12 50/19 51/8 51/11 51/19 52/5 52/11 53/5 53/7 53/13 53/18 53/21 54/11 55/22 56/15 59/8 59/10 59/12 63/17 63/18 63/22 64/4 64/11 64/15 64/16 64/23 67/6 68/11 68/20 69/21 69/24 73/22 75/10 77/11 77/12 77/24 78/16 85/18 90/3 110/5 110/8 111/20 111/21 111/22
**officer's [1]** 54/13
**officers [95]** 13/15 45/17 46/21 46/22 48/1 48/2 48/3 48/4 48/4 48/5 48/12 48/13 48/18 49/3 49/5 49/8 49/9 49/11 50/6 50/9 50/10 50/15 50/18 51/7 52/14 52/15 52/23 52/25 53/3 54/24 55/1 55/6 55/10 60/21 61/12 62/4 62/18 62/20 63/4 63/7 63/11 64/17 64/25 65/7 65/23 66/1 66/3 66/7 66/7 66/11 66/14 66/16 66/20 66/21

**O**

officers... **[40]** 66/21 67/3 67/3 67/5 67/8 67/14 68/4 68/15 68/17 69/16 70/2 70/18 71/17 71/21 73/8 73/10 73/16 74/6 74/7 75/15 75/17 75/25 76/6 76/9 76/11 76/18 77/6 77/13 77/15 77/22 78/5 78/8 79/2 79/15 86/17 98/23 98/24 99/13 100/7 103/23

officers' **[8]** 49/10 52/16 54/7 54/9 60/20 70/11 74/2 78/10

official **[22]** 1/22 9/24 9/25 11/14 33/25 46/23 63/19 63/23 66/8 67/20 69/23 69/24 76/13 90/4 90/12 93/12 95/16 99/24 100/2 100/10 116/3 116/13

officials **[6]** 9/18 11/13 39/15 39/16 86/1 86/25

often **[4]** 6/23 29/2 33/14 39/23

oh **[4]** 5/21 43/2 69/3 112/23

okay **[13]** 28/18 33/8 40/2 42/8 42/16 67/8 102/13 103/14 109/4 112/3 113/1 114/6 114/10

old **[2]** 91/6 109/8

OMB **[1]** 2/3

Omnibus **[1]** 86/8

once **[3]** 60/1 108/9 112/1

one **[72]** 5/14 9/9 9/20 10/22 16/20 18/19 21/2 22/12 22/23 24/7 24/8 24/17 24/21 26/2 26/19 29/6 31/5 34/14 35/6 36/7 38/15 38/19 38/20 38/20 39/18 40/14 41/20 41/25 42/12 42/20 46/20 47/14 48/17 50/12 53/20 56/19 58/11 58/4 59/17 61/11 65/2 67/5 67/6 67/8 71/13 74/16 74/22 75/9 80/25 82/14 84/17 87/8 88/5 88/10 89/18 89/23 90/2 91/23 92/12 92/16 95/6 95/7 97/10 97/12 101/25 104/23 105/4 105/6 105/25 112/17 112/23

ones **[2]** 40/18 88/6

ongoing **[2]** 23/1 70/12

only **[28]** 9/12 21/12 25/6 27/3 32/6 38/24 52/25 53/1 53/17 53/18 58/6 67/17 79/4 83/8 84/3 85/13 85/19 86/7 87/1 87/14 90/11 94/16 95/24 97/22 103/1 105/20 108/10 109/17

open **[10]** 48/25 51/12 51/22 51/23 51/25 52/4 52/14 53/1 54/10 55/15

opening **[3]** 27/25 28/1 81/4

opens **[1]** 51/4

operated **[1]** 71/4

operation **[1]** 56/13

operational **[2]** 71/4 71/13

opine **[1]** 41/25

opined **[1]** 25/24

opinion **[4]** 29/22 29/4 83/1 83/2

opinions **[4]** 28/23 82/24 83/11 83/12

opportunity **[2]** 101/15 111/12

oppose **[2]** 65/22 66/20

opposed **[3]** 63/16 66/13 67/24

opposing **[2]** 40/21 67/18

opposite **[1]** 106/16

option **[1]** 53/12

options **[3]** 24/21 24/24 24/24

oral **[2]** 10/9 82/10

order **[23]** 23/22 25/4 35/21 50/8 57/15 57/15 64/10 77/23 86/24 90/4 92/24 93/21 99/18 100/21 104/24 105/17 110/1 110/3 110/7 110/13 110/16 110/18 111/1

ordered **[1]** 105/14

orderly **[5]** 46/7 80/1 99/23 100/1 100/9

orders **[2]** 51/15 53/5

ordinarily **[2]** 83/14 83/24

ordinary **[3]** 83/19 86/23 87/7

organize **[1]** 54/4

organizing **[1]** 55/6

original **[12]** 12/18 12/19 25/21 32/23 33/4 37/24 87/2 87/5 87/18 96/8 97/15 103/7

originally **[4]** 40/8 105/15 105/15 106/10

other **[53]** 6/22 9/10 10/17 19/2 19/12 21/19 22/23 25/7 26/2 26/7 26/9 26/23 39/17 48/6 49/21 52/5 53/12 58/16 58/24 59/11 63/25 65/24 66/1 66/3 68/13 70/2 70/10 70/19 74/23 77/1 77/19 77/19 79/3 79/3 83/12 84/6 85/3 90/25 91/14 93/10 94/22 95/19 97/12 101/24 103/10 108/8 108/9 111/6 111/7 112/4 112/6 113/15 113/18

others **[19]** 17/12 47/18 47/18 49/18 52/21 55/16 64/5 64/12 64/14 64/17 64/18 64/22 64/24 71/7 72/25 73/7 75/15 78/17 78/17

otherwise **[28]** 8/4 9/19 11/19 11/20 13/19 18/9 19/11 26/6 36/2 36/3 36/4 36/6 36/6 36/6 41/6 43/16 52/18 57/21 67/24 70/5 82/17 83/9 84/22 86/19 92/14 92/18 97/23 98/9

our **[20]** 4/19 4/19 4/24 10/1 10/24 14/13 17/18 24/4 24/21 27/1 29/3 37/24 44/19 103/8 105/12 106/13 106/15 107/17 108/15 111/23

ourselves **[1]** 74/15

out **[29]** 6/6 6/7 6/11 9/16 12/9 13/14 18/22 19/3 19/3 19/7 27/11 34/22 37/1 38/10 43/3 52/20 54/5 56/13 66/17 66/22 69/5 85/2 88/22 101/20 102/14 102/15 109/18 111/1 111/21

outnumbered **[1]** 55/1

outside **[2]** 72/3 105/16

over **[24]** 4/9 6/8 21/18 23/5 23/10 29/5 29/24 31/8 38/18 40/10 45/16 48/12 48/15 51/5 51/8 51/11 51/11 51/14 55/22 86/24 97/17 107/5 108/16 108/17

overall **[1]** 58/2

overrun **[1]** 99/8

overwhelmed **[4]** 50/9 99/2 99/5 99/6

overwhelming **[1]** 54/24

own **[2]** 10/1 22/21

owner **[1]** 71/11

Oxnard **[1]** 2/3

**P**

P.A **[1]** 2/8

P.C **[1]** 2/2

p.m **[13]** 44/8 47/24 50/4 50/25 55/14 58/22 59/18 65/25 70/22 81/24 82/1 113/10 115/3

PAGE **[1]** 1/19

pain **[1]** 75/21

painful **[1]** 74/24

panes **[1]** 48/25

paperwork **[6]** 110/22 110/24 111/1 112/5 113/5 113/8

parade **[1]** 7/23

paragraphs **[1]** 18/21

paralegal **[1]** 44/19

park **[1]** 15/5

parked **[2]** 7/3 21/13

parking **[9]** 6/24 7/1 7/4 16/3 21/14 21/14 21/16 107/12 107/17

parse **[1]** 97/11

part **[4]** 6/19 10/12 70/1 86/8

partially **[1]** 27/13

participate **[3]** 45/12 61/7 61/15

participated **[2]** 58/15 61/10

participates **[1]** 60/2

participating **[2]** 60/11 66/11

particular **[7]** 54/21 77/11 77/12 77/15 77/15 82/12 97/10

particularly **[5]** 21/12 23/19

75/11 85/12 93/23

parties **[3]** 3/19 82/23 101/21

parties' **[2]** 44/25 103/16

partway **[1]** 92/20

party **[3]** 60/8 60/11 76/16

pass **[5]** 11/18 71/7 71/14 71/16 79/3

passed **[9]** 16/8 49/15 78/24 79/8 87/17 88/7 98/13 106/13 107/3

passes **[3]** 71/5 71/23 71/23

passing **[5]** 70/15 71/14 71/20 79/1 87/22

passport **[1]** 108/21

past **[4]** 10/8 93/25 108/18 109/21

patchwork **[5]** 12/23 14/8 16/11 38/14 40/8

Patriot **[1]** 88/7

pause **[2]** 77/8 97/4

pay **[2]** 75/19 75/22

paying **[1]** 111/11

peered **[1]** 53/22

Pelosi **[1]** 38/8

penalties **[5]** 9/7 16/9 23/24 35/2 40/23

penalty **[28]** 5/1 5/10 12/11 12/15 12/16 15/14 20/19 23/2 31/14 33/9 33/17 87/5 87/7 88/10 88/12 88/23 89/7 89/22 89/24 89/25 90/23 90/24 90/25 91/5 91/9 91/12 91/17 96/24

Pence **[5]** 26/22 28/16 31/18 38/11 56/24

pendency **[1]** 104/21

pending **[2]** 103/17 110/19

people **[14]** 8/17 13/5 14/12 17/5 29/8 29/11 29/22 40/17 40/18 47/15 50/23 52/1 53/24 99/7

percent **[1]** 13/4

perception **[1]** 53/9

perfect **[1]** 102/22

perform **[2]** 57/1 66/22

performance **[16]** 33/20 46/23 47/2 55/11 56/6 57/5 62/19 63/19 63/23 66/8 67/20 69/23 69/24 76/12 78/10 89/20

performed **[3]** 64/19 64/20 78/18

performing **[3]** 78/6 90/4 93/13

perhaps **[2]** 81/5 88/2

period **[2]** 49/7 54/10

permission **[1]** 77/1

person **[66]** 3/16 6/5 6/18 7/1 7/10 8/6 8/7 8/18 8/19 9/3 14/4 14/22 15/15 15/16 15/17 15/24 16/21 17/16 18/4 19/12 21/8 21/9 21/20 21/22 21/24 22/14 23/3 27/24 28/7 31/18 35/16 35/21 36/9 37/10 37/21 38/5 38/6 38/12 39/6 41/20 43/14 47/10 47/12 55/22 59/11 63/18 64/9 67/17 67/19 67/25 68/10 69/23 82/18 84/7 84/7 84/10 85/17 86/13 87/1 90/20 92/23 93/3 93/22 94/16 98/20 100/24

person's **[2]** 7/3 55/24

personal **[1]** 68/4

personally **[2]** 68/3 76/23

persons **[3]** 47/9 57/18 86/13

perspective **[2]** 36/13 87/12

persuaded **[2]** 88/25 93/15

persuasive **[2]** 79/12 89/2

persuasively **[1]** 86/21

petition **[1]** 25/9

phone **[2]** 106/21 106/23

photo **[1]** 72/2

photograph **[1]** 18/22

phrase **[2]** 83/15 85/22

physical **[16]** 46/8 46/11 63/10 68/12 73/17 74/17 74/17 75/3 75/11 81/14 81/18 81/21 82/6 100/19 100/23 101/12

pick **[2]** 43/22 74/2

picked **[1]** 106/14

**P**

Pierce **[4]** 2/2 2/2 3/9 44/17
piling **[1]** 105/17
Pillard **[1]** 10/13
pin **[4]** 71/1 72/17 72/18 79/9
pinch **[1]** 4/3
pinching **[2]** 74/21 74/22
place **[12]** 6/15 16/9 16/23 29/5
49/15 55/24 56/2 77/19 77/21 79/9
87/24 111/8
placed **[1]** 110/1
placement **[1]** 41/3
places **[2]** 13/9 70/25
plain **[1]** 84/21
Plaintiff **[2]** 1/4 1/12
plan **[2]** 111/21 111/23
please **[2]** 3/4 44/11
pocket **[4]** 70/23 72/2 73/2 78/22
pocketknife **[2]** 5/23 15/3
podium **[3]** 3/4 44/11 106/5
point **[29]** 6/17 7/25 11/25 13/12
20/11 20/12 25/25 26/5 30/13
32/16 34/23 34/24 44/1 51/10
53/16 55/20 55/25 60/6 62/6 62/8
77/4 82/13 92/10 92/17 97/22
101/18 106/18 107/2 109/24
pointed **[5]** 12/9 43/3 49/9 53/4
75/12
pointing **[2]** 53/13 53/15
points **[3]** 51/15 83/13 90/7
poles **[1]** 48/3
police **[81]** 45/19 47/25 48/5 48/9
48/11 48/13 49/3 50/5 50/7 50/9
50/9 53/17 53/23 54/3 54/4 54/25
55/1 56/21 58/16 58/21 58/24 59/5
59/8 59/10 59/11 59/22 59/25 60/2
60/6 60/7 60/10 60/18 60/19 60/21
61/6 61/20 62/4 62/10 65/5 65/20
65/24 66/2 66/4 66/5 66/6 66/8
66/12 66/16 68/17 69/11 69/16
70/1 70/4 70/11 70/11 73/11 73/16
73/20 74/1 74/2 74/6 75/25 76/6
76/9 76/12 78/25 79/2 81/23 81/25
98/13 98/22 98/23 98/23 99/1 99/3
99/8 99/13 100/6 100/11 100/15
101/8
polite **[1]** 52/23
political **[4]** 17/11 29/5 29/8
29/24
poor **[1]** 4/3
portion **[3]** 10/9 12/6 12/6
portions **[1]** 74/23
pose **[1]** 104/8
posed **[4]** 23/9 24/8 85/2 90/17
position **[5]** 31/16 32/23 83/3
104/18 108/14
positions **[1]** 103/16
possess **[1]** 15/25
possessed **[1]** 9/5
possesses **[1]** 16/21
possession **[5]** 14/10 15/13 15/20
16/12 16/13
possible **[2]** 49/23 102/6
possibly **[1]** 55/3
posted **[10]** 17/22 18/3 18/9 19/11
36/1 82/17 83/9 86/18 92/14 98/9
postponing **[1]** 24/18
posts **[2]** 80/14 80/15
posture **[1]** 52/10
potential **[2]** 29/1 104/19
potentially **[1]** 42/14
power **[4]** 39/11 40/10 85/15 88/1
powers **[1]** 39/7
precisely **[2]** 54/19 88/21
predicted **[1]** 57/21
prefer **[2]** 34/11 103/6
premises **[1]** 87/13
prepared **[3]** 45/4 46/13 81/1
prescribed **[1]** 89/25
presence **[6]** 5/19 13/9 26/12 89/4
96/14 96/24

present **[31]** 3/11 6/16 13/23
13/23 27/16 35/16 44/18 50/22
60/24 65/10 65/14 70/1 70/3 75/5
76/11 76/18 84/13 86/10 89/14
91/4 93/22 96/21 98/8 98/21 99/10
99/12 101/4 101/5 102/1 103/7
103/11
presentation **[1]** 22/22
presented **[1]** 27/23
presents **[3]** 15/16 75/20 82/10
president **[45]** 6/12 6/13 6/16
13/3 13/6 13/22 13/22 14/5 14/6
14/13 14/15 17/24 19/12 22/2 24/7
24/17 26/12 26/13 26/16 27/3
27/18 28/8 30/3 32/8 36/14 37/1
37/21 38/11 45/12 56/20 56/24
86/16 86/17 86/18 86/20 87/1 87/4
93/13 93/17 94/6 94/9 94/10 94/21
95/19 95/19
president's **[18]** 7/2 13/1 15/1
15/4 16/5 32/4 32/9 84/13 84/15
92/25 92/25 93/2 93/4 95/15 95/22
96/2 96/3 96/5
presidential **[3]** 84/9 87/4 94/25
press **[1]** 42/11
pressed **[1]** 86/9
presses **[1]** 83/8
presumption **[3]** 11/23 12/2 20/17
Pretrial **[14]** 110/4 110/5 110/8
110/17 110/17 110/21 111/19
111/21 111/22 112/1 113/13 114/2
114/3 114/3
pretty **[6]** 12/13 28/24 33/12
38/21 38/23 112/23
prevent **[6]** 52/17 55/18 58/18
61/12 62/21 100/14
prevented **[1]** 58/17
preventing **[1]** 76/13
previously **[8]** 48/16 69/19 69/25
77/5 82/20 92/4 111/8 113/12
principle **[1]** 83/13
prior **[3]** 72/17 102/4 111/5
prison **[3]** 5/24 7/11 22/4
private **[1]** 18/1
probably **[2]** 29/3 30/24
problem **[8]** 18/14 22/23 96/4
114/13
problems **[4]** 22/12 22/21 93/9
108/23
procedure **[1]** 42/3
proceed **[2]** 103/10 103/11
proceedings **[4]** 87/10 104/21
115/3 116/5
process **[6]** 17/11 21/21 41/23
42/9 42/10 92/10
produce **[1]** 28/12
progeny **[1]** 12/14
prohibitions **[1]** 88/17
prohibits **[4]** 32/3 67/17 95/18
95/21
promptly **[1]** 110/3
prongs **[1]** 103/18
proof **[2]** 25/3 26/23
proper **[1]** 40/20
properly **[2]** 4/10 113/6
property **[10]** 6/20 9/5 18/1 22/18
39/4 47/11 47/13 47/19 49/19
100/24
proposed **[1]** 81/4
proposition **[2]** 83/23 86/11
prosecute **[3]** 16/23 17/5 86/1
prosecuted **[1]** 31/5
prosecution **[3]** 10/3 18/2 77/18
prosecutions **[1]** 86/3
prosecutorial **[1]** 22/8
prospective **[1]** 101/18
protect **[14]** 8/11 8/17 14/12
35/21 40/17 40/20 55/3 55/3 56/19
66/24 66/24 67/12 84/8 93/11
protected **[21]** 3/16 6/17 18/4
19/12 33/25 35/17 47/2 56/7 56/11
56/12 57/8 57/9 82/18 84/7 87/1

89/21 90/12 90/14 90/20 92/23
93/5
protectee **[27]** 4/22 5/19 8/10
12/3 13/23 16/22 17/1 17/15 21/1
30/4 31/15 35/16 37/8 37/14 38/10
39/4 39/19 41/22 87/11 87/13 89/5
89/14 95/19 96/14 96/21 96/25
97/10
protectees **[7]** 8/12 21/1 29/5
29/21 29/25 35/11 88/24
protecting **[8]** 29/23 37/12 37/13
37/13 39/6 40/10 55/6 55/7
protection **[7]** 30/6 64/10 84/16
93/7 93/8 93/14 93/20
protective **[1]** 33/20
protects **[1]** 30/2
prove **[14]** 9/2 13/21 21/7 22/13
22/20 26/12 30/11 37/10 43/15
73/6 89/12 90/10 90/19 93/16
proven **[7]** 46/17 63/15 64/13
79/22 80/6 81/17 98/3
provide **[5]** 10/17 63/5 87/3
106/22 106/22
provided **[7]** 50/14 60/8 63/5 63/8
80/13 86/12 93/14
Providence **[1]** 2/6
provides **[2]** 94/1 94/8
providing **[1]** 70/18
proving **[2]** 14/1 84/15
provision **[26]** 5/18 5/20 6/2 7/14
7/20 10/18 12/16 33/22 33/23
34/17 87/18 90/23 90/24 91/8
91/13 91/16 91/20 91/20 91/24
93/23 94/15 95/5 95/23 96/12
96/13 97/4
provisions **[5]** 10/7 17/7 30/22
32/5 85/24
proximate **[1]** 23/12
proximity **[2]** 99/21 100/24
prudent **[1]** 109/18
public **[1]** 47/8
publically **[2]** 94/12 95/7
pull **[2]** 50/18 109/18
pulled **[1]** 60/21
pulls **[1]** 7/9
punish **[2]** 20/25 21/9
punishable **[1]** 9/19 89/18
punishment **[1]** 12/6
pure **[2]** 30/11 30/21
purely **[4]** 84/23 85/5 85/5 85/14
purpose **[21]** 8/11 9/16 9/16 11/10
11/12 12/18 14/8 20/10 21/5 31/17
33/16 37/7 37/7 40/16 41/6 46/19
78/19 79/5 87/5 109/14 111/5
purpose-driven **[1]** 31/17
purposeful **[1]** 33/15
purposes **[17]** 3/15 40/4 40/4
40/13 40/14 60/24 64/21 65/10
65/15 66/14 70/16 81/12 86/5 91/8
91/19 91/20 96/7
pursuant **[1]** 57/14
pursue **[2]** 63/6 63/6
pursued **[1]** 86/3
purview **[2]** 40/18 41/8
push **[7]** 58/23 61/6 62/22 65/19
66/19 68/11 69/16
pushed **[9]** 49/3 58/20 59/1 61/9
65/24 69/11 70/9 81/24 101/8
pushes **[1]** 48/2
pushing **[34]** 48/4 49/5 58/16 59/6
59/8 59/9 59/10 59/11 59/22 59/24
60/2 60/5 60/9 60/12 60/17 61/20
62/4 62/7 62/9 62/12 66/4 66/5
66/6 66/15 68/4 68/13 69/14 74/1
76/8 77/9 81/22 82/4 99/14 100/14
put **[11]** 13/2 13/22 14/14 24/4
53/6 53/6 63/12 64/7 83/18 103/14
105/12
puts **[1]** 31/15
putting **[4]** 35/23 79/9 84/18
90/22
puzzle **[1]** 38/18

**P**

**puzzled [2]**   5/9 5/14

**Q**

**question [36]**   3/15 3/21 8/21 10/5
11/24 14/6 14/7 20/14 24/8 28/14
34/8 34/20 37/12 38/15 39/7 39/25
41/11 42/24 68/7 82/10 82/21
82/23 84/17 84/18 85/9 89/11 90/9
91/21 92/6 92/12 96/13 97/6 97/7
104/6 112/17 113/20
**questioning [2]**   26/21 91/10
**questions [6]**   24/7 54/16 85/2
90/17 93/25 109/23
**quick [1]**   114/22
**quickly [1]**   34/2 51/13 62/9
**quite [11]**   4/21 35/25 41/15 59/5
60/13 68/17 71/7 74/24 86/21 89/2
112/18
**quoting [2]**   88/15 95/17

**R**

**racks [4]**   47/25 48/12 48/16 50/10
**raise [1]**   114/14
**raised [2]**   19/25 20/19
**raises [3]**   17/17 30/17 90/16
**rallies [1]**   29/7
**rally [2]**   81/5 81/7
**rams [1]**   21/21
RANDOLPH [1]   1/9
**Rash [10]**   73/10 73/15 73/25 74/5
75/24 76/4 76/7 76/15 78/2 78/9
**Rash's [1]**   103/25
**rate [1]**   106/16
**rather [6]**   28/25 34/2 34/10 85/7
88/2 88/12
**rationale [3]**   4/20 18/3 96/8
**rationally [1]**   93/15
**re [1]**   69/13
**re-entered [1]**   69/13
**rea [9]**   4/23 12/2 16/24 19/5
20/17 27/11 30/8 33/3 40/12
**reach [7]**   18/11 26/8 49/23 56/10
68/2 68/7 70/14
**reached [2]**   70/22 85/22
**reaction [1]**   55/24
**read [12]**   4/4 28/22 39/23 43/12
58/2 83/14 83/20 83/24 85/13
94/13 97/13 114/15
**reading [6]**   19/14 30/13 67/16
84/21 85/4 94/20
**ready [1]**   22/3
**real [3]**   28/14 109/13 114/21
**realize [1]**   21/11
**realized [1]**   22/14
**really [19]**   9/21 10/5 10/15 11/22
19/2 19/22 20/5 22/1 25/17 27/10
28/25 38/9 38/12 40/22 45/7 59/12
74/25 75/2 84/17
**reas [1]**   17/5
**reason [18]**   6/12 7/1 10/7 11/19
16/4 20/23 53/1 53/1 53/10 53/18
74/19 76/15 79/3 92/16 94/11
96/23 109/13 111/18
**reasonable [29]**   9/3 14/1 22/22
27/2 45/5 46/18 49/13 50/1 63/15
64/13 69/8 77/24 78/21 79/23 80/5
80/23 81/2 81/10 81/17 89/13
90/11 90/20 93/17 98/4 99/9 99/20
100/3 100/22 101/2
**reasonably [1]**   80/11
**reasoned [1]**   90/1
**reasoning [4]**   17/20 87/15 89/15
96/18
**reasons [19]**   22/7 40/7 62/17
62/24 65/12 66/10 68/6 69/18
79/13 82/3 91/4 91/25 92/2 92/10
97/20 100/4 101/3 101/6 101/9
**Reauthorization [1]**   88/7
**recall [1]**   105/2
**receives [1]**   71/25

**recent [1]**   25/23
**recently [1]**   107/10
**Recess [2]**   44/8 113/10
**recipients [1]**   76/10
**recognizes [1]**   94/6
**recollection [2]**   43/7 105/9
**reconceived [2]**   5/13 18/20
**reconceptualization [6]**   12/1
18/25 23/22 89/3 91/1 91/25
**reconceptualize [2]**   5/2 20/12
**reconceptualized [5]**   5/1 17/8
88/13 91/6 91/18
**reconceptualizing [1]**   40/22
**record [5]**   3/5 24/4 44/12 76/20
116/5
**red [2]**   72/1 72/24
**reenters [1]**   59/20
**reference [6]**   42/5 80/18 80/19
90/23 91/8 96/21
**references [1]**   24/5
**referred [1]**   89/16
**referring [1]**   25/8
**refers [1]**   89/18
**refused [1]**   52/13
**regarding [1]**   77/18
**regardless [2]**   20/8 23/7
**register [1]**   101/14
**regulate [4]**   38/23 39/11 85/1
85/15
**regulation [2]**   42/3 95/2
**Regulations [1]**   42/6
**Rehaif [3]**   20/10 83/19 97/12
**rejects [1]**   69/17
**relates [1]**   39/5
**relating [1]**   36/3
**relation [2]**   91/14 97/1
**relationships [1]**   109/7
**relatively [1]**   58/4
**release [2]**   104/9 114/16
**released [2]**   113/12 113/13
**relevant [2]**   3/20 70/2
**relied [1]**   28/23
**relies [2]**   34/18 48/6
**reluctant [1]**   74/13
**rely [7]**   10/16 32/5 32/12 80/11
81/8 95/23 98/18
**relying [3]**   17/2 31/25 48/19
**remain [2]**   19/10 86/14
**remained [3]**   9/4 82/14 98/5
**remaining [4]**   46/5 78/14 78/15
97/25
**remains [4]**   9/2 11/1 16/10 20/13
**remanded [1]**   103/17
**remedies [1]**   96/4
**remember [2]**   10/9 105/5
**remind [1]**   107/19
**remove [1]**   62/9
**removed [4]**   70/22 70/23 73/2
78/22
**removes [1]**   19/4 70/23
**removing [1]**   72/16
**rendered [2]**   71/4 71/13
**repeat [1]**   83/10
**repeated [1]**   66/15
**repeatedly [4]**   49/4 51/10 98/11
98/24
**reply [2]**   28/19 34/3
**report [12]**   32/2 87/2 89/23 94/10
95/9 96/9 105/14 110/3 110/7
110/13 110/16 113/13
**reported [1]**   94/21
**Reporter [4]**   1/22 1/22 116/3
116/13
**reports [1]**   7/18
**represent [2]**   20/1 38/13
**representatives [1]**   93/12
**represented [1]**   38/9
**representing [1]**   7/18
**represents [3]**   37/21 41/21 109/22
**Republican [1]**   41/18
**request [1]**   111/15
**require [1]**   78/15

**required [6]**   19/5 73/6 85/17
93/11 104/9 104/11
**requirement [37]**   3/15 3/16 5/12
5/18 10/5 12/2 17/1 17/21 18/17
21/4 25/1 25/2 25/4 27/6 33/23
34/20 39/20 57/25 58/3 58/4 58/9
82/13 83/5 83/17 83/24 87/13 89/6
90/6 90/17 91/19 92/6 92/8 92/13
94/14 97/8 97/16 97/21
**requirements [2]**   84/22 113/9
**requires [6]**   57/25 58/5 72/17
83/8 90/10 108/11
**requisite [1]**   16/24
**research [2]**   34/2 94/23
**residence [15]**   13/1 15/2 15/4
32/4 32/8 32/10 86/15 86/16 86/17
95/16 95/22 96/2 96/3 96/5 113/17
**resist [4]**   43/4 65/22 79/2 89/19
**resisted [7]**   63/16 64/4 64/14
64/17 66/13 67/24 78/17
**resisting [8]**   46/3 64/11 64/22
64/25 67/18 73/8 79/14 90/3
**resists [1]**   33/18
**resolves [1]**   25/14
**resolving [1]**   112/5
**resource [1]**   55/3
**respect [39]**   5/19 9/8 25/3 30/21
32/23 44/25 46/13 47/5 52/7 52/12
56/3 56/9 58/12 58/12 65/21 68/8
69/7 69/10 73/5 75/1 77/8 77/9
80/4 80/24 81/20 82/2 82/3 82/23
90/8 93/9 94/10 96/11 97/2 99/15
100/4 101/3 101/7 101/9 103/16
**respectfully [3]**   4/5 10/22 28/17
**respective [1]**   96/5
**respects [1]**   73/4
**respond [11]**   10/20 15/10 20/3
35/6 37/15 70/12 104/16 105/7
107/7 109/16 112/2
**responded [1]**   4/24
**response [7]**   4/19 12/8 16/7 17/18
20/22 23/25 37/20
**responses [2]**   19/20 34/24
**responsiveness [1]**   104/21
**rest [1]**   74/22
**resting [1]**   37/25
**restrict [2]**   35/20 36/8
**restricted [39]**   16/13 17/14 17/15
18/8 18/9 19/11 23/6 36/1 36/2
36/10 36/10 36/10 36/13 36/13
46/5 46/8 82/15 82/16 82/17 83/6
83/9 86/19 92/15 94/2 95/16 95/18
96/6 97/23 98/1 98/5 98/9 99/17
99/22 100/7 100/19 100/25 101/4
101/11 113/16
**restriction [1]**   94/2
**restrictions [1]**   111/7
**restructuring [2]**   19/1 19/2
**result [7]**   14/16 17/18 21/8 21/22
36/15 45/24 69/1
**resulted [2]**   21/23 23/12
**results [5]**   22/25 23/1 47/12
47/13 91/15
**retreat [3]**   51/19 54/5 54/14
**return [2]**   56/25 79/11
**reus [1]**   15/12
**review [2]**   24/21 26/3
**reviewed [2]**   3/19 7/18
**revisions [1]**   33/14
**rewrite [1]**   91/2
RI [1]   2/6
**rid [2]**   15/18 17/9
**rifle [4]**   6/7 6/11 6/18 6/19
**right [52]**   3/8 3/12 4/4 4/13 5/8
7/21 8/13 8/20 9/9 11/10 11/21
12/4 12/7 12/12 13/24 16/18 18/13
18/18 20/21 22/9 22/19 24/10
24/12 24/13 25/7 27/7 27/15 28/9
29/16 29/20 34/7 34/8 34/9 35/13
35/15 35/23 35/25 37/5 38/2 42/22
43/7 43/17 44/20 55/20 77/17 90/7
103/14 104/12 107/15 107/24

# R

**right...** [2] 109/15 114/14
**rightful** [1] 71/11
**rights** [3] 30/10 30/14 30/16
**rigorously** [1] 108/20
**riot** [4] 47/22 53/8 54/20 54/24
55/17 57/2 57/6 66/2 70/5 75/12
98/22
**rioter** [5] 48/17 51/4 54/21 65/6
65/7
**rioters** [40] 48/10 48/12 48/15
48/23 49/3 49/7 49/9/16 50/6 50/11
50/16 50/17 52/17 54/8 54/13
54/25 55/18 56/21 58/16 58/24
59/24 60/5 60/9 60/22 61/13 61/21
62/21 62/22 65/4 65/24 66/17
66/18 66/22 68/14 68/16 70/10
76/13 78/12 81/23 99/2 99/13
**risk** [21] 8/11 8/14 8/18 9/11
14/6 15/16 21/1 21/1 30/8 30/23
37/18 37/22 38/1 38/6 38/9 38/13
55/2 104/8 104/8 104/19 109/22
**risks** [1] 8/17
**road** [1] 21/25
**robust** [1] 26/11
**Roger** [3] 2/5 3/10 44/17
**Room** [1] 1/24
**Roots** [8] 2/5 3/10 44/17 77/17
107/8 107/15 111/9 112/16
**Rosen** [1] 1/13 3/7 3/25
**Ross** [6] 1/12 3/6 24/5 44/13
76/24 109/15
**route** [3] 23/18 106/19 106/24
**RPR** [1] 116/12
**rub** [2] 28/14 37/11
**Rudy** [1] 27/17
**rule** [3] 24/25 25/22 26/9
**ruled** [3] 5/4 25/7 25/15
**rules** [1] 84/20
**run** [2] 52/22 78/15
**runs** [1] 51/5
**rushed** [1] 6/16

# S

**Sabatini** [6] 2/8 2/8 3/10 42/23
44/17 103/5
**Sabatini's** [1] 37/20
**safe** [2] 74/15 76/14
**safely** [2] 54/14 56/25
**safety** [7] 35/21 57/17 71/2 75/11
75/20 78/9 100/12
**Safeway** [2] 57/13 57/19
**said** [23] 5/21 5/22 18/18 19/10
22/15 22/23 25/15 25/17 25/19
26/20 28/1 28/10 33/7 33/16 41/11
41/14 43/8 87/18 102/25 104/25
108/7 111/18 113/22
**sales** [1] 57/20
**same** [42] 5/16 5/17 5/19 7/15 9/2
10/4 11/2 12/8 15/11 17/20 18/21
20/9 21/20 36/5 39/15 64/18 65/17
66/10 72/1 72/2 72/9 72/10 72/22
73/21 73/24 78/18 82/3 87/7 87/8
87/14 87/17 88/4 88/18 90/5 91/9
91/11 91/18 93/24 101/2 110/4
111/2 113/12
**Samsel** [1] 25/16
**sandwiched** [1] 61/22
**Sara** [1] 1/16
**Sarah** [2] 3/6 44/13
**satisfied** [16] 56/8 56/11 58/8
58/9 58/10 62/23 62/23 67/23
67/25 69/20 78/14 78/20 98/7
100/3 100/23 101/2
**satisfy** [2] 80/22 92/24
**saw** [2] 15/6 57/20
**say** [34] 3/22 4/5 7/17 8/19 10/1
11/9 18/3 21/18 23/5 24/3 24/25
26/6 29/13 33/12 34/23 36/7 38/19
43/21 52/7 53/9 54/16 65/13 67/1
74/15 74/18 76/14 76/19 88/25
93/3 108/2 108/16 109/13 111/22
114/12
**saying** [15] 6/13 7/4 11/8 14/24
18/19 18/24 32/12 35/16 36/9
71/19 85/14 87/21 91/9 93/18
98/24
**says** [23] 6/25 9/21 13/13 14/22
16/3 16/4 18/8 20/1 22/8 31/8
32/2 33/17 34/19 35/25 35/25
36/24 51/11 51/20 52/1 53/6 67/8
67/9 109/10
**scaffolding** [36] 45/21 48/10
48/15 48/17 48/21 48/22 49/17
50/5 50/5 50/7 50/11 50/13 50/14
50/14 51/1 51/5 51/6 52/17 53/21
53/23 53/25 54/1 54/2 54/3 54/8
54/10 54/14 55/10 55/15 55/17
55/19 55/19 55/21 55/23 55/25
68/22
**scare** [1] 76/18
**scary** [2] 75/8 77/5
**scenario** [1] 12/24
**scenarios** [1] 93/10
**scheduled** [1] 80/8
**scheme** [1] 8/1
**scienter** [18] 5/18 25/1 25/2 25/4
33/22 34/20 39/20 40/7 44/25
82/12 83/17 84/22 90/5 91/19 92/6
92/8 92/13 94/14
**scope** [1] 89/10
**season** [1] 29/5
**second** [19] 7/10 21/2 42/21 46/2
46/21 55/8 60/23 61/4 62/16 62/22
63/19 64/16 65/5 68/8 77/8 79/25
80/6 82/2 102/7
**seconds** [2] 52/3 73/23
**secret** [39] 3/17 6/14 13/15 16/22
19/13 29/21 29/22 30/1 30/5 31/15
32/5 35/11 35/15 35/18 36/9 37/14
38/10 41/21 42/19 43/15 56/18
56/19 56/23 57/3 57/5 82/19 84/7
84/8 84/16 87/10 87/13 88/23
92/23 93/7 93/10 93/20 95/23
107/22
**Secretary** [1] 86/15
**secretly** [1] 6/15
**secrets** [1] 108/3
**section** [46] 3/16 33/17 33/21
46/16 47/7 56/12 58/5 58/14 63/1
63/4 65/3 67/16 78/4 79/15 79/16
79/20 81/15 82/8 83/4 84/9 85/19
85/23 86/5 86/5 86/7 86/12 87/20
88/16 88/19 88/20 89/16 89/21
89/23 89/25 90/1 92/5 92/7 92/8
93/10 94/5 95/10 95/14 96/7 97/2
97/22 98/2
**sections** [1] 84/6
**secure** [1] 70/4
**secured** [1] 70/4
**securing** [2] 100/11 100/15
**security** [8] 42/1 56/18 86/24
87/4 107/20 107/25 108/2 108/12
**see** [25] 4/20 5/10 7/9 19/25
29/18 42/20 43/13 44/4 44/7 48/21
51/22 59/16 60/19 60/20 62/12
67/5 69/3 72/15 72/18 72/24 86/9
98/20 110/25 112/24 113/8
**seeing** [1] 59/23
**seeking** [2] 62/6 63/9
**seem** [1] 10/13
**seemed** [1] 105/17
**seems** [10] 5/11 5/15 30/19 43/14
53/17 80/11 88/13 90/15 94/14
98/16
**seen** [9] 47/22 53/23 60/11 72/1
72/12 72/21 73/22 74/1 99/3
**sees** [1] 29/15
**self** [2] 105/14 107/4
**Senate** [2] 7/18 87/2
**send** [1] 43/18
**sense** [14] 21/10 38/20 39/18
39/21 54/20 78/15 79/7 85/6 85/8
85/13 85/20 87/25 88/3 97/14
**sensible** [1] 98/20
**sensitive** [1] 75/17
**sentence** [4] 6/21 19/15 92/20
96/22
**sentencing** [6] 40/25 41/1 101/16
103/15 103/17 110/19
**separate** [1] 45/18
**separated** [1] 19/7
**separately** [2] 6/17 24/16
**September** [1] 102/7
**Sergeant** [11] 49/4 59/3 59/3
60/14 65/25 66/17 67/4 68/16
69/25 75/13 75/19
**series** [1] 51/1
**serious** [3] 21/23 23/13 96/24
**seriously** [1] 21/22
**Service** [37] 3/17 13/15 16/22
19/13 29/21 29/22 30/2 30/5 31/15
32/5 35/11 35/15 35/19 36/9 37/14
38/10 41/21 42/19 43/15 56/18
56/23 57/4 57/5 82/19 84/7 84/8
84/16 87/11 87/13 88/23 92/24
93/5 93/7 93/10 93/20 93/20 94/23 95/23
**Service's** [1] 56/19
**Services** [13] 110/4 110/5 110/8
110/17 110/17 110/21 111/20
111/21 111/22 112/1 113/14 114/2
114/3
**session** [3] 80/1 80/8 80/8
**set** [2] 99/5 114/16
**settled** [2] 84/19 90/9
**seven** [2] 45/25 46/10
**several** [7] 45/17 49/23 57/1 59/2
61/17 87/19 88/5
**shall** [4] 33/21 86/12 87/19 94/10
**share** [1] 88/19
**SHAWN** [4] 1/6 3/3 44/10 45/10
**she** [3] 38/10 93/6 93/8
**Sherry** [3] 1/22 116/3 116/12
**shields** [2] 60/20 60/20
**shift** [1] 104/5
**shirt** [1] 69/1
**shock** [1] 75/8
**shock-type** [1] 75/8
**shocked** [1] 74/11
**short** [1] 23/22
**shortcut** [1] 15/5
**should** [20] 4/23 12/17 12/22
14/22 19/24 20/17 22/4 25/11
31/19 31/20 31/21 33/3 51/17 53/8
91/9 92/14 93/20 101/15 103/17
104/15
**shoulder** [1] 51/14
**shouldn't** [1] 12/16
**shoving** [3] 48/5 66/15 100/6
**show** [10] 6/24 27/23 28/12 29/1
47/21 53/19 60/7 61/1 91/6 104/5
**showed** [1] 72/23
**showing** [1] 26/24
**shown** [2] 47/23 89/11
**shows** [13] 30/8 55/16 57/13 59/1
59/19 60/15 68/12 70/21 72/3
73/18 76/7 98/7 98/10
**shut** [2] 43/25 52/6
**sick** [1] 105/1
**side** [6] 16/1 24/13 71/18 72/24
**sidewalk** [1] 43/16
**sign** [9] 13/13 13/22 14/15 14/22
16/3 35/16 36/24 114/10 114/11
**signage** [1] 98/14
**signature** [2] 114/18 114/20
**significance** [5] 41/13 94/4 94/8
94/19 94/24
**significant** [9] 21/3 21/4 33/13
39/5 88/8 88/11 89/11 89/12 91/15
**signs** [6] 13/8 15/6 98/15 98/16
98/19
**similar** [6] 20/11 72/8 72/16 73/3
81/3 90/16
**similarly** [1] 90/5

**S**

**simply [12]** 14/14 26/16 52/22 52/22 58/4 62/13 71/10 90/23 91/5 91/8 96/19 98/25
**since [5]** 4/14 5/4 81/9 104/15 106/25
**single [3]** 11/23 14/22 19/14
**sir [2]** 106/7 107/5
**sit [1]** 102/11
**sitting [1]** 102/25
**situation [2]** 7/23 51/8
**Sixth [1]** 46/8
**smash [1]** 48/25
**smashed [1]** 67/10
**SMITH [134]**
**Smith's [14]** 45/13 50/4 52/8 55/9 55/23 62/18 66/15 69/21 80/13 81/3 82/4 104/20 105/16 109/21
**snare [3]** 8/3 14/21 37/9
**sneak [1]** 42/13
**snow [1]** 21/16
**so [164]**
**social [1]** 80/13
**sold [1]** 72/15
**sole [1]** 36/12
**solemnly [1]** 114/15
**some [45]** 5/23 6/5 8/8 10/14 10/17 15/6 18/1 21/8 21/19 22/25 24/11 25/15 25/25 26/22 33/14 38/20 40/11 41/6 42/22 45/6 53/16 54/10 54/16 62/8 77/1 77/2 77/3 77/19 77/19 78/15 82/22 83/11 83/13 85/2 85/14 90/16 91/4 92/10 96/15 96/17 97/4 97/13 98/17 108/23 112/12
**somebody [5]** 9/12 31/18 38/6 55/20 62/3
**somehow [1]** 58/1
**someone [26]** 6/23 7/8 8/15 14/25 15/1 16/23 17/24 21/6 23/4 23/11 28/5 30/18 32/7 36/21 46/4 59/9 64/8 68/5 74/11 75/4 90/11 93/21 95/25 108/11 110/2 113/23
**someone's [1]** 14/21
**something [22]** 4/10 9/5 12/14 15/3 26/21 29/17 29/18 30/20 32/19 37/17 39/13 41/14 48/24 50/8 54/24 71/3 71/19 75/19 75/22 76/2 102/4 113/24
**sometimes [1]** 17/12
**somewhat [4]** 28/21 37/16 90/8 91/10
**somewhere [2]** 92/5 92/19
**soon [1]** 7/3
**sorry [4]** 45/3 86/16 102/20 102/21
**sort [42]** 4/19 4/23 7/17 7/23 7/25 9/4 10/18 10/24 11/24 12/22 13/19 14/2 14/7 14/15 15/10 17/10 17/18 18/5 18/6 19/3 19/6 19/7 19/23 20/5 20/11 21/8 22/21 23/2 24/17 24/18 24/22 26/11 26/15 34/10 34/25 35/8 35/22 36/18 41/21 41/23 56/1 88/14
**sound [2]** 32/11 75/18
**sources [1]** 94/22
**southwest [10]** 45/21 48/10 48/20 49/16 50/4 50/5 53/20 54/14 55/9 55/16
**sparking [7]** 46/12 65/15 70/18 70/20 71/16 72/7 73/21
**speak [1]** 45/12
**Speaker [1]** 38/7
**special [6]** 41/12 93/13 94/3 94/7 94/19 94/23
**specific [4]** 32/16 41/20 77/21 77/21
**specifically [5]** 73/9 77/9 80/4 96/4 113/18
**specifics [1]** 105/2
**speech [4]** 27/17 27/24 28/6 28/6

**speeches [2]** 27/17 29/7
**speed [1]** 106/16
**speeding [3]** 7/8 21/19 21/20
**spend [1]** 55/5
**spending [1]** 54/22
**spent [3]** 45/16 55/4 60/13
**sphere [1]** 8/12
**spoken [1]** 101/18
**sporting [1]** 94/24
**spot [1]** 55/25
**spray [3]** 53/4 53/13 99/6
**sprayed [1]** 53/12
**sprays [1]** 49/8
**St [1]** 2/9
**staff [1]** 86/18
**stained [1]** 69/1
**stairs [3]** 50/14 51/2 54/5
**stand [2]** 105/13 114/14
**standard [4]** 30/11 45/6 58/8 80/23
**standing [4]** 47/24 48/14 51/6 53/20
**start [10]** 11/17 21/19 44/22 45/6 46/14 70/20 83/23 106/6 106/23 111/3
**starting [2]** 3/5 44/12
**starts [1]** 55/21
**state [20]** 3/4 6/15 9/20 9/23 9/24 9/25 10/3 11/7 12/23 14/9 17/23 39/15 44/11 85/24 86/23 87/23 87/24 88/17 111/6 114/19
**stated [1]** 68/6
**states [37]** 1/1 1/3 1/10 1/14 3/3 3/7 4/1 9/22 11/15 13/5 13/7 14/5 16/17 17/3 25/24 28/8 35/12 36/14 37/14 44/10 44/14 56/14 56/15 63/18 63/22 66/7 67/15 69/22 83/1 83/2 84/8 87/19 87/19 93/12 93/13 94/25 108/3
**static [1]** 72/20
**stating [1]** 75/20
**status [1]** 39/19
**statute [77]** 5/1 5/3 5/13 5/18 6/1 8/24 9/12 9/16 9/17 9/23 10/15 11/2 11/4 11/11 11/12 11/18 11/20 12/1 12/18 12/23 15/18 15/19 16/8 16/11 16/25 17/8 17/12 18/7 18/20 18/25 19/1 19/9 19/15 20/13 20/14 20/16 23/22 26/15 27/5 29/2 30/13 31/12 32/24 35/6 35/10 36/23 39/3 40/5 40/11 40/23 42/13 42/18 43/8 47/7 58/2 82/13 83/15 84/2 88/4 89/4 89/4 90/15 90/21 91/1 91/2 91/18 91/25 92/11 92/12 93/7 93/21 94/6 94/20 95/10 95/14 97/15 97/19
**statutes [3]** 11/8 33/2 34/11
**statutory [6]** 41/2 56/19 58/3 83/14 83/20 95/1
**stay [2]** 48/1 113/5
**stayed [1]** 61/22
**Ste [1]** 2/9
**stellar [1]** 108/4
**step [15]** 6/8 7/24 10/23 11/9 22/10 31/1 31/2 31/8 51/18 52/5 55/24 89/1 89/2 110/25 113/3
**stepped [1]** 109/14
**still [17]** 12/8 20/13 20/13 22/13 23/23 26/23 28/11 35/3 35/17 41/5 41/24 43/13 89/7 90/25 98/17 106/13 110/4
**stood [2]** 53/22 86/7
**stop [2]** 97/9 107/1
**stopped [1]** 62/7
**stores [3]** 57/13 57/19 57/20
**strapped [1]** 16/1
**street [5]** 1/14 1/17 2/3 2/5 52/23
**strict [2]** 33/15 88/2
**strike [1]** 5/25
**strikes [1]** 36/20
**strobe [1]** 49/9

**stroke [1]** 103/25
**struck [1]** 67/2
**structure [7]** 12/11 12/16 16/10 20/4 31/17 31/24 32/1
**structured [1]** 18/8
**struggled [2]** 48/13
**stuck [2]** 59/15 61/9
**studied [1]** 32/17
**stun [26]** 65/8 65/11 65/13 65/16 70/15 70/18 70/20 71/15 72/7 72/14 73/21 73/23 74/3 74/5 75/16 75/20 75/21 76/4 76/5 76/8 76/10 77/18 78/22 79/6 112/7
**style [1]** 58/15
**subdue [2]** 54/13 70/5
**subduing [1]** 66/2
**subject [5]** 5/24 6/19 18/2 39/20 69/21
**submit [2]** 17/13 26/3
**submitted [2]** 20/2 57/24
**subparts [1]** 19/16
**supportions [1]** 95/12
**subsection [2]** 9/6 18/10
**subsequent [5]** 6/1 23/24 25/16 77/18 83/21
**subset [1]** 40/17
**substantial [4]** 47/20 88/6 91/3 91/23
**substantive [1]** 33/1
**substitute [1]** 4/3
**successful [1]** 100/14
**successfully [1]** 96/1
**such [14]** 12/1 32/21 56/17 63/18 63/20 63/21 69/23 79/7 83/24 84/10 84/10 91/7 93/14 94/9
**sufficient [5]** 49/22 75/6 91/1 91/6 97/18
**suggest [5]** 11/19 31/14 76/24 87/20 91/17
**suggested [2]** 71/10 77/10
**suggests [4]** 10/4 12/10 31/13 84/22
**Suite [2]** 2/3 2/6
**summits [1]** 94/25
**superseded [1]** 87/20
**superseding [8]** 45/25 46/14 63/2 79/18 79/18 97/24 99/16 100/18
**Supp [1]** 67/20
**support [1]** 43/9
**supported [1]** 14/13
**supports [3]** 10/15 95/11 97/3
**suppose [1]** 39/8
**supposed [8]** 30/20 38/5 41/17 41/19 105/20 106/15 106/25 107/4
**Supreme [11]** 5/6 7/25 9/10 11/1 11/11 30/19 36/3 83/19 85/4 85/16 88/18
**sure [33]** 10/2 11/3 11/13 14/9 16/22 18/23 18/23 26/1 26/5 27/15 27/23 29/20 30/1 30/7 32/13 34/2 34/7 38/17 41/15 43/2 43/22 44/23 44/24 78/23 85/20 86/2 90/9 96/16 107/15 112/20 112/23 113/5 113/7
**surprised [1]** 90/18
**surrender [2]** 107/1 107/4
**surrendered [1]** 107/11
**surveillance [3]** 105/16 106/13 106/17
**swarming [1]** 48/17
**swear [1]** 114/10
**swing [2]** 40/23 52/6
**sync [1]** 60/14
**synchronized [1]** 60/12
**system [1]** 111/14

**T**

**table [1]** 44/19
**take [9]** 8/6 12/15 14/4 37/20 55/25 57/15 71/9 77/1 89/4
**taken [1]** 44/8 60/21 92/13 108/19 113/10
**takes [4]** 57/25 83/3 83/4 92/22

**T**

taking **[4]** 6/14 15/5 56/2 76/7
talk **[7]** 5/3 20/2 26/14 35/7 35/8
107/14 107/14
talked **[1]** 27/17
talking **[4]** 19/18 23/19 23/20
34/15
tape **[1]** 29/15
Taser **[1]** 75/9
Taser-like **[1]** 75/9
tautological **[1]** 11/16
taxing **[1]** 66/19
team **[4]** 103/8 105/16 106/14
106/17
tear **[1]** 99/6
tell **[1]** 53/7
tells **[1]** 51/8
template **[1]** 4/19
temporarily **[5]** 3/17 19/13 82/19
86/20 95/20
temporary **[5]** 86/15 86/16 86/17
86/17 87/4
term **[11]** 18/8 35/25 47/7 56/16
74/17 83/20 84/6 85/5 85/6 85/8
95/1
terms **[19]** 4/6 4/21 4/22 7/19 9/7
10/25 13/25 14/20 19/5 19/24
20/19 22/21 35/2 35/5 35/6 43/12
62/16 109/21 113/7
terrace **[5]** 48/22 50/15 50/17
51/2 54/15
test **[2]** 74/14 74/15
tested **[2]** 71/13 78/23
testified **[13]** 49/4 50/12 50/19
56/23 65/25 66/3 66/18 67/3 68/16
72/14 72/16 75/13 98/13
testify **[1]** 77/11
testimony **[6]** 49/1 50/20 59/2
74/13 74/20 98/19
text **[2]** 18/21 18/21
textualist **[1]** 33/11
than **[24]** 8/19 8/19 15/5 15/16
17/12 19/2 31/21 33/3 33/21 47/15
49/12 50/21 54/25 57/20 78/25
79/3 79/3 88/2 105/4 108/8 108/9
112/4 112/6 113/14
Thank **[7]** 28/20 34/6 42/22 43/20
44/3 112/3 113/9
that **[915]**
their **[33]** 3/5 6/7 6/10 6/10 6/19
6/20 7/7 7/8 21/21 23/7 28/1
44/11 46/23 48/13 50/15 51/7 55/2
55/11 55/17 59/25 62/19 66/8
66/22 71/15 74/9 75/11 75/12
76/12 77/14 78/6 78/9 78/10 81/4
them **[20]** 7/9 7/9 23/5 23/6 29/8
31/15 31/20 48/14 49/8 50/24
51/20 52/24 54/15 57/18 73/18
75/25 78/8 78/11 98/17 114/4
themselves **[6]** 9/5 36/22 54/4
55/3 55/6 66/24
then **[46]** 4/14 5/3 5/4 5/5 6/1
6/2 11/24 11/25 17/2 17/20 18/19
19/15 21/8 28/6 31/2 35/3 36/15
38/3 45/8 45/12 45/20 48/8 48/23
51/5 51/13 51/21 52/3 70/7 70/23
71/5 72/23 72/24 78/2 78/23 82/9
94/5 94/8 97/24 104/2 104/6 104/9
104/11 104/16 105/18 111/25
114/11
then-President **[1]** 45/12
theories **[4]** 49/23 49/24 49/25
65/2
theory **[5]** 50/3 58/12 63/10 65/17
73/7
there **[190]**
Thereafter **[1]** 49/2
therefore **[9]** 31/16 32/5 33/2
33/3 58/10 66/5 82/5 88/15 95/23
thereof **[1]** 56/16
these **[19]** 10/25 20/16 34/11 35/7

52/13 55/13 61/2 63/13 69/9 79/13
84/12 89/11 91/22 104/21 107/24
108/12 108/22 111/24 114/24
they **[100]** 5/20 5/22 6/1 6/7 6/7
6/8 6/9 6/10 6/10 6/11 6/12 6/15
6/18 6/19 7/4 7/7 7/7 7/7 7/7 7/8
7/9 8/8 8/8 8/9 9/5 11/7 15/2
15/3 15/5 15/6 15/6 15/18 16/21
16/24 17/8 17/9 17/12 18/15 18/15
18/16 21/9 24/8 26/9 26/9 27/4
28/24 29/22 30/2 30/3 30/4 30/11
30/20 30/20 30/20 31/20 31/24
32/12 33/13 33/16 35/1 35/17
35/18 36/23 37/11 38/5 38/7 38/9
38/12 42/13 42/13 43/5 43/15 50/7
50/8 50/20 50/20 50/22 50/22 55/1
55/2 55/3 55/4 55/5 68/18 70/3
76/12 77/23 78/15 80/16 80/19
84/23 87/21 93/22 94/16 98/21
99/5 99/5 104/15 105/24 114/4
thing **[11]** 10/23 15/11 21/20
24/22 26/19 37/15 42/19 53/15
96/11 109/17 111/16
things **[6]** 15/11 35/6 59/12 97/5
107/24 108/16
think **[124]**
think we **[1]** 15/10
thinking **[3]** 5/8 39/8 43/10
thinks **[3]** 12/22 36/17 53/7
third **[12]** 46/5 46/24 56/3 58/10
60/8 60/11 62/23 63/20 64/18 69/8
72/19 99/24
third-party **[2]** 60/8 60/11
this **[153]**
thorough **[1]** 83/11
those **[39]** 6/3 7/11 8/22 13/8
29/17 31/14 31/21 40/17 49/23
49/25 51/16 51/24 52/22 53/2
53/10 59/12 60/20 62/10 63/12
62/21 67/14 71/20 78/10 78/20
80/15 83/11 84/5 86/1 86/3 87/9
88/23 91/13 94/11 97/20 98/7
98/15 98/16 104/3 104/11
though **[8]** 24/3 30/17 34/23 41/11
42/11 68/2 87/22 94/20
thought **[9]** 15/21 36/7 43/11 82/11
82/12 85/9 94/12 106/9 109/18
thoughtful **[1]** 83/10
thousand **[1]** 38/4
threat **[3]** 52/15 73/13 76/10
threaten **[3]** 51/21 76/6 76/18
threatened **[4]** 49/18 57/17 74/7
75/25
threatening **[3]** 49/10 52/25 78/8
threateningness **[1]** 52/9
threatens **[1]** 68/11
threats **[1]** 54/11
three **[9]** 18/16 46/12 47/9 47/12
47/15 51/1 51/2 61/17 100/2
three-day **[1]** 46/12
threw **[1]** 49/7
through **[38]** 6/5 17/17 28/12
33/24 48/5 48/8 49/16 52/2 52/22
53/22 53/24 58/19 60/21 61/13
69/12 78/12 82/13 83/25 84/2 84/3
84/3 84/4 88/9 88/11 90/16 90/17
92/9 92/14 92/20 94/9 94/14 97/9
97/13 97/21 98/13 106/19 114/4
114/21
throughout **[5]** 18/17 35/12 49/14
51/9 51/10
throwing **[1]** 48/4
throws **[1]** 48/17
Thursday **[1]** 102/24
thus **[1]** 57/7
ties **[5]** 108/24 109/2 109/5 109/6
109/6
time **[53]** 4/10 5/16 5/17 6/8 8/10
27/9 29/24 38/8 41/11 41/14 41/24
46/21 51/2 53/16 54/11 54/22 55/4
55/5 55/9 55/20 58/22 59/6 60/9
60/14 60/14 60/18 61/4 61/18

61/21 62/17 68/22 73/21 73/24
77/15 77/19 77/21 78/7 80/9 87/17
91/11 97/6 100/7 105/14 105/21
106/11 106/16 106/12 106/14
106/20 106/23 106/25 107/3 110/8
times **[9]** 15/20 52/8 59/2 59/14
60/19 60/20 70/2 71/9 77/10
tinkerings **[1]** 20/16
title **[1]** 84/9
today **[3]** 88/5 93/25 110/13
together **[1]** 78/15
told **[1]** 9/4
tone **[2]** 52/10 52/24
tonight **[1]** 112/4
too **[3]** 26/10 27/14 103/12
took **[7]** 33/1 45/3 49/14 52/13
72/2 92/24 106/19
top **[1]** 107/22
totally **[1]** 104/24
touch **[1]** 25/12
toward **[2]** 73/20 74/1
towards **[2]** 60/1 81/23
town **[2]** 102/15 106/19
traditionally **[1]** 40/19
traffic **[1]** 107/1
trampled **[2]** 98/15 98/17
transcript **[2]** 1/9 116/4
trapped **[2]** 61/15 69/18
travel **[4]** 9/14 18/12 43/8 111/24
traveled **[3]** 38/22 38/25 45/11
traveling **[1]** 72/15
travels **[4]** 8/1 9/8 9/11 90/18
Treasury **[1]** 86/15
treated **[1]** 31/21
trees **[1]** 22/11
trespass **[22]** 5/23 8/9 10/15
10/16 11/20 13/15 16/16 16/17
21/7 21/23 22/13 23/1 23/1 23/3
23/21 29/15 30/22 31/20 37/11
37/11 39/3 42/18
trespassed **[2]** 9/3 23/3
trespassers **[1]** 87/8
trespasses **[3]** 21/7 32/7 96/1
trespassing **[3]** 6/20 21/25 29/12
trial **[9]** 1/9 25/1 46/12 54/17
63/9 72/8 102/5 102/8 102/25
tricky **[1]** 93/23
tried **[4]** 23/4 23/5 78/9 78/11
trier **[2]** 14/2 22/22
tries **[1]** 71/7
trouble **[1]** 77/2
truck **[11]** 7/3 7/6 7/7 7/7 7/8
21/13 21/17 21/19 21/21 21/24
105/18
true **[4]** 31/10 52/7 61/23 116/4
truly **[5]** 15/15 28/15 37/25 38/12
92/23
Trump **[4]** 30/4 45/12 45/13 71/6
trust **[3]** 22/8 39/15 108/14
trusted **[2]** 9/22 108/2
try **[5]** 43/22 53/2 65/4 69/12
101/25
trying **[20]** 6/4 11/10 17/15 20/5
24/23 29/16 45/15 50/6 50/11
53/24 61/12 62/13 62/20 62/21
70/4 71/10 71/16 99/4 99/14
106/17
tunnel **[69]** 45/22 45/23 48/23
48/24 48/25 49/17 58/13 58/19
58/21 58/22 59/1 59/15 59/19
59/20 59/21 59/21 61/3 61/13
61/19 61/23 62/7 62/11 62/18
62/20 65/4 65/20 65/23 66/3 66/23
66/24 67/5 67/6 68/13 68/18 69/12
69/13 70/1 70/5 70/10 70/12 70/21
71/15 72/3 72/21 72/25 73/1 73/8
73/11 73/17 74/6 75/14 75/15
75/25 76/11 76/17 76/21 78/6 78/7
78/12 81/23 81/25 82/4 99/13
99/15 100/7 100/15 101/5 101/8
101/11
turn **[9]** 8/14 14/20 20/24 28/15

**T**

turn... [5]   38/12 45/8 65/8 69/7 93/8
turned [2]   65/8 108/21
turning [6]   55/8 61/2 62/1 73/5 79/16 97/24
turns [9]   8/16 18/25 20/24 37/1 38/9 39/19 39/20 49/20 78/14
twice [2]   61/1 77/20
two [14]   19/19 19/20 22/11 31/5 35/5 49/25 65/2 74/2 79/17 83/11 92/17 103/18 104/11 108/18
type [3]   75/8 88/3 88/21
typically [2]   41/15 75/9

**U**

U.S [2]   1/23 83/18
U.S.C [20]   33/17 46/15 47/7 56/12 63/1 63/4 63/8 73/7 78/4 79/15 79/20 81/15 82/8 88/19 89/16 90/1 94/5 97/2 98/1 100/20
Ukraine [1]   93/19
ultimate [2]   45/7 45/8
ultimately [7]   4/7 4/25 8/15 9/13 11/9 97/5 97/7
unable [2]   62/8 80/5
under [31]   5/23 9/20 14/11 22/1 30/24 30/25 33/23 34/20 35/17 40/18 49/22 50/14 50/22 53/8 53/19 56/14 63/13 69/2 73/6 77/24 79/4 84/8 87/1 87/23 89/25 90/6 90/14 90/19 93/19 93/10 104/3
underlying [1]   86/4
undermine [2]   62/16 62/11
undermines [1]   12/1
underneath [2]   54/2 54/3
Undersecretary [1]   93/18
understand [11]   20/5 23/17 23/25 38/21 65/14 76/21 83/4 83/25 84/11 103/1 111/17
understandably [1]   21/17
understanding [7]   88/20 104/3 105/22 107/10 107/18 109/20 111/14
understated [1]   67/4
understood [5]   43/11 71/12 88/18 105/11 112/13
unfairly [1]   9/11
unfortunate [1]   24/22
Unfortunately [1]   101/23
uniform [1]   87/3
uniformity [1]   86/24
unique [2]   26/14 26/15
UNITED [34]   1/1 1/3 1/10 1/14 3/2 3/7 3/25 13/5 13/7 14/5 25/23 28/8 35/12 36/14 36/25 37/13 37/14 44/9 44/14 56/14 56/15 63/18 63/22 66/7 67/15 69/22 83/1 83/2 84/8 87/19 93/12 93/12 94/25 108/3
unknowing [1]   31/21
unlawful [5]   30/18 32/3 86/13 95/18 95/21
unless [3]   14/10 20/4 30/3
unlikely [2]   31/6 94/15
unresponsive [1]   105/7
unsuccessfully [1]   32/7
unsuspecting [3]   8/3 14/21 37/9
until [4]   18/22 30/2 89/2 94/13
unusual [1]   21/12
unwilling [1]   27/2
up [30]   5/24 6/24 6/25 7/2 7/5 7/5 7/10 10/7 12/25 22/4 35/23 43/1 43/22 48/21 54/5 55/19 55/21 59/16 60/17 70/24 72/21 74/2 80/14 89/2 89/18 91/17 97/22 99/5 103/9 106/14
upheld [2]   31/20 43/13
upon [8]   8/17 25/12 26/3 32/5 61/3 95/18 95/23 96/1
urging [1]   43/25

us [20]   16/22 22/8 25/16 26/4 27/9 38/10 46/9 46/11 51/16 51/25 69/5 70/3 70/13 74/14 98/8 107/22 107/23 108/5 108/13 111/11
USA [1]   88/6
USAO [2]   1/13 1/16
use [17]   4/25 11/25 16/11 35/7 39/1 48/24 68/10 68/11 68/12 71/20 76/5 77/18 79/6 85/8 91/13 96/25 112/7
used [17]   4/19 8/2 8/2 28/24 41/15 48/16 49/8 50/13 71/17 75/17 75/23 76/17 77/20 79/1 79/4 79/5 103/23
user [1]   72/17
uses [1]   68/10
using [9]   6/19 40/1 41/10 48/12 54/4 76/15 85/5 85/5 85/22
usually [2]   36/5 84/22
uttered [1]   32/25

**V**

variety [5]   8/17 17/3 17/4 17/5 36/7
veered [1]   4/23
vein [1]   81/3
verbal [2]   52/15 54/11
verdict [5]   44/23 45/4 46/13 101/13 101/14
version [6]   19/8 19/9 31/23 32/24 32/24 97/15
versus [8]   3/3 8/5 20/18 25/24 44/10 67/15 83/1 83/2
very [20]   10/18 12/10 26/19 28/23 32/16 32/16 34/6 41/24 42/22 43/24 49/5 75/8 77/20 77/21 83/10 90/18 108/20 109/5 111/10 112/19
vetted [2]   4/10 43/24
vice [44]   7/2 13/1 13/2 13/6 13/22 13/22 14/5 14/6 14/13 14/15 15/1 15/4 16/5 17/24 22/2 24/6 24/16 26/12 26/13 26/16 27/3 27/18 28/8 32/4 32/8 32/9 36/14 37/1 37/21 38/11 56/20 56/24 84/13 84/15 92/24 92/25 93/2 93/4 95/15 95/19 95/22 96/2 96/3 96/5
victim [3]   9/25 9/25 29/9
victims [1]   29/12
video [5]   28/12 51/9 59/17 72/13 76/7
view [11]   10/15 57/25 60/15 75/10 83/7 83/7 92/11 92/12 92/22 95/12 97/3
viewed [2]   87/12 88/20
viewpoint [1]   33/11
vigor [1]   10/4 39/15
vigorously [2]   9/23 86/3
violate [2]   90/4 111/6
violated [5]   42/13 65/3 65/5 73/7 93/21
violating [4]   31/7 87/6 89/22 89/24
violation [17]   36/22 46/15 58/14 62/25 63/4 63/7 63/14 70/16 78/4 79/15 79/20 81/15 82/7 90/10 98/1 99/18 100/20
violations [1]   88/10
violence [15]   46/8 46/11 47/9 47/17 48/11 49/17 81/14 81/18 81/22 82/7 100/19 100/24 101/8 101/12 104/3
violent [3]   48/3 49/11 56/22
violently [1]   48/3
Vipertek [4]   72/6 72/14 72/17 73/3
vis [2]   16/13 16/13
visible [1]   98/17
visibly [1]   62/6
visions [1]   39/17
visit [1]   113/23
visiting [9]   3/17 19/13 26/17 27/10 82/19 86/20 87/11 93/19

95/20
visitors [1]   93/11
visits [1]   87/5
voice [1]   52/8
voluntarily [9]   61/8 61/10 61/15 62/11 62/12 63/21 69/9 69/11 76/7 107/23 108/5 108/13 111/11
vs [1]   1/5
VTS797 [6]   72/6 72/12 73/3 74/10 75/7 75/16
vulnerable [2]   50/21 50/21

**W**

waiting [2]   24/18 44/23
walk [3]   8/8 16/2 36/25
walking [3]   13/15 36/9 43/16
walks [1]   14/5
wallop [1]   23/6
wander [1]   18/2
wandered [1]   15/2
wandering [1]   17/24
want [34]   7/17 8/4 10/1 10/2 10/16 14/10 16/21 17/24 21/15 22/18 22/18 32/12 32/13 39/13 41/25 42/23 43/25 50/3 52/21 60/23 60/24 71/8 72/7 75/23 79/6 79/16 83/12 87/24 105/3 109/12 109/15 113/5 113/7
wanted [8]   10/17 37/15 43/11 44/24 59/15 61/19 74/14 113/23
wants [5]   38/23 43/18 62/2 103/10 103/11
wary [1]   23/18
was [262]
Washington [7]   1/5 1/15 1/17 1/24 6/13 6/14 45/11
wasn't [14]   7/5 18/22 19/22 21/25 41/14 54/22 61/22 63/9 71/3 77/4 104/25 106/17 112/11 112/17
way [71]   5/6 5/9 5/21 5/22 9/20 11/2 14/9 14/22 15/18 17/1 17/17 18/1 18/7 20/9 24/17 25/6 25/7 25/10 26/2 29/4 31/13 38/24 39/8 41/10 45/14 45/15 46/25 47/4 48/9 48/21 52/25 54/6 56/4 58/2 58/5 58/23 59/23 59/25 61/5 61/22 62/10 69/6 69/13 74/12 76/8 83/25 84/1 84/2 87/14 88/18 88/22 89/8 90/16 91/7 91/24 92/9 93/25 94/14 95/11 96/15 96/17 97/9 97/11 97/12 97/13 97/19 97/21 98/19 99/11 110/2
ways [8]   17/6 24/11 26/23 26/23 36/7 36/19 36/21 38/4
we [151]
we'll [3]   19/25 23/21 103/14
weapon [11]   8/8 8/18 8/19 15/14 15/14 15/21 20/24 50/13 75/18 91/14 96/20
weapons [2]   75/17 111/2
wearing [5]   70/22 71/6 71/22 71/25 72/3
Webb [1]   106/21
week [6]   102/3 102/4 102/7 102/7 102/8 102/14
weeks [1]   80/14
weight [3]   20/11 36/16 91/9
well [18]   3/13 6/2 18/24 33/10 38/13 41/24 43/17 43/24 44/21 54/17 54/18 55/2 57/17 65/20 68/2 81/24 83/11 112/2
well-being [2]   55/2 57/17
went [4]   10/8 60/13 88/21 105/18
were [98]   11/7 12/10 15/5 15/6 18/21 19/14 26/7 32/20 40/3 40/4 41/12 46/22 48/10 48/12 48/16 49/11 49/17 50/6 50/7 50/9 50/11 50/15 50/17 50/18 50/20 50/22 50/22 51/3 51/7 53/24 54/4 54/13 54/25 55/1 55/1 55/11 55/17 56/22 57/14 57/19 58/10 59/6 61/12 61/21 62/18 62/20 62/21 63/11 64/18 66/3 66/7 70/2 70/3 73/11

**W**

**were... [44]**  75/15 76/10 76/11
76/12 76/18 77/3 77/6 77/7 77/13
77/15 77/17 77/22 77/22 77/23
78/6 78/17 84/13 86/3 86/7 87/21
92/17 94/13 94/16 98/9 98/14
98/16 98/17 98/21 98/22 98/23
98/24 99/1 99/4 99/5 99/7 99/7
99/8 99/13 99/14 100/23 108/13
108/14 111/7 113/12
**weren't [3]**  11/15 41/15 55/5
**west [9]**  45/20 47/23 48/9 48/22
49/16 50/15 50/17 51/2 54/15
**what [120]**
**whatever [2]**  21/16 32/24
**whatsoever [1]**  54/22
**when [75]**  4/7 4/11 5/13 5/23 7/5
7/24 9/6 11/17 17/8 17/9 21/6
22/7 26/20 27/4 31/8 31/22 32/7
35/7 37/3 38/19 41/11 42/18
55/14 56/21 58/15 59/17 59/20
61/25 62/6 65/6 65/13 65/23 66/4
66/5 67/1 68/18 68/20 70/9 71/24
72/20 72/25 72/25 73/14 74/1 75/5
75/7 75/11 75/17 75/24 76/12
76/20 76/23 81/22 81/24 84/9 86/7
87/4 87/10 88/6 93/13 95/25 99/25
101/4 101/8 103/10 104/25 105/10
105/12 105/14 105/15 107/3 107/4
110/12 114/2 114/3
**where [59]**  4/23 6/10 6/15 6/23
9/19 9/24 10/6 11/14 12/21 13/6
14/6 16/3 16/23 17/13 17/24 18/4
19/12 22/2 25/18 26/8 29/6 29/8
29/15 30/13 30/23 31/17 31/24
36/9 38/22 39/3 39/4 39/7 41/1
41/4 41/19 45/15 47/24 48/10 51/5
67/6 69/14 71/16 82/16 84/17
84/19 86/19 89/5 91/15 91/21
92/21 94/19 95/19 97/12 99/13
105/6 105/24 106/6 106/11 111/24
**whereas [1]**  9/25
**whether [42]**  3/15 4/6 4/9 4/24
6/3 8/15 14/21 16/1 16/20 17/25
18/25 19/24 20/8 20/16 23/7 28/15
30/17 33/23 37/9 38/12 39/10
39/18 40/22 41/4 59/8 59/9 60/5
62/2 65/11 75/1 75/2 82/12 85/9
89/12 91/16 93/7 96/13 96/15
103/17 103/24 104/6 106/8
**which [87]**  4/19 5/4 8/22 9/2 9/6
11/2 12/20 12/22 13/12 14/9 15/12
15/20 16/10 17/6 20/8 20/15 21/2
22/20 25/11 26/14 27/20 27/23
28/11 29/1 29/4 30/11 32/6 33/17
35/17 37/17 38/15 39/9 39/10 40/8
40/12 40/16 43/9 43/12 45/7 45/18
46/14 47/9 47/21 48/18 52/20
54/21 55/20 56/18 57/15 58/20
60/15 61/5 61/17 64/1 67/25 71/1
72/24 73/20 79/17 83/7 83/8 85/23
85/25 87/20 87/22 87/25 88/1 89/4
89/9 89/16 89/18 90/24 91/16
94/23 95/10 95/11 95/14 95/24
96/9 96/17 97/1 100/7 103/21
102/22 108/23 111/4 111/7
**while [6]**  51/24 67/19 72/13 74/6
75/24 76/9
**White [8]**  32/3 32/8 32/9 95/15
95/21 96/1 96/2 96/4
**who [67]**  3/11 6/6 7/8 8/9 8/18
10/6 15/24 18/19 27/16 29/11
29/22 31/14 31/21 37/12 37/21
38/6 38/9 41/21 44/18 49/11 51/7
53/7 53/13 54/13 55/20 55/21 59/9
59/11 61/12 66/7 67/3 67/6 67/7
69/1 69/22 71/7 71/13 71/20 71/23
73/9 73/10 74/11 76/11 76/18 77/6
77/13 77/22 77/23 78/24 84/13
86/1 87/1 87/1 87/9 88/23 90/12
90/13 91/13 93/19 96/21 99/2

99/14 107/21 108/2 108/11 108/13
113/23
**whoever [3]**  33/18 71/15 77/21
**whole [2]**  7/25 14/8
**wholesale [1]**  8/16
**whom [1]**  84/7
**whose [1]**  67/10
**why [13]**  4/7 10/21 12/9 14/18
16/8 18/2 18/2 19/18 36/16 45/2
96/23 104/5 107/14
**wide [1]**  36/7
**wielding [2]**  73/20 76/9
**wife [4]**  105/17 108/25 109/1
109/3
**will [50]**  3/17 7/13 12/21 15/21
18/4 19/13 24/3 24/19 24/20 25/14
26/17 27/10 28/16 28/18 32/15
34/3 43/21 43/21 44/4 44/7 45/8
52/7 54/16 60/13 63/12 65/12
74/12 76/19 76/24 82/19 86/20
87/17 96/11 96/19 101/13 103/9
107/7 109/17 110/2 110/3 110/4
110/12 110/16 110/18 110/21
111/13 111/14 113/9 114/3 114/4
**willfully [9]**  15/19 17/10 19/4
33/18 43/4 80/2 82/5 86/13 90/11
**willingly [1]**  81/20
**winning [1]**  25/13
**wire [1]**  13/14
**wisely [1]**  71/7
**wish [1]**  34/9
**within [5]**  13/5 39/13 41/8 46/9
81/19
**without [6]**  75/3 82/15 94/17
96/21 98/5 111/5
**witnesses [1]**  72/6
**won't [2]**  102/25 103/7
**wonder [1]**  91/16
**Woodland [1]**  2/4
**woods [2]**  6/8 6/9
**word [13]**  11/25 12/19 15/18 17/9
19/4 25/13 36/6 39/1 83/16 83/16
85/13 97/13 104/22
**words [4]**  4/25 14/14 52/10 85/18
**work [5]**  111/1 111/13 111/15
111/20 111/24
**worked [3]**  71/13 78/23 106/11
**working [1]**  111/13
**workings [1]**  107/25
**works [2]**  103/2 107/21
**world [4]**  20/4 38/3 53/7 80/11
**worse [2]**  31/16 32/9 96/2
**worth [2]**  24/3 28/2
**would [124]**
**wouldn't [4]**  21/24 29/11 74/16
92/18
**write [3]**  17/11 17/12 25/22
**writing [1]**  26/5
**written [2]**  15/17 32/21
**wrong [4]**  29/4 29/25 31/2 112/14
**wrongfulness [1]**  84/24
**wrote [2]**  27/4 88/11

**Y**

**Yeah [5]**  10/12 13/17 107/9 111/10
114/13
**year [15]**  5/21 6/20 31/6 33/21
35/1 35/2 88/10 89/7 89/19 89/23
90/24 91/5 94/9 94/21 96/22
**years [7]**  5/24 7/11 22/4 91/17
93/6 97/17 108/18
**yelling [1]**  52/8
**yes [23]**  4/2 4/17 10/21 22/4 22/6
23/7 26/10 26/23 28/6 41/9 44/6
101/17 102/10 104/13 104/17 106/1
110/6 110/11 110/15 112/16 112/23
112/25 113/21
**yet [2]**  51/22 61/22
**you [261]**
**you'll [1]**  29/18
**you're [2]**  12/24 18/19
**younger [1]**  93/6

**your [59]**  3/6 3/9 3/23 8/21 16/1
17/18 17/20 18/3 20/19 23/2 23/15
23/25 24/23 24/24 28/22 28/25
29/13 30/7 31/4 31/10 32/15 32/23
34/1 34/6 39/18 40/15 41/14 41/23
43/20 43/21 44/6 44/16 101/17
102/10 102/15 102/16 103/13
103/18 104/13 104/14 104/17 105/2
105/11 105/25 106/10 109/17
109/24 110/5 110/11 110/15 110/17
112/7 112/13 113/15 113/17 114/8
114/14 114/18 114/18
**your argument [1]**  104/14
**yourself [1]**  77/2

**Z**

**Zach [1]**  103/25
**Zachary [1]**  73/10
**zone [1]**  8/12